Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C.
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Justin R. Bernbrock (*pro hac vice* admission pending)
Benjamin M. Rhode (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PENN VIRGINIA CORPORATION, *et al.*,[1] | ) | Case No. 16-32395 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY
## OF AN ORDER (I) AUTHORIZING THE
## DEBTORS TO ASSUME (A) THE RESTRUCTURING
## SUPPORT AGREEMENT, (B) THE BACKSTOP COMMITMENT
## AGREEMENT, AND (C) THE EXIT COMMITMENT LETTERS,
## (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN FEES IN
## CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Penn Virginia Corporation (4320); Penn Virginia Holding Corp. (7384); Penn Virginia MC Corporation (0458); Penn Virginia MC Energy L.L.C. (0462); Penn Virginia MC Operating Company L.L.C. (0466); Penn Virginia Oil & Gas Corporation (7929); Penn Virginia Oil & Gas GP LLC (3686); Penn Virginia Oil & Gas LP LLC (8109); Penn Virginia Oil & Gas, L.P. (9487).  The location of the Debtors' service address is:  Four Radnor Corporate Center, Suite 200, 100 Matsonford Road, Radnor, Pennsylvania 19087.

Penn Virginia Corporation ("Penn Virginia") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully submit the *Declaration of R. Seth Bullock, Chief Restructuring Officer of Penn Virginia Corporation, in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Assume (A) the Restructuring Support Agreement, (B) the Backstop Commitment Agreement, and (C) the Exit Commitment Letters, (II) Authorizing the Debtors to Pay Certain Fees in Connection Therewith, and (III) Granting Related Relief* (the "Bullock Declaration"), attached hereto as **Exhibit B**, and state the following in support of this motion:[2]

## Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"):   (a) authorizing the Debtors to assume (i) that certain restructuring support agreement, dated as of May 10, 2016, a copy of which is annexed as **Exhibit 1** to **Exhibit A** attached hereto (together with all exhibits and schedules attached thereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Restructuring Support Agreement"),[3] (ii) the Backstop Commitment Agreement, a copy of which is attached as Exhibit C to the Restructuring Support Agreement, and (iii) the Exit Commitment Letters, copies of which are attached as Exhibit E to the Restructuring Support Agreement; (b) authorizing the Debtors to pay certain fees, expenses, and premiums in connection with the Restructuring Support Agreement, the Backstop Commitment Agreement, and the Exit Commitment Letters; and (c) granting related relief.

---

[2]     In further support of the relief requested herein, the Debtors submit the *Declaration of R. Seth Bullock, Chief Restructuring Officer of Penn Virginia Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

[3]     Capitalized terms used in this Motion but not otherwise defined have the meanings given to them in the Restructuring Support Agreement.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested in this motion are sections 362(d), 363(b), and 365(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Preliminary Statement**

5.      The Debtors are an oil and gas company primarily engaged in the acquisition, development, and production of oil and natural gas reserves in the United States, and rank among the nation's leading businesses in this sector. The Debtors' business is fundamentally strong, with valuable working interests in the Eagle Ford Shale and Marcellus Shale formations—two of the largest and most prolific unconventional shale resource plays in the United States. But, as with many of the Debtors' peers, the current decline in the commodities market has impaired the Debtors' ability to capitalize on their business and proven reserves, resulting in a nearly 60 percent decrease in total revenues over the last year. Thus, having skipped their most-recent interest payments on their outstanding Notes, and facing imminent liquidity constraints, the Debtors commenced these chapter 11 cases.

6.      Before doing so, however, the Debtors and holders of approximately 87 percent in principal amount of the Debtors' outstanding funded debt obligations—approximately $1 billion of the Debtors' $1.2 billion of outstanding funded-debt obligations—have negotiated a

comprehensive restructuring that provides for the Debtors' swift exit from chapter 11.  The

global deal embodied in the Restructuring Support Agreement has four key components:

- a $25 million DIP Financing to be provided by the RBL Lenders as DIP Lenders;

- a $128 million committed Exit Facility provided by the RBL Lenders as Exit Facility Lenders;

- a $50 million rights offering (the "Rights Offering") backstopped by certain of the Noteholders as Backstop Parties (the "Backstop Commitment"); and

- a commitment by each of the parties to the Restructuring Support Agreement to compromise their existing claims in service of achieving a consensual restructuring.

These new sources of liquidity—more than $200 million in total—collectively form the

foundation of a restructuring that will deleverage the Debtors' balance sheet, permit the Debtors

to weather the current upheaval in the oil and gas industry, and position the Debtors to emerge

from chapter 11 as a strong, competitive company.  And, the commitments that the Debtors have

obtained via hard-fought, arm's-length negotiations in the context of the Restructuring Support

Agreement are unprecedented in the current market environment.  On a macro level, domestic

exploration and production ("E&P") companies are presently experiencing significant levels of

distress—indeed, more than fifteen E&P companies have filed for chapter 11 protection in the

last year alone.  Against this backdrop, the Debtors are poised to achieve something that no other

distressed E&P company in recent years has achieved:  ***entering chapter 11 with committed,***

***bank-funded revolving-based exit financing in hand***.

7.      As is evident from the foregoing summary, the DIP Financing, the Backstop

Commitment, the Rights Offering, and the Exit Facility are of substantial benefit to the Debtors

and drive recoveries (in both quantum and form of consideration) for the Debtors' stakeholders.

The availability of the Exit Facility is particularly significant—traditional banks have become

increasingly unwilling to lend to upstream producers like the Debtors under current market conditions.  The Backstop Parties' commitment to backstop the Rights Offering—the terms of which are set forth in the Backstop Commitment Agreement—goes hand-in-hand with the Exit Facility.  The Exit Facility Lenders would likely not have committed to fund the Exit Facility absent a commitment for some source of post-emergence, non-Exit Facility working capital.  Similarly, the Noteholders would likely have been unwilling to backstop the Rights Offering without the assurance of the fully committed Exit Facility.

8.      Further, the compromises and settlements embodied in the Restructuring Support Agreement, and to be implemented pursuant to the Plan, preserve value by enabling the Debtors to avoid protracted, value-destructive litigation that would delay their emergence from chapter 11.   Instead of litigating with the RBL Lenders and Noteholders over potential recoveries, the RBL Lenders have agreed to (a) become parties to the Restructuring Support Agreement, (b) fund the Proposed DIP Financing, and (c) participate in the Exit Facility and certain of the Noteholders have agreed to backstop the Rights Offering—each of which commitments provide significant value to the Debtors.  This is the best result for the Debtors.

9.      In short, the Restructuring Support Agreement, along with the Backstop Commitment, the Rights Offering, and Exit Facility, collectively provide the Debtors with the resources and flexibility, both during these chapter 11 cases and post-emergence, to pursue and implement a value-maximizing restructuring transaction.  To capture the full benefit of the compromises embodied in the Restructuring Support Agreement, the Debtors must move efficiently through chapter 11.  The Restructuring Support Parties' various commitments are contingent upon the Debtors' executing the Restructuring Support Agreement's restructuring in accordance with certain milestones (the "Milestones").  Under the agreed Milestones, the

Debtors must confirm the Plan in fewer than 100 days.  In light of the tumultuous market backdrop, the Restructuring Support Parties' various concessions, and their commitments to fund post-emergence sources of liquidity—which would almost certainly be unavailable to the Debtors from any other source—the Debtors believe the Milestones are reasonable and are prepared to execute their restructuring in accordance therewith.  Indeed, in addition to this motion and a panoply of traditional "first day" pleadings, the Debtors filed the Plan and related disclosure statement on the first day of these chapter 11 cases and are prepared to proceed efficiently toward Plan confirmation.

10.    As described below, in the Bullock Declaration, and in the First Day Declaration, the Debtors and their advisors tirelessly explored various restructuring alternatives in the months preceding the Petition Date.  In addition to weighing the costs and benefits of attempting to fund a non-consensual chapter 11 proceeding with proceeds from their Swap Contracts, the Debtors engaged in a third-party marketing process, ultimately considering non-binding term sheets from four outside parties (the "Third-Party Proposals").  After a thorough, comparative analysis of their alternatives, the Debtors concluded that the consensual path contemplated by the Restructuring Support Agreement maximizes value for all stakeholders.  Accordingly, assumption of the Restructuring Support Agreement, including certain prepetition agreements annexed thereto—most significantly the Backstop Commitment Agreement and Exit Commitment Letters—is a reasonable exercise of the Debtors' business judgment.

**Background**

### I.    The Debtors' Prepetition Capital Structure.

11.    As of the date hereof, the Debtors' funded debt is comprised of (a) approximately $113 million outstanding under the RBL Facility and (b) approximately $1,075 million in principal and approximately $47 million in unpaid interest outstanding under the Notes.  The

Debtors further have approximately 3,864 shares and 17,152 shares, respectively, outstanding in Series A Preferred Stock and Series B Preferred Stock, each with a stated liquidation preference of $10,000 per share.

| Funded Debt | Maturity | Principal Amount |
|---|---|---|
| RBL Facility | September 2017 | $113 million |
| 2019 Notes | April 15, 2019 | $300 million |
| 2020 Notes | May 1, 2020 | $775 million |
| | Total: | $1,188 million |

| Preferred Equity | Shares | Liquidation Preference |
|---|---|---|
| Series A Preferred Stock | 3,864 | $39 million |
| Series B Preferred Stock | 17,152 | $172 million |
| | Total: | $211 million |

**A.    RBL Facility and RBL Facility Amendments.**

12.    In the months leading up to the Petition Date, the Debtors and the RBL Agent agreed to the terms of (a) that certain Tenth Amendment to the RBL Facility (the "Tenth RBL Amendment"), dated as of January 8, 2016, (b) that certain Eleventh Amendment to the RBL Facility (the "Eleventh RBL Amendment"), dated as of March 15, 2016, and (c) that certain Amendment to the Eleventh RBL Amendment (the "Amended Eleventh RBL Amendment," and together with the Tenth RBL Amendment and Eleventh RBL Amendment, the "RBL Amendments"), dated as of May 6, 2016.

13.    Importantly, the Debtors' availability under the RBL Facility is the lesser of the borrowing base and the "commitment amount."  As of the last borrowing base redetermination in November 2015, the borrowing base for the RBL Facility was $275 million.  But, under the terms of the Eleventh RBL Amendment, the commitment amount was reduced to amounts outstanding—approximately $113 million as of the Petition Date.  Thus, there is no incremental availability under the RBL Facility.

**B.     Notes.**

14.     The Notes are comprised of two series of senior unsecured notes: (a) $300 million in principal in senior unsecured notes bearing an annual coupon of 7.25% payable on April 15 and October 15 of each year and that mature on April 15, 2019 (the "2019 Notes"); and (b) $775 million in principal in senior unsecured notes bearing an annual coupon of 8.50% payable on May 1 and November 1 of each year and that mature on May 1, 2020 (the "2020 Notes").   As of the Petition Date, approximately $12 million and $35 million, respectively, in unpaid interest remains outstanding under the 2019 Notes and 2020 Notes.

**C.     Preferred and Common Stock.**

15.     The terms of Penn Virginia's outstanding preferred stock require quarterly cash dividend payments at a rate of 6.0 percent per annum to be paid on January 15, April 15, July 15, and October 15 of each year.  As part of its ongoing efforts to preserve liquidity while exploring strategic alternatives, Penn Virginia suspended quarterly dividends on the Series A Preferred Stock and Series B Preferred Stock for the quarter ended September 30, 2015.  The Debtors subsequently extended such suspension through March 31, 2016.

16.     Until recently, Penn Virginia's common stock was publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "PVA."  On January 12, 2016, the NYSE delisted Penn Virginia's common stock, which is now publicly traded over the counter under the symbol "PVAH."

**II.     Circumstances Leading to These Chapter 11 Cases.**

17.     As described more fully in the First Day Declaration, the Debtors' success is tied closely to commodities prices—in particular oil and gas prices.  In response to the recent market contraction, the Debtors commenced various cost-saving initiatives and other strategic restructuring efforts in late 2015, including:  (a) selling certain non-core assets for aggregate net

proceeds of approximately $73 million; (b) reducing employee headcount by approximately 40 percent from year-end 2014 levels; (c) suspending preferred stock dividend payments beginning the quarter ended September 30, 2015; and (c) implementing various other operational, liquidity-enhancing measures.   Recognizing the need for a more comprehensive restructuring of their liabilities, the Debtors sought external strategic advice and assistance, engaging Jefferies, LLC ("Jefferies"), as investment banker, Kirkland & Ellis LLP ("K&E") as legal advisor, and Alvarez & Marsal North America, LLC ("A&M") as restructuring advisor in January 2016 to assist with exploring strategic alternatives to resolve their highly leveraged balance sheet and a related liquidity crunch.   Additionally, on March 22, 2016, the Debtors appointed R. Seth Bullock of A&M as Chief Restructuring Officer.

18.     The challenges the Debtors face came to a head in early 2016 when the Debtors' registered independent public accountants issued an opinion with an explanatory paragraph expressing substantial doubt as to the Debtors' ability to continue as a "going concern."  Such a qualification constituted a breach under the RBL Facility and resulted in a breach under the Notes due to certain cross-default provisions applicable thereto.   Accordingly, the Debtors classified all of their total outstanding funded-debt obligations—more than $1.2 billion—as short-term as of December 31, 2015.  Such classification gave rise to a breach of the "current ratio" covenant under the RBL Facility.

19.     Accordingly, over the first four months of 2016, the Debtors engaged the RBL Agent, the RBL Lenders, and an ad hoc committee of the Noteholders (the "Ad Hoc Committee") regarding restructuring alternatives.  As described in more detail in the First Day Declaration, during this time, the Debtors negotiated the terms of the RBL Amendments, under which the RBL Lenders agreed that the above-described defaults would not become events of

default until a future, specified date—which date was ultimately extended through the Petition

Date.  In return, the Debtors agreed to liquidate intermittently certain of their Swap Contracts

and apply a share of the proceeds to pay down the outstanding RBL Facility balance.  Ultimately,

the Debtors liquidated all six of their prepetition Swap Contracts, applying approximately $49.8

million of the proceeds to pay down the RBL Facility balance.  Under the terms of the RBL

Amendments, the Debtors were permitted to retain $11 million of the proceeds in the aggregate

to fund ongoing liquidity needs, including the administration of these chapter 11 cases.

20.    The Debtors' Swap Contract decision-making is a direct reflection of the

successful negotiations with the Ad Hoc Committee and the RBL Lenders leading up to these

chapter 11 cases.  The counterparties to all six of the Debtors' prepetition Swap Contracts were

also RBL Lenders or affiliates of RBL Lenders and would have argued for setoff rights with

respect to the proceeds from the Swap Contracts, although the Debtors felt they had certain

arguments to the contrary.    The Debtors' agreement, in consultation with the advisors to the Ad

Hoc Committee, to liquidate their six prepetition Swap Contracts incorporated their assessment

of the relative strength of such arguments and the benefits of proceeding toward a consensual

resolution.

21.    The Debtors and their advisors took full advantage of the runway afforded by the

RBL Amendments.  In addition to engaging with the RBL Agent and RBL Lenders, the Debtors

engaged in substantial negotiations with the Ad Hoc Committee.  The RBL Lenders were

hesitant to proceed with a restructuring absent an agreement with the Ad Hoc Committee and

some source of post-emergence, non-Exit Facility working capital.  Accordingly, the Debtors

negotiated the debt-for-equity swap with the Ad Hoc Committee, the terms of the $50 million

backstopped Rights Offering, and brokered a resolution under which significant stakeholders

ultimately made both concessions and accommodations for post-emergence liquidity.  The terms

of this resolution are embodied in the Restructuring Support Agreement.

22.     On May 10, 2016, the Debtors, lenders holding 100 percent of the principal

amount loans arising under the RBL Facility, and holders of approximately 86 percent of the

principal amount of the Notes executed the Restructuring Support Agreement.  On the Petition

Date, in accordance with the Milestones, the Debtors commenced these chapter 11 cases.

**III.    Marketing Process.**

23.     Parallel to the Restructuring Support Agreement negotiations, the Debtors and

their advisors engaged in a marketing process to test the market for the highest and otherwise

best restructuring alternative.  Starting in mid-2015 through late 2015, Jefferies began exploring

various strategic alternatives on the Debtors' behalf, including exploring alternative sources of

financing and the sale of some or all of the Debtors' assets.  In connection with this process a

number of third parties conducted substantial diligence regarding the Debtors and their assets.

24.     In January 2016, the Debtors announced the engagement of Jefferies, K&E, and

A&M to assist the Debtors with exploring more comprehensive restructuring alternatives.  The

Debtors and their advisors continued to explore various third-party restructuring alternatives in

the months preceding the Petition Date.  Due to its efforts on the Debtors' behalf over the second

half of 2015, Jefferies had a well-defined population of potential interested investors, both

strategic and financial, that were familiar with the Debtors' assets and liquidity constraints.  With

the assistance of Jefferies, the Debtors contacted 16 potential third-party investors, including

both strategic and financial investors, specifically requesting restructuring proposals.  A number

of these parties conducted further due diligence in connection with their analysis of whether to

submit such a proposal.  Because of the 2015 process, the Debtors were well-positioned to

provide any information third-party investors may have requested.  The Debtors ultimately

received four Third-Party Proposals.  Additionally, while the Debtors brokered the joint resolution among the RBL Lenders and Noteholders embodied in the Restructuring Support Agreement, over the course of their prepetition marketing process, the Debtors received and considered separate proposals from the RBL Agent and the Ad Hoc Committee.

25.    The Third-Party Proposals generally contemplated outside investments in the form of junior debtor-in-possession financing and post-emergence equity rights offerings (or similar equity investments) in return for the majority of reorganized Penn Virginia's equity. Noteholders were generally left with significantly less than half of reorganized Penn Virginia's equity.  The Debtors and their management team, advisors, and board of directors (the "Board") closely considered the Third-Party Proposals and, as set forth below, ultimately determined that the Restructuring Support Agreement embodies the best alternative to maximize value for all of the Debtors' stakeholders.  Further, the Debtors presented the Third-Party Proposals to both the RBL Lenders and the Ad Hoc Committee and the overwhelming majority—holding approximately 87 percent in principal of the Debtors' aggregate prepetition funded-debt obligations—elected to support the RSA.

**IV.    Board Consideration.**

26.    The Board was actively engaged in the above-described negotiations and third-party marketing process.  Over the course of the first four months of 2016, the Board met regularly and consistently to receive updates and authorize various actions, including, for example, entry into the RBL Amendments.  Prior to entry into the Restructuring Support Agreement, the Board met to receive a comprehensive presentation from the Debtors' advisors regarding the final terms of the Restructuring Support Agreement, the relative benefits of the transactions contemplated thereby, the legal and financial ramifications of entry therein, and the chapter 11 process generally.  Ultimately, on May 9, 2016, the Board unanimously authorized

the Debtors' entry into the Restructuring Support Agreement and commencement of these chapter 11 cases, subject to the resolution of certain remaining open issues that were subsequently resolved.

<div align="center">**Restructuring Support Agreement**</div>

**I.      Restructuring Term Sheet.**

27.      The Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement contemplates a swift restructuring financed by:  (a) the consensual use of cash collateral, including funds retained from the Debtors prepetition Swap Contracts liquidations; (b) the DIP Financing; (c) the Exit Facility; and (d) the Rights Offering.  The Restructuring Term Sheet contemplates consummation of a chapter 11 plan (*i.e.*, the Plan) that, if approved, will result in the following recoveries:

- holders of administrative and priority claims shall be paid in full, in cash on the effective date (the "Effective Date") of the Plan;

- holders of DIP Claims shall be paid in full, in cash on the Effective Date, funded from cash on hand and proceeds of the Exit Facility and the Rights Offering;

- holders of other secured claims shall receive such treatment as to render their claims unimpaired;

- holders of RBL Claims shall be paid in full, in cash on the Effective Date, funded from cash on hand and proceeds of the Exit Facility and the Rights Offering;

- holders of Note Claims and holders of general unsecured claims, collectively, shall each receive their pro rata share of an aggregate of 100% of the New Common Stock on the Effective Date, subject to dilution on account of the Management Incentive Plan Equity, any fees payable in New Common Stock under the terms of the Backstop Commitment Agreement (including the Commitment Premium), and the New Common Stock issued in the Rights Offering;

- holders of Note Claims shall also be entitled to participate in the Rights Offering in accordance with the Backstop Commitment Agreement, the Restructuring Support Agreement, the Plan, and the Rights Offering Procedures; and

- all existing equity interests in Penn Virginia will be canceled, extinguished, and discharged.

28.    The Restructuring Term Sheet contemplates a swift restructuring consummated in accordance with the following Milestones:

- no later than 8:00 a.m. on May 12, 2016, the PVA Entities shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court;

- on, or no later than 24 hours after, the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking entry of the Interim DIP Order and the Final DIP Order;

- no later than three days after the Petition Date, the Debtors shall file with the Bankruptcy Court (a) the Plan and the Disclosure Statement and (b) this motion;

- no later than three days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- no later than fifteen days after the Petition Date, the Debtors shall file with the Bankruptcy Court (a) a motion to establish a bar date for filing proofs of claim and (b) the schedules of assets and liabilities and statements of financial affairs for each Debtor;

- no later than thirty days after the Petition Date, (a) the Bankruptcy Court shall have entered the Final DIP Order, (b) the Bankruptcy Court shall have entered an order granting this motion, and (c) the Debtors shall have delivered a proposal with regard to the treatment of material contracts to the Majority Consenting Noteholders;

- no later than forty-five days after the Petition Date, the Bankruptcy Court shall have entered an order (the "Disclosure Statement Order") approving the adequacy

of the Disclosure Statement and related solicitation procedures (including the Rights Offering Procedures);

- no later than forty-five days after the entry of the Disclosure Statement Order, the Bankruptcy Court shall commence a hearing to confirm the Plan (the "Confirmation Hearing");

- no later than five days after the commencement of the Confirmation Hearing, the Bankruptcy Court shall enter an order (the "Confirmation Order") confirming the Plan; and

- no later than twenty-five days after entry of the Confirmation Order, the Debtors shall consummate the transactions contemplated by the Plan.

29.     The Restructuring Term Sheet further sets forth resolutions with respect to certain ancillary matters, including conditions precedent to emergence, the release and exculpation provisions contained in the Plan, employee retention and severance programs, indemnification, and release of avoidance actions.

## II.     Restructuring Support Agreement.

30.     The Restructuring Support Agreement contains a number of provisions that will impact the administration of these chapter 11 cases.   First, in addition to certain other commitments, under the Restructuring Support Agreement, each of the Restructuring Support Parties agreed to "use commercially reasonable efforts to support and cooperate with the [Debtors] to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and the Restructuring Term Sheet."[4]    Similarly, in addition to certain other commitments, the Debtors agreed to "support and make commercially reasonable efforts to

---

[4]     Restructuring Support Agreement § 5(a).

complete the Restructuring Transactions set forth in the Plan and this Agreement."[5]   Further, the

Debtors agreed, subject to certain conditions, that they will not "seek, solicit, or support any

dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors,

merger, transaction, consolidation, business combination, joint venture, partnership sale of

assets, financing (debt or equity) or restructuring of the [Debtors], other than the" restructuring

contemplated by the Restructuring Support Agreement.[6]

      31.    Further, the Restructuring Support Agreement sets forth certain termination

events exercisable by the Restructuring Support Parties and the Debtors, respectively.   With

respect to the Restructuring Support Parties, each of the (a) Majority Consenting RBL Lenders

and (b) the Majority Consenting Noteholders shall have the right, but not the obligation, to

terminate its obligations under the Restructuring Support Agreement upon notice to the other

Parties thereto upon the occurrence of certain defined events.   For the sake of brevity, each

Restructuring Support Party termination event is not described in detail herein, but such

termination events generally mandate that the Debtors diligently pursue consummation of the

restructuring contemplated by the Restructuring Support Agreement in accordance with the

terms thereof.

      32.    The Debtors may, upon notice to the Restructuring Support Parties, terminate

their obligations under the Restructuring Support Agreement upon:  (a) certain defined breaches

by a Restructuring Support Party of its obligations under the Restructuring Support Agreement;

(b) if the Definitive Documents do not comply with the Restructuring Support Agreement; and

(c) importantly, "if the board of directors or board of managers, as applicable, of any [Debtor]

---

[5]    Restructuring Support Agreement § 6(a)(i).

[6]    Restructuring Support Agreement § 6(b).

determines, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties" (often referred to as a "fiduciary out").[7]

33.     Finally, pursuant to the Restructuring Support Agreement, the Debtors have agreed to pay or reimburse all reasonable and documented fees of certain professionals (the "<u>Professional Fees</u>") employed by the Consenting RBL Lenders and Consenting Noteholders.  Such professionals include one primary counsel, one local counsel, and one financial advisor for each of the Consenting RBL Lenders and the Consenting Noteholders, plus certain consultants employed by the Consenting Noteholders, and "any such other advisors or consultants as may be reasonably determined by the Consenting Noteholders and Backstop Parties, in consultation with [the Debtors]."[8]

## III.     Backstop Commitment Agreement and Exit Commitment Letters.

34.     Certain of the Restructuring Support Agreement exhibits are agreements that the Debtors entered into prior to the Petition Date to facilitate the restructuring transactions contemplated by the Restructuring Support Agreement and provide certainty during these chapter 11 cases.  By this motion the Debtors seek authority to assume these agreements as part and parcel of the Restructuring Support Agreement.  Most significantly, the Backstop Commitment Agreement attached as Exhibit C to the Restructuring Support Agreement and the Exit Commitment Letters attached as Exhibit E to the Restructuring Support Agreement.

35.     The Debtors and certain of the Noteholders, as Backstop Parties, executed the Backstop Commitment Agreement prior to the Petition Date to facilitate the Rights Offering.  As

---

[7]     Restructuring Support Agreement § 8(c).

[8]     Restructuring Support Agreement § 14.

described above, under the terms of the Restructuring Support Agreement, on the Effective Date, the Debtors will consummate the Rights Offering, which is backstopped by the Backstop Parties. The terms of the Backstop Parties' backstop commitment are set forth in the Backstop Commitment Agreement.  Under the terms of the Backstop Commitment Agreement, in addition to agreeing to exercise fully all Subscription Rights issued to them pursuant to the Plan, the Backstop Parties have agreed to purchase all unsubscribed shares under the Rights Offering, at a Per Share Purchase Price that reflects a discount of 25 percent to the total settled plan equity value of $125 million.  Additionally, under the terms of the Backstop Commitment Agreement, the Debtors will pay the Backstop Parties either (a) a premium in an amount equal to $3,000,000 (which represents 6% of the $50 million aggregate Rights Offering amount) upon consummation of the Rights Offering, or (b) a termination fee in an amount equal to $2,000,000 (which represents 4% of the $50 million aggregate Rights Offering amount) (collectively, the "Backstop Fees").  The Backstop Parties may terminate their obligations under the Backstop Commitment Agreement upon written notice if the closing date of the Rights Offering has not occurred within 120 days after the Petition Date, which date may be extended with the requisite support of the Backstop Parties.

36.    In addition, certain of the RBL Lenders, in their capacities as Exit Facility Lenders, executed the Exit Commitment Letters prior to the Petition Date, which were agreed to and accepted by the Debtors.  Under the Exit Commitment Letters, the Exit Facility Lenders, subject to certain conditions, committed to fund their respective portions of the initial borrowing base limit of up to $128 million under the Exit Facility.  The Exit Commitment Letters also provide that the Debtors will pay, as applicable:  (a) a structuring fee to the RBL Agent, in its capacity as Exit Agent, on the closing date of the Exit Facility; (b) administrative fees to the Exit

Agent both on and continuing after the closing date of the Exit Facility; (c) "upfront fees" in an aggregate amount equal to $1.28 million to the Exit Facility Lenders on the closing date of the Exit Facility; and (d) a termination fee in an aggregate amount equal to $1.28 million to the Exit Facility Lenders in the event that the Debtors are required to pay the termination fee under the Backstop Commitment Agreement (collectively, the "Exit Commitment Fees").  Similar to the Backstop Commitment Agreement, the Exit Facility Lenders may terminate their obligations under the Exit Commitment Letters if the closing date of the Exit Facility has not occurred within 120 days after the Petition Date, which date may be extended with the requisite support of the Exit Facility Lenders.

**Basis for Relief**

I.      **Assumption of the Restructuring Support Agreement.**

37.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).   "Unlike many other sections of the Bankruptcy Code, § 365(a) of the Bankruptcy Code does not require a showing of 'cause' to support a Debtors decision to assume or reject an executory contract."  *In re Circuit City Stores, Inc.*, No. 08-35653, 2010 WL 2425957, at *3 (Bankr. E.D. Va. June 9, 2010).   "Rather, the debtor's determination to [assume or] reject an executory contract is governed by the 'business judgment' standard."  *Id.* (citing *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046–47 (4th Cir.1985)); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (business judgment is the "traditional" standard); *In re US Airways Grp., Inc.*, 287 B.R. 643, 645 (Bankr. E.D. Va. 2002) ("The standard in [the Fourth] Circuit for approving a request to [assume or reject an executory contract] is whether the trustee or debtor in possession has exercised sound business judgment.").   In addition, courts outside this district have specifically held that

19

decisions to assume restructuring support agreements are governed by the business judgment standard. *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2014); *In re Caribbean Petroleum Corp.*, 444 B.R. 263, 268 (Bankr. D. Del. 2010).

38.     The business judgment standard is exceedingly deferential—"[o]nce the Debtors articulate a valid business justification, '[t]he business judgment rule becomes a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company.'" *Circuit City*, 2010 WL 2425957, at *3 (quoting *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992)). "The Court should defer to the business judgment of the Debtors, unless 'the decision of the [Debtors] that [assumption or] rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.'" *Id*. (quoting *Lubrizol,* 756 F.3d at 1047).

39.     The Debtors' assumption of the Restructuring Support Agreement is a reasonable exercise of their business judgment.   The restructuring contemplated by the Restructuring Support Agreement positions the Debtors to accomplish a critical deleveraging that will maximize the value of the Debtors' enterprise for the benefit all of the Debtors' stakeholders.  As set forth in the Bullock Declaration, the Restructuring Support Agreement is the product of good-faith, arms'-length negotiations among the Debtors and the Restructuring Support Parties, each of whom had separate, sophisticated legal counsel and financial advisors and whom, collectively, represent the overwhelming majority of the holders of the Debtors' prepetition funded-debt obligations.

40.    Without the benefits and protections provided by the Restructuring Support Agreement, the Debtors could potentially face a prolonged stay in bankruptcy.  In light of the Debtors' prepetition defaults under the RBL Facility, they likely could not have navigated a soft landing in chapter 11 absent the RBL Lenders' support.  The RBL Lenders' support was, in turn, ultimately contingent upon the participation of the Noteholders—the RBL Lenders specifically stated that they would not fund a restructuring process that the Noteholders did not support.  Based on the Debtors' intensive prepetition negotiations and in the professional judgment of their advisors, the swift, consensual process contemplated by the Restructuring Support Agreement presents far less execution risk than any available alternative and better preserves estate assets for the benefit of the Debtors' stakeholders.

41.    Moreover, as set forth in more detail in the Bullock Declaration, the Backstop Fees and the Exit Commitment Fees are reflective of market terms—*i.e.*, such fees are in line with similar fees paid to new capital providers in both in- and out-of-court transactions similar to the Rights Offering and Exit Facility.  Even under normal operating conditions, the Debtors would expect to pay certain fees in connection with such transactions.  In light of market conditions, and the lack of traditional sources of capital for E&P companies, the Debtors are satisfied that the Backstop Fees and Exit Commitment Fees represent the market rate.  Further, locking in these commitments through the assumption of the Restructuring Support Agreement will solidify these chapter 11 cases by eliminating uncertainty with respect to the Debtor's ability to fund their current and post-emergence operations.  In light of these considerations, the Backstop Fees and the Exit Commitment Fees are reasonable and appropriate under the circumstances and the Debtors' decision to assume and pay such fees is a reasonable exercise of their business judgment.

42.     The Third-Party Proposals, on the other hand, were non-binding and had higher execution risk and associated costs to the Debtors.  First, it is not clear that the Debtors would have had the support of the RBL Lenders under any of the Third-Party Proposals.  Even with the RBL Lenders' support, if the Debtors had proceeded with one of the Third-Party Proposals, they almost certainly would have faced postpetition litigation with the Noteholders, who are by far the Debtors' largest unsecured creditor constituency.  Ultimately, the all-in economics of the Third-Party Proposals were simply not as favorable as those of the Restructuring Support Agreement, especially in light of the additional costs and uncertainty attendant to the non-consensual process contemplated by the Third-Party Proposals.  Further, the Debtors negotiated a full fiduciary out as part of the Restructuring Support Agreement in the event that proceeding with the transactions contemplated thereby would be inconsistent with the Debtors' fiduciary duties to maximize value for their stakeholders.

43.     In short, the restructuring contemplated by the Restructuring Support Agreement maximizes value.  The RBL Lenders will be paid in full and the Noteholders and general unsecured claim holders will, subject to dilution by the Rights Offering, Commitment Premium, and Management Incentive Plan, receive 100 percent of the equity in reorganized Penn Virginia. The Restructuring Support Agreement further contemplates substantial sources of post-emergence liquidity in the form of the Exit Facility and the Rights Offering.  Assumption of the Backstop Commitment Agreement and Exit Commitment Letters as part of the Restructuring Support Agreement minimizes the risk associated with these chapter 11 cases by locking in the Backstop Parties' and Exit Facility Lenders' commitments.

44.     Finally, as stated above, Debtors shared the Third-Party Proposals with both the RBL Lenders, 100 percent of which signed the Restructuring Support Agreement, and Ad Hoc

Committee, which represents holders of approximately 86 percent in principal amount of the Notes and the Debtors' largest unsecured creditor constituency. The RBL Lenders and the Ad Hoc Committee chose to support the Restructuring Support Agreement and its more consensual path.

45. As set forth in the Bullock Declaration, the Debtors engaged in an intense analysis of the Restructuring Support Agreement *vis-à-vis* the Third-Party Proposals and determined that the Restructuring Support Agreement represents the value-maximizing transaction. Further, as set forth above, the obligations of the Debtors under the Restructuring Support Agreement are subject to a full fiduciary out, thus preserving the Debtors' flexibility to pursue an alternative value-maximizing transaction, should one arise. Accordingly, the Court should authorize the Debtors to assume the Restructuring Support Agreement.

## II.    Payment of Professional Fees is Warranted under Section 363(b) of the Bankruptcy Code.

*46.* The Bankruptcy Code authorizes the use of property outside the ordinary course of business with court approval and given a valid business reason. Specifically, the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. 11 U.S.C. § 363(b)(1). "Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1)." *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) (citing *Comm. of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983)). "The business judgment test asks whether the debtor has proved that the transaction at issue is 'within the fair and reasonable business judgment of the Debtors and thus within the zone of acceptability.'" *Id.*; *see also In re Gordon Properties, LLC*, 504 B.R. 415, 419 (Bankr. E.D. Va. 2013) (applying a "sound business judgment" standard).

47.     Here, the Debtors have articulated a clear business justification for entering into the Restructuring Support Agreement and paying the Professional Fees.  By securing the support and cooperation of the Restructuring Support Parties, the Debtors have significantly reduced the potential cost and duration of their chapter 11 cases.  Further, payment of the Professional Fees pursuant to the Restructuring Support Agreement was a negotiated component of the agreements and a material inducement for the Restructuring Support Parties' various concessions and commitments thereunder.  Finally, as set forth in the Bullock Declaration, payment of the Professional Fees under the Restructuring Support Agreement is a market-based term that courts frequently approve in similar circumstances.  Consummation of the transactions contemplated by the Restructuring Support Agreement will be hugely beneficial to the Debtors.  Accordingly, the Debtors respectfully submit that payment of the Professional Fees is a proper exercise of their reasonable business judgment and should be approved pursuant to section 363(b) of the Bankruptcy Code.[9]

### III.    The Debtors Seek a Waiver of the Automatic Stay to Effectuate the Relief Requested in this Motion.

48.     Section 362(a) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to receive a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  *Id.* at § 362(d)(1).

---

[9]     Furthermore, such fees and expenses constitute "necessary costs and expenses of preserving the estate" and should be awarded administrative expense status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.  Administrative expense claims are paid in full under the terms of the Plan.  Accordingly, allowing the Debtors to pay the fees and expenses contemplated by the Restructuring Support Party would affect only the timing, not the amount, of such payments.

49.     The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to modify the automatic stay to the extent necessary to permit the relief requested in this Motion and, for the reasons described herein, believe this relief is appropriate in the context of assuming the Restructuring Support Agreement and Backstop Commitment Agreement.

### Waiver of Bankruptcy Rules 6004(h) and 6006(d)

50.     To implement the foregoing successfully, the Debtors seek a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and, to the extent applicable, the 14-day stay of an order applicable to assignment of an unexpired executory contract under Bankruptcy Rule 6006(d).

### Waiver of Memorandum of Points and Authorities

51.     The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

### Notice

52.     The Debtors will provide notice of this motion to:  (a) the Office of the United States Trustee for the Eastern District of Virginia; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition secured credit agreement; (d) the indenture trustee under the Debtors' 7.25% senior notes due 2019; (e) the indenture trustee under the Debtors' 8.500% senior notes due 2020; (f) counsel to certain holders of the 2019 and 2020 senior notes; (g) counsel to the agent under the Debtors' debtor-in-possession credit facility; (h) co-counsel to the agent under the Debtors' debtor-in-possession credit facility; (i) the United States Attorney's Office for the Eastern District of Virginia and for the states in which the Debtors operate; (j) the Internal

Revenue Service; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (l) the office of the attorneys general for the states in which the Debtors operate; (m) the Securities and Exchange Commission; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

53.      No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  May 12, 2016
Richmond, Virginia

/s/ *Michael A. Condyles*
Michael A. Condyles (VA 27807)            Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Peter J. Barrett (VA 46179)               Joshua A. Sussberg, P.C.
Jeremy S. Williams (VA 77469)             Brian E. Schartz (*pro hac vice* admission pending)
**KUTAK ROCK LLP**                        **KIRKLAND & ELLIS LLP**
Bank of America Center                    **KIRKLAND & ELLIS INTERNATIONAL LLP**
1111 East Main Street, Suite 800          601 Lexington Avenue
Richmond, Virginia 23219                  New York, New York 10022
Telephone:     (804) 644-1700             Telephone:     (212) 446-4800
Facsimile:     (804) 783-6192             Facsimile:     (212) 446-4900
Michael.Condyles@KutakRock.com            edward.sassower@kirkland.com
Peter.Barrett@KutakRock.com               joshua.sussberg@kirkland.com
Jeremy.Williams@KutakRock.com             brian.schartz@kirkland.com

                                          - and -

                                          James H.M. Sprayregen, P.C.
                                          Justin R. Bernbrock (*pro hac vice* admission pending)
                                          Benjamin M. Rhode (*pro hac vice* admission pending)
                                          **KIRKLAND & ELLIS LLP**
                                          **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                          300 North LaSalle
                                          Chicago, Illinois 60654
                                          Telephone:     (312) 862-2000
                                          Facsimile:     (312) 862-2200
                                          james.sprayregen@kirkland.com
                                          justin.bernbrock@kirkland.com
                                          benjamin.rhode@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# **EXHIBIT A**

**Proposed Order**

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C.
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Justin R. Bernbrock (*pro hac vice* admission pending)
Benjamin M. Rhode (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Proposed Co-Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PENN VIRGINIA CORPORATION, *et al.*,[1] | ) | Case No. 16-32395 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## ORDER (I) AUTHORIZING THE DEBTORS
## TO ASSUME (A) THE RESTRUCTURING SUPPORT
## AGREEMENT, (B) THE BACKSTOP COMMITMENT
## AGREEMENT, AND (C) THE EXIT COMMITMENT LETTERS,
## (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN FEES IN
## CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), for entry of an order (this "Order"), (a) authorizing the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Penn Virginia Corporation (4320); Penn Virginia Holding Corp. (7384); Penn Virginia MC Corporation (0458); Penn Virginia MC Energy L.L.C. (0462); Penn Virginia MC Operating Company L.L.C. (0466); Penn Virginia Oil & Gas Corporation (7929); Penn Virginia Oil & Gas GP LLC (3686); Penn Virginia Oil & Gas LP LLC (8109); Penn Virginia Oil & Gas, L.P. (9487). The location of the Debtors' service address is: Four Radnor Corporate Center, Suite 200, 100 Matsonford Road, Radnor, Pennsylvania 19087.

Debtors to assume (i) the Restructuring Support Agreement attached hereto as **Exhibit 1**, (ii) the Backstop Commitment Agreement attached as Exhibit C to the Restructuring Support Agreement, and (iii) the Exit Commitment Letters attached as Exhibit E to the Restructuring Support Agreement; (b) authorizing the Debtors to pay certain fees in connection with the Restructuring Support Agreement, the Backstop Commitment Agreement, and the Exit Commitment Letters; and (c) granting related relief, all as more fully set forth in the Motion; and upon the Bullock Declaration and the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their stakeholders, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

2.      The Debtors are authorized to:  (a) assume the Restructuring Support Agreement in its entirety, including, for the avoidance of doubt, the Backstop Commitment Agreement and Exit Commitment Letters; (b) comply with the terms of the Restructuring Support Agreement; (c) effect the relief granted herein; and (d) take any and all actions necessary to implement the terms of the Restructuring Support Agreement (except for actions that require further orders of the Court).

3.      Effective as of the date of entry of this Order, the Restructuring Support Agreement, including, for the avoidance of doubt, the Backstop Commitment Agreement and Exit Commitment Letters, is hereby assumed pursuant to section 365(a) of the Bankruptcy Code.

4.      The Restructuring Support Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms.

5.      The failure to describe specifically or include any particular provision of the Restructuring Support Agreement in the Motion or this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Restructuring Support Agreement be assumed by the Debtors in its entirety.

6.      So long as the Restructuring Support Agreement is in effect and has not been terminated in accordance with its terms, the Debtors are authorized to pay all of the Professional Fees in accordance with the terms of the Restructuring Support Agreement.   Under no circumstances shall such fees and expenses be subject to any otherwise applicable setoff, counterclaim or recoupment.  None of such fees and expenses shall be subject to further approval of the Court and no recipient of any such fees and expenses shall be required to file any interim or final application with the Court as a condition precedent to the Debtors' obligation to pay such

fees and expenses.  None of such fees and expenses shall be subject to avoidance under sections 542, 547, or 548 of the Bankruptcy Code.

7.      The Debtors are authorized, but not directed, to enter into amendments to the Restructuring Support Agreement from time to time as necessary, subject to the terms and conditions set forth in the Restructuring Support Agreement and without further order of the Court.  Within two business days of the effective date of each such amendment, the Debtors will file a notice attaching a copy of any such amendments with the Court.

8.      The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

9.      Notice of the Motion as provided therein is good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

10.      The Restructuring Support Agreement shall be solely for the benefit of the parties thereto and no other person or entity shall be a third-party beneficiary thereof.  No entity, other than the parties to the Restructuring Support Agreement shall have any right to seek or enforce specific performance of the Restructuring Support Agreement.

11.      For the avoidance of doubt, to the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to effectuate all of the terms and provisions of the Restructuring Support Agreement and this Order, including permitting the parties to the Restructuring Support Agreement to exercise all rights and remedies under the Restructuring Support Agreement in accordance with each of their respective terms, and deliver any notice contemplated thereunder, in each case, without further order of the Court.

12.     The failure of any party to seek relief or otherwise exercise its rights and remedies under this Order, the Restructuring Support Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of any of the Parties.

13.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

15.     All objections to the Motion or relief requested therein that have not been withdrawn, waived or settled, and any reservations of rights included therein, are overruled on the merits.

16.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Richmond, Virginia                              _____
                                                UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

 /s/  Michael A. Condyles
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C.
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Justin R. Bernbrock (*pro hac vice* admission pending)
Benjamin M. Rhode (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

        Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order
has been endorsed by or served upon all necessary parties.

        /s/  Michael A. Condyles

# EXHIBIT 1

**Restructuring Support Agreement**

*Execution Version*

---

### PENN VIRGINIA CORPORATION

### RESTRUCTURING SUPPORT AGREEMENT

### May 10, 2016

---

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"),[1] dated as of May 10, 2016, is entered into by and among:  (i) Penn Virginia Corporation ("Penn Virginia"); Penn Virginia Holding Corporation; Penn Virginia MC Corporation; Penn Virginia MC Energy L.L.C.; Penn Virginia MC Gathering Company L.L.C.; Penn Virginia MC Operating Company L.L.C.; Penn Virginia Oil & Gas Corporation; Penn Virginia Oil & Gas GP LLC; Penn Virginia Oil & Gas LP LLC; Penn Virginia Oil & Gas, L.P.; Penn Virginia Resource Holdings Corp. (such subsidiaries and Penn Virginia, each a "PVA Entity," and such subsidiaries together with Penn Virginia, collectively, the "PVA Entities"); (ii) the lenders party to that certain Credit Agreement, dated as of September 28, 2012 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, the "RBL Credit Facility Agreement"), by and among Penn Virginia Holding Corporation, as borrower, each of the guarantors party thereto, Wells Fargo Bank, N.A., as administrative agent and issuing bank (the "RBL Agent"), and the lenders party thereto (the "RBL Lenders") that are (and any RBL Lender that may become in accordance with Section 12 hereof) signatories hereto (collectively, solely in their capacity as RBL Lenders with respect to the holdings of debt under the RBL Credit Facility identified below their respective names on the signature pages hereto, the "Consenting RBL Lenders"); (iii) the holders of notes (the "Noteholders") issued pursuant to that certain Senior Indenture, dated as of June 15, 2009 (as amended, restated, modified, supplemented, or replaced from time to time, the "Indenture"), for the 7.250% Senior Notes due 2019 and the 8.500% Senior Notes due 2020 among Penn Virginia, as issuer, each of the guarantors party thereto, Wilmington Savings Fund Society, FSB, as indenture trustee (the "Indenture Trustee"), that are (and any Noteholder that may become in accordance with Section 12 hereof) signatories hereto (collectively, the "Consenting Noteholders"); and (iv) each of the DIP Lenders, the Backstop Parties, and the Exit Facility Lenders (each as defined below and, collectively with the Consenting RBL Lenders and the Consenting Noteholders, the "Restructuring Support Parties").  This Agreement collectively refers to the PVA Entities and the Restructuring Support Parties as the "Parties" and each individually as a "Party."  For the avoidance of doubt, the Indenture Trustee is not a Party to this Agreement.

---

[1] Unless otherwise noted, capitalized terms used but not immediately defined have the meanings given to such terms elsewhere in this Agreement or in the Restructuring Term Sheet (including any exhibits thereto), as applicable.

## RECITALS

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding certain restructuring transactions (the "Restructuring Transactions") pursuant to the terms and conditions set forth in this Agreement, including a joint prearranged plan of reorganization for the PVA Entities reflecting the terms and conditions of the term sheet attached hereto as **Exhibit A** (the "Restructuring Term Sheet") (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and this Agreement, the "Plan");

WHEREAS, it is anticipated that the Restructuring Transactions will be implemented through jointly administered voluntary cases commenced by the PVA Entities (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the, "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"), pursuant to the Plan, which will be filed by the PVA Entities in the Chapter 11 Cases;

WHEREAS, on March 15, 2016, the PVA Entities entered into that certain Eleventh Amendment to the RBL Credit Facility Agreement (the "RBL Amendment") with the RBL Lenders and the RBL Agent, which RBL Amendment amends, to the extent set forth therein, the RBL Credit Facility Agreement and pursuant to which the RBL Lenders and the RBL Agent agreed *inter alia* to extend the time before certain defaults would become events of default under the RBL Credit Facility Agreement;

WHEREAS, on May 9, 2016, the PVA Entities entered into that certain Amendment to the RBL Amendment (the "Amendment") with the RBL Lenders and the RBL Agent, which Amendment further amends, to the extent set forth therein, the RBL Credit Facility Agreement and pursuant to which the RBL Lenders and the RBL Agent agreed *inter alia* to further extend the time before certain defaults would become events of default under the RBL Credit Facility Agreement;

WHEREAS, (i) certain RBL Lenders or affiliates of RBL Lenders (in their capacities as such, the "DIP Lenders") have agreed to provide a $25 million debtor-in-possession financing facility (the "DIP Financing") and otherwise extend credit to the PVA Entities during the pendency of the Chapter 11 Cases, with the RBL Agent acting as the agent under the DIP Financing (in its capacity as such, the "DIP Agent") and (ii) the Consenting RBL Lenders and the RBL Agent have agreed to the PVA Entities' use of cash collateral, which DIP Financing and use of cash collateral will be in accordance with the terms and conditions set forth in the term sheet attached hereto as **Exhibit B** (the "DIP Term Sheet");

WHEREAS, certain Noteholders (collectively, the "Backstop Parties") have agreed to fund a $50 million rights offering in connection with the Restructuring Transactions substantially on the terms reflected in the Restructuring Term Sheet, pursuant to the Backstop Commitment Agreement attached hereto as **Exhibit C** (the "Backstop Commitment Agreement"), and in accordance with the rights offering procedures attached to the Backstop Commitment Agreement (the "Rights Offering Procedures");

2

WHEREAS, certain parties or affiliates thereof (in their capacities as such, the "Exit Facility Lenders") have committed to provide the reorganized PVA Entities with a new reserve-based lending facility (the "Exit Facility") on the terms and conditions set forth in the term sheet attached hereto as **Exhibit D** (the "Exit Facility Term Sheet") and the commitment letter attached hereto as **Exhibit E** and related fee letters with respect thereto (the "Exit Commitment Letters"); and

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.    RSA Effective Date.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "RSA Effective Date") that:

> (a)    each of the Backstop Commitment Agreement and the Exit Commitment Letters has been executed and is effective in accordance with its respective terms;

> (b)    this Agreement has been executed by all of the following:

>> (i)    each PVA Entity;

>> (ii)    Consenting RBL Lenders (A) holding, in aggregate, at least 66.67% in principal amount of all claims outstanding under the RBL Credit Facility Agreement (the "RBL Claims") and (B) comprising, in aggregate, at least one-half in number of all RBL Lenders;

>> (iii)    the RBL Agent; and

>> (iv)    Consenting Noteholders holding, in aggregate, at least 66.67% in principal amount of all claims outstanding under the Indenture (the "Note Claims");

> (c)    each Swap Agreement (as defined in the RBL Credit Facility Agreement) shall, before the Petition Date, have been terminated and the proceeds thereof received by the RBL Agent as a payment of the obligations under the RBL Credit Facility Agreement; provided, that, prior to such payment, the RBL Agent shall, before the Petition Date, deposit $5 million of such proceeds (but in no event more than all such proceeds) in a deposit account of a PVA Entity, which amount shall be made available for the PVA Entities, subject to the terms of the DIP Orders.

2.      Exhibits and Schedules Incorporated by Reference.  Each of the exhibits attached hereto and any schedules to such exhibits (collectively, the "Exhibits and Schedules") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (excluding the Exhibits and Schedules) shall govern.

3.      Definitive Documentation.

      (a)      The definitive documents and agreements governing the Restructuring Transactions (collectively, the "Definitive Documentation") shall include:

          (i)      the Plan (and all exhibits thereto) and the Plan Supplement;

          (ii)      the confirmation order with respect to the Plan (the "Confirmation Order");

          (iii)      the related disclosure statement (and all exhibits thereto) with respect to the Plan (the "Disclosure Statement");

          (iv)      the solicitation materials with respect to the Plan (collectively, the "Solicitation Materials");

          (v)      the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials;

          (vi)      (A) the interim order authorizing use of cash collateral and debtor-in-possession financing, on terms consistent with the DIP Term Sheet (the "Interim DIP Order") and (B) the final order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP Term Sheet (the "Final DIP Order" and together with the Interim DIP Order, collectively, the "DIP Orders");

          (vii)      the debtor-in-possession credit agreement for the DIP Financing (the "DIP Credit Agreement") to be entered into in accordance with the DIP Term Sheet and the DIP Orders, including any amendments or modifications thereto;

          (viii)      the Exit Facility Term Sheet and the Exit Facility Commitment Letters; and

          (ix)      the order of the Bankruptcy Court approving the PVA Entities' assumption of this Agreement and the Backstop Commitment Agreement (the "Approval Order").

      (b)      Except as set forth herein, the Definitive Documentation identified in Section 3(a) will, after the RSA Effective Date, remain subject to

negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the Exhibits and Schedules) and be in form and substance reasonably satisfactory to each of: (i) the PVA Entities; (ii) Consenting Noteholders who hold, in the aggregate, at least 66.67%% in principal amount outstanding of all Note Claims held by Consenting Noteholders (the "Majority Consenting Noteholders"); and (iii) Consenting RBL Lenders who hold, in the aggregate, at least 66.67% in principal amount outstanding of all RBL Claims held by Consenting RBL Lenders (the "Majority Consenting RBL Lenders," and together with the Majority Consenting Noteholders, collectively, the "Required Consenting Creditors"); provided, however, any Plan exhibits (including those documents included in the Plan Supplement) related solely to the allocation or ownership of the New Common Stock and/or corporate governance matters shall be satisfactory to the Majority Consenting Noteholders only. For the avoidance of doubt, when used herein, the term "Required Consenting Creditors" shall require the independent approval of the Majority Consenting RBL Lenders and the Majority Consenting Noteholders.

4.    Milestones. As provided in and subject to Section 6, the PVA Entities shall implement the Restructuring Transactions in accordance with the milestones set forth in the Restructuring Term Sheet (the "Milestones"). The PVA Entities may extend a Milestone only with the express prior written consent of the Required Consenting Creditors.

5.    Commitment of Restructuring Support Parties. Each Restructuring Support Party shall (severally and not jointly), from the RSA Effective Date until the occurrence of a Termination Date (as defined in Section 10) applicable to such Restructuring Support Party:

(a)    use commercially reasonable efforts to support and cooperate with the PVA Entities to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and the Restructuring Term Sheet (but without limiting consent and approval rights provided in this Agreement and the Definitive Documentation), including by: (i) voting all of its claims against, or interests in, as applicable, the PVA Entities now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter serves as the nominee, investment manager, or advisor for holders thereof, provided that if a Restructuring Support Party acts as an investment manager or advisor with respect to any Note Claims acquired after the date hereof, such Restructuring Support Party may exercise its voting and dispositive power in connection with any fiduciary obligation it may have as investment manager or advisor for holders thereof without regard to such Restructuring Support Party's commitments hereto) to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials upon receipt of the Disclosure

5

Statement and Solicitation Materials approved by the Bankruptcy Court; (ii) timely returning a duly-executed ballot and/or master ballot, as applicable, in connection therewith; and (iii) not "opting out" of any releases under the Plan;

(b)     not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; provided however, that all votes tendered by the Restructuring Support Parties in support of the Plan shall be immediately revoked and deemed void *ab initio* upon the occurrence of a Termination Date;

(c)     use commercially reasonable efforts to support and not object to, delay, impede, or take any other action to interfere, directly or indirectly, with the Restructuring Transactions; and

(d)     use commercially reasonable efforts to support and not object to, delay, impede, or take any other action to interfere with, directly or indirectly, and use commercially reasonable efforts to support the entry by the Bankruptcy Court of any of the DIP Orders, or propose, file or support, directly or indirectly, any use of cash collateral or debtor-in-possession financing other than as proposed in each of the DIP Orders.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (x) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising rights or remedies specifically reserved herein; (y) be construed to prohibit or limit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions, provided, however, that any delay or other impact on consummation of the Restructuring Transactions contemplated by the Plan caused by a Restructuring Support Party's opposition to (i) any relief that is inconsistent with such Restructuring Transactions; (ii) a motion by the Debtors to enter into a material executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior written consent of the Required Consenting Creditors; or (iii) any relief that is adverse to interests of the Restructuring Support Parties sought by the Debtors (or any other party), shall not constitute a violation of this Agreement; or (z) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

6.      <u>Commitment of the PVA Entities</u>.

(a)     Subject to Sub-Clause (b) of this <u>Section 6</u>, the PVA Entities shall, from the RSA Effective Date until the occurrence of a Termination Date (as defined in <u>Section 10</u>):

(i)     (A) support and make commercially reasonable efforts to complete the Restructuring Transactions set forth in the Plan and this Agreement, (B) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement, and (C) make commercially reasonable efforts to complete the Restructuring Transactions set forth in the Plan in accordance with each Milestone set forth in the Restructuring Term Sheet;

(ii)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Creditors, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(iii)   timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Creditors, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the PVA Entities' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; and

(iv)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Creditors, to any motion filed with the Bankruptcy Court by a party seeking the formation and appointment of an official committee of equity interest holders.

(b)     The PVA Entities' shall not seek, solicit, or support any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership sale of assets, financing (debt or equity) or restructuring of the PVA Entities, other than the Restructuring Transactions (each, an "<u>Alternative Transaction</u>"); <u>provided</u>, <u>however</u>, that nothing in this section 6(b) shall limit the Parties' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding the refinancing of the Exit Facility to be consummated

following the Effective Date (as defined in the Term Sheet); <u>provided</u>, <u>further</u>, <u>that</u> (i) if any of the PVA Entities receive a proposal or expression of interest regarding any Alternative Transaction from the RSA Effective Date until the occurrence of a Termination Date, the PVA Entities shall promptly notify counsel to the other Parties of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, and (ii) the PVA Entities shall promptly furnish counsel to the other Parties with copies of any written offer, oral offer, or any other information that they receive relating to the foregoing and shall promptly inform counsel to the other Parties of any material changes to such proposals.  The PVA Entities shall not enter into any confidentiality agreement with a party interested in an Alternative Transaction unless such party consents to identifying and providing to counsel to the Parties (under a reasonably acceptable confidentiality agreement) the information contemplated under this <u>Section 6(b)</u>.

7.    <u>Restructuring Support Party Termination Events</u>.  Each of the (a) Majority Consenting RBL Lenders and (b) the Majority Consenting Noteholders (each such group, a "<u>Terminating Support Group</u>") shall have the right, but not the obligation, upon notice to the other Parties, to terminate the obligations of the Consenting RBL Lenders or the Consenting Noteholders, respectively, under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by the Required Consenting Creditors on a prospective or retroactive basis (each, a "<u>Restructuring Support Party Termination Event</u>"):

(a)    the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of any Restructuring Support Parties, whose Terminating Support Group is seeking termination, in violation of its obligations under this Agreement or (ii) such Milestone is waived in accordance with <u>Section 4</u> of this Agreement;

(b)    the occurrence of a material breach of this Agreement by any PVA Entity that has not been cured (if susceptible to cure) within five business days after written notice to the PVA Entities of such material breach by the Terminating Support Group asserting such termination;

(c)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(e)    the Definitive Documentation does not comply with <u>Section 3</u> of this Agreement or any other document or agreement necessary to consummate the Restructuring Transactions is not reasonably satisfactory to the Majority Consenting Creditors;

8

(f)     any PVA Entity (i) amends, or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; (ii) suspends or revokes the Restructuring Transactions; or (iii) publicly announces its intention to take any such action listed in Sub-Clauses (i) and (ii) of this subsection;

(g)     any PVA Entity files or announces that it will file any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets (other than as provided for in the Plan), without the prior written consent of the Required Consenting Creditors;

(h)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; _provided_, _however_, that the PVA Entities shall have five business days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Required Consenting Creditors;

(i)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the DIP Orders or otherwise consented to by the Required Consenting Creditors;

(j)     the occurrence of any Event of Default under the DIP Credit Agreement (as defined therein) that has not been cured (if susceptible to cure) in accordance with the terms of the DIP Credit Agreement;

(k)     a breach by any PVA Entity of any representation, warranty, or covenant of such PVA Entity set forth in Section 16 of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of 5 business days after the receipt by the PVA Entities of written notice and description of such breach from any other Party;

(l)     either (i) any PVA Entity or any Restructuring Support Party files a motion, application, or adversary proceeding (or any PVA Entity or Restructuring Support Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the RBL Claims or the Note Claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such

9

claims; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief adverse to the interests of any Restructuring Support Party with respect to any of the foregoing causes of action or proceedings;

(m)    any PVA Entity terminates its obligations under and in accordance with <u>Section 8</u> of this Agreement;

(n)    if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the PVA Entities' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(o)    Mr. Bullock ceases to be the Chief Restructuring Officer prior to the Effective Date of the Plan, unless Mr. Bullock no longer holds such position on account of his (i) removal by the Board of Directors of Penn Virginia for gross mismanagement or willful misconduct or (ii) death;

(p)    if the DIP Orders, any of the orders approving assumption of this Agreement, the Exit Commitment Letters, or the Backstop Commitment Agreement, or any of the orders confirming the Plan or approving the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Creditors or a motion for reconsideration, reargument, or rehearing with respect to such orders has been filed and the PVA Entities have failed to timely object to such motion;

(q)    the termination by another Terminating Support Group upon the occurrence of a Restructuring Support Party Termination Event;

(r)    a breach by a Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five business days after notice to all Parties of such breach and a description thereof; or

(s)    the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

Notwithstanding anything to the contrary in this Agreement, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code (the "<u>Automatic Stay</u>"), the occurrence of any Restructuring Support Party Termination Event shall result in an automatic termination of this Agreement five business days following such occurrence unless waived in writing by the Required Consenting Creditors.

10

8.    <u>The PVA Entities' Termination Events</u>.  Each PVA Entity may, upon notice to the Restructuring Support Parties, terminate its obligations under this Agreement upon the occurrence of any of the following events (each a "<u>Company Termination Event</u>," and together with the Restructuring Support Party Termination Events, the "<u>Termination Events</u>"), subject to the rights of the PVA Entities to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a Company Termination Event:

(a)    a breach by a Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five business days after notice to all Restructuring Support Parties of such breach and a description thereof;

(b)    the occurrence of a breach of this Agreement by any Restructuring Support Party that has the effect of materially impairing any of the PVA Entities' ability to effectuate the Restructuring Transactions and has not been cured (if susceptible to cure) within five business days after notice to all Restructuring Support Parties of such breach and a description thereof;

(c)    upon notice to the Restructuring Support Parties, if the board of directors or board of managers, as applicable, of any PVA Entity determines, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties;

(d)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; <u>provided</u>, <u>however</u>, that the PVA Entities have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement;

(e)    any Terminating Support Group terminates its obligations under and in accordance with <u>Section 7</u> of this Agreement; or

(f)    the Definitive Documentation does not comply with <u>Section 3</u> of this Agreement.

9.    <u>Mutual Termination; Automatic Termination</u>.    This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among Penn Virginia, on behalf of itself and each other PVA Entity, and all of the Restructuring Support Parties.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically upon the occurrence of the Effective Date.

10.    <u>Effect of Termination</u>.  The earliest date on which termination of this Agreement as to a Party is effective in accordance with <u>Sections 7</u>, <u>8</u>, or <u>9</u> of this Agreement shall be referred to, with respect to such Party, as a "<u>Termination Date</u>."  Upon the occurrence of a Termination Date, the terminating Party's obligations and, in the case of a Termination Date in accordance with <u>Section 9</u> of this Agreement, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Party or Parties shall be released from its commitments, undertakings, and agreements; <u>provided</u>, <u>however</u>, that each of the following shall survive any such termination:  (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) the PVA Entities' obligations under <u>Section 14</u> of this Agreement accrued up to and including such Termination Date; and (c) <u>Sections 10</u>, <u>15</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>22</u>, <u>23</u>, <u>25</u>, <u>27</u>, <u>31</u>, <u>33</u>, and <u>34</u> hereof.  The Automatic Stay shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

11.    <u>Cooperation and Support</u>.  Penn Virginia shall provide draft copies of all "first day" motions, applications, and other documents that any PVA Entity intends to file with the Bankruptcy Court in the Chapter 11 Cases to counsel for each Restructuring Support Party at least two business days (or as soon thereafter as is reasonably practicable under the circumstances) prior to the date when such PVA Entity intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.  Penn Virginia will use reasonable efforts to provide draft copies of all other material pleadings any PVA Entity intends to file with the Bankruptcy Court to counsel to each Restructuring Support Party at least two business days prior to filing such pleading, to the extent practicable, and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree, consistent with <u>Sub-Clause (b)</u> of <u>Section 3</u> hereof, (a) to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion on the RSA Effective Date and (b) that, notwithstanding anything herein to the contrary, the Definitive Documentation, including any motions or orders related thereto, shall be consistent with this Agreement and otherwise shall be in form and substance reasonably satisfactory to the Required Consenting Creditors.  Penn Virginia shall (i) provide to the Restructuring Support Parties' advisors, and shall direct its employees, officers, advisors, and other representatives to provide the Restructuring Support Parties' advisors, (A) reasonable access (without any material disruption to the conduct of the PVA Entities' businesses) during normal business hours to the PVA Entities' books and records; (B) reasonable access during normal business hours to the management and advisors of the PVA Entities; and (C) timely and reasonable responses to all reasonable diligence requests, in each case for the purposes of evaluating the PVA Entities' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs; and (ii) promptly notify the Restructuring Support Parties of any newly commenced material governmental or third party litigations, investigations, or hearings against any of the PVA Entities.

12.   <u>Transfers of Claims and Interests</u>.

(a)   Each Restructuring Support Party shall not (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's claims against, or interests in, any PVA Entity, as applicable, in whole or in part, or (ii) deposit any of such Restructuring Support Party's claims against or interests in any PVA Entity, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "<u>Transfer</u>" and the Restructuring Support Party making such Transfer is referred to herein as the "<u>Transferor</u>"), unless such Transfer is to another Restructuring Support Party or any other entity that (x) first agrees in writing to be bound by the terms of this Agreement by executing and delivering to Penn Virginia a Transferee Joinder substantially in the form attached hereto as **<u>Exhibit F</u>** (the "<u>Transferee Joinder</u>"), and (y) solely with respect to any Transferor that is a Backstop Party, agrees in writing to be bound by the obligations of the applicable Transferor under the Backstop Commitment Agreement and is determined, after due inquiry and investigation by the Restructuring Support Parties and the PVA Entities, to be reasonably capable of fulfilling such obligations.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this <u>Sub-Clause (a)</u> of this <u>Section 12</u> shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the PVA Entities and/or any Restructuring Support Party, and shall not create any obligation or liability of any PVA Entity or any other Restructuring Support Party to the purported transferee.

(b)   Notwithstanding <u>Sub-Clause (a)</u> of this <u>Section 12</u>, (i) an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to be or become a Restructuring Support Party to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against, or interest in, any PVA Entity, as applicable, by a Restructuring Support Party to a transferee; <u>provided</u>, <u>that</u>, such transfer by a Restructuring Support Party to a transferee shall be in all other respects in accordance with and subject to <u>Sub-Clause (a)</u> of this <u>Section 12</u>; and (ii) to the extent that a Restructuring Support Party, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any PVA Entity from a holder of such claim or interest who is not a Restructuring Support Party, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Restructuring Support

13

Party in accordance with this <u>Section 12</u>.  For purposes of this <u>Sub-Clause (b)</u>, a "<u>Qualified Marketmaker</u>" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against, or interests in, the PVA Entities (including debt securities or other debt) or enter with customers into long and short positions in claims against, or interests in, the PVA Entities (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against, or interests in, the PVA Entities, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

13.   <u>Further Acquisition of Claims or Interests</u>.  Except as set forth in <u>Section 12</u>, nothing in this Agreement shall be construed as precluding any Restructuring Support Party or any of its affiliates from acquiring additional claims arising from the DIP Financing (the "<u>DIP Claims</u>"), RBL Claims, Note Claims, Penn Virginia's existing common stock or existing Series A 6% Convertible Perpetual Preferred Stock or Series B 6% Convertible Perpetual Preferred Stock (such common stock and preferred stock, collectively, the "<u>Existing Equity Interests</u>"), or interests in the instruments underlying the DIP Claims, RBL Claims, Note Claims, or Existing Equity Interests; <u>provided</u>, <u>however</u>, that any such additional DIP Claims, RBL Claims, Note Claims, Existing Equity Interests, or interests acquired by any Restructuring Support Party or by any affiliate of a Consenting Noteholder, shall automatically be subject to the terms and conditions of this Agreement and, if such acquiring Restructuring Support Party is a Backstop Party to the terms and conditions of the Backstop Commitment Agreement.  Upon any such further acquisition by a Restructuring Support Party or any affiliates of a Consenting Noteholder, such Restructuring Support Party shall promptly notify counsel to Penn Virginia, who will then promptly notify the counsel to the other Restructuring Support Parties.

14.   <u>Fees and Expenses</u>.  Subject to <u>Section 10</u>, and in accordance with and subject to the DIP Orders and the Approval Order, which orders shall provide for the payment of all of the Fees and Expenses described in this Agreement and the Backstop Commitment Agreement, as applicable, Penn Virginia shall pay or reimburse when due all reasonable and documented fees and expenses (including travel costs and expenses) of the following (regardless of whether such fees and expenses were incurred before or after the Petition Date):  (a) Bracewell LLP ("<u>Bracewell</u>") as primary counsel, one local counsel, and Opportune LLP ("<u>Opportune</u>") as financial advisor, for all Consenting RBL Lenders; and (b) Milbank, Tweed, Hadley & McCloy LLP ("<u>Milbank</u>") as primary counsel, one local counsel, W.D. Von Gonten & Co. as engineer consultants, and PJT Partners LP ("<u>PJT</u>") as financial advisor, for all Consenting Noteholders and Backstop Parties, and Heidrick & Struggles as consultant, retained by Milbank, as counsel to the ad hoc committee of Noteholders, and any such other advisors or consultants as may be reasonably determined by the Consenting Noteholders and Backstop Parties, in consultation with Penn Virginia.  Penn Virginia's payment of fees and expenses owing to Opportune shall be in accordance with that certain Engagement Agreement, dated as of February 1, 2016, between Bracewell and Opportune (the "<u>Opportune Engagement Agreement</u>").  Penn Virginia's payment of fees and expenses owing to Milbank shall be in accordance with that certain Letter Agreement, dated as of January 20, 2016, between Milbank and an *ad hoc* committee of certain Noteholders as identified therein (the "<u>Milbank Engagement Agreement</u>") or pursuant to any

14

Definitive Document superseding the Milbank Engagement Agreement.  Penn Virginia's payment of fees and expenses owing to PJT shall be in accordance with that certain Letter Agreement, dated as of December 16, 2015, between PJT and Milbank (the "PJT Engagement Agreement").  Each of the Opportune Engagement Agreement, the Milbank Engagement Agreement, and the PJT Engagement Agreement shall continue to be in full force and effect during the pendency of the Chapter 11 Cases and following the Effective Date, unless terminated in accordance with its respective terms.

15. <u>Consents and Acknowledgments</u>.

(a)    Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances of the Plan.  The acceptance of the Plan by each of the Restructuring Support Parties will not be solicited until such Restructuring Support Party has received the Disclosure Statement and Solicitation Materials in accordance with applicable law, and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

(b)    By executing this Agreement, each Restructuring Support Party (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) consents to the PVA Entities' use of its cash collateral and incurrence of debtor-in-possession financing authorized by the DIP Orders until the occurrence of a Termination Date.

(c)    By executing this Agreement, each Restructuring Support Party (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) irrevocably waives any Default or Event of Default as defined under the RBL Credit Facility Agreement or the Indenture, as applicable, that is caused by the PVA Entities' entry into this Agreement or the other documents related to this Agreement and the transactions contemplated in this Agreement.

16. <u>Representations and Warranties</u>.

(a)    Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)    it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

15

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or, with respect to each Consenting Noteholder, those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any PVA Entity's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or, with respect to each Consenting Noteholder, any of its affiliates is a party;

(iv)    the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (i) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (iii) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the PVA Entities, and (iv) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby;

(v)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi)    solely with respect to each Consenting Noteholder, it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), with sufficient knowledge and

16

experience to evaluate properly the terms and conditions of this Agreement, and has been afforded the opportunity to discuss other information concerning the PVA Entities with the PVA Entities' representatives, and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement;

(vii)    solely with respect to each Consenting Noteholder, it has been advised that (A) the offer and sale of the Reorganized Equity and any rights to acquire New Common Stock (as defined in the Plan) has not been, and will not be, registered under the Securities Act and (B) the offering and issuance of the Reorganized Equity and any rights to acquire Reorganized Equity is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code; and

(viii)   it (A) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; and (C) to the knowledge of the individuals working on the Restructuring Transactions, does not directly or indirectly own any RBL Claims, Note Claims, or Existing Equity Interests, other than as identified below its name on its signature page hereof.

(b)    Each PVA Entity hereby represents and warrants on a joint and several basis (and not any other person or entity other than the PVA Entities) that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and, subject to the approval of the Bankruptcy Court of its assumption, to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and, subject to the approval of the Bankruptcy Court of its assumption, the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action

17

on its part, including approval of each of the independent director(s) or manager(s), as applicable, of each of the corporate entities that comprise the PVA Entities;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any PVA Entity's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(v)    (A) the offer and sale of the Reorganized Equity and any rights to acquire Reorganized Equity has not been, and will not be, registered under the Securities Act and (B) the offering and issuance of the Reorganized Equity and any rights to acquire Reorganized Equity is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code;

(vi)    subject to the approval of the Bankruptcy Court of its assumption, this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vii)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

17.    <u>Survival of Agreement</u>.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the PVA Entities and in contemplation of possible chapter 11 filings by the PVA Entities and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

18.    <u>Waiver</u>.  If the transactions contemplated herein are or are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, other than as provided in <u>Section 15</u>, and the Parties expressly reserve any and all of their respective rights.  The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, the Restructuring Term Sheet, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

19.    <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.  The Parties hereto acknowledge that this agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the PVA Entities and the Restructuring Support Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.  No action taken by any Restructuring Support Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Restructuring Support Party are in any way acting in concert or as such a "group."

20.    <u>Creditors' Committee</u>.  All Parties agree that they shall not oppose, and nothing in this Agreement shall prohibit, the participation of any of the Consenting Noteholders or the Indenture Trustee on any official committee of unsecured creditors formed in the Chapter 11 Cases.  Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to and serves on an official committee of creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties to any person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; <u>provided</u>, <u>that</u>, nothing in this Agreement shall be construed as requiring any Consenting Noteholder to serve on any official committee in any of the Chapter 11 Cases.

21.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

22.     <u>Governing Law & Jurisdiction</u>.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code.   By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the Southern District of New York, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.   By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

23.     <u>Waiver of Right to Trial by Jury</u>.   Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement.   Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

24.     <u>Successors and Assigns</u>.   Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

25.     <u>No Third-Party Beneficiaries</u>.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

26.     <u>Notices</u>.   All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.   Any notice of termination or breach shall be delivered to all other Parties.

(a)     If to any PVA Entity:

Penn Virginia Corporation
Attn:   Nancy Snyder
Four Radnor Corporate Center, Suite 200

100 Matsonford Road
Radnor, PA 19087
Tel:    (610) 687-8900
Fax:    (610) 687-3688
Email: nancy.snyder@pennvirginia.com

*With a copy to:*

Kirkland & Ellis LLP
Attn:   Edward O. Sassower, P.C. and Brian Schartz
601 Lexington Avenue
New York, NY 10022-4611
Tel:    (212) 446-4800
Fax:    (212) 446-4900
Email: edward.sassower@kirkland.com
           brian.schartz@kirkland.com

Kirkland & Ellis LLP
Attn:   Justin Bernbrock and Benjamin Rhode
300 North LaSalle
Chicago, IL 60654
Tel:    (312) 862-2000
Fax:    (312) 862-2200
Email: justin.bernbrock@kirkland.com
           benjamin.rhode@kirkland.com

(b)     If to the Consenting RBL Lenders:

Bracewell LLP
Attn:   Stephanie Song
711 Louisiana Street, Suite 2300
Houston, TX 77002
Tel:    (713) 221-1542
Fax:    (713) 221-2156
Email: Stephanie.Song@bracewelllaw.com

Bracewell LLP
Attn:  Kurt Mayr and David Lawton
185 Asylum Street, 34th Floor
Hartford, CT 06103
Tel:    (860) 256-8534
Fax:    (860) 760-6528
Email: Kurt.Mayr@bracewelllaw.com
           David.Lawton@bracewelllaw.com

(c)     If to the Consenting Noteholders:

To each Consenting Noteholder at the addresses or e-mail addresses set forth below the Consenting Noteholder's signature page to this Agreement (or to the signature page to a Joinder Agreement as the case may be)

*With a copy to:*

Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney, and Bradley Scott Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email:  skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

27.     Entire Agreement.   This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

28.     Amendments.   Except as otherwise provided herein, this Agreement (including the Exhibits and Schedules) may not be modified, amended, or supplemented without the prior written consent of the PVA Entities and the Required Consenting Creditors; provided, however, that any modification of, amendment or supplement to, any exhibit hereto that materially and adversely affects any Party shall require the prior written consent of each Party so affected; provided, further, that the prior written consent of all Parties shall be required to modify, amend or supplement (a) any of Sections 1, 7, 8, 9, or 28 hereof or (b) the definition of "Majority Consenting RBL Lenders," "Majority Consenting Noteholders" or "Required Consenting Creditors" herein.

29.     Reservation of Rights.

(a)     Except as expressly provided in this Agreement or the Restructuring Term Sheet, including Section 5(a) of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties.

(b)     Without limiting Sub-Clause (a) of this Section 29 in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to Section 18 of this Agreement.  This Agreement,

22

the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

30.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

31.    <u>Other Support Agreements</u>.  Until a Termination Date, no PVA Entity shall enter into any other restructuring support agreement related to a partial or total restructuring of the PVA Entities' balance sheet unless such support agreement is consistent in all respects with the Restructuring Term Sheet and is reasonably acceptable to the Required Consenting Creditors.

32.    <u>Public Disclosure</u>.  This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; <u>provided</u>, <u>however</u>, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein without the express written consent of the other Parties; <u>provided</u> <u>further</u>, <u>however</u>, that no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than advisors to the Penn Virginia, the principal amount or percentage of any notes issued under the Indenture held by any of the Consenting Noteholders, in each case, without such Consenting Noteholder's prior written consent.

33.    <u>Headings</u>.   The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

34.    <u>Interpretation</u>.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

*[Signatures and exhibits follow]*

23

EXECUTED to be effective as of the date first above written.

PENN VIRGINIA:
**PENN VIRGINIA CORPORATION**

By: _____

Name: R. Seth Bullock
Title: Chief Restructuring Officer


PVA ENTITIES:

**PENN VIRGINIA HOLDING CORP.**

**PENN VIRGINIA OIL & GAS CORPORATION**

**PENN VIRGINIA OIL & GAS GP LLC**

**PENN VIRGINIA OIL & GAS LP LLC**

**PENN VIRGINIA MC CORPORATION**

**PENN VIRGINIA MC ENERGY L.L.C.**

**PENN VIRGINIA MC OPERATING COMPANY L.L.C.**


By: _____

Name: R. Seth Bullock
Title: Chief Restructuring Officer


**PENN VIRGINIA OIL & GAS, L.P.**

By: Penn Virginia Oil & Gas GP LLC, its general partner

By: _____

Name: R. Seth Bullock
Title: Chief Restructuring Officer

**ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.**
By:  Anchorage Capital Group, L.L.C., its investment manager

By:  _____

Name:      Natalie A. Birrell
Title       Chief Operating Officer

Holdings:

Holdings:

Holdings:

Holdings:

*[Signature Page to Restructuring Support Agreement]*

If to Anchorage Capital Master Offshore, Ltd.:

Anchorage Capital Master Offshore, Ltd.
c/o Anchorage Capital Group, L.L.C
610 Broadway, 6th Floor
New York, NY 10012
Attn: Legal; Operations
Email: legal@anchoragecap.com; ops@anchoragecap.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
            bkinney@milbank.com
            bfriedman@milbank.com

**RAPTOR ENERGY, LP**
By:  Anchorage Capital Group, L.L.C., its investment
manager

By:

Name:     Natalie A. Birrell
Title      Chief Operating Officer

Holdings:

Holdings:

Holdings:

Holdings:

*[Signature Page to Restructuring Support Agreement]*

If to Raptor Energy, LP:

Raptor Energy, LP
c/o Anchorage Capital Group, L.L.C
610 Broadway, 6th Floor
New York, NY 10012
Attn: Legal; Operations
Email: legal@anchoragecap.com; ops@anchoragecap.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

*Execution Version*

By: Contrarian Capital Management, L.L.C., on behalf of
various managed accounts and affiliated entities

By: _____

Name: Jon R. Bauer

Title: Managing Member

Holdings: ████████████████

If to Contrarian Capital Management, L.L.C.:

Contrarian Capital Management, L.L.C.
Attn: Jon Bauer, Graham Morris, & Josh Weisser
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

*Execution Version*

Global Credit Advisers, LLC as investment adviser

By:

Name: Steven Hornstein

Title: Managing Member

Holdings:

Holdings:

Holdings:

Holdings:

If to Global Credit Advisers:

Global Credit Advisers
c/o Dan Kecskes
101 Park Avenue, 26th Floor
New York, NY 10178

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
         bkinney@milbank.com
         bfriedman@milbank.com

**[JOINING PARTY]**

By: KLS Diversified Asset Management LP

Name:

Title: Managing Partner

Holdings:

Holdings:

Holdings:

Holdings:

If to KLS Diversified:

KLS Diversified
c/o Michael Hanna
452 5th Avenue
22nd Floor
New York, NY 10018

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

*Execution Version*

THE MANGROVE PARTNERS MASTER FUND, LTD.,

By: MANGROVE PARTNERS, its Investment Manager

By: _____

Name:    Ward Dietrich
Title:    Authorized Person

Holdings:

Holdings:

Holdings:

Holdings:

If to Mangrove Partners:

Mangrove Partners
c/o Mangrove Partners
645 Madison Avenue
14th Floor
New York, NY 10022
212.897.9535
Ops@mangrovepartners.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:      (212) 530-5000
Fax:      (212) 530-5219
Email:  skhalil@milbank.com
            bkinney@milbank.com
            bfriedman@milbank.com

**Marathon Asset Management, LP, solely on behalf of
certain of its affiliated funds and managed accounts**

By: _____

Name: PETER COPPA

Title AUTHORIZED SIGNATORY

Holdings:

Holdings:

Holdings:

Holdings:

If to Marathon Asset Management:

Marathon Asset Management
c/o Dan Pine
One Bryant Park
38th Floor
New York, NY 10036

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:      (212) 530-5000
Fax:      (212) 530-5219
Email:  skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

**Strategic Value Special Situations Offshore Fund III-A, L.P.**
**By: SVP Special Situations III-A LLC, its Investment Manager**

By: _____

Name: James Dougherty
Title:  Fund Chief Financial Officer

Holdings:

Holdings:

Holdings:

Holdings:



*[Signature Page to Restructuring Support Agreement]*

**Strategic Value Special Situations Master Fund III, L.P.**
**By: SVP Special Situations III LLC, its Investment**
**Manager**

By: _____

    Name: James Dougherty

    Title: Fund Chief Financial Officer

Holdings:

Holdings:

Holdings:

Holdings:



*[Signature Page to Restructuring Support Agreement]*

**Strategic Value Master Fund Ltd.**
**By: Strategic Value Partners, LLC, its Investment**
**Manager**

By: 
    Name: James Dougherty
    Title: Fund Chief Financial Officer

Holdings

Holdings

Holdings

Holdings



If to Strategic Value Partners:

Strategic Value Partners
c/o General Counsel's Office
100 West Putnam Avenue, 2nd Floor
Greenwich, CT 06830
Email: legalnotices @svpglobal.com
Fax: 203-618-3501

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
         bkinney@milbank.com
         bfriedman@milbank.com

Recipient:

Certain Funds and Accounts that are Consenting
Noteholders and advised by T. Rowe Price Associates, Inc.,
severally and not jointly

By: T. Rowe Price Associates, Inc., as investment adviser

By: _____

Name: Mark Vaselkiv
Title: Portfolio Manager

By: _____

Name: Rodney M. Rayburn
Title: Vice President

If to T. Rowe Price Associates, Inc.:

T. Rowe Price Associates, Inc.
c/o Andrew Baek
Vice President, Senior Legal Counsel
100 East Pratt Street
Mail Code BA-1020
Baltimore, MD 21202
Direct: 410-345-2090
Fax:   410-345-6575

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
            bkinney@milbank.com
            bfriedman@milbank.com

**[JOINING PARTY]**

FRANKLIN ADVISORS, INC., as investment manager on behalf of certain funds

By: _____

Name: Glenn Voyles

Title: VP / Director of Portfolio Management

Holdings:

Holdings:

Holdings:

Holdings:

Address for Notices:

1 Franklin Pkwy, San Mateo, CA 94403
Attn: Chris Chen
Telephone Number: (650) 312-3341
Email Address: chris.chen@franklintempleton.com

Notwithstanding anything to the contrary in the Restructuring Support Agreement, the Supporting Party shall vote all of its claims against, or interests in, as applicable, the Debtors now owned by the Supporting Party as set forth on this signature page or hereafter acquired (or for which the Supporting Party now has or hereafter acquires voting control over), to the extent permitted under its applicable investment guidelines in effect as of the date hereof, to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials, as approved consistent with the Bankruptcy Code upon receipt of Solicitation Materials approved by the Bankruptcy Court. In addition, notwithstanding anything to the contrary in the Restructuring Support Agreement, the Supporting Party shall, in the context of a solicitation on the Plan, vote all claims set forth on this signature page, either beneficially owned by the Supporting Party or for which it is the nominee, investment manager, or advisor for beneficial holders thereof, to the extent permitted under applicable investment guidelines in effect as of the date hereof, in favor of the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying voting materials, and return a duly-executed ballot in connection therewith no later than the deadline for voting on the Plan (except to the extent that the terms of such Plan are inconsistent with the terms contained in the Restructuring Term Sheet attached to the Restructuring Support Agreement). The Debtors acknowledge and agree that the foregoing provisions supersede anything to the contrary in the Restructuring Support Agreement. As of the date hereof, the Supporting Party acknowledges and agrees that all of its claims against, or interests in, as applicable, the Debtors set forth on this signature page can be voted in favor of the Plan as contemplated by the Restructuring Support Agreement.

If to Franklin Advisors, Inc.:

Franklin Advisors, Inc.
c/o Chris Chen
1 Franklin Parkway, San Mateo, CA 94403
Direct: 650-312-3341
Email: chris.chen@franklintempleton.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email: skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

*Execution Version*

**Pine River Baxter Fund Ltd.**

By:  Pine River Capital Management L.P.
Its:  Investment Manager

By:  _____

Name:  Tim O'Brien

Title:  General Counsel and Co-Chief Operating Officer

Holdings:

Holdings:

Holdings:

Holdings:



*Execution Version*

**Pine River Fixed Income Master Fund Ltd.**

By:  Pine River Capital Management L.P.
Its:  Investment Manager

By:  _____

Name:  Tim O'Brien

Title:  General Counsel and Co-Chief Operating Officer

Holdings:

Holdings:

Holdings:

Holdings:

*Execution Version*

**Pine River Master Fund Ltd.**

By:  Pine River Capital Management L.P.
Its:  Investment Manager

By:  _____

Name:  Tim O'Brien

Title:  General Counsel and Co-Chief Operating Officer

Holdings:

Holdings:

Holdings:

Holdings:

*Execution Version*

**LMA SPC for and on behalf of MAP 89 Segregated Portfolio**

By:  Pine River Capital Management L.P.
Its:  Investment Manager

By: _____

Name:  Tim O'Brien

Title:  General Counsel and Co-Chief Operating Officer

Holdings

Holdings

Holdings

Holdings

If to Pine River Capital Management, L.P.:

c/o Pine River Capital Management L.P.
601 Carlson Parkway, 7th Floor
Minnetonka, MN 55305
Attn:  Legal Department
Fax:  (612) 238-3301

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email:  skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

AMTRUST INTERNATIONAL INSURANCE, LTD.

By: _____

Name: Stephen Ungar

Title Secretary

Holdings

Holdings

Holdings

Holdings

*[Signature Page to Restructuring Support Agreement]*

If to AmTrust International Insurance, Ltd.:

AmTrust Financial Services Inc.
c/o Lawrence A. Heller and Harry Schlachter
59 Maiden Lane, 43rd Floor
New York, NY 10038
Email: lawrence.heller@amtrustgroup.com
Email: harry.schlachter@amtrustgroup.com


*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

NAT GEN RE LTD.

By: _____

Name: PETER RENDALL

Title: Coo and Treasurer

Holdings:

Holdings:

Holdings:

Holdings:

*[Signature Page to Restructuring Support Agreement]*

If to National General:

AmTrust Financial Services Inc.
c/o Jeffrey Weissman, Daron Skipper, and Susan Eylward
59 Maiden Lane, 43rd Floor
New York, NY 10038
Email: Jeffrey.weissmann@ngic.com
Email: susan.eylward@ngic.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
           bkinney@milbank.com
           bfriedman@milbank.com

**Wexford Spectrum Investors LLC**

By: _____

Name: Dante Domenichelli
Title: Vice President & Secretary

Holdings: ███████████████████████████

Holdings: ███████████████████████████

Holdings: ███████████████████████████

Holdings: ███████████████████████████

Prepared by MILBANK/DJW/TIMB
Approved by CD/McCARTHY

*[Signature Page to Restructuring Support Agreement]*

**Wexford Catalyst Investors LLC**

By: _____

      Name: Dante Domenichelli
      Title: Vice President & Secretary

Holdings:

Holdings:

Holdings:

Holdings:

Prepared by _MILBANK/DJW/TIM D._

Approved by _CD/McCARThY_

*[Signature Page to Restructuring Support Agreement]*

**Debello Investors LLC**

By: _____

       Name: Dante Domenichelli
       Title: Vice President & Secretary

Holdings:

Holdings:

Holdings:

Holdings:

Prepared by MILBANK / DJW / TIM D.

Approved by CD / McCARTHY

*[Signature Page to Restructuring Support Agreement]*

If to Wexford Capital LP:

Wexford Capital LP
c/o Daniel J. Weiner and Marc McCarthy
411 West Putnam Avenue
Greenwich, CT 06830

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email:  skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

*Execution Version*

By: _____

Name: Tim Lang

Title: Authorized Trader,
        Grantham, Mayo, Van Otterloo & Co., LLC,
        investment manager of
        GMO Credit Opportunities Fund, L.P.

Holdings:

If to Grantham, Mayo, Van Otterloo & Co. LLC:

Grantham, Mayo, Van Otterloo & Co. LLC
c/o Kevin O'Brien and Jon Roiter
40 Rowes Wharf
Boston, MA 02110
Phone: 617-346-7518
Fax: 617-849-7243
Email: kevin.o'brien@gmo.com
Email: jon.roiter@gmo.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
           bkinney@milbank.com
           bfriedman@milbank.com

*Execution Version*

By: J.P. MORGAN INVESTMENT MANAGEMENT, INC.
AS INVESTMENT MANAGER AND AGENT FOR CERTAIN CLIENT ACCOUNTS

Name: ALEXANDER P. SAMMARCO

Title: EXECUTIVE DIRECTOR

Holdings:

Holdings:

Holdings:

Holdings:

*Execution Version*

By: JPMORGAN CHASE BANK, N.A.
    AS TRUSTEE FOR CERTAIN CLIENT ACCOUNTS

Name: ALEXANDER P. SAMMARCO

Title: EXECUTIVE DIRECTOR

Holdings:

Holdings:

Holdings:

Holdings:

If to JP Morgan Asset Management:

J.P. Morgan Asset Management
Attn: Alexander Sammarco
Cc: Jim Shanahan and Laurie Whipkey
8044 Montgomery Road, Suite 555
Cincinnati, Ohio 45236
Phone: 513-699-4417

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email: skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

By: 

Name:    Bryan M. McDavid

Title:    Director

**ROYAL BANK OF CANADA,**



By:   _____

Name:   Mark Lumpkin, Jr.
         Authorized Signatory

Title:   _____

**BANK OF AMERICA, N.A.,**

GBAM Special Assets Group

By: _____

Name:    Edna  Aguilar Mitchell

Title:     Director

**SCOTIABANC INC.,**

By: _____

Name: J.F. Todd

Title: Managing Director

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,**

By: _____

Name: _____Didier Siffer_____

Title: ___Authorized Signatory___

By: _____

Name: ___Laura Katherine Schembri___

Title: ___Authorized Signatory___



**BRANCH BANKING AND TRUST COMPANY,**

By:

Name: DAVID A WANE

Title: SENIOR VICE PRESIDENT

**BARCLAYS BANK PLC,**

By:  

Name:    __Vanessa  Kurbatskiy_____

Title:    __Vice President _____

**COMERICA BANK,**

By: _____

Name: _____
Barry Carroll

Title: _____
Vice President

**SOCIÉTÉ GÉNÉRALE,**

By: _____

Name:  Max Sonnonstine

Title:  Director

**CAPITAL ONE, NATIONAL ASSOCIATION,**

By:

Name:   LAUREL VARNLY

Title:   VP

**SUNTRUST BANK,**

By: _William S Kaufer_

Name: _William S Kaufer_

Title: _First Vice President_

**SANTANDER BANK, N.A.,**

By: _____

Name: _Mark Connelly_

Title: _SVP_



By: _____

Name: _DAVID O'DRISCOLL_

Title: _SVP_

**<u>Exhibit A</u> to the Restructuring Support Agreement**

**Restructuring Term Sheet**

*Execution Version*

PENN VIRGINIA CORPORATION

RESTRUCTURING TERM SHEET

**May 10, 2016**

| Material Terms of the Restructuring | |
| --- | --- |
| **Term** | **Description** |
| Overview of the Restructuring | This term sheet (this "Term Sheet") contemplates a comprehensive restructuring of the PVA Entities' balance sheet (the "Restructuring"). The Restructuring will be executed pursuant to a "prearranged" chapter 11 plan of reorganization (the "Plan") to be confirmed by the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). To effectuate the Restructuring, certain parties (collectively, the "Restructuring Support Parties") have entered into a restructuring support agreement (the "RSA"),[1] to which this term sheet is attached as Exhibit A. |
| | The Restructuring will be financed by (i) consensual use of cash collateral, including $6 million funded from the termination of certain of Penn Virginia's swap contracts in accordance with the RBL Amendment; (ii) a new-money, $25 million investment in the form of DIP financing substantially on the terms set forth in the term sheet attached to the RSA as Exhibit B; and (iii) a $50 million rights offering (the "Rights Offering") that is backstopped by certain Noteholders (in their capacity as such, the "Backstop Parties") substantially on the terms set forth in the Backstop Commitment Agreement attached to the RSA as Exhibit C and in accordance with the rights offering procedures attached as an exhibit to the Backstop Commitment Agreement. All of the Backstop Parties' obligations under the Backstop Commitment Agreement are subject to the entry of the Approval Order. On the Effective Date, the PVA Entities will enter into a new reserve-based lending facility credit agreement on the terms reflected on the term sheet attached to the RSA as Exhibit D, and the commitment letter and the related fee letter attached to the RSA as Exhibit E. |
| Backstop Commitment Agreement | The Backstop Commitment Agreement shall provide for a premium of 6% of the $50 million committed amount (the "Commitment Premium") and a discount of 25% to total settled plan equity value of $125 million. The Commitment Premium will be fully earned and nonrefundable upon entry of the Approval Order and payable in shares of New Common Stock, unless the Backstop Commitment Agreement is terminated in connection with a breach by Penn Virginia or any PVA Entity, an Alternative Transaction, or Penn Virginia's entry into an Alternative Transaction during a 12-month tail period; in any of the foregoing cases, the Backstop Parties shall be entitled to a termination fee of 4% of the $50 million committed amount, which fee shall be paid in cash. The Backstop Commitment Agreement also shall provide for the PVA Entities to pay for the reasonable and documented fees of all of the professionals, advisors, and consultants retained by the Backstop Parties, and filing fees required by antitrust laws, subject to entry of the Approval Order. |

---

[1]    Capitalized terms used but not defined in this Term Sheet have the meanings given to such terms in the RSA.

| Milestones | The Restructuring will be achieved in accordance with the following milestones (collectively, the "<u>Milestones</u>"):[2]<br><br>• no later than 8:00 a.m. (prevailing Eastern Time) on May 12, 2016, the PVA Entities shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court (such filing date, the "<u>Petition Date</u>");<br><br>• on, or no later than 24 hours after, the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking entry of the Interim DIP Order and the Final DIP Order;<br><br>• no later than three days after the Petition Date, the PVA Entities shall file with the Bankruptcy Court (i) the Plan and related disclosure statement (the "<u>Disclosure Statement</u>") and (ii) a motion seeking entry of an order approving the PVA Entities' assumption of the RSA and the Backstop Commitment Agreement (the "<u>Approval Motion</u>");<br><br>• no later than three days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br><br>• no later than fifteen days after the Petition Date, the PVA Entities shall file with the Bankruptcy Court (i) a motion to establish a bar date for filing proofs of claim and (ii) the schedules of assets and liabilities and statements of financial affairs for each PVA Entity;<br><br>• no later than thirty days after the Petition Date, (i) the Bankruptcy Court shall have entered the Final DIP Order, (ii) the Bankruptcy Court shall have entered an order (the "<u>Approval Order</u>") granting the Approval Motion, and (iii) the PVA Entities shall have delivered a proposal with regard to the treatment of material contracts to the Majority Consenting Noteholders;<br><br>• no later than forty-five days after the Petition Date, the Bankruptcy Court shall have entered an order (the "<u>Disclosure Statement Order</u>") approving the adequacy of the Disclosure Statement and related solicitation procedures (including the Rights Offering Procedures);<br><br>• no later than forty-five days after the entry of the Disclosure Statement Order, the Bankruptcy Court shall commence a hearing to confirm the Plan (the "<u>Confirmation Hearing</u>");<br><br>• no later than five days after the commencement of the Confirmation Hearing, the Bankruptcy Court shall enter an order (the "<u>Confirmation Order</u>") confirming the Plan; and<br><br>• no later than twenty-five days after entry of the Confirmation Order, the PVA Entities shall consummate the transactions contemplated by the Plan (the date of such consummation, the "<u>Effective Date</u>"). |
|---|---|
| Conditions Precedent to Emergence | The occurrence of the Effective Date will be subject to the following conditions precedent:<br><br>• the RSA shall not have been terminated and remains in full force and effect;<br><br>• entry of the Interim DIP Order and the Final DIP Order;<br><br>• entry of the Disclosure Statement Order; |

---

[2]   For the avoidance of doubt, the computation of dates and deadlines set forth herein shall be in accordance with Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

|  | |
|---|---|
|  | • entry of the Confirmation Order; |
|  | • the PVA Entities shall not be in default under the debtor-in-possession credit agreement (the "DIP Credit Agreement") or the DIP Orders (or, to the extent that the PVA Entities have been in default or are in default on the proposed Effective Date, such default shall have been waived by the lenders thereunder or cured by the PVA Entities in a manner consistent with the DIP Credit Agreement and/or the DIP Orders); |
|  | • entry into the Exit Facility (with all conditions precedent thereto having been satisfied or waived); |
|  | • the Backstop Commitment Agreement shall not have been terminated and remains in full force and effect (with all conditions precedent thereto having been satisfied or waived); |
|  | • solely to the extent not in violation or breach of the Exit Facility, establishment of a professional fee escrow funded in the amount of estimated (with the reasonable consent of the Required Consenting Creditors, which consent shall not be unreasonably withheld) accrued but unpaid professional fees incurred by the PVA Entities during the Chapter 11 Cases; and |
|  | • all requisite governmental authorities and third parties will have approved or consented to the Restructuring, to the extent required. |
| Status Upon Emergence | The PVA Entities shall use commercially reasonable efforts to prepare to be a publicly listed company shortly after the Effective Date, provided, however, that any such decision of publicly listing the new equity in reorganized Penn Virginia Corporation (the "New Common Stock") on such an exchange will be determined by the New Board (as defined below).  In addition, the PVA Entities shall use commercially reasonable efforts to quote the New Common Stock on the OTC Markets Group Inc. electronic interdealer quotation system, including OTCQX, OTCQB and OTC Pink, or any similar quotation system or association promptly after the Effective Date. |
| Registration Rights | Customary for any Backstop Party to the extent it receives any "restricted" or "control" New Common Stock under the Securities Act of 1933, as amended. |
| Rights Offering | As set forth in the Rights Offering Procedures, the Rights Offering shall be a private placement conducted pursuant to section 4(a)(2) of the Securities Act of 1933, as amended. |
| Releases | The exculpation provisions, the Debtor releases, and the "Third-Party" releases to be included in the Plan will be as set forth on **Exhibit 1** attached hereto in all material respects.<br><br>The Consenting RBL Lenders, Consenting Noteholders, DIP Lenders, Backstop Parties, and Exit Facility Lenders, will, pursuant to the RSA, agree not to "opt out" of the consensual "third party" releases, including those granted to the PVA Entities' current and former officers, directors, and employees. |
| Employee Matters | Matters with respect to management and employees in connection with the Restructuring will be addressed in accordance with the term sheet set forth on **Exhibit 2** attached hereto. |
| New Board | Reorganized Penn Virginia's board of directors (the "New Board") will be chosen by the Majority Consenting Noteholders and identified at or prior to the Confirmation Hearing. |

| Indemnification Obligations | The PVA Entities' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the directors and the officers that are currently employed by, or serving on the Board of Directors of, any of the PVA Entities (including with respect to H. Baird Whitehead in his former capacity as an employee of the PVA Entities, including as Chief Executive Officer of Penn Virginia, and in his current capacity as a director of Penn Virginia), as of the Petition Date, shall be assumed pursuant to the Plan. |
|---|---|
| Release of Avoidance Actions | Subject to diligence by the advisors to the Consenting Noteholders and the PVA Entities completed prior to the Petition Date, any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code (collectively, the "Avoidance Actions") shall be released pursuant to the Plan, except for Avoidance Actions brought as counterclaims, offsets, or defenses to claims asserted against the PVA Entities or in the exercise of the rights of any PVA Entity under section 502(d) of the Bankruptcy Code; provided, that, such exception shall not apply to any claims asserted against the PVA Entities by the RBL Lenders in their capacities as such. |
| Business Plan | The PVA Entities shall operate their businesses in accordance with a business plan, agreed to by and among the Consenting RBL Lenders, the Consenting Noteholders, and the Backstop Parties on or before the Petition Date. |

| Treatment of Claims and Interests Under the Plan | |
|---|---|
| **Claim** | **Proposed Treatment** |
| Administrative and Priority Claims | Paid in full, in cash on the Effective Date, or as otherwise determined in the discretion of the reorganized PVA Entities. |
| DIP Claims | DIP Claims (other than claims under any DIP hedges that have not been terminated prior to the Effective Date) shall be paid in cash in full, funded from cash on hand and proceeds of the Exit Facility and the Rights Offering, on the Effective Date. |
| Other Secured Debt | Unimpaired under the Plan. |
| RBL Claims | To the extent not paid pursuant to the DIP Credit Agreement, paid in full in cash, funded from cash on hand and proceeds of the Exit Facility and the Rights Offering, on the Effective Date. |
| Notes Claims | Convert into an aggregate of 100% of the New Common Stock on the Effective Date (on a pro rata basis with holders of Allowed Notes Claims and Allowed General Unsecured Claims), subject to dilution on account of the Management Incentive Plan Equity, any fees payable in New Common Stock under the terms of the Backstop Commitment Agreement (including the Commitment Premium), and the New Common Stock issued in the Rights Offering. Additionally, each holder of an allowed Note Claim shall be entitled to participate in the Rights Offering in accordance with the Backstop Commitment Agreement, the RSA, the Plan, and the Rights Offering Procedures. |

| General Unsecured Claims | Convert into an aggregate of 100% of the New Common Stock on the Effective Date (on a pro rata basis with holders of Allowed General Unsecured Claims and Allowed Notes Claims), subject to dilution on account of the Management Incentive Plan Equity, any fees payable in New Common Stock under the terms of the Backstop Commitment Agreement (including the Commitment Premium), and the New Common Stock issued in the Rights Offering. |
|---|---|
| Existing Equity Interests | No recovery and shall be cancelled, extinguished, and discharged. |

\*      \*      \*      \*

5

**Exhibit 1** **to Term Sheet**

**Release and Exculpation Provisions to be Included in the Plan**

**Defined Terms**

1.  "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

2.  "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

3.  "*Backstop Commitment Agreement*" means the Backstop Commitment Agreement attached as <u>Exhibit C</u> to the Restructuring Support Agreement pursuant to which the Backstop Parties have agreed to backstop the Rights Offering.

4.  "*Backstop Parties*" means certain Noteholders that have agreed to backstop the Rights Offerings and are signatories to the Backstop Commitment Agreement, solely in their capacities as such.

5.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

6.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division) or another court having jurisdiction over the Chapter 11 Cases.

7.  "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

8.  "*Causes of Action*" means any and all claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against insiders and/or any other Entities under the Bankruptcy Code) of any of the Debtors and/or the Debtors' estates, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced by the Reorganized Debtors after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

9.  "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

10. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

11. "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

12. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

13. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

14. "*Confirmation Order*" means a Final Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1

15.    "*Consenting Noteholders*" means each Noteholder that is party to the Restructuring Support Agreement, solely in its capacity as such.

16.    "*Consenting RBL Lender*s" means each RBL Lender that is party to the Restructuring Support Agreement, solely in its capacity as such.

17.    "*Consummation*" means the occurrence of the Effective Date.

18.    "*Debtors*" means, collectively, each of the following:  Penn Virginia Corporation; Penn Virginia Holding Corp.; Penn Virginia MC Corporation; Penn Virginia MC Energy L.L.C.; Penn Virginia MC Operating Company L.L.C.; Penn Virginia Oil & Gas Corporation; Penn Virginia Oil & Gas GP LLC; Penn Virginia Oil & Gas LP LLC; and Penn Virginia Oil & Gas, L.P.

19.    "*DIP Agent*" means Wells Fargo Bank, N.A., or any successor thereto, as administrative agent under the DIP Facility, solely in its capacity as such.

20.    "*DIP Credit Agreement*" means that certain senior secured debtor-in-possession credit agreement, dated as of May 11, 2016, as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors, the DIP Lenders, and the DIP Agent.

21.    "*DIP Facility*" means that certain $25 million debtor-in-possession financing facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement.

22.    "*DIP Lenders*" means each of the lenders and their Affiliates under the DIP Facility, solely in their capacity as such.

23.    "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Penn Virginia Corporation and its Debtor Affiliates* [Docket No. _____], dated as of May 12, 2016, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law, in form and substance reasonably acceptable to the Required Consenting Creditors.

24.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in <u>Section 9.1</u> of the Plan have been satisfied or waived in accordance with <u>Section 9.2</u> of the Plan.

25.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

26.    "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

27.    "*Exculpated Parties*" means each of the following, solely in its capacity as such:  (i)(a) the Debtors; (b) the Reorganized Debtors, and (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the RBL Lenders; (b) the Noteholders; (c) the DIP Lenders; (d) the DIP Hedge Lenders; (e) the Backstop Parties; (f) the Exit Facility Lenders; (g) the Indenture Trustee; (h) the RBL Agent; (i) the DIP Agent; (j) the Exit Facility Agent; (k) the Consenting Noteholders; (l) the Consenting RBL Lenders; and (m) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(l), each of such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board

2

members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

28.    "*Exit Facility*" means the new reserve-based lending facility credit agreement to be entered into by the Reorganized Debtors on the terms set forth in the Exit Facility Term Sheet and the Exit Commitment Letters attached to the Restructuring Support Agreement as Exhibit D and Exhibit E, respectively.

29.    "*Exit Facility Agent*" means the administrative agent and collateral agent under the Exit Facility, or any successor thereto, solely in its capacity as such.

30.    "*Exit Commitment Letters*" means the commitment letter attached to the Restructuring Support Agreement as Exhibit E and related fee letters with respect thereto setting forth the Exit Facility Lenders' commitment to provide the Exit Facility and the fees related thereto.

31.    "*Exit Facility Lenders*" means each of the lenders and their Affiliates under the Exit Facility, solely in their capacity as such.

32.    "*Exit Facility Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Exhibit D setting forth the terms and conditions of the Exit Facility.

33.    "*Indenture*" means that certain Senior Indenture, dated as of June 15, 2009, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, for the 7.250% Senior Notes due 2019 and the 8.500% Senior Notes due 2020 among Penn Virginia, each of the guarantors party thereto, and the Indenture Trustee.

34.    "*Indenture Trustee*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as trustee under the Indenture.

35.    "*Intercompany Interest*" means, other than an Interest in Penn Virginia, an Interest in one Debtor or Non Debtor Subsidiary held by another Debtor.

36.    "*Interest*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including, without limitation, the Preferred Stock, and the Penn Virginia Common Stock, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing, *provided*, *however*, that the term "Interests" shall not include the Intercompany Interests.

37.    "*Notes*" means the 7.250% Senior Notes due 2019 and the 8.500% Senior Notes due 2020, in each case issued pursuant to the Indenture.

38.    "*Noteholders*" means holders of the Notes, solely in their capacity as such.

39.    "*Penn Virginia*" means Penn Virginia Corporation, a Virginia corporation, the ultimate parent of each of the Debtors and the predecessor to Reorganized Penn Virginia.

40.    "*Penn Virginia Common Stock*" means Penn Virginia's authorized and issued common stock outstanding as of the Effective Date.

41.    "*Petition Date*" means the date on which each of the Debtors filed its respective petition for relief commencing the Chapter 11 Cases.

42.    "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

43.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), to be Filed by the Debtors no later than 14 days before the Confirmation Hearing, and additional documents or amendments to previously Filed documents, Filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the Exit Facility Documents; (b) the New Organizational Documents; (c) a list of retained Causes of Action; (d) the New Shareholders' Agreement; (e) the Description of Transaction Steps; (f) the Registration Rights Agreement; (g) the Schedule of Assumed Executory Contracts and Unexpired Leases; (h) the Schedule of Rejected Executory Contracts and Unexpired Leases; (i) the Backstop Commitment Agreement, including all exhibits and schedules thereto; and (j) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with the Restructuring Support Agreement.

44.    "*Preferred Stock*" means all issuances of preferred stock issued by any of the Debtors prior to the Petition Date, including: (a) the Series A 6% Convertible Perpetual Preferred Stock; and (b) the Series B 6% Convertible Perpetual Preferred Stock.

45.    "*RBL Agent*" means Wells Fargo Bank, N.A., or any successor thereto, as administrative agent under the RBL Credit Agreement, in its capacity as such.

46.    "*RBL Credit Agreement*" means that certain Credit Agreement, dated as of September 28, 2012, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, by and among Penn Virginia Holding Corporation, as borrower, Penn Virginia, as parent, each of the guarantors party thereto, the RBL Agent, and the RBL Lenders.

47.    "*RBL Lenders*" means the lenders and their Affiliates party to the RBL Credit Agreement, in their capacities as such.

48.    "*Released Parties*" means each of the following, solely in its capacity as such:  (i)(a) the Debtors; (b) the Reorganized Debtors, and (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the RBL Lenders; (b) the Noteholders; (c) the DIP Lenders; (d) the DIP Hedge Lenders (e) the Backstop Parties; (f) the Exit Facility Lenders; (g) the Indenture Trustee; (h) the RBL Agent; (i) the DIP Agent; (j) the Exit Facility Agent; (k) the Consenting Noteholders; (k) the Consenting RBL Lenders; and (l) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(k), each of such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided, however*, that any holder of a Claim or Interest that opts out of the releases contained in, or otherwise objects to, the Plan shall not be a "Released Party."

49.    "*Releasing Parties*" means collectively, and in each case solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the RBL Lenders; (d) the DIP Hedge Lenders (e) the Noteholders; (f) the DIP Lenders; (g) the Backstop Parties; (h) the Exit Facility Lenders; (i) the Indenture Trustee; (j) the RBL Agent; (k) the DIP Agent; (l) the Exit Facility Agent; (m) all holders of Claims and Interests that are deemed to accept the Plan; (n) all holders of Claims who vote to accept the Plan; (o) all holders of Claims

in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; and (p) with respect to the foregoing clauses (a) through (o), each such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided*, *however*, that any holder of a Claim that opts out of the releases contained in the Plan shall not be a "Releasing Party."

50.     "*Reorganized Debtor*" means a Debtor, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

51.     "*Reorganized Penn Virginia*" means Penn Virginia, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

52.     "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated May 10, 2016, by and among the Debtors and the Restructuring Support Parties, including all exhibits thereto.

53.     "*Restructuring Support Parties*" means, collectively, the Consenting Noteholders, the Consenting RBL Lenders, the DIP Lenders, and the Backstop Parties, in each case, that are party to the Restructuring Support Agreement.

54.     "*Restructuring Term Sheet*" means the term sheet attached as <u>Exhibit A</u> to the Restructuring Support Agreement setting forth the terms and conditions of the Debtors' comprehensive balance sheet restructuring.

55.     "*Rights Offering*" means the rights offering that is backstopped by the Backstop Parties in connection with the Restructuring Transactions pursuant to the Backstop Commitment Agreement and in accordance with the Rights Offerings Procedures (including the Subscription Agreement).

**Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Action brought as counterclaims or defenses to Claims asserted against the Debtors), the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Rights Offering, the DIP Facility, the Exit Facility, the DIP Credit Agreement, the Backstop Commitment Agreement, the Exit Commitment Letters, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that

5

is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**Releases by Holders of Claims and Interests**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Rights Offering, the DIP Facility, the Exit Facility, the DIP Commitment Letters, the Backstop Commitment Agreement, the Exit Commitment Letters, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

**Exculpation**

Notwithstanding anything contained herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in

connection with the Disclosure Statement, the Plan, the Plan Supplement, the Restructuring Support Agreement, the Rights Offering, the DIP Facility, the Exit Facility, the DIP Credit Agreement, the Backstop Commitment Agreement, the Exit Commitment Letters, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Exhibit 2** to Term Sheet

**Term Sheet Regarding Employee Matters**

_Revised Incentives for Management through Bankruptcy Pursuant to New Agreements_[3]

The Company will enter into new 5-month employment agreements effective as of the RSA effective date (the "Short-Term Agreements") with each of John A. Brooks and Nancy M. Snyder.  The Company will enter into a new employment agreement (together with the Short-Term Agreements, the "Agreements") with Steven A. Hartman.  The term of Mr. Hartman's Agreement will begin on the RSA effective date and end on the date that is 18 months thereafter, unless terminated by either Mr. Hartman or the board of directors of the reorganized entity (the "New Board") in accordance with its terms.

The Agreements will supersede the Change of Control Severance Agreements,[4] Relocation Agreement and all other prior agreements between the Executive and the Company in their entirety and be assumed as of the Company's emergence from bankruptcy (the "Emergence") pursuant to the plan of reorganization (the "Plan").  The finalized Agreements will be subject to review and comments by the Ad Hoc Committee and will contain other market terms, including customary restrictive covenants.

Terms of Proposal:

Base Salary:  As of the RSA effective date, Mr. Hartman's base salary will be reduced to $250,000 per annum.  Mr. Brooks and Ms. Snyder will continue receiving their current annualized base salaries of $385,000 and $335,000, respectively.  The Company will provide Mr. Hartman with market relocation assistance with respect to his move to the Houston metropolitan area.

Emergence Bonus:  Mr. Brooks and Ms. Snyder will each be paid an emergence bonus equal to $500,000, if Emergence occurs on or by 10/31/16 (a "Qualifying Emergence") and either (i) he or she remains employed with the Company through the Qualifying Emergence or (ii) he or she was terminated by the Company without "cause" before the Qualifying Emergence.

Severance:  If Mr. Hartman is terminated without "cause" or for "good reason" before the six month anniversary of Emergence, he will be entitled to 18 months of continued base salary (subject to the execution of general release).  If Mr. Hartman is terminated without cause after the six month anniversary of the date of Emergence, he will be entitled to 12 months of continued base salary.

MIP:  The MIP pool will consist of up to [●]%[5] of the reorganized Company's stock determined on a fully-diluted basis.  The New Board will determine the allocation and other terms and conditions of MIP participation; provided that Mr. Hartman will receive an award of restricted stock (or economic equivalent) with a grant date value equal to $600,000 based on the Company value provided for in the Plan (the "Initial Equity Award"), so long as he is employed at the time of Emergence.  The Initial Equity Award will vest over 3 years and be subject to such other terms and conditions as determined by

---

[3]     Note, these proposals are made only with respect to S. Hartman, J. Brooks, and N. M. Snyder (each, an "Executive").

[4]     For the avoidance of doubt, each Executive will waive any and all claims the Executive may have to payments or benefits under the applicable Change of Control Severance Agreement.

[5]     To be disclosed at or prior to the hearing to approve the Company's Disclosure Statement.

1

the New Board; provided that in the event Mr. Hartman is terminated without "cause" or for "good reason", the next tranche of the Initial Equity Award will vest.

Release:  The Agreements will provide for a mutual general release of claims (including release of Executives' prepetition claims and any claims in respect of the SERP).

Consulting Agreement:  Upon Emergence, the reorganized Company will enter into a non-exclusive consulting agreement with Nancy M. Snyder (the "Consulting Agreement") in lieu of extending her Short-Term Agreement.  The Consulting Agreement will provide for a term of twelve months and payment of a monthly fee of $15,000 to Ms. Snyder for her services, so long as her employment has not been terminated for "cause" (gross negligence, willful misconduct or conviction of a felony), or due to death, disability or her voluntary resignation.  During the term of the Consulting Agreement, Ms. Snyder will report to the Chief Executive Officer, or his or her designee, and will provide consulting services as reasonably requested by the Company.

Treatment of Prepetition Obligations:  All outstanding PBRSUs and RSUs will be cancelled without payment of any consideration pursuant to release.

### Severance and Revised Incentives for Rank & File Employees During Chapter 11

The Company will establish a Key Employee Retention Plan ("KERP") with annual payments not to exceed $2.0 million in the aggregate.

Upon a Company termination other than for "cause" on or prior to the 6 month anniversary of the confirmation date of the Plan, a KERP participant will receive as his or her severance the greater of (a) up to 13 weeks of base salary (taking into account seniority based on the Company's historical practices) and (b) the balance of any unpaid KERP payments.  The severance payment contemplated by the foregoing clause (a) will be consistent with the total amounts previously provided to the Ad Hoc Committee in the 4.30.16 Comp Summary.

As a condition to participation in the KERP or to otherwise receiving severance, participants in the KERP or individuals who otherwise receive severance will be required to waive all prepetition claims he or she may have relating to prior employment or compensation arrangements, including, without limitation, any applicable Change of Control Severance Agreement, Relocation Agreement, or other severance agreement.  All outstanding long-term incentives will receive the treatment set forth in the Plan.

### Baird Whitehead

In full and final satisfaction of any and all claims that Mr. H. Baird Whitehead may have, or now has, against any of the PVA Entities in his former capacity as an employee of the PVA Entities (including as Chief Executive Officer of Penn Virginia) and in his current capacity as a director of Penn Virginia, and in exchange for inclusion in the debtor release, third-party release, exculpation, and indemnification provisions contained in the Plan as they relate to Mr. Whitehead in his former capacity as an employee of the PVA Entities (including as Chief Executive Officer of Penn Virginia) and in his current capacity as a director of Penn Virginia, Mr. Whitehead shall receive, on the Effective Date, a total recovery comprised of: (a) $110,000, paid in cash; and (b) at Mr. Whitehead's election, (i) $110,000, paid in cash, or (ii) an allowed general unsecured claim in an amount that would result in Mr. Whitehead receiving a recovery under the Plan on such

2

claim that would be valued (at plan valuation) at $110,000; provided, however, that the foregoing release by Mr. Whitehead shall not extend to (1) any claims to indemnification or insurance coverage to which Mr. Whitehead may be entitled under the PVA Entities' certificates of incorporation, bylaws, indemnification agreements, directors and officers insurance policies or applicable law with respect to the period of Mr. Whitehead's employment by the PVA Entities (including as Chief Executive Officer of Penn Virginia), and (2) any claims or rights that Mr. Whitehead cannot waive by law (*e.g.*, any right to workers' compensation).

**Exhibit B** **to the Restructuring Support Agreement**

**DIP Term Sheet**

## $25 MILLION SECURED SUPERPRIORITY DEBTOR IN POSSESSION
## CREDIT FACILITY

### SUMMARY OF TERMS AND CONDITIONS

This preliminary, non-binding summary of terms and conditions (this "*Term Sheet*") shall be governed by Rule 408 of the Federal Rules of Evidence and any and all similar and applicable rules and statutory provisions governing the non-admissibility of settlement discussions.

This Term Sheet outlines certain preliminary terms of the proposed DIP Facility referred to below. This Term Sheet was prepared for discussion purposes only and does not constitute a commitment to provide any financing to the Borrower. Each party referred to herein is free to terminate discussions with respect to the DIP Facility at any time.

| | |
|---|---|
| **Borrower:** | Penn Virginia Holding Corp. (the "*Borrower*"), in its capacity as a debtor and debtor-in-possession in a case to be filed under chapter 11 of the United States Bankruptcy Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division) (the "*Bankruptcy Court*") (the date of such filing, "*Petition Date*"). |
| **Guarantors:** | Penn Virginia Oil & Gas Corporation, Penn Virginia Oil & Gas GP LLC, Penn Virginia Oil & Gas LP LLC, Penn Virginia Oil & Gas, L.P. (TX L.P.) (by Penn Virginia Oil & Gas GP LLC, its general partner), Penn Virginia MC Corporation, Penn Virginia MC Energy L.L.C., and Penn Virginia MC Operating Company L.L.C. (collectively, the "*Guarantors*"). |
| **Cases:** | The bankruptcy cases of the Borrower, Penn Virginia Corporation (the "*Parent*") and each of the Guarantors (collectively, the "*Debtors*") to be filed under chapter 11 of the Bankruptcy Code (the "*Cases*") with the Bankruptcy Court on the Petition Date. |
| **Agent:** | Wells Fargo Bank, National Association, shall act as administrative agent and collateral agent for the DIP Facility (in such capacity, the "*DIP Agent*") on behalf of the Lenders (as defined below). |
| **Prepetition Secured Facilities:** | (a) That certain Credit Agreement, dated as of September 28, 2012 (as amended, restated, modified, supplemented or replaced from time to time prior to the Petition Date, the "*Existing Credit Agreement*"), among the Borrower, the Parent, Wells Fargo Bank, National Association, as administrative agent ("*Prepetition Agent*") and the lenders party thereto (the "*Prepetition Lenders*"), |
| | (b) Those certain Lender Party Swap Agreements (as defined in the Existing Credit Agreement) and |
| | (c) Those certain Lender Party Financial Service Products (as defined in the Existing Credit Agreement) |
| | (collectively, the facilities, agreements and products described in |

clauses (a) - (c), the "*Prepetition Secured Facilities*" and each secured party thereunder, the "*Prepetition Secured Parties*").

**Lenders:**

Those Prepetition Secured Parties and/or their affiliates who elect to participate in the DIP Facility and any of their respective successors and assigns in accordance herewith (the "*Lenders*"). The "*Requisite Lenders*" shall mean Lenders holding more than fifty percent (50.0%) of the outstanding aggregate principal amount of the Loans (as defined below).

**Noteholders and Related Agreements:**

Certain holders of the 7.250% Senior Notes due 2019 and the 8.500% Senior Notes due 2020 (together, the "*Notes*"), in each case issued pursuant to that certain Senior Indenture, dated as of June 15, 2009 (the "*Indenture*") among the Parent, each of the guarantors party thereto, and Wells Fargo Bank, National Association as indenture trustee, have entered into a Restructuring Support Agreement with the Parent, the Borrower and the their affiliates dated as of May 10, 2016 (the "*RSA*"); and certain holders of the Notes (the "*Backstop Parties*") have entered into the Backstop Commitment Agreement (as defined in the RSA) (the "*BCA*") under which the Backstop Parties have agreed to fund a rights offering in the aggregate amount of $50 million pursuant to the terms set forth in the BCA and the RSA, including the exhibits thereto.

**Operative Documents:**

The definitive documentation for the DIP Facility (the "*Operative Documents*") shall be based upon the Existing Credit Agreement as modified to reflect this Term Sheet and subject to the terms hereof and other adjustments customarily found in the loan agreements for debtor in possession financings as agreed to by the DIP Agent and the Borrower (as adjusted pursuant to terms herein, the "*Documentation Principles*"). The definitive credit agreement for the DIP Facility shall be subject to the Documentation Principles and shall be referred to herein as the "*DIP Credit Agreement*".

**DIP Facility:**

1. A non-amortizing senior secured new money facility in a principal amount of up to $25 million, composed of:

(a) $10 million of new money loans, which will be made available to the Borrower following the entry of the Interim Order (as defined below) (the "*Interim DIP Facility*" and the term loans thereunder, the "*Interim DIP Loan*"), subject to the conditions precedent set forth under "Conditions Precedent to Effectiveness and Interim DIP Loan" below;

(b) up to $10 million of additional new money loans, plus any undrawn amounts of the Interim DIP Facility, which will be made available to the Borrower following the entry of the Final Order (as defined below) (the "*Final DIP Facility*" and the term loans

2

thereunder, the "*Final DIP Loan*"), subject to the conditions precedent set forth under "Conditions Precedent to Final DIP Loan" below; and

(c) up to $5 million of new money loans, plus any undrawn amount of the Interim DIP Facility and Final DIP Loan (which, for the sake of clarity, when combined with the Interim DIP Loan and Final DIP Loan, will aggregate to an amount not to exceed $25 million), which will be made incrementally available to the Borrower on a weekly basis following the entry of the Final Order (as defined below), subject to the conditions precedent set forth under "Conditions Precedent to each Conditional DIP Loan" below (the "*Conditional DIP Facility*" and each of the term loans thereunder, a "*Conditional DIP Loan*" and, together with the Interim DIP Facility and the Final DIP Facility, the "*DIP Facility*"). As of the date of any requested Conditional DIP Loan, the aggregate amount available to the Borrower to draw as part of the Conditional DIP Loan shall be the lesser of (a) the maximum amount subject to which the Borrower is in pro forma compliance with the Anti-Hoarding Condition (as hereinafter defined) and (b) the amount of the undrawn Conditional DIP Loan as of such date.

The Interim DIP Loan, the Final DIP Loan and the Conditional DIP Loan shall be referred to herein collectively as the "*Loans*" and all accrued and unpaid interest, fees, expenses and other amounts outstanding in connection with the Loans shall become due and payable on the Maturity Date (as defined below).

2. Commodity hedge transactions pursuant to Master ISDA and Schedules on terms to be agreed between the parties thereto and entered into following entry of the Hedging Order (as defined below) (the "*DIP Hedges*"). With respect to any DIP Hedge entered into between any Debtor and any Lender (or an affiliate of any Lender), such Lender (or affiliate thereof) shall be a "*Hedge Lender*." The DIP Hedges will continue post-confirmation and, to the extent entered into between a Debtor and Hedge Lender, will share the same security in the same collateral granted in connection with the exit facility in accordance with the terms of the Exit Facility Term Sheet attached as Exhibit D to the RSA (the "*Exit Facility*").

**Borrowing Procedure:**     Borrowing of each Loan shall be made upon at least three (3) business days' notice to the Lenders by the Borrower or such shorter period as may be agreed to by the Requisite Lenders in their sole discretion.

**Term of DIP Facility:**     The period from the Closing Date (as defined below) to the earliest of (i) the Scheduled Maturity Date; (ii) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to

3

Section 363 of the Bankruptcy Code or otherwise; (iii) the effective date of a plan of reorganization or liquidation in the Cases; (iv) the date of filing or support by the Borrower of a plan of reorganization or liquidation that does not provide for indefeasible payment in full in cash of all obligations owing under the DIP Facility; (v) the entry of an order by the Bankruptcy Court (x) approving the appointment of a bankruptcy trustee or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, (y) dismissing any of the Cases, or (z) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (vi) the date of termination of the Lenders' commitments and the acceleration of any outstanding extensions of credit, in each case, under the DIP Facility in accordance with the terms of the Operative Documents (the earliest such date, the "*Maturity Date*"); <u>provided</u>, that the Maturity Date may be extended as agreed in writing by the Debtors and each Lender for an additional period not to exceed three (3) months without further approval of the Bankruptcy Court; <u>provided further,</u> if the Debtors have entered into an asset purchase agreement with a third party for a sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code, and the Bankruptcy Court has entered an order approving bidding procedures for an auction with a stalking-horse bidder, prior to the Scheduled Maturity Date, the Maturity Date may be extended as agreed in writing by the Debtors and Lenders holding more than sixty-six and two-thirds percent (66-2/3%) of the outstanding aggregate principal amount of the Loans for an additional period not to exceed three (3) months without further approval of the Bankruptcy Court.

"*Scheduled Maturity Date*" shall mean the date that is 150 days after the Petition Date.

| | |
|---|---|
| **Effective Date:** | The date on which the Conditions Precedent to the effectiveness of the DIP Credit Agreement below shall have been satisfied (the "*Effective Date*"). |
| **Closing Date:** | The date on which the Conditions Precedent to the Interim DIP Facility below shall have been satisfied (the "*Closing Date*"). |
| **Purpose:** | The proceeds of the Interim DIP Loan shall be used by the Borrower (i) to pay certain costs, fees and expenses related to the Cases, including professional fees, (ii) to pay Adequate Protection Payments (as defined below), and (iii) to fund the working capital needs, capital improvements and expenditures of the Debtors during the Case, in each case in accordance with the Initial Budget (as defined below) in form and substance acceptable to the Requisite Lenders and the Budget (as defined below) in form and substance reasonably acceptable to the Requisite Lenders, in each case including the Budget Variances. From and after entry of the Final |

4

Order, the proceeds of the Final DIP Loan shall be used by the Borrower (i) to pay fees, costs and expenses, including professional fees, (ii) to fund the working capital and capital expenditure needs of the Debtors during the Cases (including any Adequate Protection Payments), in each case in accordance with the Budget, in form and substance reasonably acceptable to the Requisite Lenders, including the Budget Variances.

Proceeds of the DIP Facility shall not be used (i) to permit the Borrower, any Guarantor or any of their representatives to directly or indirectly challenge or otherwise contest or institute any proceeding to determine (x) the validity, perfection or priority of security interests in favor of any of the Lenders or the Prepetition Secured Parties, or (y) the enforceability of the obligations of the Borrower or any Guarantor under the DIP Facility or the Prepetition Secured Facilities, (ii) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against any of the Lenders or the Prepetition Secured Parties, each in such capacity, and their respective agents, attorneys, advisors or representatives, including, without limitation, any lender liability claims or subordination claims, or (iii) to fund acquisitions, capital expenditures, capital leases, or any other expenditure (other than professional fees) other than as set forth in the Budget or the Carve-Out. This provision shall not restrict the use of up to $50,000 by any Official Committee of Unsecured Creditors appointed in the Cases (the "*Committee*") for legal fees incurred during a challenge period commencing the date of the appointment of the Committee and expiring 60 calendar days after such appointment (the "*Investigation Period*") solely for the purpose of investigating the liens and claims of the Prepetition Secured Parties pursuant to the Prepetition Secured Facilities and related documents (the "*Committee Investigation*").

Any proceeds resulting from monthly settlement payments under the DIP Hedges or the termination of the DIP Hedges shall be applied against the DIP Loans.

**Interest Rates and Fees:**       Loans under the DIP Facility will bear interest at a rate *per annum* of the Adjusted LIBO Rate plus 6.00% per annum, accruing daily and payable monthly in cash in arrears.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year (except that interest computed by reference to the alternate base rate shall be calculated on the basis of a 365/366-day year).

The DIP Agent shall receive an administration fee of $125,000, which fee will be earned, due and payable on the Closing Date.

5

The Lenders shall receive a closing fee of 0.50% of the aggregate principal amount of Loans advanced, on a pro rata basis earned, due and payable on the date of each such advance (other than any readvance).

The Lenders shall receive a commitment fee equal to 0.50% of the undrawn portion of the Loans, accruing daily and payable monthly in cash in arrears.

During the continuance of an Event of Default (as defined below), any Loans outstanding under the DIP Facility will bear interest at an additional 2.0% *per annum*.

Upon any extension of the Maturity Date in accordance with this Term Sheet, the Lenders shall receive an extension fee equal to (i) for any extension not exceeding three (3) months, 0.25% *per annum* of the aggregate principal amount of the Loans, (ii) for any extension exceeding three (3) months but not exceeding six (6) months, 0.50% *per annum* of the aggregate principal amount of the Loans, and (iii) for any extension exceeding six (6) months, 1.00% *per annum* of the aggregate principal amount of the Loans, in each case on a pro rata basis payable in cash upon the effective date of such extension.

**Optional Prepayments and Commitment Reductions:**

The Borrower may, upon at least one (1) business day's notice, prepay in full or in part, without premium or penalty, the Loans; *provided* that each such partial prepayment shall be in a minimum aggregate amount of $1 million and multiples of $500,000 in excess thereof.

Prior to the date that the Final DIP Loan is funded, the Borrower may reduce the commitments of the Lenders to fund the Final DIP Loan upon at least one (1) business day's notice; *provided* that each such reduction shall be in an amount of $1 million and multiples of $500,000 in excess thereof.

**Mandatory Prepayments:**

Mandatory prepayments of the Loans shall be required in an amount equal to (i) 100% of the net cash proceeds from asset sales or series of related asset sales (other than ordinary course sales of hydrocarbons and sales of immaterial equipment no longer used or useful in the business and provided that the application of proceeds in excess of $8 million from the Granite Wash sale shall be subject to re-advance hereunder), (ii) 100% of insurance and condemnation proceeds (other than the approximate $1 million in insurance proceeds expected to be received on account of a casualty event that occurred in 2014), and (iii) 100% of net cash proceeds from the issuance of post-petition indebtedness or equity, in each case subject to customary carve-outs, exceptions and, with respect to clauses (i) and (ii), reinvestment rights, to be agreed upon, in each

6

case received by the Borrower or any of the Guarantors. Any proceeds retained in accordance with this section shall be deposited into a controlled account with the DIP Agent.

**Priority:**

All amounts owing by the Borrower under the DIP Facility and the DIP Hedges, and by the Guarantors in respect thereof, will at all times constitute allowed super-priority administrative expense claims in the Cases against each of the Debtors, jointly and severally, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) or any other provisions of the Bankruptcy Code, subject only to the Carve-Out (as hereinafter defined). The "Carve-Out" shall have the meaning assigned to such term in the Interim Order.

All liens authorized and granted pursuant to the Interim Order (as defined below) or the Final Order (as defined below) entered by the Bankruptcy Court approving the DIP Facility and the DIP Hedges shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. The Lenders, or the DIP Agent on behalf of the Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under state law in order to reflect the security, perfection or priority of the Lenders' claims described herein.

**Credit Bidding:**

The DIP Facility shall include a provision that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code, a Chapter 11 plan of reorganization, or any equivalent thereof under any other law, that the DIP Agent, at the direction of the Requisite Lenders, shall have the absolute right to credit bid any portion, up to the full amount, of all obligations under the DIP Facility.

**Security:**

All amounts owing by the Borrower under the DIP Facility and by the Guarantors in respect thereof will be secured, subject to the Carve-out, by first priority valid, binding, continuing, enforceable, fully-perfected security interests in and liens (the "*DIP Liens*") upon all assets of the Debtors (including, without limitation and subject to entry of the Final Order, on the proceeds of any avoidance actions available to the Debtors' bankruptcy estate pursuant to the Bankruptcy Code and the proceeds of any litigation claims available to the Debtors (but not, for the avoidance of doubt, the avoidance actions or litigation) (the "*Collateral*").

All amounts owing by the Debtors under the DIP Hedges will be secured, subject to the Carve-out, by the DIP Liens upon the Collateral.

7

Such liens and security interests granted under the DIP Facility and the DIP Hedges will prime and be senior to the liens and security interests of the Prepetition Secured Parties in the Prepetition Collateral (as defined below), and shall be junior only to (i) the Carve-out, (ii) valid, perfected, enforceable and unavoidable liens in existence as of Closing, which were senior in priority to the liens and security interests of the Prepetition Secured Parties in the Prepetition Collateral as of the Closing, (iii) valid, enforceable and unavoidable liens in existence as of Closing that are perfected subsequent to Closing as permitted by section 546(b) of the Bankruptcy Code and (iv) other liens and encumbrances permitted by the Operative Documents.

The Borrower and Guarantors shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system; *provided, however,* that the Borrower shall only be allowed to withdraw or transfer from its accounts amounts necessary to fund expenses of the Borrower and its subsidiaries for the immediately following week as set forth in the Budget. Any material changes from such prepetition cash management system must be acceptable to the Requisite Lenders in their reasonable discretion. The Interim Order (as defined below) and the Final Order (as defined below) shall provide the Lenders (including the Hedge Lenders in such capacity) with a valid, perfected and enforceable first priority security interest in and lien on the cash held in the Borrower's and each Guarantor's bank accounts.

The Lenders shall be granted in each of the Interim Order and the Final Order a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Facility with *pari passu* priority to the Hedge Admin Claim and priority above all other administrative claims, subject to the Carve-out (the "DIP Admin Claim").

The Hedge Lenders shall be granted in each of the Hedging Order, the Interim Order and the Final Order a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Hedges with *pari passu* priority to the DIP Admin Claims and priority above all other administrative claims, subject to the Carve-out (the "Hedge Admin Claim").

"Hedging Order" means the "Order Authorizing the Debtors to (I) Enter into New Lender Party Swap Agreements, (II) Pledge Collateral, Grant Superpriority Claims, and Honor Obligations Thereunder, and (III) Granting Related Relief."

Notwithstanding anything to the contrary herein, in the DIP Hedges or in the Operative Documents, the obligations under the DIP

8

Facility and the obligations under the DIP Hedges shall be treated *pari passu* in respect of priority of payment and liens in all respects.

Subject to entry of the Final Order, no costs or expenses of administration shall be imposed against the Lenders', the Hedge Lenders', or the Prepetition Secured Parties' prepetition or postpetition collateral under Section 506(c) of the Bankruptcy Code.

**Adequate Protection:**    The Prepetition Secured Parties shall be entitled to receive the following adequate protection for any diminution in value arising from (a) the Debtors' use of cash collateral and the sale, lease or use by the Debtors (or other decline in value) of all of the existing and after-acquired assets with respect to which the Prepetition Agent and the Prepetition Secured Parties have first priority liens securing obligations of the Debtors owing to them under the Prepetition Secured Facilities (including cash collateral, the "*Prepetition Collateral*"), (b) the priming of their security interests and liens in the Prepetition Collateral and (c) the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code (clauses (i), (iii) and (iv) below, the "*Adequate Protection Payments*"), subject, in each case to the Carve-Out:

(i) a superpriority administrative expense claim as contemplated by Section 507(b) of the Bankruptcy Code (the "*507(b) Claims*") immediately junior to the claims under Section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the Lenders;

(ii) a lien on all collateral on which a lien in favor of the DIP Facility is granted, which such lien shall be junior to and immediately prior to the liens securing the DIP Facility (the "*Adequate Protection Liens*");

(iii) any interest payable under the Pre-Petition Secured Facilities, including any interest at the applicable default rate, which payments shall be made monthly in arrears at the default rate stated therein. The first such interest payment shall be made on May 31, 2016 and shall include all accrued interest to and including that date, including any unpaid prepetition interest; provided that the applicable default rate payable under the Pre-Petition Secured Facilities shall not apply and shall not begin to accrue until the Scheduled Maturity Date; and

(iv) without duplication of amounts required to be paid pursuant to the DIP Facility or the DIP Hedges, upon entry of the Interim Order, the Debtors shall pay (a) all accrued and unpaid fees and disbursements (including, but not limited to, fees owed to the Prepetition Agent) owing to the Prepetition Secured Parties under the Prepetition Indebtedness Documents and incurred prior to the

9

Petition Date; and (b) current cash payments of all reasonable and documented out-of-pocket fees and expenses payable to the Prepetition Secured Parties under the Prepetition Indebtedness Documents, including, but not limited to, the reasonable and documented out-of-pocket fees and disbursements of Bracewell LLP, McGuireWoods LLP, Opportune, LLP, and additional consultants as reasonably needed and consistent with past practice, in consultation with the Debtors.

**Conditions Precedent to Effectiveness of the DIP Credit Agreement:**

The effectiveness of the DIP Credit Agreement shall be subject to the conditions set forth in this section "Conditions Precedent to Effectiveness of the DIP Credit Agreement," which such conditions shall be the sole and exclusive conditions to the effectiveness of the DIP Credit Agreement:

1.      The preparation, authorization and execution of the DIP Credit Agreement with respect to the DIP Facility, in form and substance satisfactory to the Lenders and the Borrower.

**Conditions Precedent to Interim DIP Loan:**

The availability of the Interim Facility shall be subject to the conditions set forth in this section "Conditions Precedent to Interim DIP Loan," which such conditions shall be the sole and exclusive conditions to the availability of the Interim Facility:

1.      The filing of the Cases with the Bankruptcy Court on the Petition Date.

2.      Entry by the Bankruptcy Court of the Interim Order.

3.      The preparation, authorization and execution of the Operative Documents (other than the DIP Credit Agreement) with respect to the DIP Facility, in form and substance satisfactory to the Lenders and the Borrower.

4.      None of the Cases shall have been dismissed or converted to a Chapter 7 case.

5.      No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Case.

6.      (i) Within three (3) business days after the Petition Date, the Bankruptcy Court shall have entered an interim order, substantially in the form attached hereto as Exhibit C (the "*Interim Order*"), which shall be in form and substance satisfactory to the Lenders, the Prepetition Agent and the Borrower, authorizing and approving the DIP Facility and the transactions contemplated thereby, including, (a) the granting of the valid, enforceable, non-

10

avoidable and fully perfected security interests and liens described herein; (b) solely to the extent of any diminution in value of collateral, the super-priority administrative expense claims under section 507(b) of the Bankruptcy Code described herein; (c) the Adequate Protection Payments; (d) the current cash payment of reasonable and documented out-of-pocket fees and expenses incurred by the Administrative Agent, the DIP Lenders and the Lender Swap Parties, including such amounts arising before and after the Petition Date and without the necessity of filing motions or fee applications to the extent set forth in this Term sheet; (e) customary stipulations from the Debtors, including that the liens securing the extensions of credit under the Prepetition Secured Facilities are valid and unavoidable and that the obligations thereunder are valid, binding and enforceable in accordance with the terms therein but subject to the limitations of the Bankruptcy Code; (f) subject to the Committee Investigation, if any, during the Investigation Period, a customary release of the Prepetition Secured Parties and Prepetition Agent; (g) subject to entry of the Final Order, the receipt by the Lenders and the Prepetition Secured Parties of (*i*) a waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code and (*ii*) a waiver of the provisions of Section 506(c) of the Bankruptcy Code with respect to both the Prepetition Secured Facilities and the DIP Facility; (h) a customary order that the Lenders and Prepetition Secured Parties not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral and (i) all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Lenders.

7.      All material governmental and third party consents and approvals necessary in connection with the DIP Facilities and the transactions contemplated hereby shall have been obtained.

8.      The making of the Interim DIP Loan shall not violate any requirement of law in any material respect and shall not be enjoined, temporarily, preliminarily or permanently.

9.      All fees and expenses (including reasonable and documented out-of-pocket fees and expenses of counsel) required to be paid to the Lenders and the Prepetition Secured Parties on or before the Closing Date shall have been paid to the extent invoiced at least two (2) business days prior to the Closing Date.

10.     The delivery of the Initial Budget (as defined below) in form and substance acceptable to the Lenders.

11

11.     The DIP Agent shall have received reasonably satisfactory opinions of independent counsel to the Borrower and the Guarantors, addressing such matters as the DIP Agent shall reasonably request, including, without limitation, due authorization, execution, delivery and enforceability of the Operative Documents, compliance with all laws and regulations and the perfection of all security interests purported to be granted, subject to customary exceptions.

12.     At least five (5) business days prior to the Closing Date, the DIP Agent shall have received all documentation and other information with respect to the Borrower and the Guarantors requested by the DIP Agent in writing and required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the U.S. Patriot Act.

13.     The DIP Agent, on behalf of the Lenders, shall have a valid and perfected lien on and security interest in the Collateral with the priority described in the section above titled "Priority."

14.     No default would or shall exist under the Operative Documents upon their effectiveness.

15.     The RSA and the BCA shall not have terminated and shall be in full force and effect.

16.     The representations and warranties of the Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects (except to the extent that such representations and warranties are qualified by materiality, in which case such representations and warranties shall be true and correct in all respects), immediately prior to, and after giving effect to, such funding.

17.     All "first day orders" entered in the Cases at the time of commencement of the Cases (including a cash management order) shall be reasonably satisfactory in form and substance to the DIP Agent in its sole discretion.

**Conditions Precedent to Final DIP Loan**:    The availability of the Final DIP Loan shall be subject to the conditions set forth in this section "Conditions Precedent to Final DIP Loan", which conditions shall be the sole and exclusive conditions to the availability of the Final DIP Loan:

1. The representations and warranties of the Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects (except to the extent that such representations and warranties are qualified by materiality, in which

12

case such representations and warranties shall be true and correct in all respects), immediately prior to, and after giving effect to, such funding.

2. Entry by the Court of the Final Order.

3. No default or event of default shall exist under any of the Operative Documents.

4. The Borrower's available cash as set forth in the Budget on a forecast basis, including the proceeds of any Loans (including any proposed draw), as of the last business day of the immediately following week, shall not exceed $10 million (the *"Anti-Hoarding Condition"*).

5. Delivery of customary borrowing notice.

6.  The making of the Final DIP Loan shall not violate any requirement of law in any material respect and shall not be enjoined, temporarily, preliminarily or permanently.

| | |
|---|---|
| **Conditions Precedent to each Conditional DIP Loan:** | The availability of each Conditional DIP Loan shall be subject to the conditions set forth in this section "Conditions Precedent to each Conditional DIP Loan" as of each weekly draw date, which such conditions shall be the sole and exclusive conditions to the availability of any Conditional DIP Loan: |

1. The representations and warranties of the Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects (except to the extent that such representations and warranties are qualified by materiality, in which case such representations and warranties shall be true and correct in all respects), immediately prior to, and after giving effect to, such funding.

2. The Final Order is in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified.

3. No default or event of default shall exist under any of the Operative Documents.

4. The Anti-Hoarding Condition shall be satisfied.

5. The Borrower shall have delivered a certificate to the DIP Agent declaring that the value of the collateral subject to a valid cash collateral order entered by the Bankruptcy Court, and reasonably acceptable to the Lenders and the Prepetition Lenders, shall not be less than the sum of (a) the outstanding aggregate principal amount of the Loans, (b) the outstanding aggregate principal amount of the Prepetition Secured Facilities, (c) any interest, fees or other amounts due in connection with the Prepetition Secured Facilities, or (d) any other claims of the Lenders or Prepetition Lenders against the Borrower or any of the Guarantors.

6. Delivery of customary borrowing notice.

7. The making of the Conditional DIP Loans shall not violate any requirement of law in any material respect and shall not be enjoined, temporarily, preliminarily or permanently.

| | |
|---|---|
| **Representations and Warranties:** | The Operative Documents will contain representations and warranties customarily found in the loan agreements for similar debtor in possession financings, including with respect to: valid existence, requisite power, due authorization, no conflict with applicable law, enforceability of the Operative Documents, accuracy of financial statements, projections and all other information provided, taxes, compliance with law, federal reserve regulations, no default under the Operative Documents, inapplicability of Investment Company Act, use of proceeds, insurance, casualty, labor matters, litigation, ERISA compliance, |

14

employee benefit plans and labor matters, environmental
compliance, sanctions compliance, PATRIOT Act compliance,
FCPA compliance, marketing of production, gas balancing
agreements and advance payment contracts, necessary rights to
intellectual property, ownership of properties and possession under
leases, material agreements, subsidiaries, valid security, continued
effectiveness of the applicable Order, and, except as would not
reasonably be expected to have a material adverse effect, no default
under any material contractual obligation arising after
commencement of the Case or under any executory contract or
unexpired lease assumed pursuant to the Bankruptcy Code, subject
to entry of the Interim Order and Final Order, as applicable, no
material leases for which liens are not available, and as of the
Closing Date and as of the effective date of each Lender Swap
Agreement (it being agreed and understood that the representation
in this Section 3.31 shall be made as of such dates), each of the
Borrower and the Parent is an "eligible contract participant" within
the meaning of Section 1(a)(18) of the Commodity Exchange Act.

The Interim Order and Final Order shall also contain provisions,
among other things, (i) acknowledging the validity and
enforceability of the Existing Credit Agreement and the other
Prepetition Secured Facilities, the debt outstanding thereunder and
the liens granted in connection therewith, and (ii) subject to entry of
the Final Order, waiving Bankruptcy Code sections 506(c) and 552
as such may pertain to the claims and liens of the Prepetition Agent
and the Prepetition Secured Parties.

**Financial Reporting
Requirements:**

The Parent shall provide to the Lenders: (i) monthly consolidated
financial statements of the Parent and its subsidiaries, including
balance sheet, income statement and cash flow statement, without
footnotes, within 35 days of the end of each fiscal month, certified
by the Parent's chief financial officer; (ii) quarterly consolidated
financial statements of the Parent and its subsidiaries within 60
days of the end of each fiscal quarter, certified by the Parent's chief
financial officer; (iii) annual audited consolidated financial
statements of the Parent and its subsidiaries within 120 days after
the end of each fiscal year; (iv) promptly after they become
available, copies of all periodic and other reports, proxy statements
and other materials, if any, filed by the Parent or any subsidiary
with the Securities and Exchange Commission or any national
securities exchange or distributed to shareholders (provided, that, in
the case of (ii), (iii) and (iv), filing such items in the form of a Form
10-K, Form 10-Q or otherwise with the SEC shall be deemed
delivery under the Operative Document); and (v) rolling 13-week
cash flow projections reflecting projected expenditures on a weekly
basis in form and substance acceptable to the Requisite Lenders by
the fourth business day of every fourth calendar week (commencing
with the 13-week cash flow projections acceptable to the Requisite

15

Lenders and attached hereto as <u>Exhibit A</u> (the "*Initial Budget*")),
and thereafter each of such subsequent projections, as effective
upon the approval of the Requisite Lenders, the "*Budget*").

The Prepetition Agent, on behalf of itself and the Prepetition
Secured Parties, shall be entitled to receive all financial reporting
and other reports and notices delivered by the Parent in connection
with the DIP Facility.

**Other Reporting Requirements:**   The Operative Documents will contain other reporting requirements
contained in the Existing Credit Agreement and the RSA, subject to
further requirements customarily found in the loan documents for
similar debtor in possession financings as agreed by the DIP Agent
and the Borrower.

**Budget and Variances:**   Subject to the Permitted Variance (as defined below), the
expenditures authorized in the Budget shall be adhered to as
described below. The Budget shall be tested on a cumulative basis
for that portion of the Budget period then ended.

The Budget will be tested weekly on a cumulative basis. The
Debtors shall deliver to the Lenders on the fourth business day of
each week a variance report for the then-ended Testing Period
comparing actual disbursements ("*Actual Cumulative
Disbursements*") for such period to cumulative disbursements
("*Budgeted Cumulative Disbursements*") in each case, other than
professional fees, respectively, for such period as forecast in the
Budget, which variance report shall include, *inter alia*, the then
current aged accounts payable listing and the then current "AFE vs.
Actual" report for all capital expenditure projects in excess of $1
million.

Debtors' Actual Cumulative Disbursements (other than
disbursements on account of professional fees) for such period may
not vary as tested on May 26, 2016, and on the fourth business day
of each week thereafter (each, a "*Testing Date*") from Budgeted
Cumulative Disbursements (other than disbursements on account of
professional fees) as reflected in the most recently delivered Budget
by more than 20% or by such greater amount as agreed upon by the
Requisite Lenders (the "*Permitted Variance*").

**Affirmative Covenants:**   The Operative Documents will contain affirmative covenants
contained in the Existing Credit Agreement, subject to
modifications customarily found in the loan agreements for debtor
in possession financings, as agreed to by the DIP Agent and
Borrower (which will be applicable to the Borrower, the Guarantors
and their subsidiaries), including, without limitation, the following:
existence, conduct of business, payment of obligations, taxes and
material claims, maintenance of properties, insurance, books and

16

records, inspection rights, compliance with laws, use of proceeds, environmental matters, further assurances, reserve reports, title information, additional collateral, additional guarantors, ERISA compliance, business of the Borrower, permits and licenses, swap agreement termination, title diligence, payment of Adequate Protection Payments, compliance with Budget covenants consistent with the section titled "Budget and Variances" and compliance with the Milestones (as defined below), and within the earlier of (i) 30 days of the Closing Date and (ii) entry of the Final Order (as such date may be extended in DIP Agent's sole discretion), DIP Agent shall have received endorsements naming DIP Agent as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the Borrower and the Guarantors forming part of the Collateral.

**Negative Covenants:**

The Operative Documents will contain negative covenants contained in the Existing Credit Agreement, subject to modifications found in the loan agreements for debtor in possession financings, as agreed to by the DIP Agent and Borrower (which will be applicable to the Borrower, the Guarantors and their subsidiaries), including, without limitation, the following: limitations on debt and guarantees, limitations on liens, limitations on fundamental changes, limitations on investments, limitations on loans and advances, limitations on hedging transactions, limitations on restricted payments, limitations on transactions with affiliates, limitations on restrictive agreements, financial covenants, limitations on the use of proceeds, ERISA compliance, limitations on the sale of properties, environmental matters, limitations on subsidiaries, limitations on gas imbalances, take-or-pay or other prepayments, limitations on changes to the fiscal year or fiscal quarters, limitations on the repayment or acquisition of debt and the amendment of debt documents, limitations on marketing activities, limitations on the sale or discount or receivables, limitations on granting additional collateral, limitations on incurring or permitting additional super-priority claims or the grant of adequate protection, limitation on maintaining any deposit, securities or commodities accounts, limitations on changing any Order (as defined below), and Requisite Lenders consent rights with respect to (i) any settlements with respect to the assumption, assumption and assignment or rejection of any executory contracts or unexpired leases under the Bankruptcy Code (it being agreed and understood that the Requisite Lenders shall have consultation rights with respect to any such assumption or rejection before the motion therefor is entered  by the Bankruptcy Court, regardless of whether any settlement is contemplated), (ii) any motions to authorize any actions or transactions (including, without limitation, authorization to sell assets) under Section 363 of the Bankruptcy Code (except for asset sales that are permitted under the Operative Documents), (iii) motions to approve any compromise or settlement under Rule 9019,

17

and (iv) any plan of reorganization or liquidation and related disclosure statement.

**Events of Default:**          The Operative Documents will contain only the events of default (each an "*Event of Default*") set forth below:

1. failure to make any payment when due (including, without limitation, Adequate Protection Payments and any payment of principal, interest or fees) under the DIP Facility when due, and such failure continues for three (3) business days;

2. noncompliance with negative covenants, including the Budget Variances, or breaches of representations and warranties;

3. noncompliance with affirmative covenants, subject to a 10 business day cure period and reporting covenants, subject to a 5 business day cure period (and 1 business day cure period in the case of the Budget);

4. failure to satisfy or stay execution of judgments in excess of $5 million;

5. the existence of certain materially adverse employee benefit or environmental liabilities consistent with the Existing Credit Agreement;

6. any material provision of the Operative Documents fails to be enforceable;

7. change in control (to be defined consistent with the Existing Credit Agreement);

8. dismissal of the Cases or conversion of any of the Cases to a Chapter 7 case;

9. termination of the exclusivity period for any of the Debtors to file a Chapter 11 plan in the Case;

10. appointment of a Chapter 11 trustee in any of the Cases;

11. appointment of a responsible officer or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code relating to the operation of the business of the Borrower or any Guarantor;

12. granting of relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any assets of the Debtors in excess of $1,000,000 in the aggregate;

13. entry of an order granting any super-priority claim or lien which is senior to or *pari passu* with the Lenders' or Prepetition Secured Parties' claims or liens under the DIP Facility, the Interim Order or the Final Order in an amount in excess of $1,000,000 in the aggregate;

18

14. entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full of the DIP Facility as of the effective date of the plan;

15. entry of an order staying, reversing, vacating or otherwise modifying, without the prior consent of the Requisite Lenders, the DIP Facility, the Interim Order or the Final Order;

16. failure to comply with the Orders in any material respect;

17. payment of or granting adequate protection with respect to pre-petition debt (other than as described herein, as otherwise approved by the Requisite Lenders and the Bankruptcy Court or as otherwise contemplated by the Operative Documents); *provided, however,* the foregoing should not restrict reimbursement of reasonable and documented out-of-pocket fees and expenses and customary indemnitees as agreed to in the RSA or the BCA;

18. entry of an order denying or terminating use of cash collateral by the Debtors;

19. cessation of liens or super-priority claims granted with respect to the DIP Facility, the Interim Order or the Final Order to be valid, perfected and enforceable in all respects with the priority described herein with respect to any material portion of the Collateral;

20. the occurrence of any payment default, any event of default or any event, which with the giving of notice or lapse of time or both would constitute a default, under any of the Debtors' or their respective subsidiaries' debt instruments with a principal amount in excess of $5 million, other than as a result of the commencement of the Cases or with respect to any prepetition debt instruments automatically accelerated upon the commencement of the Cases;

21. the commencement of any adversary proceeding, contested matter or other action by any Debtor asserting in writing any claims or defenses against any of the Prepetition Agent or the Prepetition Secured Parties with respect to the obligations of any Debtor thereunder or the liens granted to Prepetition Agent or Prepetition Secured Parties to secure the obligations under the Prepetition Secured Facility, except as permitted under the Interim Order or Final Order;

22. the termination of the RSA or any agreement attached as an exhibit thereto, including without limitation the BCA, either in whole or in part, or any modification, amendment or supplement of the RSA, including the exhibits thereto (including without limitation the BCA), without the prior

19

written consent of the Requisite Lenders;

23. any party to the RSA or the BCA fails to comply with any of its obligations thereunder and such non-compliance gives the Consenting RBL Lenders (as defined in the RSA) a right to terminate the RSA;

24. any Debtor files, or supports a motion that has been filed, to reject the RSA; and

25. failure to comply with any of the Milestones below.

**Remedies:**   Upon the occurrence and during the continuance of an Event of Default, (a) the Requisite Lenders or the DIP Agent acting on their behalf may, in their sole and absolute discretion, immediately (i) deliver a notice of an Event of Default to Borrower, (ii) terminate any commitments of each Lender and/or any pending Loans, and (iii) terminate the DIP Facility and (b) upon five (5) business days' written notice from the Requisite Lenders, in their sole and absolute discretion, the automatic stay of Section 362 of the Bankruptcy Code shall be automatically vacated without further order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the Lenders to do any of the following: (i) enforce any and all liens and security interests created pursuant to any of the Operative Documents or any other document purporting to create a lien in favor of the Lenders (or otherwise foreclose on the Collateral), including, without limitation assuming control over the use of cash in any cash collateral accounts; (ii) enforce all of the guaranty rights; (iii) charge the default rate of interest on the Loans; (iv) declare each of the following to become due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Debtor: the unpaid principal of the Loans, together with accrued interest thereon and all outstanding fees and other obligations under the Operative Documents and (v) exercise any and all of its or their other rights and remedies (whether as a secured creditor or otherwise) under the Operative Documents and under applicable law (including, but not limited to, the Bankruptcy Code and the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction). Section 362 relief from the stay in favor of the Lenders shall be embodied in any order approving the DIP Facility and the use of cash collateral.

**Milestones:**   The Operative Documents and any Final Order shall expressly authorize and require the Debtors to comply with the following milestones (collectively, the "*Milestones*"):

1.      the Petition Date shall occur no later than May 12, 2016 at 8:00am (New York time);

20

2.      no later than three days after the Petition Date, the Debtors shall file with the Bankruptcy Court (i) the Plan and related disclosure statement (the "*Disclosure Statement*") and (ii) a motion seeking entry of an order approving the Debtors' assumption of the RSA and the Backstop Commitment Agreement (the "*Approval Motion*");

3.      no later than three days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

4.      no later than fifteen days after the Petition Date, the Debtors shall file with the Bankruptcy Court (i) a motion to establish a bar date for filing proofs of claim and (ii) the schedules of assets and liabilities and statements of financial affairs for each Debtor;

5.      no later than thirty days after the Petition Date, (i) the Bankruptcy Court shall have entered the Final DIP Order (the "*Final Order*" and together with the Interim Order, the "*Orders*"), (ii) the Bankruptcy Court shall have entered an order (the "*Approval Order*") granting the Approval Motion, and (iii) the Debtors shall have delivered a proposal with regard to the treatment of material contracts to the Majority Consenting Noteholders;

6.      no later than forty-five days after the Petition Date, the Bankruptcy Court shall have entered an order (the "*Disclosure Statement Order*") approving the adequacy of the Disclosure Statement and related solicitation procedures (including the Rights Offering Procedures);

7.      no later than forty-five days after the entry of the Disclosure Statement Order, the Bankruptcy Court shall commence a hearing to confirm the Plan (the "*Confirmation Hearing*");

8.      no later than five days after the commencement of the Confirmation Hearing, the Bankruptcy Court shall enter an order (the "*Confirmation Order*") confirming the Plan; and

9.      no later than twenty-five days after entry of the Confirmation Order, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "*Effective Date*").

The Milestones above may be extended with the consent of the Requisite Lenders without further order of the Bankruptcy Court. Capitalized terms used in this section entitled "Milestones" but not otherwise defined herein shall have the meanings given to such

terms in the Restructuring Support Agreement Term Sheet which is attached to the Restructuring Support Agreement to which this Term Sheet is attached.

**Indemnification:**

The Borrower shall indemnify and hold harmless the DIP Agent, each Lender, each Hedge Lender, each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "*Indemnified Party*") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel (limited to one primary outside counsel and one local counsel in each necessary jurisdiction for all Indemnified Parties, taken as a whole, and one conflict counsel to the extent of any actual conflicts of interest for all similarly situated Indemnified Parties, taken as a whole), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Hedges, the Operative Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction (a) to have resulted from such Indemnified Party's gross negligence or willful misconduct, (b) to have resulted from a claim brought by the Borrower against any Indemnified Party of any material breach in bad faith of such Indemnified Party's funding obligations under any Operative Documents, or (c) to be a dispute solely by or amongst Indemnified Persons (other than the DIP Agent in its role as such) to the extent such dispute does not involve and is not related to any act, omission or representation on the part of, or any information provided by or on behalf of, the Borrower, any Guarantor or affiliates thereof. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. For the avoidance of doubt, under no circumstances shall the Borrower be liable for special, indirect, consequential or punitive damages suffered or incurred by any Indemnified Party.

**Releases:**

The Debtors shall provide each of the Prepetition Agent and the Prepetition Secured Parties a standard release of any and all claims and causes of action against any of them as of the Petition Date, without prejudice to the Committee Investigation, if any, during the

22

Investigation Period.

**Expenses**:

The Borrower and each Guarantor shall jointly and severally pay, without the need for the Administrative Agent, the DIP Lenders or the Hedge Lenders to file retention motions or fee applications, or to provide notice to any party, all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent, the DIP Lenders and the Hedge Lenders (including all reasonable fees, expenses and disbursements of Bracewell, LLP, McGuireWoods LLP, and Opportune, LLP), and such other consultants as may be retained or may have been retained from time to time by (a) the Administrative Agent, in its sole discretion, or (b) the DIP Lenders or the Hedge Lenders, with the prior written consent of the Debtors (which consent shall not be unreasonably withheld).

**Yield Protection, Taxes and Other Deductions:**

The Operative Documents will contain yield protection provisions customarily found in the loan agreements for similar debtor in possession financings to protect Lenders in the event of unavailability of funding and from funding losses, increased costs, reserve and capital adequacy requirements and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. The Operative Documents will provide that all payments are to be made free and clear of any taxes subject to customary exceptions.

**Assignments:**

Assignments must be in a minimum amount of $5 million, other than in the case of an assignment to a Lender (or an affiliate of a Lender) or an assignment of a Lender's entire interest in the DIP Facility; *provided* that, other than an assignment to a Lender or an affiliate of a Lender, assignments shall be subject to the prior written consent of the Borrower (which consent shall not be unreasonably withheld or delayed) so long as no Event of Default has occurred or is continuing; *provided further*, under no circumstance shall an assignment be made to a Company Competitor. In addition, under no circumstance shall an assignment be made to any Person unless such Person is already or concurrently therewith becomes a party to the RSA.

For purposes herein. a "Company Competitor" includes the Persons set forth on Exhibit B and all readily identifiable affiliates thereof.

**Requisite Lenders:**

Lenders holding more than 50% of the outstanding commitments and/or Loans under the DIP Facility (the "*Requisite Lenders*").

**Amendments:**

This Term Sheet and the Operative Documents may be amended with the consent of the Requisite Lenders, except that no amendment, waiver, supplement or modification shall (a)(i) except as otherwise expressly set forth herein as of the Effective Date, reduce the amount or extend the maturity of any Loan or any

installment due thereon, or reduce the rate or extend the time of payment of interest thereon, or reduce the amount or extend the time of payment of any fee, indemnity or reimbursement payable to any Lender hereunder or (ii) extend or increase the Commitment of any Lender, in each case without the written consent of each Lender affected thereby; (b)(i) amend, modify or waive any provision of this "amendments" section or reduce the percentage specified in or otherwise modify the definition of Requisite Lenders, or consent to the assignment or transfer by any Debtor of any of its rights and obligations under this Term Sheet and the other Commitment Documents or (ii) amend, modify or waive any provision of this Term Sheet requiring the consent or approval of all Lenders, in each case without the written consent of the Lenders; or (c) change any of the provisions of the Credit Documentation that materially, adversely and disproportionately affect (x) a DIP Hedge counterparty as compared to the other DIP Secured Parties or (y) the DIP Hedge counterparty as compared to the Lenders, without the written consent of such DIP Hedge counterparty or the DIP Hedge counterparties, respectively.

**Governing Law; Submission to Jurisdiction; Waiver of Jury Trial:**

State of New York. Non-exclusive jurisdiction of the Bankruptcy Court, including with respect to the exercise of the remedies by the Lenders and preservation of the Collateral's value. Each party expressly waives the right to trial by jury in any proceeding relating to or arising in any way from this Term Sheet, any other Commitment Document or the transactions contemplated hereby or thereby, to the extent permitted by applicable law.

**Counsel to Lenders**:

Bracewell, LLP

**Exhibit A**

**Initial Budget**

**Initial Budget**

| ($s in millions) | 1 Fcst w/e 5/13 | 2 Fcst w/e 5/20 | 3 Fcst w/e 5/27 | 4 Fcst w/e 6/3 | 5 Fcst w/e 6/10 | 6 Fcst w/e 6/17 | 7 Fcst w/e 6/24 | 8 Fcst w/e 7/1 | 9 Fcst w/e 7/8 | 10 Fcst w/e 7/15 | 11 Fcst w/e 7/22 | 12 Fcst w/e 7/29 | 13 Fcst w/e 8/5 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $ 26.5 | $ 26.4 | $ 36.9 | $ 21.4 | $ 15.2 | $ 10.0 | $ 10.0 | $ 14.3 | $ 10.5 | $ 10.0 | $ 10.0 | $ 13.7 | $ 12.6 | $ 26.5 |
| **Receipts** | | | | | | | | | | | | | | |
| Oil & Gas Receipts: | | | | | | | | | | | | | | |
| South Texas | - | 15.3 | 0.9 | - | - | - | 14.4 | 0.9 | - | - | 13.8 | 0.9 | - | 46.1 |
| Oklahoma | - | 0.4 | 0.1 | - | - | - | 0.3 | 0.1 | - | - | 0.3 | 0.1 | - | 1.4 |
| JIB Receipts | - | 0.3 | 1.2 | - | - | - | 1.3 | - | - | - | 1.0 | - | - | 3.8 |
| Access to Hedge Proceeds | | | | | | | | | | | | | | |
| Total Receipts | - | 16.0 | 2.1 | - | - | - | 16.0 | 1.0 | - | - | 15.1 | 1.0 | - | 51.3 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll-Related: | | | | | | | | | | | | | | |
| Payroll | - | 0.6 | - | 0.5 | - | 0.5 | - | 0.5 | - | 0.5 | - | 0.5 | - | 3.0 |
| Severance Amount [1] | - | - | 0.6 | - | - | - | - | - | - | - | - | - | - | 0.6 |
| Healthcare Payments | - | 0.2 | 0.0 | - | 0.0 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 0.0 | 0.0 | 0.6 |
| Non-Payroll Related: | | | | | | | | | | | | | | |
| CapEx | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 1.4 |
| LOE | - | 0.3 | 0.3 | 0.3 | 0.5 | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 7.2 |
| G&A | - | 0.1 | 0.2 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 3.2 |
| Other/GPT | - | 0.2 | 0.2 | 0.5 | 0.3 | 0.5 | 0.5 | 0.7 | 0.4 | 0.4 | 0.4 | 0.4 | 0.7 | 5.4 |
| Royalties & Working Interest | - | - | 9.2 | - | - | - | 7.6 | - | - | - | 7.3 | - | - | 24.1 |
| Est. Royalties & Working Interest in suspense | - | - | 2.0 | - | - | - | 1.3 | - | - | - | 1.3 | - | - | 4.5 |
| Severance taxes | - | 0.2 | 1.2 | 0.0 | - | - | 1.3 | - | - | - | 1.2 | 0.0 | - | 3.9 |
| Total Operating Disbursements | - | 1.7 | 13.8 | 1.8 | 1.2 | 2.3 | 11.7 | 2.1 | 1.9 | 2.0 | 11.4 | 2.0 | 1.6 | 53.7 |
| **Restructuring Related Disbursements** | | | | | | | | | | | | | | |
| Professional Fees | - | - | - | - | 2.5 | - | - | 2.0 | 2.5 | - | - | - | 2.0 | 9.0 |
| Prepetition Opex, JIB's, Mkt, S&W, 503b9 claims | - | 3.8 | 3.8 | 3.8 | 3.8 | - | - | - | - | - | - | - | - | 15.1 |
| Utility Deposit | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | 0.0 |
| Total Restructuring-Related Payments | - | 3.8 | 3.8 | 3.8 | 6.2 | - | - | 2.0 | 2.5 | - | - | - | 2.0 | 24.1 |
| Net Cash Flow Prior To Financing Activities | - | 10.5 | (15.5) | (5.6) | (7.5) | (2.3) | 4.3 | (3.1) | (4 3) | (2.0) | 3.7 | (1.0) | (3.6) | (26.5) |
| Financing Related Disbursements | | | | | | | | | | | | | | |
| Adequate Protection Payments | - | - | - | 0.5 | - | - | - | 0.5 | - | - | - | - | 0.6 | 1.7 |
| DIP Fees & Interest | 0.1 | - | - | 0.2 | 0.0 | 0.0 | - | 0.2 | 0.0 | 0.0 | - | - | 0.2 | 0.7 |
| Total Financing Related Disbursements | 0.1 | - | - | 0.7 | 0.0 | 0.0 | - | 0.7 | 0.0 | 0.0 | - | - | 0.8 | 2.3 |
| DIP Loan Advances | - | - | - | - | 2.3 | 2.3 | - | - | 3.9 | 2.0 | - | - | 1.8 | 12.3 |
| Total Net Cash Flow | (0.1) | 10.5 | (15.5) | (6.3) | (5.2) | (0.0) | 4.3 | (3.8) | (0.5) | (0.0) | 3.7 | (1.0) | (2.7) | (16.6) |
| Ending Cash Balance | $ 26.4 | $ 36.9 | $ 21.4 | $ 15.2 | $ 10.0 | $ 10.0 | $ 14.3 | $ 10.5 | $ 10.0 | $ 10.0 | $ 13.7 | $ 12.6 | $ 10.0 | $ 10.0 |
| *Memo: DIP Balance* | $ - | $ - | $ - | $ - | 2.3 | 4.6 | 4.6 | 4.6 | 8.5 | 10.5 | 10.5 | 10.5 | 12.3 | $ 12.3 |

[1] Timing of this may be delayed depending upon the timing of the  Final Order (I) Authorizing The Debtors To (A) Pay Prepetition Wages, Salaries, Other Compensation, And Reimbursable Expenses And (B) Continue Employee Benefit Programs.

**Exhibit B**

**Company Competitors**

1.  Battle Cat Oil & Gas
2.  BHP Billiton Petroleum
3.  Canaan Resource Partners
4.  Chesapeake Energy
5.  ConocoPhillips
6.  Cypress Energy
7.  Devon Energy
8.  Earthstone Energy
9.  EOG Resources
10. EP Energy
11. Goodrich Petroleum
12. Grey Rock Energy Partners
13. Halcon Resources Corporation
14. Hunt Oil Company
15. Lux Energy
16. Marathon Oil Corp.
17. Marubini Corporation
18. Murphy Oil Corporation
19. NextEra Energy Resources
20. Pioneer Natural Resources
21. Sabine Oil & Gas Corp
22. Sanchez Oil & Gas Corporation
23. Sequitur Energy Resources
24. Statoil Inc.
25. Titanium Exploration Partners

**Exhibit C**

**Interim Order**

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C.
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Justin R. Bernbrock (*pro hac vice* admission pending)
Benjamin M. Rhode (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PENN VIRGINIA CORPORATION, *et al.*,[1] | ) | Case No. 16-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING
## THE DEBTORS TO (A) OBTAIN SENIOR
## SECURED SUPERPRIORITY POSTPETITION FINANCING
## AND (B) UTILIZE CASH COLLATERAL OF THE PREPETITION
## SECURED PARTIES, (II) GRANTING ADEQUATE PROTECTION TO THE
## PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
## (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Penn Virginia Corporation (4320); Penn Virginia Holding Corp. (7384); Penn Virginia MC Corporation (0458); Penn Virginia MC Energy L.L.C. (0462); Penn Virginia MC Operating Company L.L.C. (0466); Penn Virginia Oil & Gas Corporation (7929); Penn Virginia Oil & Gas GP LLC (3686); Penn Virginia Oil & Gas LP LLC (8109); Penn Virginia Oil & Gas, L.P. (9487).  The location of the Debtors' service address is:  Four Radnor Corporate Center, Suite 200, 100 Matsonford Road, Radnor, Pennsylvania 19087.

Upon the motion (the "Motion")[2] of Penn Virginia Corporation ("PVA") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Cases") for entry of an interim order (this "Order"), pursuant to sections 105, 361, 362, 363(c), 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001(a)-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules"), seeking, among other things:

(i)      authorization for Penn Virginia Holding Corp. ("PVH" or "Borrower") to obtain and be obligated in respect of postpetition financing (including requirements for the Debtors' use of Cash Collateral (as defined below), the "DIP Facility"), and for all of the other Debtors (together with each other present and future subsidiary of the Borrower, the "Guarantors") to guarantee and be jointly and severally obligated to pay the Borrower's obligations in connection with the DIP Facility, up to an aggregate principal amount of $25,000,000 of new money funding (the actual available principal amount and available Cash Collateral at any time being subject to those terms and conditions set forth in this Order and the DIP Credit Documents (as defined below)), from certain lenders (collectively, the "DIP Lenders") for which Wells Fargo Bank, National Association shall act as administrative agent (in such capacity, the "Administrative Agent") pursuant to the terms of this Order and that certain Debtor-in-Possession Credit Agreement dated as of May 11, 2016, by and among the Borrower, the Guarantors, the DIP Lenders, and the Administrative Agent, attached hereto as **Exhibit 1** (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement, as applicable.

KE 41500073

with the terms thereof and this Order and the Restructuring Support Agreement,[3] the "DIP Credit Agreement"), and any related security agreements, fee letters, and other documents required to be executed or delivered by or in connection with the DIP Credit Agreement (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and this Order, collectively, the "DIP Credit Documents");

(ii)     authorization for the Debtors to execute and deliver the DIP Credit Documents and to perform such other and further acts as may be required in connection with the DIP Credit Documents;

(iii)     the granting of adequate protection of the liens and security interests granted in favor of Wells Fargo Bank, National Association, as collateral agent, on behalf of and for the benefit of itself and the Prepetition Lenders (together, the "Prepetition Secured Parties") under the Security Documents (as defined below), which Prepetition Collateral (as defined below) is being primed by the liens securing the repayment of the DIP Facility, in accordance with this Order;

(iv)     authorization for the Debtors' use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, including, without limitation, any accounts receivable and general intangible and any other cash or right that would be included in such definition of "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code) constituting Prepetition Collateral (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or

---

[3]     As used herein, "Restructuring Support Agreement" shall mean that certain Restructuring Support Agreement entered into as of May 10, 2016, between the Borrower, the Guarantors, certain Prepetition Secured Parties and certain holders of notes issued pursuant to that certain Senior Indenture, dated as of June 15, 2009, for the 7.250% Senior Notes due 2019 and the 8.500% Senior Notes due 2020 among Penn Virginia, as issuer, each of the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as indenture trustee.

KE 41500073

securities account or accounts as of the Petition Date) or any cash or cash equivalents received

by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (together,

the "Cash Collateral") on the terms and conditions set forth in this Order and in the DIP Credit

Agreement and in accordance with the Approved Budget, and the granting of adequate protection

to the Prepetition Secured Parties with respect to such use of Cash Collateral;

(v)      approval of certain stipulations by the Debtors as set forth in this Order

and the DIP Credit Agreement with respect to the Prepetition Indebtedness Documents and the

Prepetition Facility (each as defined below) and the liens and security interests arising therefrom;

(vi)     authorization for the Debtors to grant security interests, liens, and

superpriority claims (including superpriority claims pursuant to section 364(c)(1) of the

Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code,

and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the Administrative

Agent for the benefit of (a) each of the DIP Lenders (together with the Administrative Agent,

collectively, the "DIP Secured Parties") and (b) certain of the DIP Lenders and their affiliates

that are party to the Lender Party Swap Agreements (as defined in the DIP Credit Agreement)

(the "Lender Swap Parties"),[4] in each case payable from, and having recourse to, all prepetition

---

[4]    For the avoidance of doubt, (i) the Debtors are authorized to grant security interests, liens, superpriority claims,
automatic stay relief, and other protections afforded by this Order for the benefit of the Lender Swap Parties
pursuant to the *Order Authorizing the Debtors to (I) Enter Into New Lender Party Swap Agreements, (II) Pledge
Collateral, Grant Superpriority Claims, and Honor Obligations Thereunder, and (III) Granting Related Relief*
(the "Swap Order") and (ii) notwithstanding anything to the contrary herein or in the DIP Credit Documents or
the Lender Party Swap Agreements, (x) any counterparty to one or more Debtors under a Lender Party Swap
Agreement that is a DIP Lender or an affiliate of a DIP Lender as of the date that such counterparty enters into
any transaction under such Lender Party Swap Agreement shall be a Lender Swap Party for purposes of this
Order and enjoy the Superiority Claims, DIP Liens, automatic stay relief, and other protections afforded by this
Order and the Swap Order in respect of each such transaction (without giving effect to any amendment,
extension, increase or other modification, including, without limitation, "blending," that occurs on or after the
date on which such counterparty ceases to be a DIP Lender or an affiliate of a DIP Lender) until the earliest of
(1) the termination of such transaction and the satisfaction of all obligations arising thereunder in full in cash,
(2) such transaction enjoying the benefit of the security package contemplated by the Exit Facility referred to in
the Lender Party Swap Agreements, and (3) other arrangements satisfactory to such Lender Swap Party having
been made, in each case regardless of whether such counterparty ceases to be a DIP Lender or an affiliate of a

4

property, including, but not limited to, all Prepetition Collateral, and postpetition property of the

Debtors' estates and all proceeds thereof; *except*, that the DIP Liens (as defined below) are

subject only to the Carve Out (as defined below) and the Permitted Liens (as defined in the DIP

Credit Agreement);

(vii)    authorization for (a) the Administrative Agent, at the direction of the DIP

Lenders, to (1) terminate the DIP Credit Agreement in accordance with its terms, (2) declare the

DIP Facility to be immediately due and payable in full, to the extent permitted by the terms

thereof, and (3) be granted relief from the automatic stay to foreclose on the DIP Liens; (b) the

Lender Swap Parties to terminate the Lender Party Swap Agreements (as defined in the Swap

Order) in accordance with their terms; (c) the Administrative Agent, at the direction of the DIP

Lenders, be granted relief from the automatic stay to foreclose on the DIP Liens; and (d) the

Administrative Agent, for the benefit of the Secured Parties and the Lender Swap Parties, to

freeze, take possession of, set off against, and otherwise exercise any remedy available to a

secured party at law or in equity with respect to all DIP Collateral (as defined below and

including Cash Collateral) until the DIP Obligations and the obligations and the rights granted in

this Order, including without limitation, all obligations of the Debtors pursuant to the Lender

Party Swap Agreements (the "Lender Party Swap Obligations") have been indefeasibly paid in

full in cash, each upon the occurrence of an Event of Default and Termination Event (as such

term is defined in the Lender Party Swap Agreements) on terms specified herein, in the DIP

Credit Agreement, or in the Lender Party Swap Agreements, as applicable;

---

DIP Lender while such transaction remains outstanding; and (y) any transferee of the Lender Party Swap Agreements pursuant to a transfer permitted by the Lender Party Swap Agreements that becomes a DIP Lender at the time of transfer shall constitute a Lender Swap Party for purposes of this Order and the Swap Order and enjoy the Superpriority Claims, DIP Liens, automatic stay relief, and other protections afforded by this Order and the Swap Order.

KE 41500073

(viii)    subject only to, and effective upon, entry of the Final Order, authorization of the limitation of the Debtors' right to assert claims to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 7 hereof;

(ix)    modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Lender Swap Parties to implement and effectuate the terms and provisions of the DIP Credit Documents, the Lender Party Swap Agreements, and this Order, as applicable;

(x)    the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order"), substantially in the form of this Order, granting the relief requested in the Motion on a final basis, authorizing the balance of the borrowings under the DIP Credit Documents on a final basis as set forth in the Motion and the DIP Credit Documents, and approving the Debtors' notice procedures with respect thereto; and

(xi)    waiver of any applicable stay (including under Rule 6004 of the Bankruptcy Rules) and the provision of immediate effectiveness of this Order.

An interim hearing having been held by this Court on May [●], 2016 (the "Interim Hearing"); based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing, and the entire record herein; this Court having heard and resolved or overruled any objections to the interim relief requested in the Motion; it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; the Debtors having provided proper notice of the Motion and the Interim Hearing; it appearing that no other or further notice of the Motion or the Interim Hearing is necessary; after due deliberation and consideration, and sufficient cause appearing therefor; and all objections to the entry of the

6

Order, if any, having been withdrawn, resolved or overruled as provided in this Order or on the record of the Interim Hearing:

**IT IS HEREBY FOUND AND DETERMINED THAT**:[5]

A.    *Background.*  On May 12, 2016 (the "Petition Date"), PVA and each of the other Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court of the Eastern District of Virginia (the "Court") (docketed at Case No. 16-[_____]).  The Debtors have continued to operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Cases.  The Cases are being jointly administered for procedural purposes only under Case No. 16-[_____].  [As of the date of the Interim Hearing, the Office of the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") had not appointed an official committee of unsecured creditors in the Cases.  If the U.S. Trustee appoints an official committee of unsecured creditors in the Cases in the future, such official committee of unsecured creditors shall be defined as the "Committee" hereunder.]

B.    *Prepetition Lender Consent.*  Subject to the terms of this Order, the Prepetition Secured Parties have agreed (i) to permit the Debtors to use the Cash Collateral and (ii) not to object to the DIP Facility or the Lender Party Swap Agreements, including the DIP Liens contemplated in connection therewith, pursuant to the DIP Credit Agreement.

C.    *Jurisdiction.*  This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and

---

[5]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* Fed. R. Bankr. P. 7052.

KE 41500073

507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001(a)-1.

D.      *Notice*.  The Debtors have provided notice of the Motion and the Interim Hearing via telephone, hand delivery, electronic transmission, or overnight mail to (i) the U.S. Trustee, (ii) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (iii) the Prepetition Agent; (iv) the indenture trustees for the Unsecured Notes; (v) counsel to the DIP Lenders; (vi) counsel to the agent under the DIP Facility; (vii) the United States Attorney's Office for the Eastern District of Virginia; (viii) the Internal Revenue Service; (ix) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (x) the offices of the attorneys general for the states in which the Debtors operate; (xi) the Securities and Exchange Commission; (xii) Swap Counterparties; (xiii) all known parties asserting a lien against the DIP Collateral; (xv) the Lender Swap Parties; and (xvi) any party that has requested notice pursuant to Bankruptcy Rule 2002.   Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Hearing constitutes appropriate, due, and sufficient notice thereof and complies with Bankruptcy Rules 2002 and 4001 and the Local Bankruptcy Rules, and no further notice of any of the foregoing is necessary or required.

E.      *Debtors' Stipulations*.  Without prejudice to the rights of the Committee or any other party in interest (but which rights are subject to the limitations thereon contained in paragraphs 16 and 17 hereof), the Debtors admit, stipulate, and agree that:

(i)      Pursuant to that certain Credit Agreement dated as of September 28, 2012 (as amended, restated, supplemented, or otherwise modified as of the date hereof, the "Prepetition Credit Agreement"), among PVH, PVA, the lenders party thereto

(the "<u>Prepetition Lenders</u>"), and Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "<u>Prepetition Agent</u>"), agreed to extend a credit facility to the Borrower in an aggregate principal amount of up to the lesser of the then-applicable borrowing base and $600,000,000 (the "<u>Prepetition Facility</u>").

(ii)     Pursuant to (a) that certain Guaranty dated as of September 28, 2012, by PVA and the other Guarantors party thereto, in favor of the Prepetition Agent for the benefit of itself and the Prepetition Lenders, and each other party signatory thereto (as amended, restated, supplemented, or otherwise modified as of the date hereof, the "<u>Guaranty</u>"), (b) that Pledge Agreement and Irrevocable Proxy dated as of September 28, 2012, by PVH, PVA, and each other Guarantor party thereto, in favor of the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, and each other party signatory thereto (as amended, restated, supplemented, or otherwise modified as of the date hereof, the "<u>Pledge Agreement</u>"), (c) (1) the Mortgage, Assignment, Security Agreement, Financing Statement and Fixture Filing dated as of September 28, 2012, from Penn Virginia MC Energy L.L.C., to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders; (2) the Mortgage, Deed of Trust, Assignment, Security Agreement, Financing Statement and Fixture Filing dated as of September 28, 2012, from Penn Virginia Oil & Gas, L.P., to the trustee and the Prepetition Agent, for the benefit of itself and the Prepetition Lenders; (3) the Mortgage, Deed of Trust, Assignment, Security Agreement, Financing Statement and Fixture Filing dated as of June 25, 2013, from Penn Virginia Oil & Gas, L.P., to the trustee and the Prepetition Agent, for the benefit of itself and the Prepetition Lenders; (4) the Mortgage, Deed of Trust, Assignment, Security Agreement, Financing Statement and Fixture Filing dated as of January 8, 2016, from Penn Virginia Oil & Gas, L.P., to the trustee and the Prepetition Agent, for the benefit of itself and the Prepetition Lenders; (5) the

9

Mortgage, Assignment, Security Agreement, Financing Statement and Fixture Filing dated as of

January 8, 2016, from Penn Virginia MC Energy L.L.C., to the Prepetition Agent, for the benefit

of itself and the Prepetition Lenders (together, the mortgages and deeds of trust described in this

clause (c), each as amended, restated, supplemented, or otherwise modified as of the date hereof,

the "Mortgages"), and (d) all other security agreements, control agreements, or other

instruments, agreements, or documents delivered by any Debtor to create or grant to the

Prepetition Secured Parties any lien on any property as security for the Secured Obligations or to

perfect, assure, or preserve any lien or any rights or remedies created thereby, including any

other Collateral Documents (as defined in the Prepetition Credit Agreement) (clauses (a), (b), (c),

and (d), together, the "Security Documents," and together with the Prepetition Credit Agreement,

the "Prepetition Indebtedness Documents"), (x) each Debtor granted to the Prepetition Secured

Parties, to secure the Secured Obligations, a lien on and first priority security interest in all right,

title, and interest in the shares of common stock and preferred stock of, or partnership, limited

liability company, and other ownership interests in, certain of its subsidiaries and (y) certain of

the Debtors granted to the Prepetition Secured Parties, to secure the Secured Obligations, a lien

on and first priority security interest in all right, title, and interest in such Debtors' accounts,

deposit accounts, instruments, documents, chattel paper, goods (including inventory, equipment,

and fixtures), payment intangibles, software, general intangibles, letter-of-credit rights, securities

accounts, investment property, financial assets, intellectual property, easements, rights-of-way,

leasehold interests, buildings, structures, fixtures, other improvements, machinery, equipment,

fittings, boilers, turbines, other articles of personal property, permits, raw materials,

hydrocarbons, as-extracted collateral, licenses, lands, interests in lands, leases, reserves, interests

in reserves, tenements, and herediments, all other property, and all proceeds, products,

KE 41500073

accessions, rents, income, royalties, and profits of or in respect of any of the foregoing, in each case whether now existing or thereafter acquired, in each case, to the extent provided for in the relevant Security Documents (collectively, the "Prepetition Collateral").

(iii)    As of the Petition Date, the aggregate amount of the Secured Obligations due and payable by the Borrower and/or any Guarantor to the Prepetition Lenders under the Prepetition Credit Agreement, equaled approximately $112,552,819.70, consisting of: (a) $112,552,819.70 in respect of the outstanding principal amount of the Secured Obligations; (b) $0 in respect of accrued and unpaid interest on such unpaid principal amount; (c) [reserved]; and (d) $[_____] in respect of fees, reasonable and documented out-of-pocket costs, and expenses incurred or estimated to be incurred by the Prepetition Lenders, through the Petition Date (collectively, the "Prepetition Indebtedness").

(iv)    The Prepetition Indebtedness constitutes the legal, valid, and binding obligations of the Debtors, enforceable against them in accordance with the terms of the Prepetition Indebtedness Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).

(v)    No portion of the Prepetition Facility, the Prepetition Indebtedness, or any payment on account thereof is subject to avoidance, recharacterization, recovery, reduction, subordination, disallowance, impairment, or any other challenges pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and the Debtors do not have, hereby forever release, and are forever barred from bringing any "claims" (as such term is defined in the Bankruptcy Code), counterclaims, cross claims, causes of action, defenses, recoupment, or setoff rights, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties, solely in their capacities as the Prepetition Secured Parties, respectively, and not in any other

11

capacity or in respect to any other relationship the Prepetition Secured Parties may have, or have

had, with or in respect to the Debtors, whether arising at law or in equity, including, without

limitation, any recharacterization, subordination, avoidance, or other claim arising under the

Bankruptcy Code or otherwise.

(vi)    The liens and security interests granted to, or for the benefit of, the

Prepetition Secured Parties, including with respect to the Cash Collateral, pursuant to the

Security Documents and in connection with the Prepetition Indebtedness constitute legal, valid,

binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of

the Bankruptcy Code) and perfected first priority liens (subject to Permitted Liens, as defined in

the DIP Credit Agreement) on and security interests in the Prepetition Collateral and are not

subject to defense, counterclaim, avoidance, recharacterization, recovery, disallowance, or

subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by

any person or entity, except insofar as such liens and security interests are subject to the DIP

Liens and the Carve Out.

F.    ***Findings Regarding the DIP Facility and Use of Cash Collateral.***

(i)    Good cause has been shown for the entry of this Order, including

immediate and irreparable harm the estate will suffer if relief is not immediately granted.

(ii)    The Debtors need to obtain immediate access to the postpetition financing

under the DIP Facility and to use Cash Collateral to, among other things, permit the orderly

continuation of the operation of their businesses, maintain business relationships with vendors

and suppliers, make capital expenditures, satisfy other working capital and operational needs,

and fund the administration and prosecution of the Cases.  The immediate access of the Debtors

to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of

KE 41500073

postpetition financing under the DIP Facility, and other financial accommodations is vital to the

preservation and maintenance of the going concern value of the Debtors' estates and to a

successful reorganization of the Debtors.

(iii)     The Debtors are unable to obtain sufficient financing on more favorable

terms from sources other than the DIP Lenders under the DIP Credit Documents and are unable

to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense.  The Debtors are also unable to obtain secured credit allowable under

sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors

granting to the Administrative Agent, DIP Secured Parties and Lender Swap Parties, subject to

the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined

below) under the terms and conditions set forth in this Order and in the DIP Credit Documents.

The only available source of secured credit available to the Debtors, other than the use of Cash

Collateral, is the DIP Facility.  The Debtors require both financing under the DIP Facility and the

continued use of Cash Collateral under the terms of this Order to satisfy their postpetition

liquidity needs.

(iv)     The Administrative Agent and the DIP Lenders are willing to provide the

DIP Facility, and the Prepetition Secured Parties are willing to consent to the use of their Cash

Collateral, subject to the terms and conditions set forth in the DIP Credit Documents and the

provisions of this Order, as applicable, and *provided* that the DIP Liens, the Superpriority

Claims, the Adequate Protection Obligations (as defined below), and other protections granted

by this Order and the DIP Credit Documents will not be affected by any subsequent reversal or

modification of this Order or any other order, as provided in section 364(e) of the Bankruptcy

Code, which is applicable to the DIP Facility and the use of Cash Collateral approved by this

Order.  The Administrative Agent and the DIP Lenders have acted in good faith in agreeing to provide the DIP Facility approved by this Order, as further evidenced by the DIP Credit Documents, and the Prepetition Secured Parties have acted in good faith in consenting to the Debtors' use of their Cash Collateral pursuant to the terms of this Order, and their reliance on the assurances referred to above is in good faith.

(v)     The DIP Credit Documents, and the DIP Facility provided for thereunder, and the use of Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, respectively, and the terms of the DIP Facility and the use of Cash Collateral, respectively, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  All of the obligations and the rights granted in this Order, including without limitation, all loans made to, or guaranties issued by, the Debtors pursuant to the DIP Credit Documents (all of the foregoing collectively, the "DIP Obligations"), and the Adequate Protection Obligations, are being extended or received, as applicable, by the DIP Secured Parties, the Prepetition Secured Parties, and their affiliates (and the successors and assigns of each of the foregoing) in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(vi)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(1) and 4001(c)(1).  The authorization granted herein on an interim basis to use

Cash Collateral, to enter into the DIP Credit Documents, and to borrow an aggregate amount of

$10,000,000 of new money is necessary to preserve the going concern value of the Debtors and

their estates.  Absent granting the relief set forth in this Order, the Debtors' estates will be

immediately and irreparably harmed.  Consummation of the DIP Facility and the use of Cash

Collateral in accordance with this Order and the DIP Credit Documents, as applicable, are

therefore in the best interests of the Debtors and their estates and creditors.

NOW, THEREFORE, on the Motion of the Debtors and the record before this Court with

respect to the Motion, including the record made during the Interim Hearing, and good and

sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      *Approval of Motion.*  The Motion is granted on an interim basis in accordance

with the terms of this Order.  Any objections to the Motion with respect to the entry of this Order

that have not been withdrawn, waived, or settled, and all reservations of rights included therein,

are hereby denied and overruled until the Final Hearing.

2.      *Authorization of the DIP Facility and the DIP Credit Documents.*

(i)      Each of the Debtors is hereby authorized to execute, issue, deliver, enter

into, and adopt, as the case may be, the DIP Credit Documents, including the DIP Credit

Agreement, and the other DIP Credit Documents are hereby approved.

(ii)     The Borrower is hereby authorized to borrow money on an interim basis,

and the Guarantors are hereby authorized to guarantee such borrowings, prior to the entry by the

Court of the Final Order, on the terms and subject to the conditions, lending formulae, and sub-

limits set forth in this Order and the DIP Credit Documents, which borrowings may be used for

all purposes permitted under the DIP Credit Documents, including, without limitation, to provide

15

agreed working capital for the Debtors, for other general corporate purposes, the Carve Out, to

pay administrative expenses approved by the Court for estate professionals, to pay any fees

required under the Restructuring Support Agreement and the Backstop Commitment Agreement

(as defined in the Restructuring Support Agreement), and to pay such other expenses to which

the DIP Lenders may consent in their sole discretion (subject to the limitations thereon contained

in paragraph 17 hereof), which borrowings shall be comprised of an aggregate principal amount

of $10,000,000, plus interest, fees, and other expenses and amounts provided for in the DIP

Credit Documents (the "Interim DIP Loan").

       (iii)    In furtherance of the foregoing and without further approval of this Court,

each Debtor hereby is authorized and directed to perform all acts, to make, execute, and deliver

all instruments and documents (including, without limitation, the execution or recordation of

security agreements, mortgages, pledges, and financing statements), and, without further

application to the Court, to promptly pay all fees set forth in the DIP Credit Documents, that may

be reasonably required or necessary for the Debtors' performance of their obligations under the

DIP Credit Documents, including, without limitation:

       (a)    the execution, delivery, and performance of the DIP Credit

Documents and any exhibits attached thereto, including, without limitation, the DIP Credit

Agreement and all related documents contemplated thereby;

       (b)    the execution, delivery, and performance of one or more

amendments to, modifications of, or waivers relating to the DIP Credit Documents for, among

other things, the purpose of adding additional financial institutions as DIP Lenders and

reallocating the commitments for the DIP Facility among the DIP Lenders, in each case in such

form as the Debtors and the DIP Secured Parties (or any portion thereof as provided in the DIP

16

Credit Documents) may agree (it being understood that no further approval of the Court shall be required for non-material amendments to or waivers relating to the DIP Credit Agreement (and, subject to and effective only upon entry of this Order, any fees paid in connection therewith) or modifications of the Approved Budget that do not shorten the maturity of the extensions of credit thereunder, increase the commitments thereunder, or otherwise do not materially change the terms of the DIP Credit Documents in a manner adverse to the interests of the Debtors); and

(c)      the performance of all other acts required under or in connection with the DIP Credit Documents.

(vii)    Upon execution and delivery of the DIP Credit Documents, the DIP Credit Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Credit Documents and this Order.   No obligation, payment, transfer, or grant of security interest under the DIP Credit Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment, or counterclaim.

3.      ***Superpriority Claims.***  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations and Lender Party Swap Obligations shall constitute allowed senior administrative expense claims against each of the Debtors (without the need to file any proof of claim or request for payment of administrative expense) with priority over any and all other administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Obligations) and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative

17

expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (with any claims arising only under section 506(c) subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof, excluding Avoidance Actions (as defined below) but including, without limitation, and subject to and effective upon entry of the Final Order, all Avoidance Proceeds (as defined below), subject only to the Carve Out.

4.      ***Carve Out.***

(i)      For purposes of this Order, the "Carve Out" shall mean the sum of: (a) all fees required to be paid to the Clerk of the Court and all fees required to be paid to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (c) below); (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (c) below); (c) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and a Committee pursuant to sections 328 or 1103 of the Bankruptcy Code

18

(together with the Debtor Professionals, the "Professionals") at any time before the delivery by the Administrative Agent of a Carve Out Trigger Notice,[6] whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (d) the Allowed Professional Fees of the Professionals in an aggregate amount not to exceed $1,000,000 incurred beginning the first business day following delivery by the Administrative Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").

(ii)     On the day on which a Carve Out Trigger Notice is given by the Administrative Agent to the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (a) be deemed a draw request and notice of borrowing by the Debtors under the DIP Credit Agreement in an amount equal to the then unpaid amounts of the Allowed Professional Fees and (b) constitute a demand to the Debtors to utilize all cash on hand as of the date of such notice and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then-unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay any then-unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims, subject to the provisions of paragraph 4(iv) of this Order.

(iii)     On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a draw request and notice of borrowing by the Debtors under the DIP Credit

---

[6]   "Carve Out Trigger Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by the Administrative Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims, subject to the provisions of the immediately following paragraph.  The Administrative Agent shall immediately send the Carve Out Trigger Notice to the DIP Lenders.   On the first business day after the Administrative Agent sends a Carve Out Trigger Notice to the DIP Lenders, notwithstanding anything to the contrary in the DIP Credit Agreement, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the loans under the DIP Facility, any termination of the commitments under the DIP Facility following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each DIP Lender (on a pro rata basis based on the then-outstanding commitments under the DIP Facility) shall make available to the Administrative Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.

(iv)     No fees shall be paid pursuant to the Final Order from the Carve Out Reserves to any professional retained in these cases pursuant to section 327, section 328, or section 1103 of the Bankruptcy Code (a "Retained Professional") absent (i) compliance with any order entered by the Court regarding interim compensation procedures governing payment of such Retained Professional and, if applicable, (ii) a Court order approving payment of the such fees upon the filing, on notice, of a fee application of such Retained Professional.   For the avoidance of doubt, the foregoing shall not apply to those professionals that are subject to any

20

order entered by the Court concerning ordinary course professionals (an "OCP Order"), with respect to which no fees shall be paid to such ordinary course professionals except in compliance with the procedures set forth in such OCP Order.

(v)      All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (a) through (c) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Administrative Agent for the benefit of the DIP Lenders and the Lender Swap Parties until the DIP Obligations and Lender Party Swap Obligations have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities under applicable law.

(vi)      All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay any remaining obligations set forth in clause (a) of the definition of Carve Out set forth above, and then to pay the obligations set forth in clause (d) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Administrative Agent for the benefit of the DIP Lenders and the Lender Swap Parties until the DIP Obligations and Lender Party Swap Obligations have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities as of the Petition Date.

(vii)      Notwithstanding anything to the contrary in the DIP Credit Documents, Lender Party Swap Agreements, this Interim Order, or the Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth under this paragraph 4 entitled "Carve Out", then any excess funds in one of the Carve Out Reserves following the payment of the Pre-

21

Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 4 entitled "Carve Out", prior to making any payments to the Administrative Agent, the DIP Lenders, the Lender Swap Parties, or any prepetition claimants.

(viii)    Notwithstanding anything to the contrary in the DIP Credit Documents, Lender Party Swap Agreements, this Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, none of the Administrative Agent, DIP Lenders, Lender Swap Parties, Prepetition Agent, or Prepetition Lenders shall, nor shall they direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Administrative Agent for application in accordance with the DIP Credit Documents and Lender Party Swap Agreements.  Further, notwithstanding anything to the contrary in the DIP Credit Documents, the Lender Party Swap Agreements, this Interim Order, or the Final Order: (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute loans or increase or reduce the DIP Obligations or Lender Party Swap Obligations; (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out; and (iii) in no way shall the Initial Budget, 13-Week Budget, Approved Budget,[7] any Permitted Variances, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors nor shall the Debtor Professionals be subject to any budget.  For the avoidance of doubt and notwithstanding anything to the contrary

---

[7]    A copy of the initial 13-Week Budget, which has been approved by the Prepetition Lenders, is attached hereto as **Exhibit 2**.

contained in this Order or any prepetition secured debt, the Carve Out shall be senior to all liens and claims securing the DIP Facility and Lender Party Swap Agreements, the Adequate Protection Liens, the Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the obligations under the DIP Facility, the Lender Party Swap Agreements, or the Prepetition Indebtedness.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice in respect of any Allowed Professional Fees shall not reduce the Carve Out.

5.    ***DIP Liens***.   As security for the DIP Obligations and Lender Party Swap Obligations, effective and perfected as of the Petition Date and without the necessity of the execution by the Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by any DIP Secured Party or Lender Swap Party of, or over, any DIP Collateral, the following security interests and liens, hereby are granted by the Debtors to each of the DIP Secured Parties and Lender Swap Parties (all property of the Debtors identified in clauses (i), (ii), and (iii) below being collectively referred to as the "DIP Collateral"), subject only to the Carve Out (all such liens on and security interests in the DIP Collateral granted to the DIP Secured Parties and Lender Swap Parties, pursuant to this Order, the DIP Credit Documents, and the Lender Party Swap Agreements, the "DIP Liens"):

(i)    First Lien on Any Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, first priority senior security interest in and lien upon all pre-petition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date or the date acquired (if acquired after the Petition Date) is not subject to valid, perfected, and non-

23

avoidable liens, if any (collectively, "Unencumbered Property"), (a) including, without

limitation, any unencumbered cash of the Debtors (wherever maintained) and any investment of

such cash, inventory, accounts receivable, other rights to payment whether arising before or after

the Petition Date, contracts, properties, plants, equipment, general intangibles, documents,

instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names,

other intellectual property, equity interests, and any claims and causes of the Debtors;

(b) excluding any claims and causes of action against any directors or officers of the Debtors, but

including, subject only to entry of the Final Order, any proceeds of, or property recovered in

connection with, any successful claims and causes of action against any directors or officers of

the Debtors; and (c) excluding any claims and causes of action of the Debtors under

sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions

under the Bankruptcy Code or other applicable law (collectively, the "Avoidance Actions"), but

including, subject only to entry of the Final Order, any proceeds of, or property recovered in

connection with, any successful Avoidance Action (whether by judgment, settlement or

otherwise, and unencumbered or not, the "Avoidance Proceeds").  Notwithstanding anything to

the contrary herein or in the DIP Credit Documents or the Lender Party Swap Agreements, in no

event shall any enclosed structure (having two walls and a roof) or manufactured mobile home

be included as DIP Collateral.

   (ii) Liens Senior to Prepetition Secured Parties' Liens. Pursuant to

section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-

perfected, first priority (subject to any Permitted Liens, as defined in the DIP Credit Agreement)

senior priming security interest in and lien upon all pre- and postpetition property of the Debtors

(including, without limitation, Cash Collateral), whether now existing or hereafter acquired, of

the same nature, scope, and type as the Prepetition Collateral.  Such security interests and liens

shall be senior in all respects to the interests in such property of the Prepetition Secured Parties

arising from current and future liens of the Prepetition Secured Parties (including, without

limitation, the Adequate Protection Liens granted hereunder).

(iii)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in

and lien upon all pre- and postpetition property of the Debtors (other than the property described

in clauses (i) or (ii) of this paragraph 5, as to which the liens and security interests in favor of the

Administrative Agent for the benefit of the DIP Secured Parties and Lender Swap Parties, will be

as described in such clauses), whether now existing or hereafter acquired, that is (a) subject to

valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or

(b) subject to valid and unavoidable liens in existence immediately prior to the Petition Date that

are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy

Code, which security interests and liens in favor of the DIP Secured Parties and Lender Swap

Parties, are junior to such valid, perfected, and unavoidable liens.

(iv)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be subject or

subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the

Debtors and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after

the Petition Date including, without limitation, any liens or security interests granted in favor of

any federal, state, municipal, or other governmental unit, commission, board, or court for any

liability of the Debtors.

KE 41500073

6. ***Protection of the DIP Secured Parties' and Lender Swap Parties' Rights.***

(i) So long as any DIP Obligations or Lender Party Swap Obligations are outstanding or the DIP Lenders or Lender Swap Parties have any outstanding Commitments under the DIP Credit Agreement, the Prepetition Secured Parties shall (a) have no right to and shall take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Indebtedness Documents or this Order, or otherwise exercise or seek to exercise any enforcement rights or remedies against any DIP Collateral without the prior written consent of the DIP Lenders and Lender Swap Parties, except as authorized by a further order of this Court entered after the date hereof and (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Credit Documents or Lender Party Swap Agreements.

(ii) The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Secured Parties to exercise (a) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under, and in accordance with, the DIP Credit Documents other than those rights and remedies against the DIP Collateral, as provided in the following clause (b); and (b) upon the occurrence and during the continuance of such an Event of Default and after the giving of five (5) Business Days' prior written notice (the "Default Notice Period") to the U.S. Trustee, the Debtors, and any Committee through their respective counsel, all rights and remedies against the DIP Collateral provided for in the DIP Credit Documents and this Order. In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors,

any Committee, and all other parties in interest shall not be entitled to seek relief, including,

without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in

any way impair or restrict the rights and remedies of the Administrative Agent or the DIP

Lenders set forth in this Order, the Final Order, or the DIP Credit Documents, as applicable. In

no event shall any of the DIP Secured Parties, Lender Swap Parties, or the Prepetition Secured

Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect

to their respective liens and security interests upon and in the DIP Collateral or the Prepetition

Collateral, as applicable. Any DIP Secured Party's delay or failure to exercise rights and

remedies under the DIP Credit Documents or this Order shall not constitute a waiver of any DIP

Secured Party's rights hereunder, thereunder, or otherwise, unless any such waiver is pursuant to

a written instrument executed in accordance with the terms of the DIP Credit Agreement.

Further, subject only to and effective upon entry of the Final Order, in no event shall the

"equities of the case" exception of section 552(b) of the Bankruptcy Code apply to the secured

claims of the Prepetition Secured Parties.

        (iii)    Subject to the Carve Out, on or after a Termination Declaration Date and

immediately after funding the Carve-Out Reserves, the Debtors shall pay-down the DIP

Obligations in an amount equal to the difference between the Debtors' Available Cash (as such

term is defined in the DIP Credit Agreement, but excluding, for the avoidance of doubt, amounts

held in the Carve-Out Reserves) *minus* $7,000,000 (to the extent greater than zero) (the "Pay-

down Amount"). The failure by the Debtors to pay the Pay-down Amount shall be an immediate

Event of Default and the Administrative Agent shall immediately be authorized to exercise

remedies against the Debtors' cash in the amount of the Pay-down Amount without prior written

notice and without further order of the Court and the automatic stay provisions of section 362 of

the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Secured

Parties to exercise such remedy.

(iv)    No rights, protections, or remedies of the DIP Secured Parties or Lender

Swap Parties granted by the provisions of this Order or the DIP Credit Documents or Lender

Party Swap Agreements shall be limited, modified, or impaired in any way by (a) any actual or

purported withdrawal of the consent of any party to the Debtors' use of Cash Collateral, (b) any

actual or purported termination of the Debtors' authority to use Cash Collateral, or (c) the terms

of any other order or stipulation related to the Debtors' use of Cash Collateral or any other

matter, or the provision of adequate protection to any party.

7.      ***Limitation on Charging Expenses Against Collateral.***   Subject only to and

effective upon entry of the Final Order, except to the extent of the Carve Out, no claim may be

asserted against any of the DIP Secured Parties, the Lender Swap Parties, or the Prepetition

Secured Parties, each in their capacity as such, to (i) charge any expenses of administration of the

Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or

other proceedings under the Bankruptcy Code, against the DIP Collateral or the Prepetition

Collateral or (ii) recover such expenses from the DIP Collateral or the Prepetition Collateral

pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, in each case

without the prior written consent of the DIP Secured Parties, the Lender Swap Parties, and the

Prepetition Secured Parties, and no such consent shall be implied from any other action, inaction,

or acquiescence by any of the DIP Secured Parties, the Lender Swap Parties, or the Prepetition

Secured Parties.

8.      ***Use of Cash Collateral.***   The Debtors are hereby authorized, subject to the terms

and conditions of the DIP Credit Documents and this Order, to use all Cash Collateral, including,

28

without limitation, any Cash Collateral on which the DIP Secured Parties and the Prepetition Secured Parties hold a lien to fund (i) working capital, (ii) general corporate purposes, (iii) restructuring expenses, (iv) professional fees, and (v) any fees required under the Restructuring Support Agreement and the Backstop Commitment Agreement, in each case with respect to clauses (i) through (iii), pursuant to the Approved Budget, subject to Permitted Variances; *provided*, *however*, that no Cash Collateral shall be used in a manner that would violate paragraph 17 hereof.  The Debtors' right to use any such Cash Collateral shall be in accordance with the DIP Credit Agreement and the Approved Budget, subject to Permitted Variances, and such right shall terminate automatically upon the earliest of (x) the Maturity Date and (y) five (5) Business Days' written notice provided by the Administrative Agent to the U.S. Trustee, the Debtors, and the Committee through their respective counsel, or provided by the Debtors to the DIP Secured Parties and the Prepetition Secured Parties, through each of their respective counsel, of the occurrence and continuance of any Event of Default under the DIP Credit Documents.

9.      ***Failure to Provide Notice of an Event of Default.***      Notwithstanding the foregoing, the Debtors' right to use Cash Collateral shall immediately terminate (without notice from the DIP Secured Parties or the Prepetition Secured Parties) at the time that any Debtor has actual knowledge of an Event of Default if the Debtors fail to promptly notify the Secured Parties, the Prepetition Secured Parties, and their respective counsel of such Event of Default.

10.      ***Optional and Mandatory Prepayments.***  The Borrower may voluntarily prepay the principal of the Loans, in whole or in part, in accordance with the DIP Credit Agreement. Pursuant to the terms and conditions set forth in the DIP Credit Agreement, the Borrower shall make mandatory prepayments of the principal amount of the Loans.

29

11.    ***Adequate Protection.***  The Prepetition Secured Parties are entitled, pursuant to

sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their

interests in the Prepetition Collateral, including the Cash Collateral, for and to the extent of any

diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral

during the Cases, including, without limitation, any such diminution during the Cases resulting

from the sale, lease, or use by the Debtors (or other decline in value) of Cash Collateral and any

other Prepetition Collateral, the priming of the Prepetition Secured Parties' security interests and

liens in the Prepetition Collateral by the DIP Secured Parties and Lender Swap Parties, pursuant

to the DIP Credit Documents, the Lender Party Swap Agreements, this Order, and the imposition

of the automatic stay pursuant to section 362 of the Bankruptcy Code (any such diminution in

value, "Diminution in Value").   As adequate protection, the Prepetition Secured Parties are

hereby granted the following adequate protection to the extent of any Diminution in Value

(collectively, the "Adequate Protection Obligations"):

(i)    Adequate Protection Liens.  Effective and perfected as of the Petition Date

and without the necessity of the execution by the Debtors of mortgages, security agreements,

pledge agreements, financing statements, or other agreements, a replacement security interest in

and lien upon all of the DIP Collateral to the extent of any Diminution in Value, subject and

subordinate only to the DIP Liens, the Carve Out, and Permitted Liens (as defined in the DIP

Credit Agreement) (the "Adequate Protection Liens").

(ii)    Adequate Protection Superpriority Claims.  Allowed superpriority claims

against each of the Debtors (the "Adequate Protection Superpriority Claims") with priority over

any and all other administrative expenses, and other claims against the Debtors, now existing or

hereafter arising, of any kind whatsoever, including, without limitation, all other administrative

KE 41500073

expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over

any and all other administrative expenses or other claims arising under sections 105, 326, 328,

330, 331, 503(b), subject to entry of the Final Order 506(c), 507(a), 507(b), 546, 726, 1113, or

1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a

judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall for

purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative

expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from

and have recourse to all prepetition and postpetition property of the Debtors and all proceeds

thereof; *provided*, *however*, that the Adequate Protection Superpriority Claims shall be

subordinate only to (a) the Superpriority Claims and (b) the Carve Out.

(iii)    [RESERVED]

(iv)    Prepetition Secured Party Fees and Expenses.  The Debtors shall pay, in

accordance with paragraph 26 of this Order, (a) all accrued and unpaid fees and disbursements

(including, but not limited to, fees owed to the Prepetition Agent) owing to the Prepetition

Secured Parties under the Prepetition Indebtedness Documents and incurred prior to the Petition

Date; and (b) current cash payments of all reasonable fees and out-of-pocket disbursements of

(v) Bracewell LLP, (w) McGuireWoods LLP, (x) Opportune LLP, (y) such other consultants as

may be retained or may have been retained from time to time by the Prepetition Agent, in its sole

discretion, and (z) such other consultants as may be retained or may have been retained from

time to time by the Prepetition Lenders with the prior written consent of the Debtors (which

consent shall not be unreasonably withheld).

(v)    Payment of Interest.  Payments of interest payable under the Prepetition

Credit Agreement, including (a) any prepetition interest and postpetition interest at the applicable

non-default rate for interest accruing prior to the Scheduled Maturity Date (as defined in the DIP Credit Agreement) and (b) any interest at the applicable default rate for interest accruing after such Scheduled Maturity Date, which payments shall be made monthly in arrears on the last day of each calendar month.  The first such interest payment shall be made on May 31, 2016, and shall include all accrued interest to and including that date, including any unpaid prepetition interest.

(vi)    <u>Reporting</u>.    Receipt of financial and all other reporting, including the periodic provision of budgets and forecasts, as described in the DIP Credit Documents.

12.    ***Reservation of Rights of Prepetition Secured Parties.***  Under the circumstances, the Court finds that the adequate protection provided in this Order is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  However, the Prepetition Secured Parties may request further or different adequate protection, and the Debtors or any other party may contest any such request; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Secured Parties and the Lender Swap Parties granted under this Order, the DIP Credit Documents, the Lender Party Swap Agreements, and the Carve Out.  Except as expressly provided herein, nothing contained in this Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to the Prepetition Secured Parties, the DIP Secured Parties, or the Lender Swap Parties.  Notwithstanding anything to the contrary in this Order, nothing herein shall impair the rights or the ability to exercise any rights that any Prepetition Secured Party may have under any swap or other hedging agreement with any Debtor, including any right of set-off.

KE 41500073

13.    *Perfection of DIP Liens and Adequate Protection Liens.*

(i)    The DIP Secured Parties and the Lender Swap Parties are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, take possession of or control over, or take any other action, in each case, to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Secured Parties or the Lender Swap Parties choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it under this Order, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination, as of the Petition Date.  The Prepetition Secured Parties, without any further consent of any party, are authorized to take, execute, deliver, and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Secured Parties and the Lender Swap Parties to further validate, perfect, preserve, and enforce the DIP Liens and for the Prepetition Secured Parties to further validate, perfect, preserve, and enforce the Adequate Protection Liens.  The Debtors shall execute and deliver to the DIP Secured Parties, the Lender Swap Parties and/or the Prepetition Secured Parties all such agreements, financing statements, instruments, and other documents as the DIP Secured Parties, the Lender Swap Parties, and/or the Prepetition Secured Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens and the Adequate Protection Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

KE 41500073

(ii)     A certified copy of the Order may, in the discretion of the DIP Secured Parties, the Lender Swap Parties, or the Prepetition Secured Parties, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of the Order for filing and recording.  For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be, and hereby is, modified to the extent necessary to permit the DIP Secured Parties, the Lender Swap Parties, and the Prepetition Secured Parties to take all actions, as applicable, referenced in this subparagraph (ii) and in the immediately preceding subparagraph (i).

(iii)     Subject to and effective only upon entry of this Order, any provision of any lease or other license, contract or other agreement that requires (a) the consent or approval of one or more landlords or other parties or (b) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting postpetition liens on (x) such leasehold interest or (y) the proceeds of any assignment and/or sale thereof by any Debtor in favor of any DIP Secured Party, the Lender Swap Parties, or the Prepetition Secured Parties in accordance with the terms of the DIP Credit Documents or this Order.

14.     ***Setoff of Lender Party Swap Obligations.***   Notwithstanding anything to the contrary herein or in the Bankruptcy Code, any proceeds due any of the Debtors resulting from the termination of a Lender Party Swap shall be deposited with the Administrative Agent and

applied in the following order: *first*, to repay the DIP Obligations; and, *second*, after the DIP

Obligations have been repaid in full in cash, to be deposited with the Debtors and distributed

pursuant to a plan of reorganization.

15.    ***Preservation of Rights Granted Under the Order.***

(i)    Except as expressly provided herein and subject to the Carve Out and

Permitted Liens (as defined in the DIP Credit Agreement), (a) no claim or lien having a priority

superior to or *pari passu* with those granted by this Order to the DIP Secured Parties, the Lender

Swap Parties, or the Prepetition Secured Parties, respectively, shall be granted or allowed while

any portion of the DIP Facility or the commitments thereunder or the DIP Obligations, Lender

Party Swap Obligations, or the Adequate Protection Obligations remain outstanding, and (b) the

DIP Liens and the Adequate Protection Liens shall not be (1) subject or junior to any lien or

security interest that is avoided and preserved for the benefit of the Debtors' estates under

section 551 of the Bankruptcy Code or (2) subordinate to or made *pari passu* with any other lien

or security interest, whether under section 364 of the Bankruptcy Code or otherwise.

(ii)    Each Guarantor's guarantee of the Borrower's obligations in connection

with the DIP Facility (the "DIP Guarantees"), and any liens granted thereunder by each

Guarantor to secure the obligations and liabilities arising pursuant to the DIP Guarantees, shall

not constitute a fraudulent conveyance or fraudulent transfer under section 548 of the

Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the provisions of any

applicable fraudulent conveyance or fraudulent transfer law or similar law of any state, nation, or

other governmental unit, as in effect from time to time.

(iii)    Unless all DIP Obligations shall have been indefeasibly paid in full in cash

in accordance with the DIP Credit Agreement and the Adequate Protection Obligations shall

KE 41500073

have been paid in full, no Debtor shall assert, file or seek, or consent to the filing or the assertion

of or joinder in, and it shall constitute an Event of Default under the DIP Credit Agreement and

terminate the right of the Debtors to use any and all Cash Collateral if any of the Debtors asserts,

files or seeks, or consents to the filing or the assertion of or joinder in, or if there is entered,

without the prior written consent of each of the DIP Secured Parties and the Prepetition Secured

Parties (a) any reversal, modification, amendment, stay, or vacatur of this Order; (b) an order

dismissing any of the Cases under sections 105, 305, or 1112 of the Bankruptcy Code or

otherwise; (c) an order converting any of the Cases to cases under chapter 7 of the Bankruptcy

Code; (d) an order appointing a chapter 11 trustee in any of the Cases; (e) an order appointing an

examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4)

of the Bankruptcy Code in any of the Cases; or (f) an order granting a change of venue with

respect to any Case.  If an order dismissing any of the Cases under section 1112 of the

Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance

with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, Adequate

Protection Superpriority Claims, and other administrative claims granted under this Order, the

DIP Liens, and the Adequate Protection Liens granted to the DIP Secured Parties, the Lender

Swap Parties, and, as applicable, the Prepetition Secured Parties, pursuant to this Order shall

continue in full force and effect and shall maintain their priorities as provided in this Order until

all of the DIP Obligations, the Lender Party Swap Obligations, and the Adequate Protection

Obligations shall have been paid and satisfied in full (and that such Superpriority Claims,

Adequate Protection Superpriority Claims, the other administrative claims granted under this

Order, the DIP Liens, and the Adequate Protection Liens shall, notwithstanding such dismissal,

remain binding on all parties in interest) and (y) the Court shall retain jurisdiction

KE 41500073

notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(iv)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall not affect (a) the validity, priority, or enforceability of any DIP Obligations, Lender Party Swap Obligations, or the Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Administrative Agent, the DIP Lenders, the Lender Swap Parties, or the Prepetition Secured Parties, as applicable, of the effective date of such reversal, stay, modification, or vacatur or (b) the validity, the priority, or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations, Lender Party Swap Obligations, or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification, or vacatur, any use of Cash Collateral, any DIP Obligations, Lender Party Swap Obligations, or any Adequate Protection Obligations incurred by the Debtors to any of the DIP Secured Parties, the Lender Swap Parties, and/or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Secured Parties, the Lender Swap Parties, and/or the Prepetition Secured Parties, as the case may be, of the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of this Order, and the DIP Secured Parties, the Lender Swap Parties, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code, this Order, and pursuant to the DIP Credit Documents with respect to all such uses of Cash Collateral and proceeds of the DIP Facility, all DIP Obligations, Lender Party Swap Obligations, and all Adequate Protection Obligations.

(v)      Except as expressly provided in this Order or in the DIP Credit Documents or Lender Party Swap Agreements, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and all other rights and remedies of the DIP Secured Parties, the Lender Swap Parties, and the Prepetition Secured Parties granted by the provisions of this Order, the Lender Party Swap Agreements, and the DIP Credit Documents shall survive, and shall not be modified, impaired, or discharged by (a) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases, terminating the joint administration of the Cases, or by any other act or omission, (b) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Credit Documents), or (c) except as may otherwise be provided in a plan of reorganization with respect to any allowed claims for diminution, the entry of an order confirming a plan of reorganization in any of the Cases, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations, Lender Party Swap Obligations, and Adequate Protection Obligations.  The terms and provisions of this Order, the Lender Party Swap Agreements, and the DIP Credit Documents shall continue in the Cases, in any successor cases thereto (the "Successor Cases") if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the Superpriority Claims and all other administrative claims granted pursuant to this Order, the Adequate Protection Obligations, and all other rights and remedies of the DIP Secured Parties, the Lender Swap Parties, and the Prepetition Secured Parties granted by the provisions of this Order, the Lender Party Swap Agreements, and the DIP Credit Documents shall continue in full

38

force and effect until the DIP Obligations, Lender Party Swap Obligations, and the Adequate

Protection Obligations are indefeasibly paid in full in cash.

16.     ***Effect of Stipulations on Third Parties.***     The stipulations and admissions

contained in this Order, including, without limitation, in paragraph E hereof, shall be binding in

all circumstances upon the Debtors and any successor thereto (including, without limitation, any

chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors), the Debtors' estates,

and all parties in interest, including, without limitation, any committee (including the

Committee) or any other person or entity acting on behalf of the Debtors, unless and solely to the

extent that (i) a properly authorized adversary proceeding or contested matter (subject to the

limitations contained herein, including, *inter alia*, in paragraph 17) has been commenced by the

Committee or any other party in interest with requisite standing other than the Debtors (or if the

Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as

defined below), the chapter 7 trustee in such successor case) (a) challenging the validity,

enforceability, priority, or extent of the Prepetition Indebtedness, the Prepetition Indebtedness

Documents, or the Prepetition Secured Parties' liens on the Prepetition Collateral or

(b) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other

avoidance power claims, subordination, recharacterization, or any other claims, counterclaims, or

causes of action, objections, contests, or defenses (collectively, "Claims and Defenses") against

any of the Prepetition Secured Parties or any of their affiliates, representatives, attorneys, or

advisors in connection with matters related to the Prepetition Indebtedness, the Prepetition

Indebtedness Documents, the Prepetition Collateral, or the Prepetition Secured Parties' liens on

the Prepetition Collateral, as applicable (such adversary proceeding or Claims and Defenses,

a "Challenge"), by the earlier of (1) in the case of the Committee, by no later than the date that is

KE 41500073

sixty (60) days after the date that notice of the formation of a Committee appointed under section 1102 of the Bankruptcy Code in the Cases is filed on the docket of such Cases and (2) with respect to other parties in interest with requisite standing other than the Debtors or the Committee, by no later than the date that is ninety (90) days after the date of entry of this Order (such time period established by the earlier of clauses (1) and (2) above, or such later date as has been agreed to, in writing, by the Prepetition Secured Parties in their sole discretion, the "Challenge Period"); and (ii) there is a final order in favor of the plaintiff sustaining any such Challenge in any such properly authorized and timely filed adversary proceeding; *provided* that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date.  If no such properly authorized adversary proceeding or contested matter is timely filed, then (x) to the extent not theretofore indefeasibly repaid, the Prepetition Indebtedness and all related obligations of the Debtors shall constitute allowed claims not subject to counterclaim, setoff, recoupment, subordination, recharacterization, defense, or avoidance, for all purposes, in the Cases and any subsequent chapter 7 cases, (y) the Prepetition Secured Parties' liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be legal, valid, binding, and perfected liens not subject to defense, counterclaim, recharacterization, subordination, or avoidance, and (z) the Prepetition Indebtedness, the Prepetition Indebtedness Documents, and the liens of the Prepetition Secured Parties on the Prepetition Collateral shall not be subject to any other or further challenge by the Debtors, any committee, or any party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors with respect thereto).  If any such properly authorized adversary proceeding

40

KE 41500073

or contested matter is timely filed, the stipulations and admissions contained in paragraph E hereof shall nonetheless remain binding and preclusive (as provided in the third sentence of this paragraph) on any committee, whether official, *ad hoc*, or other (including the Committee), and any other person or entity, except to the extent that any such findings and admissions were expressly and successfully challenged in such properly authorized and timely filed adversary proceeding.  Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee (including the Committee), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Facility, the Prepetition Indebtedness, the Prepetition Indebtedness Documents, or the Prepetition Secured Parties' liens on the Prepetition Collateral.  Except as expressly provided in this Order, the rights and remedies of the Prepetition Secured Parties granted by the provisions of this Order shall (x) survive and shall not be modified or affected by the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of the Cases or by any other act or omission, and (y) continue in the Cases or in any Successor Cases in full force and effect.

17.     ***Limitation on Use of Financing Proceeds and Collateral.***     Notwithstanding anything to the contrary herein or in any other order by this Court, none of the proceeds of the Loans and none of the DIP Obligations, the Cash Collateral, the DIP Collateral, or the Carve Out may be used for the following purposes, including any fees or expenses incurred by any professional in connection therewith:    (i) an assertion or joinder in (but excluding any investigation into) any claim, counter-claim, action, proceeding, application, motion, defense, or other contested matter seeking any order, judgment, determination or similar relief

41

(a) challenging the legality, validity, priority, perfection, or enforceability of any amount due under the DIP Credit Documents, the Prepetition Facility, or the Prepetition Indebtedness Documents or the liens, security interests, or claims granted under this Order, the DIP Credit Documents, or the Prepetition Indebtedness Documents; (b) invalidating, setting aside, recharacterizing, avoiding, or subordinating in whole or in part any amount due under the DIP Credit Documents, the Prepetition Facility, or the Prepetition Indebtedness Documents or the liens, security interests, or claims granted under this Order, the DIP Credit Documents, or the Prepetition Indebtedness Documents; (c) challenging or objecting to payment of any amount due under the DIP Credit Documents, the Prepetition Facility, or the Prepetition Indebtedness Documents pursuant to the chapter 11 plan of reorganization in any of the Cases; (d) preventing, hindering, or delaying the assertion or enforcement by any of the DIP Secured Parties, the Lender Swap Parties or the Prepetition Secured Parties of any of their respective liens, claims, rights, or security interests or realization upon the Prepetition Collateral, the DIP Collateral, the DIP Liens, the Secured Obligations, or the DIP Obligations; or (e) seeking to modify any of the rights granted to any of the DIP Secured Parties, the Lender Swap Parties, or the Prepetition Secured Parties hereunder or under the DIP Credit Documents, the Lender Party Swap Agreements, the Swap Order, or the Prepetition Indebtedness Documents, in each of the foregoing cases without such parties' prior written consent; (ii) the commencement or prosecution of any action or proceeding of any claims, causes or action, or defenses against any of the DIP Secured Parties, the Lender Swap Parties, or the Prepetition Secured Parties or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from any of the DIP Secured Parties, the Lender Swap Parties, or the Prepetition Secured Parties under

42

Chapter 5 of the Bankruptcy Code; or (iii) selling or otherwise disposing of any DIP Collateral,

using or seeking to use any insurance proceeds, or incurring any indebtedness, in each case to the

extent not permitted under the DIP Credit Documents or without the Administrative Agent's

express prior written consent; *provided* that notwithstanding the foregoing, an aggregate amount

not to exceed $50,000 of the DIP Facility, DIP Collateral, Cash Collateral, and Carve Out may

be used by the Committee (if any) to investigate the Prepetition Indebtedness and liens on the

Prepetition Collateral within the Challenge Period.  Nothing herein shall be construed as consent

to the allowance of any Debtor or Committee Professional Fees or shall affect the right of any of

the DIP Secured Parties, the Lender Swap Parties, or the Prepetition Secured Parties to object to

the allowance of such fees and expenses.

18.     ***Sales of Collateral, Right to Credit Bid.***  Upon entry of this Order, the DIP

Lenders and the Prepetition Secured Parties, with respect to the Prepetition Indebtedness,

respectively, shall have the right to credit bid up to the full amount of the DIP Obligations or the

Prepetition Indebtedness (subject to any Challenge), as applicable, in connection with any sale of

the DIP Collateral conducted (i) pursuant to a plan of reorganization subject to confirmation

under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code or (ii) pursuant to section 363 of the

Bankruptcy Code.  No sale of any DIP Collateral shall constitute a waiver by any DIP Lender or

the Prepetition Secured Parties of any deficiency claim under any applicable law, regardless of

whether the Administrative Agent, any DIP Lender, or any Prepetition Secured Party consents to

or opposes such sale and regardless of whether the DIP Obligations are credit bid in connection

with such sale.  For the avoidance of doubt, as part of the Adequate Protection Obligations, the

Prepetition Secured Parties shall be allowed to credit bid the full amount of the Prepetition

Indebtedness (subject to any Challenge) with respect to any sale of the Prepetition Collateral not

KE 41500073

in the ordinary course of business pursuant to a plan of reorganization or section 363 of the Bankruptcy Code.

19.     *Insurance.*  Wells Fargo Bank, National Association, as the Administrative Agent for the benefit of the Prepetition Secured Parties, shall be deemed to be the loss payee or additional insured under the Debtors' applicable insurance policies, shall act in such capacities, and, subject to the terms of the DIP Credit Documents, distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the payment in full of the DIP Obligations, *second*, to the payment of the Adequate Protection Obligations, and, *third*, to the payment of the Prepetition Indebtedness.

20.     *Recharacterization.*  In the event that it is determined by a final order that the Prepetition Secured Parties are not entitled to the payment of some or all interest payments required by paragraph 11(v) of this Order as adequate protection for the Diminution in Value of their interests in the Prepetition Collateral and the Prepetition Secured Parties are determined to be undersecured, then such interest payments shall either be applied as a payment made to the allowed amount of such Prepetition Secured Parties' unsecured deficiency claims or be applied to the principal balance of such Prepetition Secured Parties' secured claims.

21.     *Proofs of Claim.*  The Prepetition Secured Parties, DIP Secured Parties, and Lender Swap Parties will not be required to file proofs of claim in any of the Cases or Successor Cases in respect of any claims arising under or related to Prepetition Indebtedness, the Prepetition Indebtedness Documents, DIP Obligations, DIP Credit Documents, Lender Party Swap Obligations, or Lender Party Swap Agreements.  The Debtors' stipulations and admissions contained in this Order shall be deemed to constitute a timely proof of claim for the Prepetition Secured Parties upon approval of this Order, and the Prepetition Secured Parties shall be treated

KE 41500073

under section 502(a) of the Bankruptcy Code as if the Prepetition Secured Parties have filed a proof of claim and shall have an allowed claim (subject to any Challenge) with respect to the Prepetition Indebtedness for the purposes of credit bidding.  Nothing in this paragraph shall waive, alter, or modify the Prepetition Secured Parties' right to file, amend, and/or supplement, in its sole discretion, a proof of claim(s) in each of the Cases or Successor Cases for any claim allowed herein.

22.     ***Modifications of DIP Credit Documents.***  Without further Order of the Court, the Debtors and the DIP Secured Parties are hereby authorized to implement, in accordance with the terms of the respective DIP Credit Documents, any modifications to the Approved Budget, any extension of the maturity subject to the conditions set forth in the DIP Credit Documents, non-material modifications of the DIP Credit Documents (that do not shorten the maturity of the extensions of credit thereunder, increase the commitments thereunder, or otherwise do not materially change the terms of the DIP Credit Documents in a manner adverse to the interests of the Debtors) or waivers with respect to the DIP Credit Documents; *provided*, *however*, any material modification or amendment to the respective DIP Credit Documents not expressly authorized hereby or pursuant to the DIP Credit Documents shall be subject to court approval after notice and a hearing.

23.     ***Order Governs.***  The DIP Credit Documents and this Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Secured Parties; *provided* that in the event of any inconsistency between the provisions of the DIP Credit Documents and this Order, the provisions of this Order shall govern.

24.     ***Binding Effect; Successors and Assigns.***  The DIP Credit Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest

45

KE 41500073

in the Cases, including, without limitation, each of the DIP Secured Parties and the Prepetition

Secured Parties, any committee (including the Committee) appointed in the Cases, and the

Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee

hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit

of the DIP Secured Parties, the Lender Swap Parties, and the Prepetition Secured Parties, any

committee (including the Committee) appointed in the Cases, and the Debtors and their

respective successors and assigns; *provided*, *however*, that none of the DIP Secured Parties or

Lender Swap Parties shall have any obligation to extend any financing to any chapter 7 trustee or

similar responsible person appointed for the estates of the Debtors.  In determining to make any

loan or other financial accommodation under the DIP Credit Agreement or in exercising any

rights or remedies as and when permitted pursuant to this Order or the DIP Credit Documents,

none of the DIP Secured Parties or Lender Swap Parties, individually or collectively, shall be

deemed to be in control of the operations of the Debtors or to be acting as a "responsible person"

or "owner or operator" with respect to the operation or management of the Debtors (as such

terms, or any similar terms, are used in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*., as amended, or any

similar federal or state statute).

　　　　25.　　***DIP Fees and Expenses***.   The Debtors shall pay, without the need for the

Administrative Agent, the DIP Lenders, or the Lender Swap Parties to file retention motions or

fee applications, or to provide notice to any party, all (i) reasonable and documented out-of-

pocket expenses incurred by the Administrative Agent, the DIP Lenders, and the Lender Swap

Parties, including the reasonable and documented out-of-pocket fees, charges, and expenses of

counsel and other outside consultants for the Administrative Agent, the DIP Lenders, and the

46

Lender Swap Parties (limited to the reasonable and documented fees, expenses, and disbursements of (a) Bracewell LLP, (b) McGuireWoods LLP, (c) Opportune LLP, (d) such other consultants as may be retained or may have been retained from time to time by the Administrative Agent, in its sole discretion, and (e) such other consultants as may be retained or may have been retained from time to time by the DIP Lenders or Lender Swap Parties, with the prior written consent of the Debtors (which consent shall not be unreasonably withheld), including the reasonable travel, photocopy, mailing, courier, telephone, and other similar expenses in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery, and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent and any DIP Lender with respect thereto) of the DIP Credit Agreement and the other DIP Credit Documents and any amendments, modifications or waivers of, or consents related to the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs and expenses incurred by the Administrative Agent in connection with any filing, registration, recording, or perfection of any security interest contemplated or permitted by the DIP Credit Agreement or any other DIP Credit Document, and (iii) the reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and the DIP Lenders, including the fees, charges, and disbursements of any counsel for the Administrative Agent and the DIP Lenders as limited above and subject to the procedural requirements set forth in paragraph 26 hereof, in connection with the administration of, amendment or waiver of any provisions of, interpretation of, or enforcement or protection of its or their rights in connection with the DIP Credit Documents or Lender Party Swap Agreements, or in connection with the DIP Loans or hedges entered into pursuant to the Lender Party Swap Agreements, including,

KE 41500073

without limitation, all such out-of-pocket expenses incurred in connection with the discussion, negotiation, preparation, execution, and delivery of any documents related to any proposed financing of the Debtors, including the DIP Credit Documents and the Lender Party Swap Agreements, and the funding of all DIP Loans, such costs and expenses including, without limitation, due diligence, syndication (including printing, distribution, and bank meeting), transportation, duplication, messenger, audit, insurance, appraisal, and consultant costs and expenses.

26.     ***Professional Fee Procedural Requirements.***   A copy of each invoice shall be submitted to the Debtors for professional fees, expenses, and disbursements (to the extent incurred by such professionals after the Effective Date (as defined in the DIP Credit Agreement)), the payment of which is authorized by paragraphs 11(iv) and 25 of this Order (such fees and expenses, the "Lender Professional Fees").  The invoices for such Lender Professional Fees shall include the number of hours billed and a reasonably detailed description of the services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice (i) may be redacted to protect privileged, confidential, or proprietary information and (ii) shall not be required to contain individual time detail.  None of the Lender Professional Fees shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any payment on account thereof shall be required to file with respect thereto any interim or final fee application with the Court.  Payment of Lender Professional Fees shall not be delayed based on any objections thereto, and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of the Court.

KE 41500073

27.     The Debtors are authorized and empowered to jointly and severally indemnify and hold harmless the Administrative Agent (solely in its capacity as an administrative agent), each DIP Lender (solely in its capacity as a DIP Lender), and each other Indemnified Party (as defined in the DIP Credit Agreement) solely to the extent provided in the DIP Credit Agreement.

28.     *Effectiveness*.  This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

29.     *Retention of Jurisdiction*.  The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

30.     *Final Hearing.*  The Final Hearing on the Motion shall be held on _____, 2016, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2016, and shall be served on:  (i) the Debtors, Penn Virginia Corporation, Four Radnor Corporate Center, Suite 200, 100 Matsonford Road, Radnor Pennsylvania 19087, Attn: General Counsel; (ii) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Edward O. Sassower, P.C. and Brian E. Schartz, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Justin R. Bernbrock and Benjamin M. Rhode; (iii) proposed co-counsel to the Debtors, Kutak Rock LLP, Bank of America Center, 1111 East Main Street, Suite 800, Richmond, Virginia 23219, Attn: Michael A. Condyles, Peter J. Barrett, and Jeremy S. Williams; (iv) the Administrative

49

Agent, [___]; (v) the indenture trustees for the Unsecured Notes, [___] and [___]; (vi) counsel to

the Ad Hoc Committee of Noteholders, Milbank Tweed Hadley & McCloy, 28 Liberty Street,

New York, New York 10005, Samuel Khalil, Brian Kinney, and Bradley Friedman; (vii) counsel

to the Administrative Agent, Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas

77002, Attn: Stephanie Song and Kurt Mayr; (viii) co-counsel to the Administrative Agent,

McGuireWoods LLP, 800 East Canal Street, Richmond, Virginia 23219, Attn: Dion W. Hayes

and Sarah B. Boehm; (ixi) counsel to any statutory committee appointed in these cases; and

(x) the Office of The United States Trustee, 701 East Broad Street, Suite 4304, Richmond,

Virginia 23219, Attn: Robert Van Arsdale, Esq., and 210 First Street, Suite 505, Roanoke,

Virginia 24011, Attn: Webb King, Esq.  In the event no objections to entry of a final order on

the Motion are timely received, this Court may enter such final order without need for the Final

Hearing.


Richmond, Virginia                              _____
                                                UNITED STATES BANKRUPTCY JUDGE

KE 41500073

WE ASK FOR THIS:

/s/ Michael A. Condyles
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219
Telephone:          (804) 644-1700
Facsimile:          (804) 783-6192

- and -

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C.
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:          (212) 446-4800
Facsimile:          (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Justin R. Bernbrock (*pro hac vice* admission pending)
Benjamin M. Rhode (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:          (312) 862-2000
Facsimile:          (312) 862-2200

*Proposed Co-Counsel to the Debtors*


<u>**CERTIFICATION OF ENDORSEMENT**</u>
<u>**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**</u>

        Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order
has been endorsed by or served upon all necessary parties.

                                        /s/ Michael A. Condyles

KE 41500073

**Exhibit C** to the Restructuring Support Agreement

**Backstop Commitment Agreement**

*Execution Version*

BACKSTOP COMMITMENT AGREEMENT

AMONG

PENN VIRGINIA CORPORATION

AND

THE COMMITMENT PARTIES PARTY HERETO

Dated as of May 10, 2016

TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ............................................................................................ **2**

    Section 1.1    Definitions ................................................................................ 2

    Section 1.2    Construction .............................................................................. 16

**ARTICLE II BACKSTOP COMMITMENT** ............................................................ **16**

    Section 2.1    The Rights Offering; Subscription Rights ................................. 16

    Section 2.2    The Backstop Commitment ...................................................... 17

    Section 2.3    Commitment Party Default ....................................................... 17

    Section 2.4    Escrow Account Funding .......................................................... 18

    Section 2.5    Closing ..................................................................................... 19

    Section 2.6    Designation and Assignment Rights .......................................... 19

**ARTICLE III BACKSTOP COMMITMENT PREMIUM AND EXPENSE
REIMBURSEMENT** ......................................................................................... **21**

    Section 3.1    Premium Payable by the Company ............................................ 21

    Section 3.2    Payment of Premium ................................................................ 21

    Section 3.3    Expense Reimbursement ........................................................... 22

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY** ........ **22**

    Section 4.1    Organization and Qualification ................................................. 22

    Section 4.2    Corporate Power and Authority ................................................ 23

    Section 4.3    Execution and Delivery; Enforceability .................................... 23

    Section 4.4    Authorized and Issued Capital Stock ........................................ 24

    Section 4.5    Issuance ................................................................................... 25

    Section 4.6    No Conflict ............................................................................... 25

    Section 4.7    Consents and Approvals ............................................................ 25

    Section 4.8    Arm's-Length ............................................................................ 26

i

TABLE OF CONTENTS (cont'd)

Page

Section 4.9     Financial Statements ..................................................................... 26

Section 4.10    Company SEC Documents and Disclosure Statement............................. 26

Section 4.11    Absence of Certain Changes ............................................................. 27

Section 4.12    No Violation; Compliance with Laws .................................................. 27

Section 4.13    Legal Proceedings .......................................................................... 27

Section 4.14    Labor Relations ............................................................................. 27

Section 4.15    Intellectual Property........................................................................ 27

Section 4.16    Title to Real and Personal Property .................................................... 28

Section 4.17    No Undisclosed Relationships ........................................................... 28

Section 4.18    Licenses and Permits....................................................................... 29

Section 4.19    Environmental................................................................................ 29

Section 4.20    Tax Returns .................................................................................. 30

Section 4.21    Employee Benefit Plans ................................................................... 30

Section 4.22    Internal Control Over Financial Reporting ............................................. 31

Section 4.23    Disclosure Controls and Procedures .................................................... 31

Section 4.24    Material Contracts........................................................................... 32

Section 4.25    No Unlawful Payments .................................................................... 32

Section 4.26    Compliance with Money Laundering Laws............................................. 32

Section 4.27    Compliance with Sanctions Laws........................................................ 32

Section 4.28    No Broker's Fees ........................................................................... 33

Section 4.29    Takeover Statutes .......................................................................... 33

Section 4.30    Investment Company Act ................................................................. 33

Section 4.31    Insurance ..................................................................................... 33

Section 4.32    Alternative Transactions .................................................................. 33

#4823-7500-2415

TABLE OF CONTENTS (cont'd)

Page

**ARTICLE  V  REPRESENTATIONS  AND  WARRANTIES  OF  THE
COMMITMENT PARTIES** ..................................................................................... **33**

Section 5.1     Incorporation .............................................................................. 33

Section 5.2     Corporate Power and Authority .................................................. 33

Section 5.3     Execution and Delivery ............................................................... 34

Section 5.4     No Conflict .................................................................................. 34

Section 5.5     Consents and Approvals ............................................................. 34

Section 5.6     No Registration ........................................................................... 35

Section 5.7     Purchasing Intent ........................................................................ 35

Section 5.8     Sophistication; Investigation ...................................................... 35

Section 5.9     No Broker's Fees ......................................................................... 35

Section 5.10    Note Claims ................................................................................. 35

Section 5.11    Arm's-Length .............................................................................. 36

**ARTICLE VI ADDITIONAL COVENANTS** ........................................................... **36**

Section 6.1     Orders Generally ......................................................................... 36

Section 6.2     Confirmation Order; Plan and Disclosure Statement ................. 36

Section 6.3     Conduct of Business .................................................................... 37

Section 6.4     Access to Information; Confidentiality ....................................... 38

Section 6.5     Financial Information ................................................................... 39

Section 6.6     Commercially Reasonable Efforts .............................................. 39

Section 6.7     Registration Rights Agreement; Reorganized Company Corporate
Documents; Rights Offering Procedures ................................... 40

Section 6.8     Blue Sky ...................................................................................... 41

Section 6.9     DTC Eligibility ........................................................................... 41

Section 6.10    Use of Proceeds ........................................................................... 41

TABLE OF CONTENTS (cont'd)

Page

Section 6.11    Share Legend ................................................................ 41

Section 6.12    Antitrust Approval ......................................................... 42

Section 6.13    Alternative Transactions ................................................ 43

Section 6.14    Hedging Arrangements .................................................. 43

**ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ................. 44**

Section 7.1     Conditions to the Obligations of the Commitment Parties ...................... 44

Section 7.2     Waiver of Conditions to Obligations of Commitment Parties ................. 46

Section 7.3     Conditions to the Obligations of the Debtors ........................................... 46

**ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION ........................................... 47**

Section 8.1     Indemnification Obligations .......................................... 47

Section 8.2     Indemnification Procedure ............................................ 48

Section 8.3     Settlement of Indemnified Claims .................................. 49

Section 8.4     Contribution .................................................................. 49

Section 8.5     Treatment of Indemnification Payments ......................... 50

Section 8.6     No Survival .................................................................... 50

**ARTICLE IX TERMINATION ........................................................................................... 50**

Section 9.1     Consensual Termination ................................................ 50

Section 9.2     Automatic Termination .................................................. 50

Section 9.3     Termination by the Company ......................................... 52

Section 9.4     Effect of Termination ..................................................... 53

**ARTICLE X GENERAL PROVISIONS ............................................................................ 54**

Section 10.1    Notices .......................................................................... 54

Section 10.2    Assignment; Third Party Beneficiaries ......................... 55

Section 10.3    Prior Negotiations; Entire Agreement ........................... 56

iv

TABLE OF CONTENTS (cont'd)

Page

Section 10.4    Governing Law; Venue................................................................................ 56

Section 10.5    Waiver of Jury Trial.................................................................................. 57

Section 10.6    Counterparts.............................................................................................. 57

Section 10.7    Waivers and Amendments; Rights Cumulative; Consent......................... 57

Section 10.8    Headings ................................................................................................... 57

Section 10.9    Specific Performance ............................................................................... 57

Section 10.10          Damages......................................................................................... 58

Section 10.11          No Reliance .................................................................................... 58

Section 10.12          Publicity ......................................................................................... 58

Section 10.13          Settlement Discussions ................................................................. 58

Section 10.14          No Recourse................................................................................... 59

SCHEDULES

Schedule 1          Backstop Commitment Percentages

Schedule 2          Note Claims

Schedule 3          Consents

EXHIBITS

Exhibit A          Form of Rights Offering Procedures

#4823-7500-2415

## BACKSTOP COMMITMENT AGREEMENT

THIS BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of May 10, 2016, is made by and among Penn Virginia Corporation, a Virginia corporation and the ultimate parent of each of the other Debtors (as the debtor in possession and a reorganized debtor, as applicable, the "**Company**"), on behalf of itself and the other Debtors, on the one hand, and the parties set forth on Schedule 1 hereto (each referred to herein, individually, as a "**Commitment Party**" and, collectively, as the "**Commitment Parties**"), on the other hand. The Company and each Commitment Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**".  Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meaning given to them in the Plan.

## RECITALS

WHEREAS, the Debtors and the Commitment Parties have entered into a Restructuring Support Agreement, dated as of May 10, 2016 (such agreement, including all the exhibits thereto, as may be amended, supplemented or otherwise modified from time to time, the "**Restructuring Support Agreement**"), which (a) provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a "prearranged" plan of reorganization to be filed in jointly administered cases (the "**Chapter 11 Cases**") under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended from time to time, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**"), implementing the terms and conditions of the Restructuring Transactions, including the terms and conditions set forth in the Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement (the "**Restructuring Term Sheet**") and (b) requires that the Plan be consistent with the Restructuring Support Agreement.

WHEREAS, the Debtors plan to file with the Bankruptcy Court, in accordance with the terms of the Restructuring Support Agreement, motions seeking entry of (u) the Approval Order; (v) the Plan Solicitation Order; (w) an interim Order authorizing use of cash collateral and debtor in-possession financing, on terms consistent with the DIP Credit Agreement (the "**Interim DIP Order**"); (x) a final Order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP Credit Agreement (the "**Final DIP Order**," and together with the Interim DIP Order, collectively, the "**DIP Orders**"); and (y) the Confirmation Order.

WHEREAS, pursuant to the Plan and this Agreement, and in accordance with the Rights Offering Procedures, the Company will conduct a rights offering for the Rights Offering Shares in the Rights Offering Amount at an aggregate purchase price of $50,000,000 and at the Per Share Purchase Price.

WHEREAS, subject to the terms and conditions contained in this Agreement, each Commitment Party has agreed to purchase (on a several and not joint basis) its Backstop Commitment Percentage of the Unsubscribed Shares, if any.

1

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby agrees as follows:

ARTICLE I

**DEFINITIONS**

Section 1.1    <u>Definitions</u>.  Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below or in the Plan, as applicable:

"**Acceptable Hedging Program**" has the meaning set forth in <u>Section 6.14</u>.

"**Ad Hoc Committee**" means that certain ad hoc committee of Noteholders (including any Ultimate Purchaser(s) to which any member thereof or any of its Affiliates has transferred all or a portion of its Backstop Commitment pursuant to <u>Section 2.6(b)</u>) represented by Milbank, Tweed, Hadley & McCloy LLP.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code. "**Affiliated**" has a correlative meaning.

"**Affiliated Fund**" means any investment fund the primary investment advisor to which is such Commitment Party or an Affiliate thereof.

"**Aggregate New Common Shares**" means the total number of shares of New Common Stock of the Reorganized Company outstanding as of the Closing Date (without giving effect to the New Common Stock issued or issuable under the Rights Offering or in respect of the Commitment Premium or in respect of the new management incentive plan adopted in accordance with the Restructuring Term Sheet).

"**Agreement**" has the meaning set forth in the Preamble.

"**Alternative Transaction**" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), or restructuring of any of the Debtors, other than the Restructuring Transactions.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any of them.

"**Antitrust Laws**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in <u>Section 4.7</u>.

"**Approval Order**" means an Order of the Bankruptcy Court, approving the Debtors' assumption of and entry into the Restructuring Support Agreement, including all exhibits and other attachments thereto, including without limitation this Agreement and the Exit Commitment Letters, pursuant to section 365 of the Bankruptcy Code.

"**Available Shares**" means the Unsubscribed Shares that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party.

"**Backstop Commitment**" has the meaning set forth in <u>Section 2.2</u>.

"**Backstop Commitment Percentage**" means, with respect to any Commitment Party, such Commitment Party's percentage of the Backstop Commitment as set forth opposite such Commitment Party's name under the column titled "<u>Backstop Commitment Percentage</u>" on <u>Schedule 1</u> (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement). Any reference to "Backstop Commitment Percentage" in this Agreement means the Backstop Commitment Percentage in effect at the time of the relevant determination.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**BCA Approval Obligations**" means the obligations of the Company and the other Debtors under this Agreement and the Approval Order.

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Bylaws**" means the amended and restated bylaws of the Company as of the Closing Date, which shall be consistent with the terms set forth in the Restructuring Support Agreement and in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.

"**Certificate of Incorporation**" means the amended and restated certificate of incorporation of the Company as of the Closing Date, which shall be consistent with the terms set forth in the Restructuring Support Agreement and the Plan, and otherwise be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

3

#4823-7500-2415

"**Closing**" has the meaning set forth in Section 2.5(a).

"**Closing Date**" has the meaning set forth in Section 2.5(a).

"**Code**" means the Internal Revenue Code of 1986.

"**Commitment Party**" has the meaning set forth in the Preamble.

"**Commitment Party Default**" means the failure by any Commitment Party to (a) deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of any Unsubscribed Shares by the Escrow Account Funding Date in accordance with Section 2.4(b) or (b) fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering and duly purchase all Rights Offering Shares issuable to it pursuant to such exercise, in accordance with the Rights Offering Procedures and the Plan.

"**Commitment Party Replacement**" has the meaning set forth in Section 2.3(a).

"**Commitment Party Replacement Period**" has the meaning set forth in Section 2.3(a).

"**Commitment Premium**" has the meaning set forth in Section 3.1.

"**Commitment Premium Settlement Percentage**" means the percentage determined by multiplying (a) 100% by (b) the quotient determined by dividing (i) the Commitment Premium by (ii) the Discounted Equity Plan Value.

"**Company**" has the meaning set forth in the Preamble.

"**Company Disclosure Schedules**" means the disclosure schedules delivered by the Company to the Commitment Parties on the date of this Agreement.

"**Company Plan**" means any employee pension benefit plan, as such term is defined in Section 3(2) of ERISA, (other than a Multiemployer Plan), subject to the provisions of Title IV of ERISA or Section 412 or 430 of the Code or Section 302 of ERISA, and (i) sponsored or maintained (at the time of determination or at any time within the six years prior thereto) by the Company or any of its Subsidiaries or any ERISA Affiliate, or with respect to which any such entity has any liability or obligation or (ii) in respect of which the Company or any of its Subsidiaries or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

4

"**Confirmation Order**" means a Final Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting Noteholders**" means each Noteholder that is party to the Restructuring Support Agreement, solely in its capacity as such.

"**Consenting RBL Lenders**" means each RBL Lender that is party to the Restructuring Support Agreement, solely in its capacity as such.

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Debtors**" means, collectively, each of the following, as the debtors in possession and reorganized debtors, as applicable:  Penn Virginia Corporation; Penn Virginia Holding Corporation; Penn Virginia MC Corporation; Penn Virginia MC Energy L.L.C.; Penn Virginia MC Gathering Company L.L.C.; Penn Virginia MC Operating Company L.L.C.; Penn Virginia Oil & Gas Corporation; Penn Virginia Oil & Gas GP LLC; Penn Virginia Oil & Gas LP LLC; Penn Virginia Oil & Gas, L.P.; and Penn Virginia Resource Holdings Corp.

"**Defaulting Commitment Party**" means in respect of a Commitment Party Default that is continuing, the applicable defaulting Commitment Party.

"**Definitive Documentation**" means the definitive documents and agreements governing the Restructuring Transactions as set forth in the Restructuring Support Agreement.

"**DIP Agent**" means Wells Fargo Bank, N.A., or any successor thereto, as administrative agent under the DIP Facility, solely in its capacity as such.

"**DIP Credit Agreement**" means that certain senior secured debtor-in-possession credit agreement, dated as of May 11, 2016, as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors, the DIP Lenders, and the DIP Agent.

"**DIP Facility**" means that certain $25 million debtor-in-possession financing facility provided by the DIP Lenders pursuant to the DIP Credit Agreement and the DIP Orders.

"**DIP Lenders**" means certain RBL Lenders that have agreed to provide the DIP Facility, solely in their capacity as such.

"**DIP Orders**" has the meaning set forth in the Recitals.

"**Disclosure Statement**" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Penn Virginia Corporation and its Debtor Affiliates*, dated as of May 12, 2016, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and

5

distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

"**Discounted Equity Plan Value**" means $95,100,000.

"**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan have been satisfied or waived in accordance with Section 9.2 of the Plan.

"**Environmental Laws**" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders in council, Orders, decrees, treaties, directives, judgments or legally binding agreements promulgated or entered into by or with any Governmental Entity, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material or to health and safety matters (to the extent relating to the environment or Hazardous Materials).

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Company or any of its Subsidiaries, is, or at any relevant time during the past six years was, treated as a single employer under any provision of Section 414 of the Code.

"**ERISA Event**" means (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Company Plan; (b) any failure by any Company Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Company Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Company Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Company Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by the Company or any of its Subsidiaries or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Company Plan, including the imposition of any Lien in favor of the PBGC or any Company Plan or Multiemployer Plan; (e) a determination that any Company Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); (f) the receipt by the Company or any of its Subsidiaries or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Company Plan or to appoint a trustee to administer any Company Plan under Section 4042 of ERISA; (g) the incurrence by the Company or any of its Subsidiaries or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Company Plan or Multiemployer Plan; (h) the receipt by the Company or any of its Subsidiaries or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Company or any of its Subsidiaries or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA), or in "endangered" or "critical status" (within the meaning of Section 305 of ERISA or Section 432 of

the Code); (i) the conditions for imposition of a Lien under Section 303(k) of ERISA or Section 430(k) of the Code shall have been met with respect to any Company Plan; (j) the adoption of an amendment to a Company Plan requiring the provision of security to such Company Plan pursuant to Section 307 of ERISA; or (k) receipt from the IRS of notice of the failure of any Company Plan (or any other employee benefit plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Company Plan to qualify for exemption from taxation under Section 501(a) of the Code.

"**Escrow Account**" has the meaning set forth in Section 2.4(a).

"**Escrow Account Funding Date**" has the meaning set forth in Section 2.4(b).

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exit Commitment Letters**" means the commitment letter and related fee letter with respect thereto attached to the Restructuring Support Agreement as Exhibit E setting forth the Exit Facility Lenders' commitment to provide the Exit Facility.

"**Exit Facility**" means the new reserve-based lending facility credit agreement on the terms set forth in the Exit Facility Term Sheet and the Exit Commitment Letters attached to the Restructuring Support Agreement as Exhibit D and Exhibit E, respectively.

"**Exit Facility Lender**" means any lender under the Exit Facility, solely in its capacity as such.

"**Exit Facility Term Sheet**" means the term sheet attached to the Restructuring Support Agreement as Exhibit D setting forth the terms and conditions of the Exit Facility.

"**Expense Reimbursement**" has the meaning set forth in Section 3.3(a).

"**Filing Party**" has the meaning set forth in Section 6.12(b).

"**Final DIP Order**" has the meaning set forth in the Recitals.

"**Final Order**" means, as applicable, an Order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the Order could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such Order, or has otherwise been dismissed with prejudice.

"**Financial Reports**" has the meaning set forth in Section 6.5(a).

"**Financial Statements**" has the meaning set forth in Section 4.9.

"**Funding Notice**" has the meaning set forth in the Subscription Agreement.

"**GAAP**" has the meaning set forth in Section 4.9.

"**Governmental Entity**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Indenture**" means that certain Senior Indenture, dated as of June 15, 2009, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, governing the Company's 7.250% Senior Notes due 2019 and the 8.500% Senior Notes due 2020, among the Company, each of the guarantors party thereto, and the Indenture Trustee.

"**Indenture Trustee**" means Wilmington Savings Fund Society, FSB, or any successor thereto, as trustee under the Indenture.

"**Intellectual Property Rights**" has the meaning set forth in Section 4.15.

"**Interim DIP Order**" has the meaning set forth in the Recitals.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Filing Party**" has the meaning set forth in Section 6.12(c).

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry of their direct reports, of the chief executive officer, chief financial officer, chief operating officer and general counsel of the Company.  As used herein, "actual knowledge" means information that is personally known by the listed individual(s).

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"**Legal Proceedings**" has the meaning set forth in Section 4.13.

8

"**Legend**" has the meaning set forth in <u>Section 6.11</u>.

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in <u>Section 8.1</u>.

"**Material Adverse Effect**" means any Event, which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, or (b) the ability of the Company and its Subsidiaries, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Transaction Agreements, including the Rights Offering, in each case, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Company and its Subsidiaries operate, including any change in the United States or foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby (including any act or omission of the Company or its Subsidiaries expressly required or prohibited, as applicable, by this Agreement or consented to or required by the Requisite Commitment Parties in writing); (iv) changes in the market price or trading volume of the claims or equity or debt securities of the Company or any of its Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the departure of officers or directors of the Company or any of its Subsidiaries (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (vi) the filing or pendency of the Chapter 11 Cases or actions taken in connection with the Chapter 11 Cases that are directed by the Bankruptcy Court and made in compliance with the Bankruptcy Code; (vii) declarations of national emergencies or natural disasters; (viii) the effect of any action taken by Commitment Parties or their Affiliates with respect to the DIP Facility or with respect to the Debtors (including through such Persons' participation in the Chapter 11 Cases); (ix) any matters expressly disclosed in the Disclosure Statement or the Company Disclosure Schedules as delivered on the date hereof; or (x) the occurrence of a Commitment Party Default; <u>provided</u>, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such Event is disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other companies in the industries in which the Company and its Subsidiaries operate.

"**Material Contracts**" means (a) all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which the Company or any of its Subsidiaries is a party, (b) any Contracts to which the Company or any of its Subsidiaries is a party that is likely to reasonably involve consideration of more than $5,000,000, in the aggregate, over a twelve-month period, and (c) the Contracts described in Section 1.1 of the Company Disclosure Schedules.

"**Minimum Commitment Parties**" means members of the Ad Hoc Committee holding at least thirty-five percent (35%) of the Backstop Commitment that is held by the Commitment Parties that are members of the Ad Hoc Committee as of the date on which the consent or approval of such members is solicited; provided, that for the purposes of this definition, each Commitment Party shall be deemed to hold the Backstop Commitment held by such Commitment Party's Related Purchasers.

"**Money Laundering Laws**" has the meaning set forth in Section 4.26.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Company or any of its Subsidiaries or any ERISA Affiliate is making or accruing an obligation to make contributions, has within any of the preceding six plan years made or accrued an obligation to make contributions, or each such plan with respect to which any such entity has any liability or obligation.

"**New Common Stock**" means the common stock of the Reorganized Company.

"**Note Claims**" means all claims against the Debtors arising on account of the Indenture and the Notes.

"**Noteholders**" means all holders of the Notes.

"**Notes**" means the 7.250% Senior Notes due 2019 and the 8.500% Senior Notes due 2020, in each case issued pursuant to the Indenture.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Outside Date**" has the meaning set forth in Section 9.2(a).

"**Party**" has the meaning set forth in the Preamble.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not yet delinquent or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens for labor, materials or supplies provided with respect to any Real Property or personal property incurred in the ordinary course of business consistent with

10

past practice and as otherwise not prohibited under this Agreement, for amounts that do not materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of the Company or any of its Subsidiaries, or, if for amounts that do materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of the Company or any of its Subsidiaries, if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; provided, that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (d) easements, covenants, conditions, restrictions on transfer and other similar matters affecting title to any Real Property (including any title retention agreement) and other title defects and encumbrances that do not or would not materially impair the ownership, use or occupancy of such Real Property or the operation of the Company's or any of its Subsidiaries' business; (e) Liens granted under any Contracts (including joint operating agreements, oil and gas leases, farmout agreements, joint development agreements, transportation agreements, marketing agreements, seismic licenses and other similar operational oil and gas agreements), in each case, to the extent the same are ordinary and customary in the oil and gas business and do not or would not materially impair the ownership, use or occupancy of any Real Property or the operation of the Company's or any of its Subsidiaries' business; (f) Liens granted under the DIP Credit Agreement and the DIP Orders; (g) from and after the occurrence of the Effective Date, Liens granted in connection with the Exit Facility; and (h) Liens that, pursuant to the Plan and the Confirmation Order, will be discharged and released on the Effective Date.

"**Per Share Purchase Price**" means (a) the difference between the Discounted Equity Plan Value and the Rights Offering Amount divided by (b) the Aggregate New Common Shares.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization.

"**Petition Date**" means the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

"**Plan**" means the Debtors' joint plan of reorganization to be approved by the Confirmation Order, including the Plan Supplement and all exhibits, supplements, appendices and schedules thereto, in form and substance reasonably satisfactory to each of the Requisite Commitment Parties and the Company, as may be amended, supplemented, or modified from time to time in accordance with its terms and with the Restructuring Support Agreement and in a manner that is reasonably acceptable to the Requisite Commitment Parties and the Company.

"**Plan Solicitation Motion**" means the Debtors' motion, in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company, for an order, among other things, (a) approving the Disclosure Statement; (b) establishing a voting record date for the Plan; (c) approving solicitation packages and procedures for the distribution thereof; (d) approving the forms of ballots; (e) establishing procedures for voting on the Plan;

(f) establishing notice and objection procedures for the confirmation of the Plan; (g) approving the Rights Offering Procedures; and (h) establishing procedures for the assumption and/or assignment of executory Contracts and unexpired leases under the Plan.

"**Plan Solicitation Order**" means an Order entered by the Bankruptcy Court approving the relief requested in the Plan Solicitation Motion, which Order shall be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), including without limitation disclosure required under section 1129(a)(5) of the Bankruptcy Code, to be filed by the Debtors no later than 14 days before the Confirmation Hearing, and additional documents or amendments to previously filed documents, filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Exit Facility Documents; (b) the New Organizational Documents; (c) a list of retained Causes of Action; (d) the New Shareholders' Agreement; (e) the Description of Transaction Steps; (f) the Registration Rights Agreement; (g) the Schedule of Assumed Executory Contracts and Unexpired Leases; (h) the Schedule of Rejected Executory Contracts and Unexpired Leases; (i) the Agreement; and (j) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with and subject to the Restructuring Support Agreement.

"**Pre-Closing Period**" has the meaning set forth in Section 6.3.

"**RBL Agent**" means Wells Fargo Bank, N.A., or any successor thereto, as administrative agent under the RBL Credit Agreement, solely in its capacity as such.

"**RBL Credit Agreement**" means that certain Credit Agreement, dated as of September 28, 2012, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, by and among Penn Virginia Holding Corporation, as borrower, the Company, as parent, each of the guarantors party thereto, the RBL Agent, and the RBL Lenders.

"**RBL Lenders**" means the lenders party to the RBL Credit Agreement, solely in their capacity as such.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by the Company or any of its Subsidiaries, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Registration Rights Agreement**" has the meaning set forth in Section 6.7(a).

"**Related Party**" means, with respect to any Person, (i) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (ii) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"**Related Purchaser**" has the meaning set forth in Section 2.6(a).

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment. "**Released**" has a correlative meaning.

"**Reorganized Company**" means the Company, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

"**Reorganized Company Corporate Documents**" means, collectively, the Bylaws and the Certificate of Incorporation.

"**Replacing Commitment Parties**" has the meaning set forth in Section 2.3(a).

"**Reportable Event**" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30 day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Company Plan.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Requisite Commitment Parties**" means members of the Ad Hoc Committee holding at least two-thirds of the Backstop Commitment that is held by the Commitment Parties that are members of the Ad Hoc Committee as of the date on which the consent or approval of such members is solicited; provided, that for the purposes of this definition, each Commitment Party shall be deemed to hold the Backstop Commitment held by such Commitment Party's Related Purchasers.

"**Restructuring Support Agreement**" has the meaning set forth in the Recitals.

"**Restructuring Support Parties**" means, collectively, the Consenting Noteholders, the DIP Lenders, the Commitment Parties, and the RBL Lenders in their capacity as Consenting RBL Lenders, DIP Lenders and Exit Facility Lenders, in each case, that are party to the Restructuring Support Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals.

"**Restructuring Transactions**" has the meaning set forth in the Restructuring Support Agreement.

13

"**Rights Offering**" means the rights offering that is backstopped by the Commitment Parties in connection with the Restructuring Transactions substantially on the terms reflected in the Restructuring Support Agreement and this Agreement, and in accordance with the Rights Offering Procedures.

"**Rights Offering Amount**" means an amount equal to $50,000,000.

"**Rights Offering Expiration Time**" means the time and the date on which the rights offering subscription forms must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures, together with the applicable aggregate Per Share Purchase Price.

"**Rights Offering Participants**" means those Persons who duly subscribe for Rights Offering Shares in accordance with the Rights Offering Procedures.

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering that are approved by the Bankruptcy Court pursuant to the Plan Solicitation Order, which procedures shall be in form and substance substantially as set forth on Exhibit A hereto, may be modified in a manner that is reasonably acceptable to the Requisite Commitment Parties and the Company.

"**Rights Offering Shares**" means the shares of New Common Stock (including all Unsubscribed Shares purchased by the Commitment Parties pursuant to this Agreement) distributed pursuant to and in accordance with the Rights Offering Procedures.

"**Rights Offering Subscription Agent**" means Epiq Bankruptcy Solutions LLC or another subscription agent appointed by the Company and satisfactory to the Requisite Commitment Parties.

"**RSA Effective Date**" has the meaning set forth in the Restructuring Support Agreement.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subscription Agreement**" means that certain Subscription Agreement, by and between the Company and the Subscriber (as defined therein).

"**Subscription Rights**" means the subscription rights to purchase Rights Offering Shares.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body, or (c) has the power to direct the business and policies.

14

"**Takeover Statute**" means any restrictions contained in any "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation.

"**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.   For the avoidance of doubt, such term shall exclude any tax, penalties or interest thereon that result or have resulted from the non-payment of royalties.

"**Termination Date**" has the meaning set forth in the Restructuring Support Agreement.

"**Termination Fee**" means $2,000,000, which represents 4% of the Rights Offering Amount.

"**Transaction Agreements**" has the meaning set forth in Section 4.2(a).

"**Transfer**" means to sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest in a Subscription Right, a Note Claim, a Rights Offering Share or a share of New Common Stock).   "**Transfer**" used as a noun has a correlative meaning.

"**Ultimate Purchaser**" has the meaning set forth in Section 2.6(b).

"**Unfunded Pension Liability**" means the excess of a Company Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Company Plan's assets, determined in accordance with the assumptions used for funding the Company Plan pursuant to Section 412 of the Code for the applicable plan year.

"**Unlegended Shares**" has the meaning set forth in Section 6.9.

"**Unsubscribed Shares**" means the Rights Offering Shares that have not been duly purchased by the Rights Offering Participants in accordance with the Rights Offering Procedures and the Plan.

"**willful or intentional breach**" has the meaning set forth in Section 9.4(a).

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Section 4203 of ERISA.

Section 1.2    Construction.    In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e)    the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)    references to "day" or "days" are to calendar days;

(h)    references to "the date hereof" means the date of this Agreement;

(i)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(j)    references to "dollars" or "$" refer to currency of the United States of America, unless otherwise expressly provided.

ARTICLE II

**BACKSTOP COMMITMEN**T

Section 2.1    The Rights Offering; Subscription Rights.    On and subject to the terms and conditions hereof, including entry of the Approval Order, the Company shall

conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures and the Plan Solicitation Order.  If reasonably requested by the Requisite Commitment Parties from time to time prior to the Rights Offering Expiration Time (and any extensions thereto), the Company shall notify, or cause the Rights Offering Subscription Agent to notify, the Commitment Parties of the aggregate number of Subscription Rights known by the Company or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.

Section 2.2    The Backstop Commitment.  On and subject to the terms and conditions hereof, including entry of the Approval Order, each Commitment Party agrees, severally and not jointly, to fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering and duly purchase all Rights Offering Shares issuable to it pursuant to such exercise, in accordance with the Rights Offering Procedures and the Plan; provided that any Commitment Party that fails to comply with such obligations shall be liable to each non-Defaulting Commitment Party as a result of such failure to comply.  On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Commitment Party agrees, severally and not jointly, to purchase, and the Company agrees to sell to such Commitment Party, on the Closing Date for the applicable aggregate Per Share Purchase Price, the number of Unsubscribed Shares equal to (a) such Commitment Party's Backstop Commitment Percentage multiplied by (b) the aggregate number of Unsubscribed Shares, rounded among the Commitment Parties solely to avoid fractional shares as the Commitment Parties may determine in their sole discretion (provided that in no event shall such rounding reduce the aggregate commitment of such Commitment Parties).  The obligations of the Commitment Parties to purchase the Unsubscribed Shares as described in this Section 2.2 shall be referred to as the "**Backstop Commitment**".

Section 2.3    Commitment Party Default.

(a)    Upon the occurrence of a Commitment Party Default, the Commitment Parties that are, or are Affiliated with, members of the Ad Hoc Committee (other than any Defaulting Commitment Party) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Commitment Parties of such Commitment Party Default, which notice shall be given promptly following the occurrence of such Commitment Party Default and to all Commitment Parties substantially concurrently (such five (5) Business Day period, the "**Commitment Party Replacement Period**"), to make arrangements for one or more of the Commitment Parties that is, or is Affiliated with, a member of the Ad Hoc Committee (other than the Defaulting Commitment Party) to purchase all or any portion of the Available Shares (such purchase, a "**Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the Commitment Parties electing to purchase all or any portion of the Available Shares, or, if no such agreement is reached, based upon the relative applicable Backstop Commitment Percentages of any such Commitment Parties that are, or are Affiliated with, members of the Ad Hoc Committee (other than the Defaulting Commitment Party) (such Commitment Parties, the "**Replacing Commitment Parties**").  Any such Available Shares purchased by a Replacing Commitment Party (and the commitment and applicable aggregate Per Share Purchase Price associated therewith) shall be included, among other things, in the determination of (x) the Unsubscribed Shares of such Replacing Commitment Party for all

17

purposes hereunder, (y) the Backstop Commitment Percentage of such Replacing Commitment Party for purposes of <u>Section 2.3(c)</u> and <u>Section 3.1</u> and (z) the Backstop Commitment of such Replacing Commitment Party for purposes of the definition of "Requisite Commitment Parties". If a Commitment Party Default occurs, the Outside Date shall be delayed only to the extent necessary to allow for the Commitment Party Replacement to be completed within the Commitment Party Replacement Period.

(b)    If a Commitment Party is a Defaulting Commitment Party, it shall not be entitled to any of the Commitment Premium or Termination Fee hereunder.

(c)    Nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Backstop Commitment Percentage of the Unsubscribed Shares.

(d)    For the avoidance of doubt, notwithstanding anything to the contrary set forth in <u>Section 9.4</u> but subject to <u>Section 10.10</u>, no provision of this Agreement shall relieve any Defaulting Commitment Party from liability hereunder, or limit the availability of the remedies set forth in <u>Section 10.9</u>, in connection with any such Defaulting Commitment Party's Commitment Party Default.

Section 2.4    <u>Escrow Account Funding</u>.

(a)    <u>Funding Notice</u>. No later than the fifth (5th) Business Day following the Rights Offering Expiration Time, the Rights Offering Subscription Agent shall deliver to each Commitment Party the Funding Notice setting forth (i) the number of Rights Offering Shares elected to be purchased by the Rights Offering Participants and the aggregate Per Share Purchase Price therefor; (ii) the aggregate number of Unsubscribed Shares, if any, and the aggregate Per Share Purchase Price therefor; (iii) the aggregate number of Unsubscribed Shares (based upon such Commitment Party's Backstop Commitment Percentage) to be issued and sold by the Company to such Commitment Party and the aggregate Per Share Purchase Price therefor; and (iv) subject to the last sentence of <u>Section 2.4(b)</u>, the escrow account designated in escrow agreements mutually satisfactory to each of the Parties, acting reasonably, to which such Commitment Party shall deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of the Unsubscribed Shares (the "**Escrow Account**"). The Company shall promptly direct the Rights Offering Subscription Agent to provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Commitment Party may reasonably request.

(b)    <u>Escrow Account Funding</u>. At the Effective Date or such earlier date agreed with the Requisite Commitment Parties pursuant to escrow agreements mutually satisfactory to each of the Parties, acting reasonably (the "**Escrow Account Funding Date**"), each Commitment Party shall deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of the Unsubscribed Shares by wire transfer in immediately available funds in U.S. dollars into the Escrow Account in satisfaction of such Commitment Party's Backstop Commitment. Notwithstanding the foregoing, if the Parties are unable to agree to escrow agreements that are mutually acceptable to each of them, then all payments contemplated to be made by the Noteholders to the Escrow Account pursuant to this

18

Section 2.4 shall instead be made to a Company bank account designated by the Company in the Funding Notice and shall be delivered and paid to such account on or prior to the Closing Date.

Section 2.5   Closing.

(a)   Subject to Article VII, unless otherwise mutually agreed in writing between the Company and the Requisite Commitment Parties, the closing of the Backstop Commitment (the "**Closing**") shall take place at the offices of Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005, at 10:00 a.m., New York City time, on the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**".

(b)   At the Closing, the funds held in the Escrow Account (and any amounts paid to a Company bank account pursuant to the last sentence of Section 2.4(b)) shall, as applicable, be released and utilized in accordance with the Plan.

(c)   At the Closing, issuance of the Unsubscribed Shares will be made by the Company to each Commitment Party (or to its designee in accordance with Section 2.6(a)) against payment of the aggregate Per Share Purchase Price for the Unsubscribed Shares of such Commitment Party, in satisfaction of such Commitment Party's Backstop Commitment.  Unless a Commitment Party requests delivery of a physical stock certificate, the entry of any Unsubscribed Shares to be delivered pursuant to this Section 2.5(c) into the account of a Commitment Party pursuant to the Company's book entry procedures and delivery to such Commitment Party of an account statement reflecting the book entry of such Unsubscribed Shares shall be deemed delivery of such Unsubscribed Shares for purposes of this Agreement.  Notwithstanding anything to the contrary in this Agreement, all Unsubscribed Shares will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company.

Section 2.6   Designation and Assignment Rights.

(a)   Each Commitment Party shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of the Unsubscribed Shares that it is obligated to purchase hereunder be issued in the name of, and delivered to, one or more of its Affiliates or Affiliated Funds (other than any portfolio company of such Commitment Party or its Affiliates) (each, a "**Related Purchaser**") upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Commitment Party and each such Related Purchaser, (ii) specify the number of Unsubscribed Shares to be delivered to or issued in the name of such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations set forth in Sections 5.6 through 5.9 as applied to such Related Purchaser; provided, that no such designation pursuant to this Section 2.6(a) shall relieve such Commitment Party from its obligations under this Agreement.

19

(b)    Except as set forth in <u>Section 2.6(c)</u>, each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment only to (i) any investment fund the primary investment advisor to which is such Commitment Party or an Affiliate thereof (an "**Affiliated Fund**") or (ii) one or more special purpose vehicles that are wholly owned by one or more of such Commitment Party and its Affiliated Funds, created for the purpose of holding such Backstop Commitment or holding debt or equity of the Debtors, and with respect to which such Commitment Party either (A) has provided an adequate equity support letter or a guarantee of such special purpose vehicle's Backstop Commitment or (B) otherwise remains obligated to fund the Backstop Commitment to be Transferred until the consummation of the Plan; <u>provided</u>, that such special purpose vehicle shall not be related to or Affiliated with any portfolio company of such Commitment Party or any of its Affiliates or Affiliated Funds (other than solely by virtue of its affiliation with such Commitment Party) and the equity of such special purpose vehicle shall not be directly or indirectly transferable other than to such Persons described in clause (i) or (ii) of this <u>Section 2.6(b)</u>, and in such manner, as such Commitment Party's Backstop Commitment is transferable pursuant to this <u>Section 2.6(b)</u> (each of the Persons referred to in clauses (i) and (ii), an "**Ultimate Purchaser**"), and that, in each case, provides a written agreement to the Company under which it (x) confirms the accuracy of the representations set forth in <u>Article V</u> as applied to such Ultimate Purchaser, (y) agrees to purchase such portion of such Commitment Party's Backstop Commitment, and (z) agrees to be fully bound by, and subject to, this Agreement as a Commitment Party hereto; <u>provided</u>, that no sale or Transfer pursuant to this <u>Section 2.6(b)</u> shall relieve such Commitment Party from its obligations under this Agreement.  Other than as set forth in this <u>Section 2.6(b)</u>, no Commitment Party shall be permitted to Transfer its Backstop Commitment without the prior written consent of the Company and the Requisite Commitment Parties, which shall not be unreasonably withheld, conditioned or delayed.

(c)    Additionally, each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to a Restructuring Support Party or any other entity to whom such Commitment Party transfers its Note Claims in accordance with the Restructuring Support Agreement, in each case, in full compliance with all transfer restrictions set forth in the Restructuring Support Agreement, including those contained in subclause (a) of Section 12 thereof, <u>provided</u>, <u>further</u>, that in accordance with the Restructuring Support Agreement, such transferee agrees in writing to be bound by the obligations of such Commitment Party under this Agreement and is determined, after due inquiry and investigation by the Restructuring Support Parties and the Debtors, to be reasonably capable of fulfilling such obligations.  Upon compliance with this <u>Section 2.6(c)</u>, the transferring Commitment Party shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this <u>Section 2.6(c)</u> shall be deemed null and void ab initio and of no force or effect, regardless of any prior notice provided to the Parties or any Commitment Party, and shall not create any obligation or liability of any Debtor or any other Commitment Party to the purported transferee.

(d)    Each Commitment Party, severally and not jointly, agrees that it will not Transfer, at any time prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, any of its rights and obligations under this Agreement to any Person other than in accordance with <u>Sections 2.3</u>, <u>2.6(a)</u>, <u>2.6(b)</u> or <u>2.6(c)</u>.  After the Closing Date,

nothing in this Agreement shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer any of the shares of New Common Stock or any interest therein; <u>provided</u>, that any such Transfer shall be made pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable securities Laws.

<div align="center">ARTICLE III</div>

<div align="center">**BACKSTOP COMMITMENT PREMIUM AND EXPENSE REIMBURSEMENT**</div>

Section 3.1    <u>Premium Payable by the Company</u>.  Subject to <u>Section 3.2</u>, in consideration for the Backstop Commitment and the other agreements of the Commitment Parties in this Agreement, the Debtors shall pay or cause to be paid a nonrefundable aggregate premium in an amount equal to $3,000,000, which represents 6% of the Rights Offering Amount, payable in accordance with <u>Section 3.2</u>, to the Commitment Parties (including any Replacing Commitment Party, but excluding any Defaulting Commitment Party) or their designees based upon their respective Backstop Commitment Percentages at the time the payment is made (the "**Commitment Premium**").

The provisions for the payment of the Commitment Premium, the Termination Fee and Expense Reimbursement, and the indemnification provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.

Section 3.2    <u>Payment of Premium</u>.  The Commitment Premium shall be fully earned, nonrefundable and non-avoidable upon entry of the Approval Order and shall be paid by the Debtors, free and clear of any withholding or deduction for any applicable Taxes, on the Closing Date as set forth above.  For the avoidance of doubt, to the extent payable in accordance with the terms of this Agreement, the Commitment Premium will be payable regardless of the amount of Unsubscribed Shares (if any) actually purchased.  The Company shall satisfy its obligation to pay the Commitment Premium on the Closing Date by, in lieu of any cash payments, issuing the number of additional shares of New Common Stock (rounding down to the nearest whole share solely to avoid fractional shares) to the Commitment Parties that is required to be issued so that, after giving effect to the New Common Stock issued or issuable under the Rights Offering and in respect of the satisfaction of the Commitment Premium by way of issuance of such additional shares of New Common Stock pursuant to this <u>Section 3.2</u>, the Commitment Parties are issued, in satisfaction of the Company's obligation to pay the Commitment Premium, the Commitment Premium Settlement Percentage of the total number of shares of New Common Stock of the Reorganized Company outstanding as of the Closing Date (excluding from such total number of shares of New Common Stock any shares of New Common Stock issued or issuable in respect of the new management incentive plan adopted in accordance with the Restructuring Term Sheet); <u>provided</u>, that if the Closing does not occur, the Termination Fee shall be payable (in lieu of the Commitment Premium), in cash, to the extent provided in <u>Section 9.4</u>.

<div align="center">21</div>

Section 3.3       Expense Reimbursement.

(a)       The Debtors agree to pay, in accordance with Section 3.3(b) below, (A) the reasonable and documented fees and expenses (including travel costs and expenses) of Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") as primary counsel, one local counsel, W.D. Von Gonten & Co. as engineer consultants, and PJT Partners LP, as financial advisor, for all Consenting Noteholders and Commitment Parties, and Heidrick & Struggles as consultant, retained by Milbank, as counsel to the Ad Hoc Committee, and any such other advisors or consultants as may be reasonably determined by the Consenting Noteholders and the Commitment Parties, in consultation with the Company, and (B) subject to entry of the Approval Order, all filing fees, if any, required by the HSR Act or any other Antitrust Law in connection with the transactions contemplated by this Agreement and all reasonable and documented expenses related thereto (such payment obligations set forth in clauses (A) and (B) above, collectively, the "**Expense Reimbursement**").  The Expense Reimbursement shall, pursuant to the Approval Order, constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code.

(b)       The Expense Reimbursement described in Section 3.3(a)(A) shall be paid in accordance with Section 14 of the Restructuring Support Agreement.  The Expense Reimbursement described in Section 3.3(a)(B) accrued through the date on which the Approval Order is entered shall be paid in accordance with the DIP Orders, and the Approval Order upon its entry by the Bankruptcy Court, and in no event later than two Business Days after the date of the entry of the Approval Order.  The Expense Reimbursement described in Section 3.3(a)(B) shall thereafter be payable by the Debtors in accordance with the DIP Orders and the Approval Order; provided, that the Debtors' final payment shall be made contemporaneously with the Closing or the termination of this Agreement pursuant to Article IX.  The Commitment Parties shall promptly provide summary copies of all invoices (redacted as necessary to protect privileges) to the Debtors and to the United States Trustee.

ARTICLE IV

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except (i) as set forth in the corresponding section of the Company Disclosure Schedules or (ii) as disclosed in the Company SEC Documents filed with the SEC on or after December 31, 2015 and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior to the date hereof (excluding the exhibits, annexes and schedules thereto, any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature), the Debtors, jointly and severally, hereby represent and warrant to the Commitment Parties (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 4.1       Organization and Qualification.  The Company and each of its Subsidiaries (a) is a duly organized and validly existing corporation, limited liability company or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization (except where the

failure to be in good standing (or the equivalent) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect), (b) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, except in the cases of clauses (b) and (c) where the failure to have such authority or qualifications would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2     Corporate Power and Authority.

(a)     The Company has the requisite corporate power and authority (i) (A) subject to entry of the Approval Order and the Confirmation Order, to enter into, execute and deliver this Agreement and to perform the BCA Approval Obligations and (B) subject to entry of the Approval Order and the Confirmation Order, to perform each of its other obligations hereunder and (ii) subject to entry of the Approval Order, the Plan Solicitation Order, and the Confirmation Order, to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver the Registration Rights Agreement and all other agreements to which it will be a party as contemplated by this Agreement and the Plan (this Agreement, the Plan, the Disclosure Statement, the Restructuring Support Agreement, the Registration Rights Agreement, the debtor-in-possession credit agreement for the DIP Facility to be entered into in accordance with the DIP Credit Agreement and the DIP Orders, the Exit Facility, and such other agreements and any Plan supplements or documents referred to herein or therein or hereunder or thereunder, collectively, the "**Transaction Agreements**") and to perform its obligations under each of the Transaction Agreements (other than this Agreement).  Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(b)     Subject to entry of the Approval Order, the Plan Solicitation Order, and the Confirmation Order, each of the other Debtors has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver each Transaction Agreement to which such other Debtor is a party and to perform its obligations thereunder.  Subject to entry of the Approval Order, the Plan Solicitation Order, and the Confirmation Order, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite action (corporate or otherwise) on behalf of each other Debtor party thereto, and no other proceedings on the part of any other Debtor party thereto are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

Section 4.3     Execution and Delivery; Enforceability.  Subject to entry of the Approval Order, this Agreement will have been, and subject to the entry of the Approval Order, the Plan Solicitation Order, and the Confirmation Order, each other Transaction

23

Agreement will be, duly executed and delivered by the Company and each of the other Debtors party thereto.  Upon entry of the Approval Order and assuming due and valid execution and delivery hereof by the Commitment Parties, the BCA Approval Obligations will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.  Upon entry of the Approval Order and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Commitment Parties and, to the extent applicable, any other parties hereof and thereof, each of the obligations of the Company and, to the extent applicable, the other Debtors hereunder and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

Section 4.4     Authorized and Issued Capital Stock.

(a)     On the Closing Date, (i) the total issued capital stock of the Company will consist of the Aggregate New Common Shares plus the shares of New Common Stock issued under the Rights Offering plus the shares of New Common Stock issued in respect of the Commitment Premium pursuant to Article III, (ii) no shares of New Common Stock will be held by the Company in its treasury, (iii) no shares of New Common Stock will be reserved for issuance upon exercise of stock options and other rights to purchase or acquire shares of New Common Stock granted in connection with any employment arrangement entered into in accordance with Section 6.3, except as reserved in respect of the new management incentive plan adopted in accordance with the Restructuring Term Sheet, and (iv) no warrants to purchase shares of New Common Stock will be issued and outstanding.

(b)     As of the Closing Date, all issued and outstanding shares of New Common Stock will have been duly authorized and validly issued and will be fully paid and non-assessable, and will not be subject to any preemptive rights.

(c)     Except as set forth in this Section 4.4, as of the Closing Date, no shares of capital stock or other equity securities or voting interest in the Company will have been issued, reserved for issuance or outstanding.

(d)     Except as described in this Section 4.4 and except as set forth in the Registration Rights Agreement, the Reorganized Company Corporate Documents and this Agreement, as of the Closing Date, neither the Company nor any of its Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any of its Subsidiaries or any security convertible or

24

exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company or any of its Subsidiaries, (ii) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any shares of capital stock of the Company or any of its Subsidiaries (other than any restrictions included in the Exit Facility or any corresponding pledge agreement) or (iv) relates to the voting of any shares of capital stock of the Company.

Section 4.5    <u>Issuance</u>.  The shares of New Common Stock to be issued pursuant to the Plan, including the shares of New Common Stock to be issued in connection with the consummation of the Rights Offering and pursuant to the terms hereof, will, when issued and delivered on the Closing Date in exchange for the aggregate Per Share Purchase Price therefor, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, Liens (other than Transfer restrictions imposed hereunder or under the Reorganized Company Corporate Documents or by applicable Law), preemptive rights, subscription and similar rights (other than any rights set forth in the Reorganized Company Corporate Documents, and the Registration Rights Agreement).

Section 4.6    <u>No Conflict</u>.    Assuming the consents described in clauses (a) through (g) of <u>Section 4.7</u> are obtained, the execution and delivery by the Company and, if applicable, its Subsidiaries of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, its Subsidiaries with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which the Company or any of its Subsidiaries (including any Subsidiaries that are not Debtors) will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the Company or any of its Subsidiaries (including any Subsidiaries that are not Debtors) will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of the Reorganized Company Corporate Documents or any of the organization documents of any of the Company's Subsidiaries (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Company's or any Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases), or (c) result in any violation of any Law or Order applicable to the Company or any of its Subsidiaries (including any Subsidiaries that are not Debtors) or any of their properties, except in each of the cases described in clause (a) or (c) for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7    <u>Consents and Approvals</u>.    No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over the Company or any of its Subsidiaries or any of their properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, its Subsidiaries of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, to the extent relevant, its Subsidiaries with the

provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the Approval Order authorizing the Company to assume this Agreement and perform the BCA Approval Obligations, (b) entry of the Plan Solicitation Order, (c) entry by the Bankruptcy Court, or any other court of competent jurisdiction, of orders as may be necessary in the Chapter 11 Cases from time-to-time;  (d) the entry of the Confirmation Order, (e) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, (f) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the purchase of the Unsubscribed Shares by the Commitment Parties, the issuance of the Subscription Rights, the issuance of the Rights Offering Shares pursuant to the exercise of the Subscription Rights, the issuance of New Common Stock as payment of the Commitment Premium, and (g) any Applicable Consents that, if not made or obtained, would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole.

Section 4.8    Arm's-Length.   The Company acknowledges and agrees that (a) each of the Commitment Parties is acting solely in the capacity of an arm's-length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of its Subsidiaries and (b) no Commitment Party is advising the Company or any of its Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.9    Financial Statements.   The audited consolidated balance sheets of the Company as at December 31, 2015 and the related consolidated statements of operations and of cash flows for the fiscal year then ended, accompanied by a report thereon by KPMG LLP (collectively, the "**Financial Statements**"), present fairly the consolidated financial condition of the Company as at such date, and the consolidated results of its operations and its consolidated cash flows for the fiscal year then ended.  All such Financial Statements, including the related schedules and notes thereto, have been prepared in accordance with U.S. generally accepted accounting principles ("**GAAP**") applied consistently throughout the periods involved (except as disclosed therein).

Section 4.10   Company SEC Documents and Disclosure Statement.  Since December 31, 2014, the Company has filed all required reports, schedules, forms and statements with the SEC.  As of their respective dates, and giving effect to any amendments or supplements thereto filed prior to the date of this Agreement, each of the Company SEC Documents that have been filed as of the date of this Agreement complied in all material respects with the requirements of the Securities Act or the Exchange Act applicable to such Company SEC Documents.  The Company has filed with the SEC all Material Contracts that are required to be filed as exhibits to the Company SEC Documents that have been filed as of the date of this Agreement.  No Company SEC Document that has been filed prior to the date of this Agreement, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, in each case filed prior to the date of this Agreement, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were

made, not misleading.  The Disclosure Statement as approved by the Bankruptcy Court will conform in all material respects with section 1125 of the Bankruptcy Code.

Section 4.11   Absence of Certain Changes.  Since December 31, 2015 to the date of this Agreement, no event, development, occurrence or change has occurred or exists that constitutes, individually or in the aggregate, a Material Adverse Effect.

Section 4.12   No Violation; Compliance with Laws.  (i) The Company is not in violation of its charter or bylaws, and (ii) no Subsidiary of the Company is in violation of its respective charter or bylaws or similar organizational document in any material respect. Neither the Company nor any of its Subsidiaries is or has been at any time since January 1, 2013 in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.13   Legal Proceedings. Other than as listed in Section 4.13 of the Company Disclosure Schedules and other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which the Company or any of its Subsidiaries is a party or to which any property of the Company or any of its Subsidiaries is the subject, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Transaction Agreements or that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.14   Labor Relations.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or threatened against the Company or any of its Subsidiaries; (b) the hours worked and payments made to employees of the Company or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters; and (c) all payments due from the Company or any of its Subsidiaries or for which any claim may be made against the Company or any of its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Company or such Subsidiaries to the extent required by GAAP.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the transactions contemplated by the Transaction Agreements will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which the Company or any of its Subsidiaries (or any predecessor) is a party or by which the Company or any of its Subsidiaries (or any predecessor) is bound.

Section 4.15   Intellectual Property.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of the Company and its Subsidiaries owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**Intellectual Property**

27

**Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, (b) to the Knowledge of the Company, none of the Company or any of its Subsidiaries nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by such Person, is interfering with, infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any Person, and (c) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of the Company, threatened.

Section 4.16    Title to Real and Personal Property.

(a)    Real Property.  Each of the Company and its Subsidiaries has valid fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its Real Properties and has valid title to its personal property and assets, in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of the Company, all such properties and assets are free and clear of Liens, other than Permitted Liens.

(b)    Leased Real Property.  Each of the Company and its Subsidiaries is in compliance with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each of the Company and its Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Personal Property.  Each of the Company and its Subsidiaries owns or possesses the right to use, all Intellectual Property Rights and all licenses and rights with respect to any of the foregoing used in the conduct of their businesses, without any conflict (of which the Company or any of its Subsidiaries has been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the Company and its Subsidiaries, as the case may be, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.17    No Undisclosed Relationships.  Other than Contracts or other direct or indirect relationships between or among the Company and its Subsidiaries or between the Subsidiaries of the Company and each other, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among the Company or any of its Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Company or any of its Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that is not so

described, except for the transactions contemplated by this Agreement. Any Contract existing as of the date hereof between or among the Company or any of its Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Company or any of its Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC is filed as an exhibit to, or incorporated by reference as indicated in, the Annual Report on Form 10-K for the year ended December 31, 2015 that the Company filed on March 15, 2016 or another Company SEC Document filed between March 15, 2016 and the date hereof.

Section 4.18    Licenses and Permits. The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the business, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Neither the Company nor any of its Subsidiaries (i) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.19    Environmental. Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) no written notice, claim, demand, request for information, Order, complaint or penalty has been received by the Company or any of its Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Company or any of its Subsidiaries, (b) the Company and each of its Subsidiaries has all environmental permits, licenses and other approvals, and has maintained all financial assurances, necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits, licenses and other approvals and with all other applicable Environmental Laws, (c) to the Knowledge of the Company, no Hazardous Material is located at, on or under any property currently owned, operated or leased by the Company or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its Subsidiaries under any Environmental Laws, (d) no Hazardous Material has been generated, owned, treated, stored, handled or controlled by the Company or any of its Subsidiaries and transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its Subsidiaries under any Environmental Laws, and (e) there are no agreements in which the Company or any of its Subsidiaries has expressly assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other Person arising under or relating to Environmental Laws, which in any such case has not been made available to the Commitment Parties prior to the date hereof.

29

Section 4.20    Tax Returns.

(a)    Except as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole, (i) each of the Company and its Subsidiaries has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it and (ii) taken as a whole, each such Tax return is true and correct;

(b)    Each of the Company and its Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the date hereof (except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which the Company and its Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or with respect to the Debtors only, except to the extent the non-payment thereof is permitted by the Bankruptcy Code), which Taxes, if not paid or adequately provided for, would reasonably be expected to be material to the Company and its Subsidiaries taken as a whole; and

(c)    As of the date hereof, with respect to the Company and its Subsidiaries, other than in connection with the Chapter 11 Cases and other than Taxes or assessments that are being contested in good faith and are not expected to result in significant negative adjustments that would be material to the Company and its Subsidiaries taken as a whole, (i) there are no claims being asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from, the IRS or any other Governmental Entity.

Section 4.21    Employee Benefit Plans.

(a)    Except for the filing and pendency of the Chapter 11 Cases or otherwise as would not reasonably be expected to result, individually or in the aggregate, in material liability to the Company or any of its Subsidiaries: (i) each Company Plan and each Multiemployer Plan is in compliance with the applicable provisions of ERISA and the Code; (ii) no Reportable Event has occurred during the past six years (or is reasonably likely to occur); (iii) no Company Plan has any Unfunded Pension Liability in excess of $2,000,000 with respect to any single Company Plan and in excess of $3,000,000 with respect to all Company Plans in the aggregate; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) none of the Company or any of its Subsidiaries has engaged in a "prohibited transaction" (as defined in Section 406 of ERISA and Section 4975 of the Code) in connection with any employee pension benefit plan (as defined in Section 3(2) of ERISA) that would subject the Company or any of its Subsidiaries to Tax; (vi) no employee welfare plan (as defined in Section 3(1) of ERISA) maintained or contributed to by the Company or any of its Subsidiaries provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA); and (vii) none of the Company or any of its Subsidiaries or any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability.

(b)    Neither the Company nor any of its Subsidiaries has established, sponsored or maintained, or has any liability with respect to, any employee pension benefit plan or other employee benefit plan, program, policy, agreement or arrangement governed by or subject to the Laws of a jurisdiction other than the United States of America.

(c)    Except as would not be reasonably expected to result, individually or in the aggregate, in a Material Adverse Effect, there are no pending, or to the Knowledge of the Company, threatened claims, sanctions, actions or lawsuits, asserted or instituted against any Company Plan or any Person as fiduciary or sponsor of any Company Plan, in each case other than claims for benefits in the normal course.

(d)    Within the last six years, no Company Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect nor has any Company Plan with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA).

(e)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all compensation and benefit arrangements of the Company and its Subsidiaries comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements, and neither the Company, nor any of its Subsidiaries, could reasonably be expected to have any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Section 409A or 4999 of the Code.

(f)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company and each of its Subsidiaries has complied and is currently in compliance with all Laws and legal requirements in respect of personnel, employment and employment practices; (ii) all service providers of the Company or its Subsidiaries are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable tax and employment policies or law); and (iii) the Company and its Subsidiaries have not and are not engaged in any unfair labor practice.

Section 4.22    Internal Control Over Financial Reporting.  The Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies in all material respects with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.  To the Knowledge of the Company, there are no material weaknesses in the Company's internal control over financial reporting as of the date hereof.

Section 4.23    Disclosure Controls and Procedures.  The Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's

rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

Section 4.24  <u>Material Contracts</u>.  All Material Contracts are valid, binding and enforceable by and against the Company or its relevant Subsidiary and, to the Knowledge of the Company, each other party thereto (except where the failure to be valid, binding or enforceable does not constitute a Material Adverse Effect), and no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company or any of its Subsidiaries (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).  Other than as a result of the filing of the Chapter 11 Cases, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.25  <u>No Unlawful Payments</u>.  Since January 1, 2012, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers or employees has in any material respect: (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 4.26  <u>Compliance with Money Laundering Laws</u>.  The operations of the Company and its Subsidiaries are and, since January 1, 2013 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company and its Subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar Laws (collectively, the "**Money Laundering Laws**") and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

Section 4.27  <u>Compliance with Sanctions Laws</u>.  Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.  The Company will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

#4823-7500-2415

Section 4.28    No Broker's Fees.    Neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Shares.

Section 4.29    Takeover Statutes.    No Takeover Statute is applicable to this Agreement, the Backstop Commitment and the other transactions contemplated by this Agreement.  As of the entry of the Approval Order, the board of directors of the Company shall have authorized and approved the issuance of the New Common Stock, including the Rights Offering Shares, pursuant to this Agreement, the Plan and the Rights Offering.

Section 4.30    Investment Company Act.    Neither the Company nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 4.31    Insurance.    The Company and its Subsidiaries have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses.    All premiums due and payable in respect of material insurance policies maintained by the Company and its Subsidiaries have been paid.    The Company reasonably believes that the insurance maintained by or on behalf of the Company and its Subsidiaries is adequate in all material respects.    As of the date hereof, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has received notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company and its Subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 4.32    Alternative Transactions.    As of the date hereof, neither the Company nor any of its Subsidiaries is pursuing, or in discussions regarding, any solicitation, offer, or proposal from any Person concerning any actual or proposed Alternative Transaction.

ARTICLE V

**REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES**

Each Commitment Party represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1    Incorporation.    Such Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 5.2    Corporate Power and Authority.    Such Commitment Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreements to which such Commitment Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action

33

(corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

    Section 5.3  <u>Execution and Delivery</u>.  This Agreement and each other Transaction Agreement to which such Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Commitment Party and (b) upon entry of the Approval Order and assuming due and valid execution and delivery hereof and thereof by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Commitment Party, enforceable against such Commitment Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

    Section 5.4  <u>No Conflict</u>.  Assuming that the consents referred to in clauses (a) and (b) of <u>Section 5.5</u> are obtained, the execution and delivery by such Commitment Party of this Agreement and each other Transaction Agreement to which such Commitment Party is a party, the compliance by such Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Commitment Party is party or is bound or to which any of the property or assets or such Commitment Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Commitment Party and (c) will not result in any material violation of any Law or Order applicable to such Commitment Party or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement.

    Section 5.5  <u>Consents and Approvals</u>.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Commitment Party or any of its properties is required for the execution and delivery by such Commitment Party of this Agreement and each other Transaction Agreement to which such Commitment Party is a party, the compliance by such Commitment Party with the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Commitment Party of its Backstop Commitment Percentage of the Unsubscribed Shares and its portion of the Rights Offering Shares) contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement and each other Transaction Agreement to which such Commitment Party is a party and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement.

<div align="center">34</div>

Section 5.6    No Registration.  Such Commitment Party understands that (a) the Unsubscribed Shares and any shares of New Common Stock issued to such Commitment Party in satisfaction of the Commitment Premium, have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the foregoing shares cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.7    Purchasing Intent.  Such Commitment Party is acquiring the Unsubscribed Shares and any shares of New Common Stock issued to such Commitment Party in satisfaction of the Commitment Premium, for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Commitment Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.8    Sophistication; Investigation.  Such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Unsubscribed Shares and any shares of New Common Stock issued to such Commitment Party in satisfaction of the Commitment Premium.   Such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.   Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time).   Except for the representations and warranties expressly set forth in this Agreement or any other Transaction Agreement, such Commitment Party disclaims reliance on any representations or warranties, either express or implied, by or on behalf of the Company or any of its Subsidiaries.

Section 5.9    No Broker's Fees.  Such Commitment Party is not a party to any Contract with any Person (other than the Transaction Agreements and any Contract giving rise to the Expense Reimbursement hereunder) that would give rise to a valid claim against the Company or any of its Subsidiaries for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Shares.

Section 5.10    Note Claims.

(a)    As of the date hereof, such Commitment Party and its Affiliates (to the extent of such Commitment Party's knowledge) were, collectively, the beneficial owner of, or the investment advisor or manager for the beneficial owner of, at least the aggregate principal amount of Note Claims as set forth opposite such Commitment Party's name under the column titled "Note Claims" on Schedule 2 attached hereto.

(b)    As of the date hereof, such Commitment Party or its applicable Affiliates has the full power to vote, dispose of and compromise at least the aggregate principal amount of

35

the Note Claims set forth opposite such Commitment Party's name under the column titled "Note Claims" on Schedule 2 attached hereto.

(c)     As of the date hereof, such Commitment Party has not entered into any Contract to Transfer, in whole or in part, any portion of its right, title or interest in such Note Claims where such Transfer would prohibit such Commitment Party from complying with the terms of this Agreement or the Restructuring Support Agreement.

Section 5.11   Arm's-Length.  Such Commitment Party acknowledges and agrees that (a) the Company and its Subsidiaries are acting solely in the capacities of arm's-length contractual counterparties to such Commitment Party with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, such Commitment Party and (b) neither the Company nor any of its Subsidiaries is advising such Commitment Party as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

ARTICLE VI

**ADDITIONAL COVENANTS**

Section 6.1   Orders Generally.  The Company shall support and make commercially reasonable efforts, consistent with the Restructuring Support Agreement, to (a) obtain the entry of the Approval Order, the Plan Solicitation Order, the Confirmation Order, and the DIP Orders, and (b) cause the Approval Order, the Plan Solicitation Order, the Confirmation Order, and the DIP Orders to become Final Orders (and request that such Orders become Final Orders effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable), in each case, as soon as reasonably practicable, consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, following the filing of the respective motion seeking entry of such Orders.  The Company shall provide to each of the Commitment Parties and its counsel copies of the proposed motions seeking entry of the Approval Order, the Plan Solicitation Order, the Confirmation Order, and the DIP Orders (together with the proposed Plan Solicitation Order and the DIP Orders), and a reasonable opportunity to review and comment on such motions and such Orders prior to such motions and such Orders being filed with the Bankruptcy Court, and such motions and such Order must be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.  Unless otherwise determined by the Requisite Commitment Parties, counsel to the Commitment Parties will provide the Company and its counsel with copies of the proposed Approval Order, and a reasonable opportunity to review and comment on such Orders prior to such Orders being filed with the Bankruptcy Court, and such Orders shall be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.  Any amendments, modifications, changes, or supplements to any of the Approval Order, Plan Solicitation Order, Confirmation Order, and DIP Orders, and any of the motions seeking entry of such Orders, shall be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.

Section 6.2   Confirmation Order; Plan and Disclosure Statement.  The Debtors shall use their commercially reasonable efforts to obtain entry of the Confirmation

36

Order.  The Company shall provide to each of the Commitment Parties and its counsel a copy of the proposed Plan and the Disclosure Statement and any proposed amendment, modification, supplement or change to the Plan or the Disclosure Statement, and a reasonable opportunity to review and comment on such documents, and each such amendment, modification, supplement or change to the Plan or the Disclosure Statement must be in form and substance reasonably satisfactory to each of the Requisite Commitment Parties and the Company.  The Company shall provide to each of the Commitment Parties and its counsel a copy of the proposed Confirmation Order (together with copies of any briefs, pleadings and motions related thereto), and a reasonable opportunity to review and comment on such Order, briefs, pleadings and motions prior to such Order, briefs, pleadings and motions being filed with the Bankruptcy Court, and such Order, briefs, pleadings and motions must be in form and substance reasonably satisfactory to each of the Requisite Commitment Parties and the Company.

Section 6.3    Conduct of Business. Except as expressly set forth in this Agreement or in the Restructuring Support Agreement or with the prior written consent of Requisite Commitment Parties (requests for which, including related information, shall be directed to the counsel and financial advisors to the Ad Hoc Committee), during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), (a) the Company shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course and use its commercially reasonable efforts to: (i) preserve intact its business, (ii) keep available the services of its officers and employees, (iii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company or its Subsidiaries in connection with their business, and (iv) file Company SEC Documents within the time periods required under the Exchange Act, in each case in accordance with ordinary course practices, and (b) the Company shall not, and shall not permit any of its Subsidiaries to, enter into any transaction that is material to their business other than (A) transactions in the ordinary course of business to the extent necessary to conduct operations of the Company and its Subsidiaries, as applicable, in a manner consistent with the financial and business projections provided to the Commitment Parties prior to the date hereof, (B) other transactions after prior notice to the Commitment Parties to implement tax planning which transactions are not reasonably expected to materially adversely affect any Commitment Party and (C) transactions expressly contemplated by the Transaction Agreements.

For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Company and shall require the prior written consent of the Requisite Commitment Parties unless the same would otherwise be permissible under the preceding clause (B) or (C): (1) any amendment, modification, termination, waiver, supplement, restatement or other change to any Material Contract or any assumption of any Material Contract in connection with the Chapter 11 Cases (other than any Material Contracts that are otherwise addressed by clause (3) below), (2) entry into, or any amendment, modification, waiver, supplement or other change to, any employment agreement to which the Company or any of its Subsidiaries is a party or any assumption of any such employment agreement in connection with the Chapter 11 Cases, and (3) the adoption or amendment of any management incentive or equity plan by any of the Debtors except for the new management incentive plan in accordance with the Restructuring Term Sheet.  Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or

37

direct the operations of the Company and its Subsidiaries.  Prior to the Closing Date, the Company and its Subsidiaries shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Company and its Subsidiaries.

Section 6.4        Access to Information; Confidentiality.

(a)        Subject to applicable Law and Section 6.4(b), upon reasonable notice during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) afford the Commitment Parties and their Representatives upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's and its Subsidiaries' business or operations, to the Company's and its Subsidiaries' employees, properties, books, Contracts and records and, during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to such parties all reasonable information concerning the Company's and its Subsidiaries' business, properties and personnel as may reasonably be requested by any such party, provided that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company or any of its Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (ii) to disclose any legally privileged information of the Company or any of its Subsidiaries or (iii) to violate any applicable Laws or Orders.   All requests for information and access made in accordance with this Section 6.4 shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers.

(b)        From and after the date hereof until the date that is one (1) year after the expiration of the Pre-Closing Period, each Commitment Party shall, and shall cause its Representatives to, (i) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such Commitment Party or its Representatives pursuant to Section 6.4(a), Section 6.5 or in connection with a request for approval pursuant to Section 6.3 (except that provision or disclosure may be made to any Affiliate or Representative of such Commitment Party who needs to know such information for purposes of this Agreement or the other Transaction Agreements and who agrees to observe the terms of this Section 6.4(b) (and such Commitment Party will remain liable for any breach of such terms by any such Affiliate or Representative)), and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby.  Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (A) is now or subsequently becomes generally available to the public through no violation of this Section 6.4(b), (B) becomes available to a Commitment Party or its Representatives on a non-confidential basis from a source other than the Company or any of its Subsidiaries or any of their respective Representatives, (C) becomes available to a Commitment Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases or other such process, or (D) such Commitment Party or any Representative thereof is required to disclose pursuant to judicial or administrative

38

process or pursuant to applicable Law or applicable securities exchange rules; provided, that, such Commitment Party or such Representative shall provide the Company with prompt written notice of such legal compulsion and cooperate with the Company to obtain a protective Order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Company's sole cost and expense; provided, further, that, in the event that such protective Order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts (at the Company's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents.

Section 6.5      Financial Information.

(a)      During the Pre-Closing Period, the Company shall deliver to the counsel and financial advisors to the Ad Hoc Committee, and to each Commitment Party that so requests, all statements and reports the Company is required to deliver to the DIP Agent pursuant to Section 5.01 of the DIP Credit Agreement (as in effect on the date hereof) (the "**Financial Reports**"). Neither any waiver by the parties to the DIP Credit Agreement of their right to receive the Financial Reports nor any amendment or termination of the DIP Credit Agreement shall affect the Company's obligation to deliver the Financial Reports to the Commitment Parties in accordance with the terms of this Agreement.

(b)      Information required to be delivered pursuant to Section 5.01 of the DIP Credit Agreement (as in effect on the date hereof) shall be deemed to have been delivered in accordance with Section 6.5(a) on the date on which the Company provides written notice to the counsel and financial advisors to the Ad Hoc Committee, and to each Commitment Party that so requests, such information that such information is available via the EDGAR system of the SEC on the internet (to the extent such information has been posted or is available as described in such notice).

(c)      Each Commitment Party agrees that all information and reports delivered pursuant to this Section 6.5 shall be subject to the provisions of Section 6.4(b).

Section 6.6      Commercially Reasonable Efforts.

(a)      Without in any way limiting any other respective obligation of the Company or any Commitment Party in this Agreement, each Party shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including using commercially reasonable efforts in:

(i)      timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

39

(ii)      defending any Legal Proceedings in any way challenging (A) this Agreement, the Plan or any other Transaction Agreement, (B) the Approval Order, the Plan Solicitation Order, the Confirmation Order or the DIP Orders or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)      working together in good faith to finalize the Reorganized Company Corporate Documents, Transaction Agreements and all other documents relating thereto for timely inclusion in the Plan and filing with the Bankruptcy Court.

(b)      Subject to applicable Laws relating to the exchange of information, and in accordance with the Restructuring Support Agreement, the Commitment Parties and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Commitment Parties or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; provided, however, that the Commitment Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, the Parties shall act as reasonably and as promptly as practicable.

(c)      Without limitation to Sections 6.1 and 6.2, to the extent exigencies permit, the Company shall provide or cause to be provided a draft of all motions, applications, pleadings, schedules, Orders, reports or other material papers (including all material memoranda, exhibits, supporting affidavits and evidence and other supporting documentation) in the Chapter 11 Cases relating to or affecting the Transaction Agreements in accordance with the Restructuring Support Agreement.  All such motions, applications, pleadings, schedules, Orders, reports and other material papers shall be in form and substance reasonably satisfactory to each of the Requisite Commitment Parties and the Company.

(d)      Nothing contained in this Section 6.6(d) shall limit the ability of any Commitment Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the Restructuring Support Agreement.

Section 6.7      Registration Rights Agreement; Reorganized Company Corporate Documents; Rights Offering Procedures.

(a)      The Plan will provide that from and after the Closing Date each Commitment Party receiving New Common Stock that are "control" or "restricted" securities shall be entitled to registration rights pursuant to a registration rights agreement, which agreement shall be in form and substance consistent with the terms set forth in the Restructuring Term Sheet and otherwise reasonably acceptable to the Requisite Commitment Parties and the Company (the "**Registration Rights Agreement**").   A form of the Registration Rights

40

Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

(b)    The Plan will provide that on the Effective Date the Reorganized Company Corporate Documents will be approved, adopted and effective.    Forms of the Reorganized Company Corporate Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

Section 6.8    Blue Sky.    The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Unsubscribed Shares issued hereunder, sale to the Commitment Parties at the Closing Date pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Commitment Parties on or prior to the Closing Date.    The Company shall timely make all filings and reports relating to the offer and sale of the Unsubscribed Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.    The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 6.8.

Section 6.9    DTC Eligibility.    Unless otherwise requested by the Requisite Commitment Parties, the Company shall use commercially reasonable efforts to promptly make, when applicable from time to time after the Closing, all Unlegended Shares eligible for deposit with The Depository Trust Company.    "**Unlegended Shares**" means any shares of New Common Stock acquired by the Commitment Parties and their respective Affiliates (including any Related Purchaser or Ultimate Purchaser in respect thereof) pursuant to this Agreement and the Plan, including all shares issued to the Commitment Parties and their respective Affiliates in connection with the Rights Offering, that do not require, or are no longer subject to, the Legend.

Section 6.10    Use of Proceeds.    The Debtors will apply the proceeds from the exercise of the Subscription Rights and the sale of the Unsubscribed Shares for the purposes identified in the Disclosure Statement and the Plan.

Section 6.11    Share Legend.    Each certificate evidencing all shares of New Common Stock issued hereunder, including any certificate evidencing shares of New Common Stock that may be issued in satisfaction of the Commitment Premium as provided herein, and each certificate issued in exchange for or upon the Transfer of any such shares, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION

41

STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such shares are uncertificated, such shares shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by the Company or agent and the term "Legend" shall include such restrictive notation. The Company shall remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such shares (or the stock ledger or other appropriate Company records, in the case of uncertified shares), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144 of the Securities Act. The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

Section 6.12   <u>Antitrust Approval</u>.

(a)   Each Party agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Agreement, the Plan and the other Transaction Agreements, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable and no later than fifteen (15) Business Days following the date hereof and (ii) promptly furnishing documents or information reasonably requested by any Antitrust Authority.

(b)   The Company and each Commitment Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements that has notified the Company in writing of such obligation (each such Commitment Party, a "**<u>Filing Party</u>**") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content. The Company and each Filing Party shall, to the extent permitted by applicable Law:  (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Commitment Parties and the Company.

(c)    Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)    The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of filing.  The communications contemplated by this Section 6.12 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 6.12 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Transaction Agreements.

Section 6.13    Alternative Transactions.  The Company and the other Debtors shall not seek, solicit, or support any Alternative Transaction; provided, however, that nothing in this Section 6.13 shall limit the Parties' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding refinancing of the Exit Facility to be consummated following the Effective Date; provided, further, that (i) if any of the Debtors receive a proposal or expression of interest regarding any Alternative Transaction from the RSA Effective Date until the occurrence of a Termination Date, the Debtors shall promptly notify counsel to the other parties to the Restructuring Support Agreement of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, and (ii) the Debtors shall promptly furnish counsel to the parties to the Restructuring Support Agreement with copies of any written offer, oral offer, or any other information that they receive relating to the foregoing and shall promptly inform counsel to the parties to the Restructuring Support Agreement of any material changes to such proposals.  The Debtors shall not enter into any confidentiality agreement with a party interested in an Alternative Transaction unless such party consents to identifying and providing to counsel to the parties to the Restructuring Support Agreement (under a reasonably acceptable confidentiality agreement) the information contemplated under Section 0 of the Restructuring Support Agreement.

Section 6.14    Hedging Arrangements.  The Company (or its relevant Subsidiaries) will use all good faith reasonable efforts necessary to implement a hedging program that is reasonably acceptable to the Minimum Commitment Parties (an "Acceptable Hedging Program") as promptly as practicable and to maintain such program through the Closing Date.

ARTICLE VII

**CONDITIONS TO THE OBLIGATIONS OF THE PARTIES**

Section 7.1    <u>Conditions to the Obligations of the Commitment Parties</u>. The obligations of each Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with <u>Section 7.2</u>) the satisfaction of the following conditions prior to or at the Closing:

(a)    <u>Approval Order</u>.  The Bankruptcy Court shall have entered the Approval Order and such Order shall be a Final Order.

(b)    <u>Plan Solicitation Order</u>.  The Bankruptcy Court shall have entered the Plan Solicitation Order, and such Order shall be a Final Order.

(c)    <u>Confirmation Order</u>.   The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Requisite Commitment Parties, and such Order shall be a Final Order.

(d)    <u>DIP Orders</u>.  The Bankruptcy Court shall have entered the DIP Orders, and such Orders shall be Final Orders.

(e)    <u>Plan</u>.  The Company and all of the other Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Company and the other Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or waived in accordance with the terms of the Plan.

(f)    <u>Rights Offering; Rights Offering Procedures</u>.  The Rights Offering and Rights Offering Procedures shall have been conducted, in all material respects, in accordance with the Plan Solicitation Order and this Agreement, and the Rights Offering Expiration Time shall have occurred.

(g)    <u>Effective Date</u>.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(h)    <u>Registration Rights Agreement; Reorganized Company Corporate Documents</u>.

(i)    The Registration Rights Agreement shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the Commitment Parties and the other parties thereto, and shall be in full force and effect.

(ii)    The Reorganized Company Corporate Documents shall duly have been approved and adopted and shall be in full force and effect.

#4823-7500-2415

(i)      Expense Reimbursement.   The Debtors shall have paid all Expense Reimbursement accrued through the Closing Date pursuant to Section 3.3.

(j)      Consents.    All governmental and third-party notifications, filings, consents, waivers and approvals set forth on Schedule 3 and required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received.

(k)      Antitrust Approvals.   All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by this Agreement shall have been obtained.

(l)      No Legal Impediment to Issuance.   No Law or Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement;

(m)      Representations and Warranties.

(i)      The representations and warranties of the Debtors contained in Sections 4.11 and 4.29 shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)      The representations and warranties of the Debtors contained in Sections 4.2, 4.3, 4.4, 4.5, and 4.6(b) shall be true and correct in all material respects on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(iii)      The representations and warranties of the Debtors contained in this Agreement other than those referred to in clauses (i) and (ii) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

(n)      Covenants.   The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(o)     Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred, and there shall not exist, any event, development, occurrence or change that constitutes, individually or in the aggregate, a Material Adverse Effect.

(p)     Officer's Certificate.  The Commitment Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in Sections 7.1(m), (n), and (o) have been satisfied.

(q)     Funding Notice.  The Noteholders shall have received the Funding Notice.

(r)     Exit Facility Borrowing Base.  The Exit Facility Term Sheet and the Exit Facility Commitment Letters shall be in effect that provide for an initial borrowing base limit in the Exit Facility of no less than $128,000,000.

(s)     Key Contracts.  The assumption or rejection (in each case, pursuant to section 365 of the Bankruptcy Code) and/or amendment of the Contracts described in Section 1.1 of the Company Disclosure Schedules as of the Closing Date and the liabilities of the Reorganized Debtors with respect to such Contracts shall, in the aggregate, be reasonably satisfactory to the Requisite Commitment Parties.

Section 7.2     Waiver of Conditions to Obligations of Commitment Parties.  All or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to all Commitment Parties by a written instrument executed by the Requisite Commitment Parties in their sole discretion and if so waived, all Commitment Parties shall be bound by such waiver.

Section 7.3     Conditions to the Obligations of the Debtors.   The obligations of the Debtors to consummate the transactions contemplated hereby with the Commitment Parties is subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a)     Approval Order.  The Bankruptcy Court shall have entered the Approval Order and such Order shall be a Final Order.

(b)     Plan Solicitation Order.  The Bankruptcy Court shall have entered the Plan Solicitation Order, and such Order shall be a Final Order.

(c)     Confirmation Order.   The Bankruptcy Court shall have entered the Confirmation Order, and such Order shall be a Final Order.

(d)     DIP Orders.  The Bankruptcy Court shall have entered the DIP Orders, and such Orders shall be Final Orders.

(e)     Effective Date.  The Effective Date shall have occurred in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(f)    <u>Rights Offering</u>.    The Rights Offering Expiration Time shall have occurred.

(g)    <u>Antitrust Approvals</u>.  All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by this Agreement shall have been obtained.

(h)    <u>No Legal Impediment to Issuance</u>.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(i)    <u>Representations and Warranties</u>.

(i)    The representations and warranties of the Commitment Parties contained in this Agreement that are qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all respects only as of the specified date).

(ii)    The representations and warranties of the Commitment Parties contained in this Agreement that are not qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(j)    <u>Covenants</u>.  The Commitment Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement.

(k)    <u>Officer's Certificate</u>.  Upon request of the Company, the Debtors shall have received on and as of the Closing Date a certificate of an executive officer or other authorized signatory of each of the Commitment Parties confirming that the conditions set forth in <u>Section 7.3(i)</u> and <u>(j)</u> have been satisfied.

ARTICLE VIII

**INDEMNIFICATION AND CONTRIBUTION**

Section 8.1    <u>Indemnification Obligations</u>.  Following the entry of the Approval Order, the Company and the other Debtors (the "**<u>Indemnifying Parties</u>**" and each, an "**<u>Indemnifying Party</u>**") shall, jointly and severally, indemnify and hold harmless each Commitment Party and its Affiliates, equity holders, members, partners, general partners,

47

managers and its and their respective Representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Commitment Parties except to the extent otherwise provided for in this Agreement) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby, including the Backstop Commitment, the Rights Offering, the payment of the Commitment Premium or the Termination Fee or the use of the proceeds of the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party, its Related Parties or any Indemnified Person related thereto, caused by a Commitment Party Default by such Commitment Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Section 8.2    Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VIII.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be

48

liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.  Notwithstanding anything herein to the contrary, the Company and its Subsidiaries shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company and its Subsidiaries.

Section 8.3    Settlement of Indemnified Claims.  In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VIII, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4    Contribution.    If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also

49

the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Unsubscribed Shares in the Rights Offering contemplated by this Agreement and the Plan bears to (b) the Commitment Premium paid or proposed to be paid to the Commitment Parties.  The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5    Treatment of Indemnification Payments.  All amounts paid by an Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the Per Share Purchase Price for all Tax purposes.  The provisions of this Article VIII are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.  The Approval Order shall provide that the obligations of the Company under this Article VIII shall constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Company may comply with the requirements of this Article VIII without further Order of the Bankruptcy Court.

Section 8.6    No Survival.  All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

ARTICLE IX

**TERMINATION**

Section 9.1    Consensual Termination.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company and the Requisite Commitment Parties.

Section 9.2    Automatic Termination.  Notwithstanding anything to the contrary in this Agreement, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed Order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, and except as otherwise provided in this Section 9.2, at which point this Agreement may be terminated by the Requisite Commitment Parties upon written notice to the Company upon the occurrence of any of the following events, this Agreement shall terminate automatically without any further action or notice by any Party at 5:00 p.m., New York City time on the fifth Business Day following the occurrence of any of the following events; provided that the Requisite Commitment Parties may waive such termination or extend any applicable dates in accordance with Section 10.7:

50

#4823-7500-2415

(a)    the Closing Date has not occurred by 11:59 p.m., New York City time on the date that is one hundred twenty (120) days after the Petition Date (as it may be extended pursuant to this Section 9.2(a) or Section 2.3(a), the "**Outside Date**"), unless prior thereto the Effective Date occurs and the Rights Offering has been consummated; provided, that the Outside Date (i) may be waived or extended with the prior written consent of the Requisite Commitment Parties and (ii) shall automatically be extended to the extent the Termination Date (as defined in the Exit Commitment Letters) is extended; provided, that, in no event shall the Outside Date be extended pursuant to this Section 9.2(a)(ii) beyond 5:00 p.m. (New York City time) on the date that is one hundred fifty (150) days after the Petition Date;

(b)    the obligations of the Consenting Noteholders under the Restructuring Support Agreement are terminated in accordance with the terms of the Restructuring Support Agreement;

(c)    the Company, any of the other Debtors or any other Commitment Party files any motion, application or adversary proceeding (or any of the Company, any of the other Debtors or other Restructuring Support Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of the Note Claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(d)    (i) the Company or the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or the other Debtors in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Sections 7.1(m), (n), or Section 7.1(o) not to be satisfied, (ii) the Commitment Parties shall have delivered written notice of such breach or inaccuracy to the Company, (iii) such breach or inaccuracy is not cured by the Company or the other Debtors by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in Sections 7.1(m), (n), or Section 7.1(o) is not capable of being satisfied; provided, that, this Agreement shall not terminate automatically pursuant to this Section 9.2(d) if the Commitment Parties are then in willful or intentional breach of this Agreement;

(e)    any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements, and, by the tenth (10th) Business Day after such Law or final and non-appealable Order shall have been enacted, adopted or issued, no relief has been obtained allowing consummation of the Rights Offering or the transactions contemplated by this Agreement and the other Transaction Agreements in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Requisite Commitment Parties;

(f)    (i) the Debtors have materially breached their obligations under Section 6.13; (ii) the Bankruptcy Court approves or authorizes an Alternative Transaction; or (iii) the Company or any of its Subsidiaries enters into any Contract providing for the

51

consummation of any Alternative Transaction or files any motion or application seeking authority to propose, join in or participate in the formation of, any actual or proposed Alternative Transaction;

(g)     an acceleration of the obligations or termination of commitments under the DIP Facility;

(h)     the Company or any other Debtor (i) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; (ii) suspends or revokes the Transaction Agreements; or (iii) publicly announces its intention to take any such action listed in sub-clauses (i) and (ii) of this subsection;

(i)     any of the Approval Order, Plan Solicitation Order, Confirmation Order, or DIP Orders is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior written consent of the Requisite Commitment Parties; or

(j)     the Requisite Commitment Parties determine, in their reasonable discretion, that either (i) at any time from and after May 19, 2016, the Company and its Subsidiaries do not have an Acceptable Hedging Program in place; provided, however, that such time period may be extended by the written consent of the Minimum Commitment Parties or (ii) the condition set forth in Section 7.1(r) is not capable of being satisfied prior to Closing.

Section 9.3     Termination by the Company.

This Agreement may be terminated by the Company upon written notice to each Commitment Party upon the occurrence of any of the following events, subject to the rights of the Company to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of such event:

(a)     any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements, and, by the tenth (10th) Business Day after such Law or final and non-appealable Order shall have been enacted, adopted or issued, no relief has been obtained allowing consummation of the Rights Offering or the transactions contemplated by this Agreement and the other Transaction Agreements in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Requisite Commitment Parties;

(b)     subject to the right of the Commitment Parties to arrange a Commitment Party Replacement in accordance with Section 2.3(a) (which will be deemed to cure any breach by the replaced Commitment Party pursuant to this subsection (b)), (i) any Commitment Party shall have breached any representation, warranty, covenant or other agreement made by such Commitment Party in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 7.3(i) or Section 7.3(j) not to be satisfied, (ii) the Company shall

52

have delivered written notice of such breach or inaccuracy to such Commitment Party, (iii) such breach or inaccuracy is not cured by such Commitment Party by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in Section 7.3(i) or Section 7.3(j) is not capable of being satisfied; provided, that the Company shall not have the right to terminate this Agreement pursuant to this Section 9.3(b) if it is then in willful or intentional breach of this Agreement;

(c)    the Company or any of its Subsidiaries determines, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of the fiduciary duties of the board of directors or analogous governing body of the Company or such Subsidiary; provided, that, concurrently with such termination, the Company pays the Termination Fee pursuant to Section 9.4(b)(ii);

(d)    the Restructuring Support Agreement is terminated in accordance with its terms; or

(e)    the Closing Date has not occurred by the Outside Date (as the same may be extended pursuant to Section 9.2(a) or Section 2.3(a)), unless prior thereto the Effective Date occurs and the Rights Offering has been consummated; provided, that the Company shall not have the right to terminate this Agreement pursuant to this Section 9.3(e) if it is then in willful or intentional breach of this Agreement;

Section 9.4    Effect of Termination.

(a)    Upon termination of this Agreement pursuant to this Article IX, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; provided, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to Article III, to satisfy their indemnification obligations pursuant to Article VIII and to pay the Termination Fee pursuant to Section 9.4(b) shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in this Section 9.4 and Article X shall survive the termination of this Agreement in accordance with their terms and (iii) subject to Section 10.10, nothing in this Section 9.4 shall relieve any Party from liability for its gross negligence or any willful or intentional breach of this Agreement.    For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)    The Debtors shall make payments to the Commitment Parties or their designees based upon their respective Backstop Commitment Percentages on the date of payment, by wire transfer of immediately available funds to such accounts as the Requisite Commitment Parties may designate, if this Agreement is terminated as follows:

(i)    upon termination pursuant to Section 9.2(d) or Section 9.2(f), or Section 9.2(b) or Section 9.3(d) as a result of a termination of the Restructuring Support Agreement pursuant to Section 8(c) thereof, then the Company shall pay

the Termination Fee, in cash, on or prior to the second (2nd) Business Day following such termination;

(ii)    if the Company shall terminate this Agreement pursuant to Section 9.3(c), then the Company shall pay the Termination Fee, in cash, concurrently with such termination; and

(iii)    if this Agreement shall be terminated pursuant to Section 9.2 (other than clauses (d) or (f) of Section 9.2, or by the Company pursuant to Section 9.3(c)), and, within twelve (12) months after the date of such termination, any of the Debtors executes a definitive agreement with respect to, or consummates, an Alternative Transaction, or the Bankruptcy Court approves or authorizes an Alternative Transaction, then the Company shall pay the Termination Fee, in cash, on or prior to the second (2nd) Business Day following such execution or consummation.

To the extent that all amounts due in respect of the Termination Fee pursuant to this Section 9.4(b) have actually been paid by the Debtors to the Commitment Parties in connection with a termination of this Agreement, the Commitment Parties shall not have any additional recourse against the Debtors for any obligations or liabilities relating to or arising from this Agreement, except for liability for gross negligence or willful or intentional breach of this Agreement pursuant to Section 9.4(a).  Except as set forth in this Section 9.4(b), the Termination Fee shall not be payable upon the termination of this Agreement.  The Termination Fee shall, pursuant to the Approval Order, constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code.

ARTICLE X

**GENERAL PROVISIONS**

Section 10.1    Notices.    All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)    If to the Company or any of the other Debtors:

Penn Virginia Corporation
Attn:   Nancy Snyder
Four Radnor Corporate Center, Suite 200
100 Matsonford Road
Radnor, PA 19087
Tel:    (610) 687-8900
Fax:    (610) 687-3688
Email: nancy.snyder@pennvirginia.com

54

*With a copy to:*

Kirkland & Ellis LLP
Attn:   Edward O. Sassower, P.C. and Brian Schartz
601 Lexington Avenue
New York, NY 10022-4611
Tel:     (212) 446-4800
Fax:     (212) 446-4900
Email: edward.sassower@kirkland.com
          brian.schartz@kirkland.com

Kirkland & Ellis LLP
Attn:   Justin Bernbrock
and Benjamin Rhode
300 North LaSalle
Chicago, IL 60654
Tel:     (312) 862-2000
Fax:     (312) 862-2200
Email: justin.bernbrock@kirkland.com
          benjamin.rhode@kirkland.com

(b)      If to the Commitment Parties:

To each Commitment Party at the addresses or e-mail addresses set forth
below the Commitment Party's signature page to this Agreement.

*With a copy to*:

Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email: skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

Section 10.2   Assignment; Third Party Beneficiaries.   Neither this
Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned
by any Party (whether by operation of Law or otherwise) without the prior written consent of the
Company and the Requisite Commitment Parties, other than an assignment by a Commitment
Party expressly permitted by Section 2.3 or 2.6 and any purported assignment in violation of this
Section 10.2 shall be void *ab initio.*   Except as provided in Article VIII with respect to the
Indemnified Persons, this Agreement (including the documents and instruments referred to in
this Agreement) is not intended to and does not confer upon any Person any rights or remedies
under this Agreement other than the Parties.

Section 10.3    Prior Negotiations; Entire Agreement.

(a)    This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the Restructuring Support Agreement (including the Restructuring Term Sheet) will each continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4    Governing Law; Venue.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, MAY BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO NEW YORK JURISDICTION, IF THE CHAPTER 11 CASES ARE COMMENCED, EACH PARTY AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OF ALL MATTERS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.  BY EXECUTING AND DELIVERING THIS AGREEMENT, AND UPON COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE PERSONAL JURISDICTION OF THE BANKRUPTCY COURT SOLELY FOR PURPOSES OF ANY ACTION, SUIT, PROCEEDING, OR OTHER CONTESTED MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED OR ORDER ENTERED IN ANY SUCH ACTION, SUIT, PROCEEDING, OR OTHER CONTESTED MATTER. THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN

#4823-7500-2415

WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5   Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6   Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7   Waivers and Amendments; Rights Cumulative; Consent. This Agreement may be amended, restated, modified or changed only by a written instrument signed by the Company and the Requisite Commitment Parties; provided, that (a) any Commitment Party's prior written consent shall be required for any amendment that would, directly or indirectly: (i) modify such Commitment Party's Backstop Commitment Percentage, (ii) increase the Per Share Purchase Price to be paid in respect of the Unsubscribed Shares, or (iii) have a materially adverse and disproportionate effect on such Commitment Party; and (b) the prior written consent of each Commitment Party that was an original signatory hereto that is still a Commitment Party as of such date of amendment shall be required for any amendment to the definition of "Requisite Commitment Parties".  Notwithstanding the foregoing, Schedule 1 shall be revised as necessary without requiring a written instrument signed by the Company and the Requisite Commitment Parties to reflect changes in the composition of the Commitment Parties and Backstop Commitment Percentages as a result of Transfers permitted in accordance with the terms and conditions of this Agreement.  The terms and conditions of this Agreement (other than the conditions set forth in Sections 7.1 and 7.3, the waiver of which shall be governed solely by Article VII) may be waived (A) by the Debtors only by a written instrument executed by the Company and (B) by the Requisite Commitment Parties only by a written instrument executed by the Requisite Commitment Parties.  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

Section 10.8   Headings.   The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9   Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the

57

necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 10.10  <u>Damages</u>.  Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

Section 10.11  <u>No Reliance</u>.  No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity, (d) no Commitment Party may rely, and confirms that it has not relied, on any due diligence investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, and (e) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Unsubscribed Shares or Backstop Commitment Percentage of its Backstop Commitment.

Section 10.12  <u>Publicity</u>.  At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this <u>Section 10.12</u> shall prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Cases.

Section 10.13  <u>Settlement Discussions</u>.   This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Section 408 of the U.S. Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than a Legal Proceeding to approve or enforce the terms of this Agreement).

#4823-7500-2415

Section 10.14 <u>No Recourse</u>.   Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or respective Related Parties in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; <u>provided</u>, <u>however</u>, nothing in this <u>Section 10.14</u> shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments.  For the avoidance of doubt, prior to the Effective Date, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

*[Signature Pages Follow]*

#4823-7500-2415

EXECUTED to be effective as of the date first above written.

COMPANY:
**PENN VIRGINIA CORPORATION**

By: _____

Name: R. Seth Bullock
Title: Chief Restructuring Officer

**Anchorage Capital Master Offshore, Ltd.**
By: Anchorage Capital Group, L.L.C., its investment
manager

By: _____

Name:    Natalie A. Birrell
Title:     Chief Operating Officer

*[Signature Page to Backstop Commitment Agreement]*

If to Anchorage Capital Master Offshore, Ltd.:

Anchorage Capital Master Offshore, Ltd.
c/o Anchorage Capital Group, L.L.C
610 Broadway, 6th Floor
New York, NY 10012
Attn: Legal; Operations
Email: legal@anchoragecap.com; ops@anchoragecap.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

**Raptor Energy, LP**
By:  Anchorage Capital Group, L.L.C., its investment
manager

By: _____

　　　Name:　　　Natalie A. Birrell
　　　Title:　　　Chief Operating Officer

*[Signature Page to Backstop Commitment Agreement]*

If to Raptor Energy, LP:

Raptor Energy, LP
c/o Anchorage Capital Group, L.L.C
610 Broadway, 6th Floor
New York, NY 10012
Attn: Legal; Operations
Email: legal@anchoragecap.com; ops@anchoragecap.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
            bkinney@milbank.com
            bfriedman@milbank.com

**Marathon Asset Management, LP, solely on behalf of
certain of its affiliated funds and managed accounts**

By: _____

Name:   PETER    COPPA

Title   AUTHORIZED    SIGNATORY

*[Signature Page to Backstop Commitment Agreement]*

If to Marathon Asset Management:

Marathon Asset Management
c/o Dan Pine
One Bryant Park
38th Floor
New York, NY 10036

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

Contrarian Capital Management, L.L.C., on behalf of
various managed accounts and affiliated entities

By: _____
Name:  Jon R. Bauer
Title:  Managing Member

If to Contrarian Capital Management, L.L.C.:

Contrarian Capital Management, L.L.C.
Attn: Jon Bauer, Graham Morris, & Josh Weisser
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

Global Credit Advisers, LLC as investment adviser

By: _____

Name: Steven Hornstein
Title: Managing Member

#4823-7500-2415

If to Global Credit Advisers:

Global Credit Advisers
c/o Dan Kecskes
101 Park Avenue, 26th Floor
New York, NY 10178

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

KLS Diversified Asset Management LP

By: _____

Name: John Steinhardt

Title: Managing Partner

If to KLS Diversified:

KLS Diversified
c/o Michael Hanna
452 5th Avenue
22nd Floor
New York, NY 10018

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email: skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

THE MANGROVE PARTNERS MASTER FUND, LTD.,

By: MANGROVE PARTNERS, its Investment Manager

By: _____
     Name:    Ward Dietrich
     Title:    Authorized Person

If to Mangrove Partners:

Mangrove Partners
c/o Mangrove Partners
645 Madison Avenue
14th Floor
New York, NY 10022
212.897.9535
Ops@mangrovepartners.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:      (212) 530-5000
Fax:      (212) 530-5219
Email:  skhalil@milbank.com
            bkinney@milbank.com
            bfriedman@milbank.com

**Strategic Value Special Situations Offshore Fund III-A, L.P.**

**By: SVP Special Situations III-A LLC, its Investment Manager**

By: _____

      Name: James Dougherty

      Title:  Fund Chief Financial Officer

*[Signature Page to Backstop Commitment Agreement]*



**Strategic Value Special Situations Master Fund III, L.P.**
**By: SVP Special Situations III LLC, its Investment**
**Manager**

By: _____

      Name: James Dougherty
      Title:  Fund Chief Financial Officer



*[Signature Page to Backstop Commitment Agreement]*

**Strategic Value Master Fund Ltd.**
**By: Strategic Value Partners, LLC, its Investment**
**Manager**

By: _____

    Name: James Dougherty

    Title:  Fund Chief Financial Officer



If to Strategic Value Partners:

Strategic Value Partners
c/o General Counsel's Office
100 West Putnam Avenue, 2nd Floor
Greenwich, CT 06830
Email: legalnotices @svpglobal.com
Fax: 203-618-3501

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:      (212) 530-5000
Fax:      (212) 530-5219
Email:  skhalil@milbank.com
            bkinney@milbank.com
            bfriedman@milbank.com

Recipient:

Certain Funds and Accounts that are Commitment Parties
and advised by T. Rowe Price Associates, Inc., severally
and not jointly

By: T. Rowe Price Associates, Inc., as investment adviser

By: _Mark Vaselkiv_____

Name: Mark Vaselkiv

Title: Portfolio Manager

*[Signature Page to Backstop Commitment Agreement]*

If to T. Rowe Price Associates, Inc.:

T. Rowe Price Associates, Inc.
c/o Andrew Baek
Vice President, Senior Legal Counsel
100 East Pratt Street
Mail Code BA-1020
Baltimore, MD 21202
Direct: 410-345-2090
Fax:  410-345-6575

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email: skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

**Wexford Spectrum Investors LLC**

By: _____

Name: Dante Domenichelli
Title: Vice President & Secretary

Prepared by MILBANK/MMWD/DJW

Approved by CD/MCCARTHY

*[Signature Page to Backstop Commitment Agreement]*

**Wexford Catalyst Investors LLC**

By: _____

Name: Dante Domenichelli
Title: Vice President & Secretary

*[Signature Page to Backstop Commitment Agreement]*

**Debello Investors LLC**

By: _____

Name: Dante Domenichelli
Title: Vice President & Secretary

Prepared by MILBANK/ _____ /DJW

Approved by CD/McCARTHY

*[Signature Page to Backstop Commitment Agreement]*

If to Wexford Capital LP:

Wexford Capital LP
c/o Daniel J. Weiner and Marc McCarthy
411 West Putnam Avenue
Greenwich, CT 06830

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

**Pine River Baxter Fund Ltd.**

By:  Pine River Capital Management L.P.
Its:  Investment Manager

By:  _____

      Name:  Tim O'Brien
      Title: General Counsel and Co-Chief Operating
      Officer

**Pine River Fixed Income Master Fund Ltd.**

By:  Pine River Capital Management L.P.
Its:  Investment Manager

By:  _____

      Name:  Tim O'Brien
      Title: General Counsel and Co-Chief Operating
      Officer



**Pine River Master Fund Ltd.**

By: Pine River Capital Management L.P.
Its: Investment Manager


By: _____
        Name: Tim O'Brien
        Title: General Counsel and Co-Chief Operating
        Officer


**LMA SPC for and on behalf of MAP 89 Segregated
Portfolio**

By: Pine River Capital Management L.P.
Its: Investment Manager


By: _____
        Name: Tim O'Brien
        Title: General Counsel and Co-Chief Operating
        Officer



If to Pine River Capital Management, L.P.:

c/o Pine River Capital Management L.P.
601 Carlson Parkway, 7th Floor
Minnetonka, MN 55305
Attn:  Legal Department
Fax:  (612) 238-3301

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:    (212) 530-5219
Email:  skhalil@milbank.com
           bkinney@milbank.com
           bfriedman@milbank.com

AMTRUST INTERNATIONAL INSURANCE, LTD.

By: _____

Name: Stephen Ungar

Title: Secty

*[Signature Page to Backstop Commitment Agreement]*

If to AmTrust International Insurance, Ltd.:

AmTrust Financial Services Inc.
c/o Lawrence A. Heller and Harry Schlachter
59 Maiden Lane, 43rd Floor
New York, NY 10038
Email: lawrence.heller@amtrustgroup.com
Email: harry.schlachter@amtrustgroup.com


*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
          bkinney@milbank.com
          bfriedman@milbank.com

NAT GEN RE LTD.

By: _____

Name: PETER REMALL

Title: COO and TREASURER

*[Signature Page to Backstop Commitment Agreement]*

If to National General:

AmTrust Financial Services Inc.
c/o Jeffrey Weissman, Daron Skipper, and Susan Eylward
59 Maiden Lane, 43rd Floor
New York, NY 10038
Email: Jeffrey.weissmann@ngic.com
Email: susan.eylward@ngic.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email:  skhalil@milbank.com
           bkinney@milbank.com
           bfriedman@milbank.com

GMO CREDIT OPPORTUNITIES FUND, L.P.

By: _____
    Name: Tim Lang
    Title: Authorized Trader
          Grantham, Mayo, Van Otterloo & Co. LLC,
          investment manager of
          GMO Credit Opportunities Fund, L.P.

#4823-7500-2415

If to Grantham, Mayo, Van Otterloo & Co. LLC:

Grantham, Mayo, Van Otterloo & Co. LLC
c/o Kevin O'Brien and Jon Roiter
40 Rowes Wharf
Boston, MA 02110
Phone: 617-346-7518
Fax: 617-849-7243
Email: kevin.o'brien@gmo.com
Email: jon.roiter@gmo.com

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:   Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email:  skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

[COMMITMENT PARTIES]

J.P. MORGAN INVESTMENT MANAGEMENT, INC.
AS INVESTMENT ADVISER AND AGENT FOR CERTAIN CLIENT ACCOUNTS

By: _____

Name: ALEXANDER P. SAMMARCO

Title: EXECUTIVE DIRECTOR

#4823-7500-2415

[COMMITMENT PARTIES]

JPMORGAN CHASE BANK, N.A.
AS TRUSTEE FOR CERTAIN CLIENT ACCOUNTS

By: _____

Name:  ALEXANDER P. SAMMARCO

Title:  EXECUTIVE DIRECTOR

#4823-7500-2415

If to JP Morgan Asset Management:

J.P. Morgan Asset Management
Attn: Alexander Sammarco
Cc: Jim Shanahan and Laurie Whipkey
8044 Montgomery Road, Suite 555
Cincinnati, Ohio 45236
Phone: 513-699-4417

*With a copy to*:
Milbank, Tweed, Hadley & McCloy LLP
Attn:    Samuel Khalil, Brian Kinney and Bradley Friedman
28 Liberty Street
New York, NY 10005-1413
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email:  skhalil@milbank.com
        bkinney@milbank.com
        bfriedman@milbank.com

Privileged & Confidential

**Schedule 1**
**Backstop Commitment Percentages**

| Commitment Party(including by Manager) | Backstop Commitment Percentage |
| --- | --- |

Privileged & Confidential

## Schedule 2
## Note Claims

| Commitment Party (including by Manager) | Note Claims (US Dollars) |
|---|---|
|  |  |

Privileged & Confidential

**Schedule 3**
**Consents**

- None

Exhibit A

## PENN VIRGINIA CORPORATION

## RIGHTS OFFERING PROCEDURES

**Each Rights Offering Share is being distributed and issued by the Debtors without registration under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon the exemption provided by Section 4(a)(2) thereof and/or Regulation D promulgated thereunder.**

**None of the Subscription Rights or Rights Offering Shares issuable upon exercise of such rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security. No Subscription Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the Rights Offering Shares, the Notes and any related claims) (each of the above, a "Transfer").**

**None of the Rights Offering Shares have been registered under the Securities Act, nor any State or local law requiring registration for offer or sale of a security, and no Rights Offering Shares may be sold or transferred except pursuant to an exemption from registration under the Securities Act.**

**Each Rights Offering Share issued upon exercise of a Subscription Right, and each certificate issued in exchange for or upon the transfer, sale or assignment of any such Rights Offering Share, shall be stamped or otherwise imprinted with a legend in substantially the following form:**

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

**The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

Eligible Holders (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Record Date………………………. | [•], 2016 | The date and time fixed by the Company for the determination of the holders entitled to participate in the Rights Offering. |
| Subscription Commencement Date .. | [•], 2016 | Commencement of the Rights Offering. |
| Subscription Expiration Deadline … | 5:00 p.m. New York City time on [•], 2016 | The deadline for Eligible Holders to subscribe for Rights Offering Shares. The Eligible Holder's Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement must be received by the Eligible Holder's Nominee (as defined below) in sufficient time to allow such Nominee to deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline. |
| | | Eligible Holders who are not Backstop Parties must deliver the aggregate Purchase Payment by the Subscription Expiration Deadline. |
| | | Eligible Holders who are Backstop Parties must deliver the aggregate Purchase Payment within the second $(2^{nd})$ Business Day following |

|  | receipt of a Funding Notice (as defined below) in accordance with the terms of the Backstop Commitment Agreement. |

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below).**

To Eligible Holders and Nominees of Eligible Holders:

On May 12, 2016, the Debtors filed their Chapter 11 Plan of Reorganization with the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (as such plan of reorganization may be amended or modified from time to time in accordance with its terms, the "Plan"), and the disclosure statement with respect to the Plan (as such disclosure statement may be amended from time to time in accordance with its terms, the "Disclosure Statement"). Pursuant to the Plan, each holder of an Allowed Note Claim as of the Record Date that is an Accredited Investor and that has timely and validly completed and returned the letter confirming it is an Accredited Investor, pursuant to the cover letter dated May [•], 2016 of the Company attached to the Beneficial Holder Subscription Form (the "Accredited Investor Cover Letter") (each such holder, an "Eligible Holder") has the right to participate in the Rights Offering in accordance with the terms and conditions of the Subscription Agreement and these Rights Offering Procedures. Only Eligible Holders that complete the Accredited Investor Questionnaire included as Exhibit B to the Beneficial Holder Subscription Form may participate in the Rights Offering of the Rights Offering Shares.

Pursuant to the Plan, each Eligible Holder will receive Subscription Rights to subscribe for its pro rata Rights Offering Shares, provided that it timely and properly executes and delivers its Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent or its Nominee, as applicable, in advance of the Subscription Expiration Deadline. Each Nominee will receive a Master Subscription Form which it shall use to summarize the Subscription Rights exercised by each Eligible Holder that timely returns a properly filled out Beneficial Holder Subscription Form to such Nominee. Please note that all Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be returned to the applicable Nominee in sufficient time to allow such Nominee to process and deliver the Master Subscription Form and copies of all Beneficial Holder Subscription Forms and accompanying IRS Forms) prior to the Subscription Expiration Deadline.

No Eligible Holder shall be entitled to participate in the Rights Offering unless the aggregate Purchase Price (as defined below) for the Rights Offering Shares it subscribes for is received by the Subscription Agent (i) in the case of an Eligible Holder that is not a Backstop Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Holder that is a Backstop Party, on the second (2nd) Business Day following  receipt of a written notice (a "Funding Notice") delivered by the Debtors to the Backstop Parties in accordance with Section 2.4 of the Backstop Commitment Agreement (the "Backstop Funding Deadline"). No interest is payable on any advanced funding of the Purchase Price. If the Rights Offering is terminated for any reason, your Purchase Price will be returned to you promptly. No interest will be paid on any returned Purchase Price. Any Eligible Holder submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Subscription Agent by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable.

**In order to participate in the Rights Offering, you must complete all the steps**

**outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline, or the Backstop Funding Deadline, as applicable.  If you fail to do so, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

1.      **Rights Offering**

Eligible Holders have the right, but not the obligation, to participate in the Rights Offering. Only holders of an Allowed Note Claim as of the Record Date that validly and timely completed the Accredited Investor Cover Letter and that are Accredited Investors may participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreement, each Eligible Holder is entitled to subscribe for up to [•] Rights Offering Shares per $1,000 of Principal Amount of the Notes, at a purchase price of $[•] per share (the "Purchase Price").

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT AND THE BACKSTOP AGREEMENT IN THE CASE OF ANY BACKSTOP PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

2.      **Subscription Period**

The Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline. Each Eligible Holder intending to purchase Rights Offering Shares in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Beneficial Holder Subscription Form by the Subscription Expiration Deadline.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

The Subscription Expiration Deadline may be extended with the consent of the Requisite Commitment Parties (as defined in the Backstop Commitment Agreement), or as required by law.

3.      **Delivery of Subscription Agreement**

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Subscription Rights, but subject to the terms and conditions of the Subscription Agreement. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a Subscription Agreement to each Eligible Holder or its Nominee, as applicable, together with appropriate instructions for the

proper completion, due execution and timely delivery of the executed Subscription Agreement and the payment of the applicable Purchase Price for its Rights Offering Shares.

**4.        Exercise of Subscription Rights**

(a)        In order to validly exercise its Subscription Rights, each Eligible Holder that is not a Backstop Party must:

    i.    return a duly executed Subscription Agreement along with a duly completed and executed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

    ii.    at the same time it returns its Subscription Agreement and Beneficial Holder Subscription Form to the Subscription Agent or its Nominee, as applicable, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 4 of the Beneficial Holder Subscription Form.

(b)        In order to validly exercise its Subscription Rights, each Eligible Holder that is a Backstop  Party must:

    i.    return a duly executed Subscription Agreement along with a duly completed and executed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

    ii.    no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 4 of the Beneficial Holder Subscription Form.

**ALL BACKSTOP PARTIES MUST PAY THEIR APPLICABLE PURCHASE PRICE DIRECTLY TO THE SUBSCRIPTION AGENT AND SHOULD NOT PAY THEIR NOMINEES, IF ANY.**

With respect to (a) and (b) above, for those Eligible Holders that hold Allowed Note Claims through a Nominee, you must duly complete, execute and return your Beneficial Holder Subscription Form in accordance with the instructions herein **to your Nominee** in sufficient time to allow your Nominee to process your instructions and deliver to the Subscription Agent the Master Subscription Form, your completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), Subscription Agreement and, solely with respect to the Eligible Holders that are not Backstop Parties, payment of the applicable Purchase Price, payable for the Rights Offering Shares elected to be purchased by such Eligible Holder, by the Subscription Expiration Deadline.

Any Eligible Holder that <u>does not</u> hold an Allowed Note Claim through a Nominee must deliver their completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), Subscription Agreement and payment of the applicable Purchase Price payable for the Rights Offering Shares elected to be purchased by such Eligible Holder (with respect to the Eligible Holders that are not Backstop Parties) directly to the Subscription Agent on or before the Subscription Expiration Deadline. In all cases, Eligible Holders that are Backstop Parties must deliver their payment of the applicable Purchase Price payable for the Rights Offering Shares elected to be purchased by such Eligible Holder directly to the Subscription Agent no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent from any Eligible Holder do not correspond to the Purchase Price payable for the Rights Offering Shares elected to be purchased by such Eligible Holder, the number of the Rights Offering Shares deemed to be purchased by such Eligible Holder will be the lesser of (i) the number of the Rights Offering Shares elected to be purchased by such Eligible Holder and (ii) a number of the Rights Offering Shares determined by dividing the amount of the funds received by the Purchase Price.

The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated escrow account designed in escrow agreements mutually satisfactory to each of the Eligible Holders and the Debtors until administered in connection with the settlement of the Rights Offering on the Effective Date. The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

## 5.        Transfer Restriction; Revocation

The Subscription Rights are not detachable from the Allowed Note Claims.  If any Subscription Rights are Transferred by an Eligible Holder, the Subscription Rights will be cancelled, and neither such Eligible Holder nor the purported transferee will receive any Rights Offering Shares otherwise purchasable on account of such transferred Subscription Rights.

Once an Eligible Holder has properly exercised its Subscription Rights, subject to the terms and conditions of the Subscription Agreement and the Backstop Commitment Agreement in the case of any Backstop Party, such exercise will be irrevocable.

## 6.        Return of Payment

If the Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days, after the date on which the Rights Offering is terminated.

## 7.        Settlement of the Rights Offering and Distribution of the Rights Offering

Shares

The Debtors intend that the Rights Offering Shares will be issued to the Eligible Holders, and/or to any Affiliates (as defined in the Subscription Agreement) or Related Funds (as defined in the Subscription Agreement) that the Eligible Holders so designate in the Beneficial Holder Subscription Form, in book-entry form, and that DTC, or its nominee, will be the holder of record of such Rights Offering Shares.

**8.      Fractional Shares**

No fractional rights or Rights Offering Shares will be issued in the Rights Offering. All share allocations (including each Eligible Holder's Rights Offering Shares) will be calculated and rounded down to the nearest whole share.

**9.      Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors may waive any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, or reject, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.

*Before exercising any Subscription Rights, Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

**10.      Modification of Procedures**

With the prior written consent of the Requisite Commitment Parties, the Debtors reserve the right to modify or adopt additional procedures consistent with these Rights Offering Procedures to effectuate the Rights Offering and to issue the Rights Offering Shares, provided, however, that the Debtors shall provide prompt written notice to each Eligible Holder of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date. In so doing, and subject to the consent of the Requisite Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement the Rights Offering and the issuance of the Rights Offering Shares. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Holder party thereto.

The Debtors shall undertake reasonable procedures to confirm that each participant in the Rights Offering is in fact an Eligible Holder, including but not limited to, requiring such participant to validly and timely complete an Accredited Investor Cover Letter, requiring additional certifications by such participant to that effect and other diligence measures as the

Debtors deem reasonably necessary.

**11.      Inquiries And Transmittal of Documents; Subscription Agent**

The Rights Offering Instructions attached hereto should be carefully read and strictly followed by the Eligible Holders.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number: [•].

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

<div align="center">

**PENN VIRGINIA CORPORATION**

**RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE HOLDERS**

</div>

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.    **Insert** the principal amount of the Allowed Note Claims that you held as of the Record Date in Items 1a, 1b and 1c of your Beneficial Holder Subscription Form (if your Nominee holds your Allowed Note Claims on your behalf and you do not know such amount, please contact your Nominee immediately).

2.    **Confirm** whether you a Backstop Party pursuant to the representation in Item 3 of your Beneficial Holder Subscription Form.

3.    **Complete** the calculation in Item 2a of your Beneficial Holder Subscription Form, which calculates the maximum number of Rights Offering Shares available for you to purchase. Such amount must be rounded down to the nearest whole share.

4.    **Complete** the calculation in Item 2b of your Beneficial Holder Subscription Form, which calculates the Purchase Price for the Rights Offering Shares that you elect to purchase.

5.    **Read and complete** the certification in Item 2c of your Beneficial Holder Subscription Form certifying that you are an Accredited Investor.

6.    **Read, complete and sign** the certification in Item 5 of your Beneficial Holder Subscription Form.

7.    **Read and countersign** the Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

8.    **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

9.    **Return** your signed Subscription Agreement and Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent prior to the Subscription Expiration Deadline or to your Nominee in sufficient time to allow your Nominee to process your instructions and prepare and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline.  A registered holder of Allowed Note Claims should follow the delivery instructions as provided in the Master Subscription Form.

10.  **Arrange for full payment** of the aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2b of your Beneficial Holder Subscription Form.  For Eligible Holders that are not Backstop Parties that hold Allowed Note Claims via a Nominee, please instruct your Nominee to coordinate payment of the Purchase Price and transmit and deliver such payment to the Subscription Agent by the Subscription Expiration Deadline.  A registered holder of Allowed Note Claims that is not a Backstop Party should follow the payment instructions as provided in the Master Subscription Form. A registered holder of Allowed Note Claims that is a Backstop Party should follow the payment instructions in the Funding Notice.

---

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [•], 2016.**

**Please note that the Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and the Subscription Agreement must be received by your broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "Nominee") in sufficient time to allow such Nominee to process and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline, along with the appropriate funding (with respect to Eligible Holders that are not Backstop Parties) or the subscription represented by your Beneficial Holder Subscription Form will not be counted and you will be deemed forever to have relinquished and waived your right to participate in the Rights Offering.  Registered holders of Allowed Note Claims that are not Backstop Parties should follow the delivery and payment instructions provided in the Master Subscription Form. Registered holders of Allowed Note Claims that are Backstop Parties should follow the payment instructions in the Funding Notice.**

**Eligible Holders that are Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Backstop Funding Deadline.**

*Execution Version*

_____

**SCHEDULES TO THE**

**BACKSTOP COMMITMENT AGREEMENT**

**by and among**

**PENN VIRGINIA CORPORATION**

**and**

**THE COMMITMENT PARTIES THERETO**

_____

These schedules have been arranged for purposes of convenience in separately titled sections corresponding to sections of the Backstop Commitment Agreement, dated May 10, 2016, by and among Penn Virginia Corporation and the Commitment Parties thereto (the "Agreement"); *provided*, *however*, information disclosed in any section of the schedules shall be deemed to modify any information disclosed in any other section of the Agreement (whether or not such section calls for a schedule) to which the applicability of such information is reasonably apparent on its face. Capitalized terms used in the schedules and not otherwise defined therein have the meanings given to them in the Agreement. The information contained in the Agreement and in the Schedules and Exhibits thereto is disclosed solely for purposes of the Agreement, and no information contained herein or therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including, without limitation, any violation of law or breach of contract).

## **Schedules**

| | |
|---|---|
| Schedule 1.1 | Material Contracts |
| Schedule 4.4 | Authorized and Issued Capital Stock |
| Schedule 4.11 | Absence of Certain Changes |
| Schedule 4.12 | No Violation; Compliance with Laws |
| Schedule 4.13 | Legal Proceedings |
| Schedule 4.14 | Labor Relations |
| Schedule 4.16 | Title to Real Property |
| Schedule 4.21 | Employee Benefit Plans |
| Schedule 4.24 | Material Contracts |
| Schedule 4.28 | No Broker's Fees |

2

## Schedule 1.1 – Material Contracts

1. Patterson-UTI Drilling Company LLC

   a. Drilling Bid Proposal and Daywork Drilling Contract - U.S., dated December 7, 2015, by and between Patterson-UTI Drilling Company LLC and Penn Virginia Oil & Gas, L.P.

2. Dominion Transmission, Inc.

   a. Service Agreement Applicable to Transportation of Natural Gas Under Rate Schedule FT (Contract No. 200597), dated May 31, 2011, by and between Dominion Transmission, Inc. and Penn Virginia Oil & Gas Corporation, together with the Negotiated Rate Agreement, undated, by and between Dominion Transmission, Inc. and Penn Virginia Oil & Gas Corporation, and the Revised Negotiated Rate Agreement, dated July 17, 2012, by and between Dominion Transmission, Inc. and Penn Virginia Oil & Gas Corporation.

   b. Precedent Agreement for Firm Transportation Services – Appalachian Gateway Project, dated September 4, 2008, as amended on March 13, 2009, by and between Dominion Transmission, Inc. and Penn Virginia Oil & Gas Corporation.

   c. Service Agreement Applicable to Transportation of Natural Gas Under Rate Schedule FT (Contract No. 200627), dated March 28, 2013, by and between Dominion Transmission, Inc. and Penn Virginia Oil & Gas Corporation.

   d. Precedent Agreement for Firm Transportation Services Tioga Area Expansion Project, dated February 25, 2011, by and between Dominion Transmission, Inc. and Penn Virginia Oil & Gas Corporation.

3. Republic Midstream, LLC

   a. Transportation Agreement, dated July 30, 2014, by and between Republic Midstream, LLC and Penn Virginia Oil & Gas, L.P.

   b. Crude Oil Marketing Agreement, dated July 30, 2014, by and between Republic Midstream Marketing, LLC and Penn Virginia Oil & Gas, L.P., as amended by that certain First Amendment to Crude Oil Marketing Agreement, dated September 24, 2015.

   c. Amended and Restated Construction and Field Gathering Agreement, dated September 24, 2015, by and between Republic Midstream, LLC and Penn Virginia Oil & Gas, L.P.

   d. Letter Agreement re Buy-Sell Marketing Arrangements, dated May 22, 2015, by and among Republic Midstream, LLC, Republic Midstream Marketing, LLC and Penn Virginia Oil & Gas, L.P.

4. CEP Holdings, Ltd.

   a. Farmout Agreement – Blackjack South Prospect (Block 1), dated August 28, 2014, by and between CEP Holdings, Ltd. and Penn Virginia Oil & Gas, L.P., as amended by that certain Amendment to Farmout Agreement, dated November 6, 2014.

      b.   Farmout Agreement – Shiner East Prospect, dated August 28, 2014, by and between CEP Holdings, Ltd. and Penn Virginia Oil & Gas, L.P.

5.   <u>American Midstream (Lavaca), LLC</u>

      a.   Construction and Field Gathering Agreement, dated January 31, 2014, by and between American Midstream (Lavaca), LLC (f/k/a HPIP Lavaca, LLC) and Penn Virginia Oil & Gas, L.P., as amended by that certain First Amendment to Construction and Field Gathering Agreement, dated May 7, 2015.

      b.   Letter Agreement, dated June 29, 2015, by and between American Midstream (Lavaca), LLC and Penn Virginia Oil & Gas, L.P.

      c.   Letter Agreement, dated August 21, 2015, by and between American Midstream (Lavaca), LLC and Penn Virginia Oil & Gas, L.P.

      d.   Letter Agreement, dated September 18, 2015, by and between American Midstream (Lavaca), LLC and Penn Virginia Oil & Gas, L.P.

      e.   Letter Agreement, dated September 28, 2015, by and between American Midstream (Lavaca), LLC and Penn Virginia Oil & Gas, L.P.

6.   <u>ETC Texas Pipeline, Ltd.</u>

      a.   Gas Processing Agreement, dated January 1, 2011, by and between ETC Texas Pipeline, Ltd. and Penn Virginia Oil & Gas, L.P., as amended by that certain Amendment to Gas Processing Agreement, dated July 1, 2013, as amended by that certain Second Amendment to Gas Processing Agreement, dated October 1, 2014.

      b.   Gathering and Natural Gas Services Agreement, dated January 1, 2011, by and between ETC Texas Pipeline, Ltd. and Penn Virginia Oil & Gas, L.P., and all Individual Transaction Confirmations related thereto.

           i.   Letter Agreement, dated April 19, 2013, by and between ETC Texas Pipeline, Ltd. and Penn Virginia Oil & Gas, L.P.

          ii.   Letter Agreement, dated January 9, 2015, by and between ETC Texas Pipeline, Ltd. and Penn Virginia Oil & Gas, L.P.

## Schedule 4.4 - Authorized and Issued Capital Stock

(c)

1.      Capital stock or other equity securities or voting interests reserved for issuance under the new management incentive plan described in the Plan.

(d)

1.      The new management incentive plan described in the Plan.

**Schedule 4.11 - Absence of Certain Changes**

1.    The Company's financial condition has weakened as a result of the continued depressed
commodity prices and other events leading to the pendency of the Chapter 11 Cases.

## Schedule 4.12 - No Violation; Compliance with Laws

1.      Following an audit of the Company's Bureau of Indian Affairs leases (the "Indian Affairs Leases") for the period of 2007-2008, the Office of Natural Resources Revenue ("ONRR") had verbally notified the Company that it intended to assess a civil penalty against the Company in the amount of $3.5 million for late payment of royalties due under the Indian Affairs Leases (the "ONRR Matter"). Following discussions with ONRR, the Company has reason to believe that the amount of the penalty will be reduced to approximately $2.5 million and will not involve litigation; however, the discussions with ONRR are ongoing.

2.      The Company has failed to make certain payments required under the Penn Virginia Corporation Supplemental Employee Retirement Plan (the "SERP").

## <u>Schedule 4.13 - Legal Proceedings</u>

The following current litigation involves the Company and/or its Subsidiaries.

### PENN VIRGINIA OIL & GAS CORPORATION ("<u>PVOG</u>") LITIGATION

1.  <u>Excalibur Rentals, Inc. and Elite Toilet Rentals, Inc. v. Penn Virginia Oil and Gas Corporation</u>

**Background**:  Plaintiffs brought suit against PVOG for non-payment of amounts that plaintiffs claim are owed as a result of their providing equipment and services to PVOG.

**Status**: Discovery is underway. Plaintiffs are claiming damages of approximately $1.4 million in the aggregate. PVOG believes it owes plaintiffs only a small portion of the amount claimed as much of the amounts claimed by plaintiffs are not supported by invoices and an audit of the services provided resulted in a credit to PVOG of nearly $400,000.

### PENN VIRGINIA OIL & GAS, L.P. ("<u>PVOG LP</u>") LITIGATION

2.  <u>Freddy Howard Driver v. Penn Virginia Oil & Gas, L.P.</u>

**Background**:  Mr. Driver claims he was injured in June 2014 while picking up a load of produced salt water at PVOG LP's Targac #1H well.  Mr. Driver was an employee of Key Energy Services, Inc. ("<u>Key</u>") at the time of his injury.

**Status**:  Discovery is ongoing.  Trial has been set for September 19, 2016.  Key's insurer is providing the defense and indemnifying PVOG LP.

3.  <u>EOG Resources, Inc. v. Penn Virginia Oil & Gas, L.P. et al</u>

**Background**:  EOG, a nonconsenting cotenant in certain Munson Ranch wells operated by PVOG LP, brought suit against PVOG LP alleging that (i) PVOG LP overcharged EOG for EOG's interest in the wells, including by charging EOG an impermissible marketing fee in its payout calculations, as set forth in an audit conducted on behalf of EOG covering the period from 2011 to April 2013, (ii) PVOG LP was required to but failed to make payment on drip condensate on the wells and (iii) PVOG LP failed to pay EOG revenue from the Munson Ranch #6H well from November 2013 through January 2015.

**Status**: PVOG LP responded to each audit exception and adjusted the relevant payout dates, resulting in a $190,000 payment to EOG for agreed exceptions. PVOG LP paid EOG the approximately $300,000 in revenue it owed for production on the Munson Ranch #6H well (see (iii) above) in August 2015. After giving effect to such payments, EOG's outstanding demand amounts to approximately $200,000.

4. <u>Hornacky et al. v. American Midstream (Lavaca), LLC et al</u>

**Background**: Plaintiffs filed suit in February 2016 against numerous parties, including American Midstream (Lavaca), LLC ("<u>AMID</u>") and PVOG LP. Plaintiffs are homeowners of property adjacent to Republic Midstream, LLC's midstream operations in Lavaca County. The lawsuit alleges, among other things, (i) that AMID's midstream operations constitute a private nuisance and (ii) civil conspiracy to deceive the plaintiffs with respect to the intended use of its property.

**Status**: PVOG LP filed its answer in March 2016. Republic Midstream, LLC is controlling the defense and indemnifying PVOG LP.

### PENN VIRGINIA MC CORPORATION ("<u>PVMCE</u>") LITIGATION

5. <u>Petroleum Development Corporation ("PDC") v. Penn Virginia MC Energy L.L.C.</u>

**Background**: PDC filed this action on April 5, 2013, alleging that PDC and PVMCE had entered into a letter agreement in April 2007 whereby PDC assigned PVMCE several hundred mineral acres in properties in Washita County, Oklahoma. PDC further alleges that the letter agreement provided if another party made an offer to purchase the acreage within 12 months, then PDC would have an option to meet that offer. PDC asserts that PVMCE sold a portion of the acreage within the 12-month period without offering PDC the option.

**Status**: In March 2014, the court denied both plaintiff's and PVMCE's motions for summary judgment. A new judge was assigned to the case in May 2015 and PVMCE has filed a new motion for summary judgment on statute of limitations which was denied. In January 2016, PDC proposed a settlement whereby PVMCE would pay approximately $5 million and make an assignment of certain leasehold interests. PVMCE rejected the offer.

### PENN VIRGINIA CORPORATION (THE "<u>COMPANY</u>") LITIGATION

6. <u>Shelton v. Penn Virginia Corp.</u>

**Background**: Shelton is a former contractor who claims he was terminated for retaliation under Sarbanes-Oxley after he reported to the Company that certain service companies were paying kickbacks.

**Status**: Penn Virginia Corp.'s answer was filed in April 2016. It is expected that Penn Virginia Corp. will prevail in the lawsuit. In his complaint, Shelton requested past and future earnings, punitive damages and fees, to be determined by a jury.

7. Potential litigation regarding the ONRR Matter.

8. <u>Hunt Oil Company</u>.

**Background**: In 2014, Hunt Oil Company ("<u>Hunt</u>") demanded payment of $8.7 million in damages from Magnum Hunter Resources Corporation ("<u>MHR</u>") in connection with a seismic program and as a result of certain audits relating to contractual arrangements between Hunt and Eagle Ford Hunter, Inc. ("<u>EFH</u>"), which was a subsidiary of MHR during the period subject to the penalty assessment. In 2014, the Company acquired EFH from MHR and MHR agreed to provide customary indemnification for pre-existing liabilities. MHR has failed to make the $8.7 million payment and is now bankrupt.

**Status**: Hunt sent a demand letter, dated November 17, 2015, to the Company demanding that the Company make the $8.7 million payment in full by November 30, 2015. The Company's response, dated November 24, 2015, disavows liability for substantially all amounts demanded by Hunt and affirms that MHR is responsible for payment of such amounts. Hunt sent a settlement offer by letter, dated December 10, 2015, which was rejected by the Company by letter, dated December 15, 2015.

### Schedule 4.14 - Labor Relations

1.      Reference is made to item 2 of Schedule 4.13 as if fully set forth herein.

2.      Reference is made to item 6 of Schedule 4.13 as if fully set forth herein.

**Schedule 4.16 - Title to Real and Personal Property**

(a)

1.    Hunt Oil Company maintains a Lien on all of the Company's equipment, fixtures, oil and gas when extracted and other personal property described in that certain Memorandum and Notice of Operating Agreement, Statement of Liens, Security Agreement and Financing Statement affecting the Bongo North Unit.

2.    The following involuntary liens have been filed against certain of the Company's Real Properties located in Gonzales County, Texas.

| | | |
|---|---|---|
| 1. | Lien Affidavit<br>1221/526 DR<br>3/16/2016 | Cactus Wellhead, LLC<br>To The Public<br>Washington Wells - # 2H; API – 42-177-33669 $123,335.33 |
| 2. | Lien Affidavit<br>1221/559 DR<br>3/16/2016 | Cactus Wellhead, LLC<br>To The Public<br>Washington Wells - # 3H; API – 42-177-33670 $123,335.33 |
| 3. | Lien Affidavit<br>1221/592 DR<br>3/16/2016 | Cactus Wellhead, LLC<br>To The Public<br>L & J Unit Wells - # 4H; API – 42-177-33666 $70,702.55 |
| 4. | Lien Affidavit<br>1221/617 DR<br>3/16/2016 | Cactus Wellhead, LLC<br>To The Public<br>L & J Unit Wells - # 5H; API – 42-177-33625 $70,259.35 |
| 5. | Lien Affidavit<br>1221/642 DR<br>3/16/2016 | Cactus Wellhead, LLC<br>To The Public<br>L & J Unit Wells - # 6H; API – 42-177-33626 $70,956.12 |
| 6. | Lien Affidavit<br>1221/802 DR<br>3/16/2016 | Bedrock Petroleum Consultants, LLC<br>To The Public<br>Axis Unit<br>Wells - # 1H, 2H, 3H;<br>API – 42-177-33695, 42-177-33696, 42-177-33697<br>$13,589.75 |
| 7. | Lien Affidavit<br>1221/814 DR<br>3/16/2016 | Bedrock Petroleum Consultants, LLC<br>To The Public<br>Washington Unit Wells - # 2H, 3H; API – 42-177-33669, 42-177-33670 $4,968.75 |
| 8. | Affidavit Claiming<br>Oil and Gas Lien<br>1222/151 DR<br>3/10/2016<br>3/21/2016 | Patterson-UTI Drilling Company LLC<br>To The Public<br>Washington 2H & 3H<br>$23,800.00 |

3.    The following involuntary liens have been filed against certain of the Company's Real Properties located in Lavaca County, Texas.

| | | |
|---|---|---|
| 1. | Lien Affidavit<br>To Secure Lien Against<br>Mineral Property<br>712/851 DR | Acock Engineering & Associates, L.P.<br>To The Public<br>Property Owner<br>Penn Virginia Oil & Gas, LP, |

12

|   | | |
|---|---|---|
|   | 3/1/2016 | Ted Collings, Jr.<br>Plein Sud Holdings, LLC<br>Marubeni Eagle Ford, LP<br>Hawg Hunter Unit<br>$15,595.00 |
| 2. | Lien Affidavit<br>To Secure Lien Against<br>Mineral Property<br>712/866 DR<br>3/1/2016 | Acock Engineering & Associates, L.P.<br>To The Public<br>Property Owner<br>Penn Virginia Oil & Gas, LP,<br>ZaZa Energy, LLC Hess Corporation Sable Hunter Unit<br>$8,050.00 |
| 3. | Lien Affidavit<br>713/808 DR<br>3/14/2016 | Cactus Wellhead, LLC<br>To The Public<br>Hawg Hunter Wells - # 3H; API – 42-285-33975 $144,817.10 |
| 4. | Lien Affidavit<br>713/867 DR<br>3/14/2016 | Cactus Wellhead, LLC<br>To The Public<br>Hawg Hunter Wells - # 4H; API – 42-285-33972 $164,322.27 |
| 5. | Lien Affidavit<br>714/12 DR<br>3/14/2016 | Cactus Wellhead, LLC<br>To The Public<br>Hawg Hunter Wells - # 5H; API – 42-285-33973 $140,582.64 |
| 6. | Lien Affidavit<br>714/51 DR<br>3/14/2016 | Cactus Wellhead, LLC<br>To The Public<br>RBK Unit Wells - # 3H;<br>API – 42-285-33873<br>$2,424.80 |
| 7. | Lien Affidavit<br>714/57 DR<br>3/14/2016 | Cactus Wellhead, LLC<br>To The Public<br>Sable Hunter Wells - # 4H; API – 42-285-33979 $60,365.07 |
| 8. | Lien Affidavit<br>714/120 DR<br>3/14/2016 | Cactus Wellhead, LLC<br>To The Public<br>Sable Hunter Wells - # 5H; API – 42-285-33980 $57,638.51 |
| 9. | Lien Affidavit<br>714/144 DR<br>3/14/2016 | Cactus Wellhead, LLC<br>To The Public<br>Sable Hunter Wells - # 6H; API – 42-285-33981 $31,971.61 |
| 10. | Lien Affidavit<br>714/570 DR<br>3/16/2016 | Bedrock Petroleum Consultants, LLC<br>To The Public<br>Hawg Hunter Unit<br>Wells - # 3H, 4H, 5H;<br>API – 42-285-33975, 42-285-33972, 42-285-33973<br>$20,239.75 |
| 11. | Lien Affidavit<br>714/584 DR<br>3/16/2016 | Bedrock Petroleum Consultants, LLC<br>To The Public<br>Sable Hunter Unit<br>Wells - # 4H, 5H, 6H;<br>API – 42-285-33979, 42-285-33980, 42-285-33981<br>$26,272.50 |
| 13. | Lien Affidavit<br>714/616 DR<br>3/16/2016 | Bedrock Petroleum Consultants, LLC<br>To The Public<br>Kelly Deep Water<br>Wells - # 2, |

| | | API – 42-285-33730<br>$11,957.00 |
|---|---|---|
| 14. | Affidavit Claiming Oil and Gas Lien<br>715/40 DR<br>3/10/2016<br>3/21/2016 | Patterson – UTI Drilling Company LLC<br>To The Public<br>Hawg Hunter 3H, 4H & 5H<br>$436,902.40 |
| 15. | Affidavit Claiming Oil and Gas Lien<br>715/63 DR<br>3/10/2016<br>3/21/2016 | Patterson – UTI Drilling Company LLC<br>To The Public<br>Sable Hunter 4H, 5H & 6H $636,861.30 |

(b)

1. The Company is in default under that certain Lease Agreement, dated December 14, 2001, by and between Memorial City Towers, Ltd. and Penn Virginia Oil & Gas, L.P., as amended, and the related Lease Commencement Agreement, dated September 4, 2002, with respect to its leased facilities at Three Memorial City Plaza, Suite 700, 840 Gessner, Houston, Texas 77024.

2. The Company is in default under that certain Lease, dated June 8, 1995, by and between Radnor Center Associates and Penn Virginia Corporation, as amended, with respect to its leased facilities at Four Radnor Corporate Center, 100 Matsonford Road, Radnor, Pennsylvania 19087.

## <u>Schedule 4.21 - Employee Benefit Plans</u>

(a)

1.      The Company has failed to make certain payments required under the SERP.

(e)

1.      The Company has failed to make certain payments required (i) under the Penn Virginia
        Corporation 2013 Amended and Restated Long-Term Incentive Plan, (ii) under the Penn Virginia
        Corporation Supplemental Employee Retirement Plan, (iii) with respect to performance-based
        restricted stock units and (iv) due to adjustments to its severance program.

## <u>Schedule 4.24 - Material Contracts</u>

1.      As a result of the Company's insolvency, the Company is  in default under the terms of certain Material Contracts and, as a result of the anticipated filing of the Chapter 11 Cases, will be in default under the terms of certain Material Contracts and the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability.

## **Schedule 4.28 - No Broker's Fees**

1.      Jefferies LLC is entitled to certain fees and expenses from the Company or its Subsidiaries, subject to confirmation of the Plan.

2.      Alvarez & Marsal North America LLC is entitled to certain fees and expenses from the Company or its Subsidiaries, subject to confirmation of the Plan.

3.      PJT Partners Inc. is entitled to certain fees and expenses from the Company or its Subsidiaries, subject to confirmation of the Plan.

17

**Exhibit D** to the Restructuring Support Agreement

**Exit Facility Term Sheet**



***CONFIDENTIAL***
**Penn Virginia Holding Corp.**
*Senior Secured Revolving Credit Facility*
*Indicative Summary of Terms and Conditions*

May 10, 2016

## I.    Parties

| | |
|---|---|
| Borrower: | Penn Virginia Holding Corp. |
| Guarantors: | Penn Virginia Corporation (the "Parent") and all subsidiaries of the Parent that will exist as of the Closing Date, or that are formed or acquired during the tenor of the Facility. |
| Sole Lead Arranger and Sole Bookrunner: | Wells Fargo Securities, LLC ("Wells Fargo Securities" and, in such capacity, the "Arranger"). |
| Administrative Agent: | Wells Fargo Bank, National Association ("Wells Fargo Bank" and, in such capacity, the "Administrative Agent"). |
| Other Agents: | To be mutually agreed upon by the Arranger and the Borrower. |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Wells Fargo Bank (collectively, the "Lenders"), arranged by the Arranger and mutually agreed by the Borrower. |
| Majority Lenders: | Lenders holding more than 50.0% of the aggregate amount of the Loans and participations in Letters of Credit and unused commitments under the Facility (the "Majority Lenders"). |
| Required Lenders: | Lenders holding not less than 66.67% of the aggregate amount of the Loans and participations in Letters of Credit and unused commitments under the Facility. |

Exhibit A
1

| | |
|---|---|
| Lender Swap Counterparties: | Lenders or affiliates of a Lender that are party to Lender Swap Agreements (to be defined as set forth in the Debtor-in-Possession Credit Agreement dated on or about May 11, 2016 (the "DIP Credit Agreement")), with the Borrower or any Guarantor (collectively, the "Lender Swap Agreements"). |
| Secured Parties: | Administrative Agent, Lenders, Issuing Bank, Lender Swap Counterparties and providers of cash management products provided to the Borrower or any Guarantor by a Lender or an affiliate of a Lender (collectively, the "Cash Management Products") (as defined below) (the "Secured Parties"). Any Lender Swap Counterparty that is a Lender or an Affiliate of a Lender as of the date such Lender Swap Counterparty enters into any transaction under a Lender Swap Agreement shall be a Secured Party with respect to such transaction (without giving effect to any extension, increases or modifications (including blending) thereof which are made after such Lender Swap Counterparty ceases to be a Lender or an Affiliate of a Lender) until the payment in full in cash by Borrower and any Guarantor of all of their obligations under such transaction regardless of whether such Lender Swap Counterparty ceases to be a Lender or an Affiliate of a Lender while such transaction remains outstanding or arrangements satisfactory to such Lender Swap Counterparty has been made with respect to such transaction. |

## II.    Facility

| | |
|---|---|
| Type and Amount of Facility: | A senior secured revolving credit facility (the "Facility") in an amount up to $200 million (the "Aggregate Maximum Credit Amount") (the loans thereunder, the "Loans"). |
| Scheduled Termination Date: | The fourth anniversary of the Closing Date (the "Termination Date"). |
| Commitment Termination Date under Commitment Letter: | 120 days after the Petition Date as may be extended in accordance with Section 11(b) of the Commitment Letter. |
| Availability: | Subject to the Borrowing Base then in effect, the Facility shall be available on a revolving basis during the period commencing on the Closing Date and |

Exhibit A

2

ending on the Termination Date in accordance with the terms hereof and subject to satisfaction of applicable conditions precedent, including, without limitation, pro forma compliance with financial covenants to the extent set forth below.

Availability under the Facility shall be equal to the lesser of (a) the Aggregate Maximum Credit Amount and (b) the then effective Borrowing Base (such lesser amount being the "Commitments").

Letters of Credit:

A portion of the Facility not in excess of $5 million shall be available for the issuance of letters of credit (the "Letters of Credit") by Wells Fargo Bank (in such capacity, the "Issuing Bank"). No Letter of Credit shall have an expiration date after the earlier of (a) twelve (12) months after the date of issuance and (b) five (5) business days prior to the Termination Date, provided that any Letter of Credit may provide for the renewal thereof (which shall in no event extend beyond the date referred to in clause (b) above).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Loans) on the business day the Borrower receives notice of such drawing from the Issuing Bank if such notice is received by the Borrower prior to 12:00 p.m. New York time or, if such notice is received after 12:00 p.m. New York time, then on the business day following such notice. To the extent that the Borrower does not so reimburse the Issuing Bank, the Lenders shall be irrevocably and unconditionally obligated to reimburse the Issuing Bank on a *pro rata* basis.

Purpose:

The proceeds of the Loans shall be used by the Borrower for (a) financing certain fees, costs and expenses in connection with the Borrower's and Guarantor's exit from chapter 11 and refinancing certain debt in connection therewith, (b) financing capital expenditures and acquisitions, and (c) working capital and general corporate purposes of the Borrower and its subsidiaries, provided that neither the Borrower nor its subsidiaries nor any other Guarantor will use any proceeds for the purpose of

Exhibit A
3

purchasing or carrying directly or indirectly any margin stock or for any other purpose which would constitute this transaction a "purpose credit" within the meaning of Regulation U.

| | |
|---|---|
| Security/Guarantee: | The Facility, the Lender Swap Agreements and the Cash Management Products (obligations and liabilities arising thereunder, the "<u>Secured Obligations</u>") shall be ratably secured on a pari passu basis (as provided in the Application of Proceeds section below) by: |

- First priority, perfected liens and security interests on substantially all personal and real property assets of the Borrower and the Guarantors, including a first priority, perfected lien on:

  (a)  all oil and gas properties of the Borrower and the Guarantors, including (i) not less than 95% of the total value of the oil and gas properties evaluated in the most recent reserve report delivered to the Administrative Agent ("Proven Reserves") and (ii) not less than 95% of all other oil and gas properties (but in any event, 100% of oil and gas properties covered by the mortgages filed in connection with the existing credit facility (which such mortgages will be delivered (A) with each Scheduled Borrowing Base Redetermination or any other redetermination which results in an increase in the Borrowing Base, (B) with each acquisition (whether completed in one transaction or a series of related transactions) of oil and gas properties with a purchase price in excess of $5 million, and (C) to comply with the title covenant.

  (b)  all present and future capital stock or other membership or partnership equity ownership or profit interests (collectively, "<u>Equity Interests</u>") owned or held of record or beneficially by the Borrower or any Guarantor;

  (c)  all tangible and intangible personal property and assets of the Borrower and the Guarantors (including, without limitation, all equipment,

Exhibit A
4

#4834-9214-0593v2
#4834-9214-0593v3

inventory and other goods, accounts, licenses, contracts, intellectual property and other general intangibles, deposit accounts, securities accounts and other investment property and cash); and

(d) all products, profits, and proceeds of the foregoing,

subject to customary exclusions to be mutually agreed, including without limitation, exclusions for (i) contracts/leases/permits which expressly prohibit the granting of a security interest, (ii) intent-to-use trademark applications, (iii) commercial tort claims where the amount of damages expected to be claimed is less than $250,000, (iv) letter of credit rights where the amount thereof is less than $250,000, (v) perfecting liens on vehicles and other assets subject to certificate of title statutes and (vi) perfecting liens on other assets where the cost or burden of perfection outweighs the benefit to the Administrative Agent and the Lenders thereof as determined by the Administrative Agent in its reasonable discretion.

For the avoidance of doubt, all deposit accounts and securities accounts (excluding (x) (A) accounts designated solely for payroll or employee benefits, (B) cash collateral accounts under the Facility and cash collateral accounts permitted under the Facility, (C) trust accounts held exclusively for the payment of taxes of the Borrower or any Guarantor, and (D) suspense or trust accounts held exclusively for royalty and working interest payments owing to third parties (the funds in such clauses (A) through (D), "Excluded Funds"), and (y) petty cash accounts holding no more than $250,000 in the aggregate) of the Borrower and Guarantors shall be subject to control agreements in form and substance reasonably satisfactory to the Administrative Agent.

- Negative pledge on substantially all non-mortgaged assets of the Parent, the Borrower and its subsidiaries.

The Facility, the Cash Management Products and the

Exhibit A
5

#4834-9214-0593v2
#4834-9214-0593v3

Lender Swap Agreements shall be ratably guaranteed on a pari passu basis (as provided in the Application of Proceeds section below) by an unconditional joint and several guarantee of payment from the Borrower (of the Cash Management Products of, and Lender Swap Agreements entered into by, Guarantors) and from the Guarantors.  Security and Guarantees of obligations under the Lender Swap Agreements shall be subject to customary exceptions for non-qualified ECP counterparties.

Lender Swap Agreements shall constitute Secured Obligations and Guaranteed Obligations until all obligations of Borrower and any Guarantor thereunder are paid in full, irrespective of whether the Lender Swap Counterparty is a Lender under the Facility.

Borrowing Base:

The Borrowing Base shall be the loan value to be assigned to the proved reserves attributable to the Borrower's and the Guarantors' oil and gas properties located in the United States (the "Borrowing Base Properties").   The Borrowing Base will be redetermined on a semi-annual basis (the "Scheduled Borrowing Base Redetermination"), with the parties having the right to interim unscheduled redeterminations as described below.

Scheduled Borrowing Base Redeterminations will be on a semi-annual basis each April 1st and October 1st, commencing with April 1, 2017 (the "First Scheduled Borrowing Base Redetermination") and will be based upon a Reserve Report prepared as of the immediately preceding January 1st and July 1st, respectively, and delivered to the Administrative Agent on or before March 1st and September 1st, respectively.  The January 1st Reserve Report will be prepared by (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company, L.P., (c) DeGolyer and MacNaughton or (d) any other independent petroleum engineering firm reasonably acceptable to the Majority Lenders (collectively, the "Approved Engineers"), and the July 1st Reserve Report will be prepared internally by the Borrower in a form reasonably acceptable to the Administrative Agent.

Exhibit A
6

The Borrowing Base will also be subject to interim reductions in connection with (a) any asset dispositions of oil and gas properties (including, but not limited to, disposition of Equity Interests in Guarantors holding oil and gas properties and, for the avoidance of doubt, casualty/condemnation events), (b) hedge unwinds or terminations, and (c) title defects, if the aggregate value attributed thereto (when aggregated with all such dispositions, hedge events or title defects) in the Borrowing Base (as determined by the Administrative Agent) is in excess of 5.0% of then current Borrowing Base in between Scheduled Borrowing Base Redeterminations.  With respect to interim redeterminations on account of title defects, the Borrower shall have a period of 60 days to cure or correct such title defects before a redetermination on account of such title defects is made effective.

Decisions regarding the amount of the Borrowing Base will be made at the sole discretion of the Lenders in accordance with their normal and customary oil and gas lending criteria as it exists at the particular time and as specified in the Credit Documentation. Increases in the amount of the Borrowing Base will require approval of all Lenders, and decreases or maintenance of the amount of the Borrowing Base will require approval of the Required Lenders.

Initial Borrowing Base:

The Borrowing Base will be set initially at an amount equal to $118 million until the next scheduled redetermination or such amount is otherwise adjusted as described herein, and subject to the following paragraph.

If the Borrower has entered into commodity hedging agreements hedging proved, developed producing oil and gas reserves of the Borrower and the Guarantors in the minimal notional volumes and at the prices and for the periods described on Schedule A attached hereto (the "Minimum Hedges") and such Minimum Hedges are in effect on the Closing Date, then the initial Borrowing Base amount set forth above shall be increased by $10 million on the Closing Date so long as such Minimum Hedges are otherwise on

Exhibit A
7

terms permitted under the Facility and no other commodity hedging agreements are in effect which would negatively impact the benefits of such Minimum Hedges.   If the Borrower and the Guarantors enter into commodity hedging agreements hedging proved, developed producing oil and gas reserves of the Borrower and the Guarantors for the periods described on Schedule A but with lesser notional volumes or lower prices than those set forth on Schedule A (the "Other Lower Hedges") and such Other Lower Hedges are in effect on the Closing Date, then the Lenders and the Administrative Agent will, in good faith, consider (but is not obligated to agree to) a lesser increase in the initial Borrowing Base to be in effect on the Closing Date taking into account such Other Lower Hedges and other factors as the Lenders customarily deem appropriate (including, but not limited to, proven increases to cost savings and increases to proven reserves as reflected in an Approved Engineer's reserve report) and determined in accordance with the Administrative Agent's and the Lenders' then in effect internal standards and practices for valuing and redetermining the value of Oil and Gas Properties in connection with reserve based oil and gas loan transactions.   If the Borrower and the Guarantors enter into commodity hedging agreements hedging proved, developed producing oil and gas reserves of the Borrower and the Guarantors for the periods and minimal volumes described on Schedule A but with higher prices than those set forth on Schedule A (the "Other Higher Hedges") and such Other Higher Hedges are in effect on the Closing Date, then the Lenders and the Administrative Agent will, in good faith, consider (but is not obligated to agree to) an increase in the initial Borrowing Base to be in effect on the Closing Date taking into account such Other Higher Hedges and other factors as the Lenders customarily deem appropriate and determined in accordance with the Administrative Agent's and the Lenders' then in effect internal standards and practices for valuing and redetermining the value of Oil and Gas Properties in connection with reserve based oil and gas loan transactions.

The foregoing conditions and parameters around

Exhibit A

8

setting the initial Borrowing Base to be in effect on the Closing Date takes into account various factors and circumstances, including but not limited to those expressly discussed above, and are being provided herein with the express understanding and agreement that the foregoing should not be construed as an indication or precedent for any future redetermination of the Borrowing Base and that no course of dealing shall be established hereby.

The Administrative Agent, at the request of the Required Lenders, and the Borrower, each may request one additional unscheduled Borrowing Base redetermination during each period between scheduled Borrowing Base redeterminations (each, a "Wild Card Redetermination").  The Wild Card Redetermination requested by the Required Lenders may not be exercised prior to the First Scheduled Borrowing Base Redetermination.

The Borrower may request additional unscheduled Borrowing Base redeterminations in connection with any acquisition of oil and gas properties having a purchase price, either individually or in the aggregate, in excess of 5.0% of the then current Borrowing Base.

### III.    Certain Payment Provisions

Fees and Interest Rates:                         As set forth on Annex I.

Principal Payments:                              On the Termination Date.

Voluntary Prepayments:                           Voluntary prepayments of Loans are permitted without premium or penalty (but subject to payment of applicable breakage costs, if any, except in the event of a payment made on account of the Anti-Hoarding Prepayment Provision) in minimum amounts and with prior notices to be agreed, except in the event of a payment made on account of the Anti-Hoarding Prepayment Provision.

Mandatory Prepayments:                           If as a result of (a) a Scheduled Borrowing Base Redetermination, (b) a Wild Card Redetermination, or (c) an adjustment for title defects, the sum of outstanding Loans and Letters of Credit exceeds the Commitments (a "Borrowing Base Deficiency"), a

Exhibit A
9

Borrowing Base Deficiency shall exist, then the Borrower will be required to prepay/cash collateralize such Borrowing Base Deficiency within 90 days (such period of time, a "<u>Deficiency Period</u>") in three consecutive monthly installments. If a Scheduled Borrowing Base Redetermination, a Wild Card Redetermination or an adjustment on account of title defects ("<u>Additional Trigger</u>") occurs during a Deficiency Period when a prepayment/cash collateralization schedule is in effect, then the Borrower shall continue to make such prepayments/cash collateralization when due and any additional amount of Borrowing Base Deficiency occurring as a result of the Additional Trigger shall be prepaid/cash collateralized within its own Deficiency Period of 90 days in three consecutive monthly installments. During any Deficiency Period, the Applicable Margin will increase by 2.00%.

If as a result of an adjustment for an asset disposition or an adjustment resulting from the unwind or termination of a hedging agreement, a Borrowing Base Deficiency exists, then the Borrower will be required to prepay such Borrowing Base Deficiency on the first business day after such net cash proceeds from such asset disposition is paid, or on the day net cash proceeds are received in the case of an unwind or termination of a hedging agreement.

If an asset disposition or a hedge unwind or termination occurs during the period when a Borrowing Base Deficiency already exists, then in addition to the requirement to prepay any Borrowing Base Deficiency occurring as a result thereof (as provided above), the Borrower shall apply any remaining proceeds resulting from such asset disposition or hedge unwind or termination on the date thereof as a pro rata prepayment of monthly installments due in such Deficiency Period.

If, at any time Loans or Letters of Credit are outstanding, the Consolidated Cash Balance (as defined below) exceeds the Consolidated Cash Balance Limit (as defined below) as of the end of the last business day of any week, then the Borrower shall, within one business day, prepay the Loans in an

Exhibit A
10

aggregate principal amount equal to such excess, and if any excess remains after prepaying all of the Loans as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral (the "<u>Anti-Hoarding Prepayment Provision</u>").

As used herein, the following terms have the meanings indicated below:

"<u>Consolidated Cash Balance</u>" means, at any time, the aggregate amount of cash and cash equivalents, marketable securities, treasury bonds and bills, certificates of deposit, investments in money market funds and commercial paper, in each case, held or owned by (whether directly or indirectly), credited to the account of, or otherwise reflected as an asset on the balance sheet of, the Parent and its consolidated subsidiaries less Excluded Funds.

"<u>Consolidated Cash Balance Limit</u>" means $10 million.

| | |
|---|---|
| Optional Commitment Reductions: | Commitments may be reduced by the Borrower in minimum amounts to be agreed upon or terminated in whole without penalty (other than breakage costs, if any).  Optional reductions in Commitments which result in credit exposure exceeding the Commitments, as so reduced, shall be accompanied by concurrent payments sufficient to eliminate such excess. |

Exhibit A
11

#4834-9214-0593v2
#4834-9214-0593v3

## IV.    <u>Certain Conditions</u>

Initial Conditions:

Below is an exclusive list of conditions to the initial availability of the Facility:

The initial availability of the Facility shall be conditioned upon satisfaction of the following conditions precedent (the date upon which all such conditions precedent shall be satisfied or waived, the "<u>Closing Date</u>"):

(a)    The Borrower and each Guarantor shall have executed and delivered satisfactory definitive financing documentation with respect to the Facility (the "<u>Credit Documentation</u>"), including mortgages, security agreements, pledge agreements, control agreements, transfer order letters executed in blank, other documentation reasonably satisfactory for the creation and perfection of the liens and security interests contemplated hereby (provided, however, if the Borrower has not received the initial draft forms of any such collateral documentation on or prior to 15 days prior to the Closing Date, then the terms of the Credit Documentation will not impair availability of the Facility on the Closing Date if a perfected security interest in any such collateral (the security interest in respect of which cannot be perfected by means of the filing of a UCC financing statement, the making of a federal intellectual property filing or delivery of possession of capital stock or other certificated security of domestic entities) is not able to be provided on the Closing Date after Borrower's use of commercially reasonable efforts to do so, the perfection of such security interest in such collateral will not constitute a condition precedent to the availability of the Facility on the Closing Date, but a security interest in such collateral will be required to be perfected (or delivery of documentation necessary to establish such perfection will be required) no later than 15 days after the Closing Date pursuant to arrangements to be mutually agreed between Borrower and the Administrative Agent (or by such later date as the Administrative Agent may agree to in its sole discretion).

(b)    The Lenders, the Administrative Agent and

Exhibit A
12

the Arranger shall have received all fees required to be paid, and all expenses for which invoices have been presented at least two (2) business days prior to the Closing Date (it being agreed and understood that this condition (b) may be satisfied concurrent with the initial funding under the Facility).

(c)     All material governmental and third party approvals necessary (as determined in the reasonable discretion of the Administrative Agent) in connection with the financing and transactions contemplated hereby and the continuing operations of the Parent, the Borrower and its subsidiaries shall have been obtained and be in full force and effect.

(d)     The Lenders shall have received (i) unaudited consolidated financial statements of the Borrower for each fiscal quarter of the current fiscal year ended at least 45 days prior to the Closing Date, and (ii) a satisfactory reserve report for the oil and gas properties of the Parent, Borrower and its subsidiaries prepared by an Approved Engineer.  The reserve report dated as of December 31, 2015 and delivered to the Administrative Agent prior to the date of the Commitment Letter satisfies this clause (d)(ii).

(e)     The Lenders shall have received a satisfactory opening balance sheet of the Borrower giving pro forma effect to the debt (if any) to be incurred on the Closing Date (it being agreed and understood that the opening balance sheet attached to the approved Disclosure Statement shall be deemed satisfactory to the Lenders).

(f)     Since the date of the Commitment Letter the Administrative Agent shall not become aware (i) of any material title defects arising since the date of the Commitment Letter or (ii) that any title diligence materials reviewed by the Administrative Agent (or counsels thereto) prior to the date of the Commitment Letter were inaccurate in any material respect, in the case of clauses (i) and (ii), to the extent the Borrowing Base value attributable to such affected properties exceeds 5% of the initial Borrowing Base in the aggregate; provided however, any defects or inaccuracies remedied upon effectiveness of and

Exhibit A
13

pursuant to, the Plan of Reorganization shall not count towards such 5%.

(g)     No "Material Adverse Effect" as defined in BCA shall have occurred since the date of the Commitment Letter.

(h)     The Administrative Agent shall have received customary evidence of authorization, customary officer's certificates, good standing certificates in the Borrower's and each Guarantor's jurisdiction of incorporation or formation, customary UCC searches, customary funds flow memorandum, insurance certificates and a solvency certificate from the Parent's chief financial officer or treasurer (certifying that, after giving pro forma effect to the Transactions and after giving effect to each debtors' exit from the Chapter 11 Cases in accordance with the Plan of Reorganization, that the Borrower and the Guarantors, on a consolidated basis, are solvent) in the form of Schedule B hereto.

(i)     There shall be no adversary proceeding pending in the Bankruptcy Court, or litigation commenced outside of the Chapter 11 Cases that is not stayed pursuant to section 362 of the Bankruptcy Code, seeking to enjoin or prevent the financing or the transactions contemplated hereby.

(j)     The Administrative Agent shall be reasonably satisfied that after the making of the Loans, the application of the proceeds thereof and after giving effect to the other transactions contemplated hereby, the aggregate amount of credit extensions under the Facility outstanding on the Closing Date shall not exceed the lesser of (A) $125 million and (B) the initial Borrowing Base in effect on the Closing Date.

(k)     The Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that the Borrower has received common equity proceeds in an aggregate amount not less than $50 million (it being understood that this clause (k) may be satisfied concurrently with the initial funding under the Facility).

(l)     The Lenders shall have received such legal

Exhibit A

14

opinions, including opinions of local counsel, documents and other instruments as are customary for transactions of this type.

(m)    If the initial Borrowing Base is adjusted as a result of Other Lower Hedges or Other Higher Hedges, then the Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that the Borrower has entered into such Other Lower Hedges or Other Higher Hedges, as applicable.   This condition may be satisfied concurrent with the initial funding on the Closing Date.

(n)    The Administrative Agent shall have received a certificate of insurance coverage of the Parent, the Borrower and its subsidiaries evidencing that the Parent, the Borrower and its subsidiaries are carrying insurance in accordance with the Credit Documentation.

(o)    The Borrower's capital structure and financing plan shall be satisfactory to the Administrative Agent (it being agreed and understood that the capital structure and financing plan as set forth in the RSA as in effect on the "RSA Effective Date" as defined in the RSA, and as amended by any amendments consented to in writing by the Administrative Agent, is deemed satisfactory to the Administrative Agent).

(p)    The Administrative Agent shall have received from the Borrower a written policy regarding its and its subsidiaries' marketing activities for oil and gas production to be in effect on the Closing Date.

(q)    The Administrative Agent shall have received a certificate of a responsible officer of the Borrower certifying as to compliance with the provision titled "Ongoing Conditions" below.

(r)    The Administrative Agent and the Lenders shall have received (at least five (5) business days prior to Closing Date to the extent requested at least ten business (10) days prior to the Closing Date unless the facts related thereto were not disclosed to the Administrative Agent prior to such 10th business day), and be reasonably satisfied in form and

Exhibit A
15

substance with, all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including but not restricted to the USA Patriot Act.

(s)     The Bankruptcy Court shall have entered an Order in form and substance reasonably acceptable to the Administrative Agent and the Majority Lenders approving the Commitment Letter and the Fee Letter and such Order shall be a Final Order.

(t)     The Bankruptcy Court shall have entered an Order confirming the Plan of Reorganization in form and substance reasonably acceptable to the Administrative Agent and the Majority Lenders, and such Order shall be a Final Order. Such Plan of Reorganization shall authorize and approve the extensions of credit under the Facility and the performance of the Borrower and the Guarantors' obligations thereunder and otherwise be in form and substance reasonably acceptable to the Administrative Agent and the Majority Lenders (it being agreed and understood that any Plan of Reorganization that is substantially consistent with that certain Restructuring Term Sheet dated as of the date hereof attached hereto as Schedule C (the "Form Plan") is deemed to be in form and substance reasonably acceptable to the Administrative Agent and the Majority Lenders).

The Plan of Reorganization shall be deemed to be substantially consistent with the Form Plan as long as the Plan of Reorganization contains no departures, amendments, changes or modifications from the Form Plan that that could be reasonably expected to affect any Lender's rights, claims, recoveries, and/or obligations.

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to

Exhibit A
16

which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"Order" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"Governmental Entity" has the meaning set forth in section 101(27) of the Bankruptcy Code.

(t)     All authorizations, consents, and regulatory approvals required, if any, in connection with the Consummation (as defined in the Plan of Reorganization) of the Plan of Reorganization shall have been obtained.

(u)     All other actions, documents, and agreements necessary to implement the Plan of Reorganization shall have been effected or executed, including the final forms of the documents contained in the Plan of Reorganization, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

(v)     All documents and agreements referred to in clause (u) above shall be reasonably acceptable to the Administrative Agent and the Majority Lenders, solely as to provisions that could be reasonably expected to affect the Lenders' rights, claims, recoveries, and/or obligations.

(w)     Each of the conditions listed in the Plan of Reorganization shall have been satisfied and in full force and effect or waived in accordance with the provisions thereof.

(x)     No event of default under the DIP facility

Exhibit A
17

shall have occurred and be continuing.

(y)  The Administrative Agent shall have received a customary notice of borrowing in accordance with the Credit Documentation.

(z)  (i) All obligations owing to the Lender Swap Counterparties shall constitute Secured Obligations pursuant to Lender Swap Agreements under the Facility or (ii) to the extent such obligations owing to the Lender Swap Counterparties are not rolled over to the Facility, such obligations shall have been paid in full.

(aa)  No event of default shall have occurred and be continuing under the Lender Swap Agreements (as defined in the DIP Credit Agreement) with respect to the Borrower or the Guarantors as the defaulting or sole affected parties.

On-Going Conditions:  The making of each extension of credit, including the initial funding on the Closing Date, shall be conditioned upon (a) the accuracy of all representations and warranties in all material respects (unless already qualified by materiality or material adverse change in the Credit Documentation, in which case, such representations and warranties shall be true and correct in all respects) in the Credit Documentation (including, without limitation, the material adverse change since the Closing Date and litigation representations), (b) there being no default or Event of Default in existence at the time of, and after giving effect to the making of, such extension of credit, (c) in the good faith reasonable expectation of the certifying officer and as certified to such in the request for extension of credit (i) the Borrower intends to apply the proceeds of such extension of credit and (ii) after giving effect to the making of such extension of credit and the application thereof, the pro forma Consolidated Cash Balance as of the end of the last business day of the week in which such extension of credit is to be made will not exceed the Consolidated Cash Balance Limit, and (d) other than as to the initial funding on the Closing Date and any funding prior to the delivery of financial statements with respect to the fiscal quarter ending

Exhibit A
18

December 31, 2016, after giving effect to the making of such extension of credit, the Borrower would be in pro forma compliance with the financial covenants based on EBITDAX as of the immediately preceding fiscal quarter end for which financial statements are available.

As used herein and the Credit Documentation, a "material adverse effect" shall mean any material adverse effect on (a) the business, property, operations, or condition (financial or otherwise) of the Borrower and the Guarantors taken as a whole, (b) the ability of the Borrower and Guarantors, taken as a whole, to perform any of their obligations under the Credit Documentation to which any of them is a party, (c) the validity or enforceability of any of the Credit Documentation or (d) the rights or remedies of or benefits available to the Administrative Agent, any other agent, the Issuing Bank or the Lenders under the Credit Documentation.

## V.    **Certain Documentation Matters**

The Credit Documentation shall contain representations, warranties, covenants and Events of Default customary for financings of this type and other terms to be mutually agreed, without limitation:

Representations and Warranties:

Limited to the following representations and warranties to be made by the Borrower and the Guarantors, subject to customary exceptions, baskets and materiality qualifiers:  Organization; Powers; Authority; Enforceability; Approvals; No Conflicts; Financial Condition; No Material Adverse Effect since the Closing Date; Litigation; Environmental Matters; Compliance with Laws and Agreements; No Defaults; Investment Company Act; Taxes; ERISA; Disclosure of Written Information (with customary exceptions for forward-looking statements, projections or information of a general industry or economic nature); No Material Misstatements; Insurance; Restriction on Liens; Subsidiaries; Location of Business and Offices; Properties; Titles; Maintenance of Properties; Gas Imbalances, Prepayments; Marketing of Production; Swap Agreements; Intellectual Property; Material Personal

Exhibit A
19

#4834-9214-0593v2
#4834-9214-0593v3

Property; Use of Loans and Letters of Credit; Solvency of Borrower and Guarantors on a consolidated basis; Line of Business and International Operations; Anti-Corruption Laws, Sanctions, PATRIOT Act; Deposit Accounts and Securities Accounts; Licenses, Permits, etc.; Fiscal Year; Senior Debt Status.

Affirmative Covenants:

Limited to the following affirmative covenants applicable to the Borrower, the Guarantors and their respective subsidiaries, subject to customary exceptions, baskets and materiality qualifiers: Financial Statements; Other Information (including Consolidated Cash Balance Information on a weekly basis); Notices of Default; Notices of other Material Events; Existence; Conduct of Business; Payment of Taxes (other than taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been made in accordance with GAAP); Performance of Obligations under Loan Documents; Operation and Maintenance of Properties; Intercompany Indebtedness; Information Regarding Borrower and Guarantors; Insurance; Books and Records; Inspection Rights (which such rights (a) may be exercised by the Administrative Agent and the Lenders, acting together, at reasonable times and with reasonable prior notice, (b) shall be reimbursed only once per year by the Borrower absent an Event of Default, and (c) shall be subject to customary limiters for confidentiality, privilege, attorney work product and non-financial trade secrets and proprietary information; provided that the Borrower shall not be obligated to reimburse the expenses of any Lender that is not the Administrative Agent absent an Event of Default); Compliance with Laws (including, but not limited to, Anti-Corruption Laws and Sanctions); Environmental Matters; Further Assurances; Reserve Reports; Title Information; Additional Collateral (maintenance of liens on not less than 95% of the total value of the oil and gas properties of the Borrower and the Guarantors at any time and, in any event, 100% of the oil and gas properties of the Borrower and the Guarantors covered by the mortgages filed in connection with the existing credit facility); Additional Guarantors; ERISA Compliance;

Exhibit A
20

Permits, Licenses, etc.; and, within 30 days of the Closing Date, the Borrower shall have entered into commodity hedging agreements hedging proved developed producing oil and gas reserves of the Borrower and its subsidiaries covering minimal notional volumes of 75% of projected oil and gas production from such proved developed producing oil and gas reserves and at the prices reasonably acceptable to the Administrative Agent and for a period of no less than 36 consecutive months (which covenant may be satisfied on the Closing Date to the extent hedges in effect at the Closing Date complies with such requirements).

Financial Covenants:                   Limited to the following financial covenants:

Total Debt to EBITDAX:  The Borrower will not permit, at any time, the ratio of total debt (not including (a) surety performance and other similar bonds and (b) hedging obligations) as of such time to consolidated EBITDAX for the four fiscal quarters ending on the last day of the fiscal quarter immediately preceding the date of determination (beginning with the first full fiscal quarter post-Closing Date) for which financial statements are available (or if such ratio is being tested as of the last day of any fiscal quarter, EBITDAX for the four fiscal quarters ending on such day) to be greater than 4.00 to 1.00 as of each fiscal quarter end through and including September 30, 2017, 3.75 to 1.00 as of the fiscal quarter ending December 31, 2017 and 3.50 to 1.00 as of each fiscal quarter thereafter.

The definition of EBITDAX will (a) add-back all non-cash charges (except to the extent that such non-cash charges are reserved for cash charges to be taken in the future) and extraordinary losses (excluding extraordinary losses from discontinued operations) (b) deduct non-cash gains or other non-cash items increasing income and extraordinary gains, and (c) be measured on an annualized basis for the first three fiscal quarters of testing (e.g., for purposes of calculating EBITDAX for the four fiscal quarters ending (i) at the end of the first full fiscal quarter post-Closing Date, such EBITDAX shall be EBITDAX for such fiscal quarter then ended times

Exhibit A
21

four, (b) at the end of the second full fiscal quarter post-Closing Date, such EBITDAX shall be EBITDAX for such two fiscal quarters then ended times two and (c) at the end of the third full fiscal quarter post-Closing Date, such EBITDAX shall be EBITDAX for such three fiscal quarters then ended times four-thirds).

<u>Interest Coverage Ratio</u>:   The Borrower will not permit, as of the last day of any fiscal quarter, the ratio of consolidated EBITDAX for the four fiscal quarters then ending to consolidated cash interest expense for such period to be less than 3.00 to 1.00. For the avoidance of doubt, cash interest expense for the first three fiscal quarters shall be measured on an annualized basis (e.g., for purposes of calculating cash interest expense for the four fiscal quarters ending (i) at the end of the first full fiscal quarter post-Closing Date, such cash interest expense shall be cash interest expense for such fiscal quarter then ended times four, (b) at the end of the second full fiscal quarter post-Closing Date, such cash interest expense shall be cash interest expense for such two fiscal quarters then ended times two and (c) at the end of the third full fiscal quarter post-Closing Date, such cash interest expense shall be cash interest expense for such three fiscal quarters then ended times four-thirds).

<u>Current Ratio</u>:   The Borrower will not permit, as of the last day of (i) consolidated current assets (including the unused amount of the Commitments unless a Default exists, but excluding non-cash assets under FASB Accounting Standards Codification 815) to (ii) consolidated current liabilities (excluding non-cash obligations under FASB Accounting Standards Codification 815, current maturities under the Facility and non-cash liabilities recorded in connection with stock-based or similar incentive based compensation awards or arrangements) to be less than 1.0 to 1.0.

Negative Covenants:                    Limited to the following negative covenants to be applicable to the Borrower, the Guarantors and their subsidiaries, subject to customary exceptions, baskets and materiality qualifiers: Limitations on:  Debt (but

Exhibit A
22

permitting $10 million for capital leases or purchase money debt for equipment and $10 million for unsecured debt); Liens (but permitting (i) $1 million lien basket encumbering oil and gas properties and (ii) $2 million lien basket encumbering non-oil and gas properties, in any case, for non-debt obligations except that hedges may not be secured other than the obligations under the Lender Swap Agreements secured through the Facility); Restricted Payments (Dividends, Distributions and Redemptions) (but permitting permitted tax distributions so long as no payment, bankruptcy, or fundamental change Event of Default has occurred and is continuing); Investments, Loans and Advances (but permitting acquisitions of a person, or substantially all the assets of a person, or a line of business, division or enterprise on terms to be mutually agreed including, without limitation, (a) no dollar limit on acquisitions to the extent funded with common equity issuance proceeds, (b) after giving effect thereto (including, any increases in the Borrowing Base resulting therefrom), availability under the Facility is no less than 15% of the then effective Borrowing Base, (c) a requirement that all such acquired assets (including assets of any acquired subsidiary) become Collateral and (d) customary exceptions for customary oil and gas investments made in the ordinary course of business); Nature of Business; No Foreign Subsidiaries or International Operations; Leases; Proceeds of Loans; Anti-Corruption Laws and Sanctions; ERISA Compliance; Sale or Discount of Receivables; Mergers, Etc.; Sale of Properties, including Sale-Leasebacks; Environmental Matters; Transactions with Affiliates; Subsidiaries; Restrictive Agreements; Gas Imbalances, Take-or-Pay or Other Prepayments; Swap Agreements (with limitations on maximum hedging volumes to be consistent with those set forth in the DIP Credit Agreement); Required Hedges; Deposit Accounts and Securities Accounts; Fiscal Year and Quarter; Repayment of Debt; Marketing Activities; Passive Holding Company.

For the avoidance of doubt, the Credit Documentation will permit the professional fee escrow (including payments therefrom) as contemplated under the Form

Exhibit A
23

Plan.

Events of Default:    Limited to the following events of default to be applicable to the Borrower, the Guarantors and their subsidiaries, subject to customary exceptions, baskets and materiality qualifiers: Nonpayment of principal of any loan or any reimbursement obligation in respect of a letter of credit disbursement when due; nonpayment of interest, fees or other amounts after a grace period of three (3) business days, in each case, under the Facility; inaccuracy of representations and warranties in any material respects (unless already qualified by materiality or material adverse effect in the Credit Documentation, in which case, in any respect); violation of covenants (subject, in the case of certain customary affirmative covenants, to a grace period of 30 days); cross-default to debt, including hedges ($10 million); bankruptcy events; ERISA events ($10 million); material judgments ($5 million); Change of Control (as defined below); any of the Credit Documentation or any material provision therein ceases to be in full force and effect and valid, binding and enforceable.

As used herein "Change of Control" shall mean (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) (other than the equity holders at the Closing Date) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a "person" or "group" shall be deemed to have "beneficial ownership" of all equity interests that such "person" or "group" has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of more than 35% of the Equity Interests of the Parent entitled to vote in the election of members of the board of directors (or equivalent governing body) of the Parent, (b) a majority of the members of the board of directors (or other equivalent governing body) of Parent shall not constitute Continuing Directors, (c) there shall have occurred under any indenture or other

Exhibit A
24

instrument evidencing any debt or equity interests in excess of $5 million any "change in control" or similar provision (as set forth in the indenture, agreement or other evidence of such debt) obligating the Parent or any of its subsidiaries to repurchase, redeem or repay all or any part of the debt or equity interests provided for therein, or (d) the Parent ceasing to own directly or indirectly 100% of the Borrower.[1]

"Continuing Directors" means the directors (or equivalent governing body) of the Parent on the Closing Date and each other director (or equivalent) of Parent if, in each case, such other Person's nomination for election to the board of directors (or equivalent governing body) of Parent is approved by at least 51% of the then Continuing Directors.

| | |
|---|---|
| Remedies: | Usual and customary with the Administrative Agent, acting on behalf of the Secured Parties and at the direction of the Majority Lenders. |
| Voting: | Amendments and waivers with respect to the Credit Documentation shall require the approval of the Majority Lenders, except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) extensions of the scheduled date of the Termination Date, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof, (iii) increases in the amount or extensions of the expiry date of any Lender's commitment and (iv) other customary exceptions (including, but not limited to, (x) changes to application of proceeds, and (y) releases of all or substantially all guarantors or collateral), (b) the consent of all the Lenders or the Required Lenders, as applicable, shall be required with respect to modifications of the Borrowing Base, (c) the consent of all the Lenders shall be required with respect to modifications of any of the voting percentages and (d) the consent of each Lender Swap Counterparty directly affected thereby shall be required with respect to any amendments or waivers |

---

[1] *Assumes reorganized entity is a public entity. A reorganized entity that is private may have a different Change of Control.*

Exhibit A
25

to the Credit Documentation that materially, adversely and disproportionately affects (i) such Lender Swap Counterparty as compared to the other Secured Parties or (ii) the Lender Swap Counterparties as compared to the Lenders.

**Application of Proceeds:** Usual and customary, including, without limitation, obligations under the Lender Swap Agreements and the Cash Management Products being provided pari passu and pro rata treatment with payments of principal owing under the Facility.

**Release of Collateral and Guarantors:** Usual and customary, including, without limitation, no release of all or substantially all guarantors or all or substantially all of the collateral until all Secured Obligations have been paid (other than contingent indemnification obligations as to which no claim has been made and other Secured Obligations as to which arrangements satisfactory to the holders of such obligations have been made) and commitments terminated.

**Assignments and Participations:** The Lenders shall be permitted to assign all or a portion of their Loans and commitments with the consent, not to be unreasonably withheld, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund (provided that, the Borrower shall be deemed to have consented to an assignment unless it shall have objected thereto by written notice to the Administrative Agent within five (5) business days after having received notice thereof) or (ii) an Event of Default has occurred and is continuing, (b) the Administrative Agent and (c) the Issuing Bank.  In the case of partial assignments (other than to another Lender, to an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $5,000,000, in each case unless otherwise agreed by the Borrower and the Administrative Agent.  The Lenders shall also be permitted to sell participations in their Loans. Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions.  Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of the Lender from which it purchased its participation would be required as

<p align="center">Exhibit A
26</p>

described under "Voting" above.  Pledges of Loans in accordance with applicable law shall be permitted without restriction.  Promissory notes shall be issued under the Facility only upon request.  No assignments or participations shall be permitted to be made to the Borrower or any of its affiliates or to natural persons.

| | |
|---|---|
| Yield Protection; Etc: | The Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy or other requirements of law, and from the imposition of or changes in withholding or other taxes (including reflecting that both (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III shall, in the case of each of the foregoing clause (x) and clause (y), be deemed to be a change in law after the Closing Date regardless of the date enacted, adopted or issued), (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan on a day other than the last day of an interest period with respect thereto (other than any such repayment on account of the Anti-Hoarding Prepayment Provision), and (c) concerning defaulting lenders. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent, the Arranger and the Lender Swap Counterparties associated with the syndication of the Facility and the preparation, execution, delivery and administration of the Credit Documentation and the Lender Swap Agreements and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) and (b) all documented out-of-pocket expenses of the Administrative Agent, the |

Exhibit A
27

Lenders and the Lender Swap Counterparties (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Credit Documentation and the Lender Swap Agreements..

The Administrative Agent, the Arranger, the Lenders and the Lender Swap Counterparties (and their affiliates and their respective sub-agents, partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's affiliates) (each of the foregoing being called an "Indemnitee") will have no liability to the Parent, the Borrower, any subsidiary or affiliate thereof, and will be indemnified and hold harmless each Indemnitee against, and hold each Indemnitee harmless from, and shall pay or reimburse any such Indemnitee for, any and all losses, claims (including, without limitation, any environmental claims), penalties, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel and any consultant for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Parent, the Borrower, any subsidiary or any affiliate thereof), arising out of, in connection with, or as a result of (i) the execution or delivery of the Credit Documentation or the Lender Swap Agreements, or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by the Parent, the Borrower or any subsidiary or affiliate thereof, or any environmental claim related in any way to the Parent, the Borrower or any subsidiary or affiliate thereof, (iv) any actual or prospective claim, litigation, investigation or

Exhibit A
28

proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Parent, the Borrower or any subsidiary or affiliate thereof, and regardless of whether any Indemnitee is a party thereto, or (v) any claim (including, without limitation, any environmental claims), investigation, litigation or other proceeding (whether or not the Administrative Agent, any Lender or any Lender Swap Counterparty is a party thereto) and the prosecution and defense thereof, arising out of or in any way connected with the Loans, the Credit Documentation, the Lender Swap Agreements or any documents contemplated by or referred to therein or the transactions contemplated thereby (and in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of such Indemnitee); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment (a) to have resulted from the gross negligence or willful misconduct of such Indemnitee, (b) to have resulted from a claim brought by the Borrower against any Indemnitee of any material breach in bad faith of such Indemnitee's funding obligations under the Credit Agreement or with respect to the Lender Swap Agreements, or (c) are on account of a dispute arising solely among Indemnitees (other than the Administrative Agent in its role as such) to the extent such dispute does not involve and is not related to any act, omission or representation on the part of, or any information provided by or on behalf of, the Borrower, any Guarantor or affiliates thereof. This indemnity shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

| | |
|---|---|
| Waiver of Consequential Damages; Confidentiality: | To the fullest extent permitted by applicable law the parties to the Credit Documentation shall not assert, and will waive, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection |

Exhibit A
29

with, or as a result of, any Credit Documentation or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof; provided that, this waiver and agreement shall not limit the Borrower or any Guarantor's indemnification obligations to the extent set forth in Credit Documentation to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such indemnified person is otherwise entitled to indemnification hereunder.   No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials      distributed      by      it      through telecommunications, electronic or other information transmission systems in connection with the Credit Documentation or the transactions contemplated hereby or thereby. The Credit Documentation shall include customary confidentiality provisions.

| | |
|---|---|
| Set-Off Rights: | Usual and customary, including, but not limited to, a Lender Swap Counterparty's ability, during such time as an Event of Default has occurred and is continuing, to set-off any amounts owed by such Lender Swap Counterparty to the Borrower or any Guarantor pursuant to a Lender Swap Agreement against obligations owed by the Borrower or any Guarantor to such Lender Swap Counterparty. |
| Defaulting Lender; Yank-a-Bank; Bail-In Language: | Customary defaulting lender provisions, yank-a-bank and Bail-In provisions. |
| Governing Law and Forum: | State of New York |
| Counsel to the Arranger and the Administrative Agent: | Bracewell LLP |

Exhibit A

30

**Annex I**

**Interest and Certain Fees**

Interest Rate Options:

The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to:

- the ABR plus the Applicable Margin; or

- the Adjusted LIBO Rate plus the Applicable Margin.

As used herein:

"ABR" means, for any day, the highest of (a) the rate of interest publicly announced by Wells Fargo Bank as its prime rate in effect on such day (the "Prime Rate"), (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, and (c) the Adjusted LIBO Rate plus 1%.  In no event shall the Federal Funds Rate be less than 0%.

"Applicable Margin" means a percentage determined in accordance with the pricing grid attached hereto as Annex I-A.

"Commitment Fee Rate" means a percentage determined in accordance with the pricing grid attached hereto as Annex I-A.

"Interest Period" means a period of one, three or six months (as selected by the Borrower).

"LIBO Rate" means (a) for purposes of determining Adjusted LIBO Rate for ABR, the rate per annum for Dollar deposits quoted by the Administrative Agent for the purpose of calculating effective rates of interest for loans making reference to the "Daily Three-Month LIBOR" or the "LIBOR Market Index Rate" or other words of similar import, as the inter-bank offered rate in effect from time to time for delivery of funds for three (3) months in

amounts approximately equal to the principal amount of the applicable Advances; provided that, the Administrative Agent may base its quotation of the inter-bank offered rate upon such offers or other market indicators of the inter-bank market as the Administrative Agent in its reasonable discretion deems appropriate including the rate determined under the following clause (b), and (b) with respect to any borrowing comprised of Eurodollar Loans for any Interest Period, the rate (rounded upwards, if necessary, to the next 1/100 of 1%) appearing on Reuters Screen LIBOR01 Page at approximately 11:00 a.m., London time, two business days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period; provided that, if such quotation is not available for any reason, then for purposes of this clause (b), LIBO Rate shall then be the rate determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in immediately available funds in the approximate amount of the Loans being made, continued or converted by the Lenders and with a term equivalent to such Interest Period would be offered by the Administrative Agent's London Branch (or other branch or Affiliate of the Administrative Agent, or in the event that the Administrative Agent does not have a London branch, the London branch of a Lender chosen by the Administrative Agent) to major banks in the London or other offshore inter-bank market for Dollars at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; provided further that, if the rate determined under the preceding clause (a) or clause (b) is less than zero, then "LIBO Rate" shall be deemed to be zero for such determination.

"Adjusted LIBO Rate" means the LIBO Rate, as adjusted for statutory reserve requirements for eurocurrency liabilities.

#4834-9214-0593v2
#4834-9214-0593v3

| | |
|---|---|
| Interest Payment Dates: | In the case of Loans bearing interest based upon the ABR ("ABR Loans"), quarterly in arrears. |
| | In the case of Loans bearing interest based upon the Adjusted LIBO Rate ("Eurodollar Loans"), on the last day of each relevant Interest Period and, in the case of any Interest Period longer than three months, on each successive date three months after the first day of such Interest Period. |
| Commitment Fees: | The Borrower shall pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Lender. Accrued commitment fees shall be payable quarterly in arrears and on the date that is the earlier of the Termination Date and the date of termination of the Commitments. |
| Letter of Credit Fees: | The Borrower shall pay a participation fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans on the face amount of each such Letter of Credit. Such participation fee shall be shared ratably among the Lenders and shall be payable quarterly in arrears. |
| | A fronting fee equal to the greater of (i) $700 or (ii) 1/4 of 1% per annum on the face amount of each Letter of Credit, shall be payable quarterly in arrears to the Issuing Bank for its own account.    In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Bank for its own account. |
| | During the continuation of an Event of Default, Letter of Credit fees shall increase by 2.00% per annum over the then applicable rate; provided that, such increase shall be automatic in the event of a payment default, a bankruptcy related default and failure to provide default |

|  | notice default, and only at the election of the Majority Lenders in the case of all other defaults. |
|---|---|
| Default Rate: | During the continuation of an Event of Default, all Loans shall bear interest at 2.00% above the then applicable rate; provided that, such increase shall be automatic in the event of a payment default, a bankruptcy related default and failure to provide default notice default, and only at the election of the Majority Lenders in the case of all other defaults. |
| Rate and Fee Basis: | All commitment fees and all per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed. |

Annex I - 4

## Annex I – A

**Applicable Margin and Commitment Fee Rate:**

The Applicable Margin and the Commitment Fee Rate will be determined based upon the "Utilization Percentage", which shall equal, as of any date, (a) the sum of all outstanding Loans and issued and outstanding Letters of Credit, divided by (b) the Commitments then in effect, as follows (expressed as a percentage):

| Utilization Percentage | ≤25% | >25%, but ≤50% | >50%, but ≤75% | >75%, but ≤90% | >90% |
|---|---|---|---|---|---|
| **ABR Loans** | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| **Eurodollar Loans** | 3.00% | 3.25% | 3.50% | 3.75% | 4.00% |
| **Commitment Fee Rate** | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

Annex I - A

#4834-9214-0593v2
#4834-9214-0593v3

**Schedule A**

**Minimum Hedges**

|      | MMBL  | Swap Strike | Period Covered            |
|------|-------|-------------|---------------------------|
| 2016 | 1,093 | $40.63      | Balance of July – Dec, 2016 |
| 2017 | 1,609 | $42.11      | Calendar year 2017        |
| 2018 | 1,269 | $43.63      | Calendar year 2018        |
| 2019 | 1,064 | $44.95      | Calendar year 2019        |

Schedule A

## Schedule B

## FORM OF SOLVENCY CERTIFICATE

[_____], 2016

This Solvency Certificate is being executed and delivered pursuant to Section [__] of that certain Credit Agreement, dated as of [_____], 2016 (the "*Credit Agreement*"; the terms defined therein being used herein as therein defined), among Penn Virginia Holding Corp. (the "*Borrower*"), Penn Virginia Corporation (the *"Parent"*), the other guarantors party thereto, the lenders party thereto, and Wells Fargo Bank, National Association, as administrative agent and collateral agent.

I, [_____], the [Chief Financial Officer] / [Treasurer] of the Parent, solely in such capacity and not in an individual capacity, hereby certify as follows:

1.     I am generally familiar with the businesses and assets of the Parent, the Borrower and its subsidiaries, on a consolidated basis, and am duly authorized to execute this Solvency Certificate on behalf of the Parent pursuant to the Credit Agreement.

2.     As of the date hereof and after giving effect to the Transactions and after giving effect to each of the Parent, the Borrower and its subsidiaries' exit from the Chapter 11 Cases in accordance with the Plan of Reorganization and the incurrence of the indebtedness and obligations being incurred in connection with the Credit Agreement and the Transactions, (a) the fair value of the properties of the Parent, the Borrower and its subsidiaries, on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of the Parent, the Borrower and its subsidiaries, on a consolidated basis, (b) the present fair salable value of the assets of the Parent, the Borrower and its subsidiaries, on a consolidated basis, is not less than the amount that will be required to pay the probable liability of the Parent, the Borrower and its subsidiaries, on a consolidated basis, on its respective debts as they become absolute and matured, (c) neither Parent, the Borrower nor any of their respective subsidiaries intends to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) neither Parent, the Borrower nor any of their respective subsidiaries is engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) each of the Parent, the Borrower and its subsidiaries is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business.  For the purposes hereof, the amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.


By:
Name:
Title:

#4834-9214-0593v2
#4834-9214-0593v3

**Schedule C**

**RESTRUCTURING TERM SHEET**

[See attached.]

**<u>Exhibit E</u> to the Restructuring Support Agreement**

**Exit Commitment Letters**

*EXECUTION VERSION*



**Wells Fargo Bank, National Association**
**1000 Louisiana, 9th Floor**
**MAC T0002-090**
**Houston, Texas 77002**

<u>CONFIDENTIAL</u>

**May 10, 2016**

Penn Virginia Corporation
Penn Virginia Holding Corp.
1011 Centre Road, Suite 322
Wilmington, Delaware 19805
Attention:  Steven A. Hartman

Re:    Exit Facility Commitment Letter
$200 Million Senior Secured Credit Facility

Ladies and Gentlemen:

Penn Virginia Corporation (the "<u>Parent</u>") and Penn Virginia Holding Corp. (the "<u>Borrower</u>", and together with the Parent, the "<u>Obligors</u>", individually and collectively, "<u>you</u>") have advised Wells Fargo Bank, National Association ("<u>Wells Fargo Bank</u>") and each financial institution signatory hereto (together with Wells Fargo Bank, the "<u>Initial Lenders</u>" and individually, an "<u>Initial Lender</u>", "<u>we</u>" or "<u>us</u>") that the Borrower seeks financing to (a) refinance certain existing indebtedness of the Parent and its subsidiaries (such refinancings, collectively, the "<u>Refinancing</u>"), (b) pay fees, commissions and expenses in connection with the Transactions (as defined below) and (c) finance ongoing working capital requirements and other general corporate purposes, all as more fully described in the Indicative Summary of Terms and Conditions attached hereto as <u>Exhibit A</u> (the "<u>Term Sheet</u>").  This Commitment Letter (as defined below) describes the general terms and conditions for senior secured credit facility with aggregate note amount of $200 million to be provided to the Borrower consisting of a revolving credit facility subject to an initial borrowing base limit of up to $128 million, all as more fully described in the Term Sheet (the "<u>Senior Credit Facility</u>").

As used herein, the term "<u>Transactions</u>" means, collectively, the Refinancing, the initial borrowings and other extensions of credit under the Senior Credit Facility on the Closing Date (as defined below) and the payment of fees, commissions and expenses in connection with each of the foregoing. This letter, including the Term Sheet, is hereinafter referred to as the "<u>Commitment Letter</u>".  The date on which the Senior Credit Facility is closed is referred to as the "<u>Closing Date</u>".

1.        <u>Commitment</u>.  Upon the terms and subject to the conditions set forth in this Commitment Letter, the fee letter dated the date hereof from the Commitment Parties to you (the "<u>Lender Fee Letter</u>") and the fee letter dated the date hereof from Wells Fargo Bank to you (the "<u>Agent Fee Letter</u>"; together with the Lender Fee Letter, the "<u>Fee Letters</u>"), each Initial Lender hereby advises you of its several, but not joint, commitment to provide to the Borrower such percentage of the Senior Credit Facility that is set forth next to such Initial Lender's name on Annex A attached hereto (each a "<u>Commitment</u>", and collectively, the "<u>Commitments</u>"; and each such Initial Lender's percentage, the "<u>Commitment Percentage</u>").  Notwithstanding anything in this Commitment Letter or in Financing Documentation (as defined below) to the contrary, in no event shall the principal amount of any Initial Lender's Commitment

exceed such Initial Lender's Commitment Percentage of $128,000,000 without each Initial Lender's written consent.

2.    <u>Titles and Roles</u>.  Wells Fargo Bank, acting alone or through or with affiliates selected by it, will act as the sole bookrunner and sole lead arranger (in such capacities, the "<u>Lead Arranger</u>"; together with the Initial Lenders, the "<u>Commitment Parties</u>") in arranging and syndicating the Senior Credit Facility.  Wells Fargo Bank will act as the sole administrative agent (in such capacity, the "<u>Administrative Agent</u>") for the Senior Credit Facility.  No additional agents, co-agents, arrangers or bookrunners will be appointed, no other titles will be awarded and no other compensation will be paid (other than compensation expressly contemplated by this Commitment Letter and the Fee Letters) unless you and Wells Fargo Bank shall agree in writing; <u>provided</u> that the Lead Arranger shall have the right, in consultation with you, to award titles to other co-agents, arrangers or bookrunners who are Initial Lenders (it being further agreed that (i) no other agent, co-agent, arranger or bookrunner (other than the Lead Arranger) will have rights in respect of the management of the syndication of the Senior Credit Facility and (ii) Wells Fargo Bank will have the "left" and "highest" placement in any and all marketing materials or other documentation used in connection with the Senior Credit Facility and shall hold the leading role and responsibilities conventionally associated with such placement, including maintaining sole physical books for the Senior Credit Facility).

3.    <u>Conditions to Commitment</u>.  The Commitments and undertakings of the Commitment Parties hereunder are subject solely to the satisfaction of the conditions precedent set forth in the Term Sheet under the heading "IV.  Certain Conditions".

4.    <u>Syndication</u>.

(a)    The Lead Arranger reserves the right, both prior to and after the Closing Date, to secure additional commitments for the Senior Credit Facility from a syndicate of banks, financial institutions and other entities (such banks, financial institutions and other entities committing to the Senior Credit Facility, including the Initial Lenders, the "<u>Lenders</u>"), such Lenders to be mutually agreed upon by the Borrower and the Lead Arranger, upon the terms and subject to the conditions set forth in this Commitment Letter.  The Commitments of the Initial Lenders will be reduced on a dollar-for-dollar basis by the amount of any corresponding commitment received through syndication from such other Lenders, subject to Section 4(c) below. To assist us in our syndication efforts, each Obligor agrees that it will, and will cause its representatives and advisors to, and will use commercially reasonable efforts to cause appropriate members of management and its representatives and advisors to, (i) provide promptly to the Commitment Parties and the other Lenders upon request all information reasonably deemed necessary by the Lead Arranger to assist the Lead Arranger and each Lender in their evaluation of the Transactions and to complete the syndication, (ii) make its senior management and (to the extent reasonable and practical) appropriate members of management available to prospective Lenders on reasonable prior notice and at reasonable times and places, (iii) host, with the Lead Arranger, one or more meetings and/or calls with prospective Lenders at mutually agreed times and locations, and (iv) assist, and cause its affiliates and advisors to assist, the Lead Arranger in the preparation of one or more confidential information memoranda and other marketing materials in form and substance reasonably satisfactory to the Lead Arranger to be used in connection with the syndication.

(b)    The Lead Arranger and/or one or more of its affiliates will exclusively manage all aspects of the syndication of the Senior Credit Facility, including decisions as to the selection and number of potential other Lenders to be approached, when they will be approached, whose commitments will be accepted, how the Commitments of the Initial Lenders may be reduced, any titles offered to the Lenders and the final allocations of the commitments and any related fees among the Lenders (it being agreed and understood that you shall not be required to pay any fees other than those specifically agreed to in the Fee

Letters), and the Lead Arranger will exclusively perform all functions and exercise all authority as is customarily performed and exercised in such capacities; <u>provided</u> that any Lender (other than an Initial Lender) from which commitments have been accepted shall be reasonably acceptable to you.

(c)      Notwithstanding the Lead Arranger's right to syndicate the Senior Credit Facility and receive commitments with respect thereto, unless otherwise agreed to by you, (i) each Initial Lender shall not be relieved or released from its obligations hereunder (including its obligation to fund the Senior Credit Facility on the Closing Date) in connection with any syndication, assignment or participation in the Senior Credit Facility, including its respective Commitment, until the initial funding under the Senior Credit Facility has occurred on the Closing Date, (ii) no assignment by any Initial Lender shall become effective with respect to all or any portion of such Initial Lender's Commitment until the initial funding of the Senior Credit Facility and (iii) unless you, the Lead Arranger and the applicable Initial Lender agree to in writing, each Initial Lender will retain exclusive control over all rights and obligations with respect to its respective Commitment in respect of the Senior Credit Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Closing Date has occurred.

5.      <u>Information</u>.

(a)      Each Obligor represents, warrants and covenants that (i) all written information and written data (other than the Projections, as defined below, other forward-looking information and information of a general economic or general industry nature) concerning the Parent, the Borrower and your respective subsidiaries and the Transactions that has been or will be made available to the Commitment Parties or the Lenders by any Obligor, or any of your respective representatives, subsidiaries or affiliates (or on your or their behalf) (the "<u>Information</u>"), when taken as a whole, (x) is, and in the case of Information made available after the date hereof, will be, complete and correct in all material respects and (y) does not, and in the case of Information made available after the date hereof, will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading and (ii) all financial projections concerning the Parent, the Borrower and your respective subsidiaries, taking into account the consummation of the Transactions, that have been or will be made available to the Commitment Parties or the Lenders by any Obligor or any of your respective representatives, subsidiaries or affiliates (or on your or their behalf) (the "<u>Projections</u>") have been and will be prepared in good faith based upon assumptions believed by you to be reasonable at the time made available to the Commitment Parties or the Lenders, it being understood that such Projections are not to be viewed as facts and that actual results may vary materially from the Projections.  You agree that if, at any time prior to the Closing Date, you become aware that any of the representations and warranties contained in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections so that such representations are correct in all material respects under those circumstances.  We will be entitled to use and rely upon, without responsibility to verify independently, the Information and the Projections.  You acknowledge that we may share with any of our affiliates (it being understood that such affiliates will be subject to the confidentiality agreements between you and us), and such affiliates may share with the Commitment Parties, any information related to you or any of your subsidiaries or affiliates (including, without limitation, in each case, information relating to creditworthiness) and the transactions contemplated hereby.

(b)      You acknowledge that (i) the Commitment Parties will make available, on your behalf, the Information, Projections and other marketing materials and presentations, including the confidential information memoranda (collectively, the "<u>Informational Materials</u>"), to the potential Lenders by posting the Informational Materials on SyndTrak Online or by other similar electronic means (collectively, the "<u>Electronic Means</u>") and (ii) certain prospective Lenders may be "public side" (i.e.,

lenders that have personnel that do not wish to receive material non-public information (within the meaning of the United States federal securities laws, "MNPI") with respect to the Obligors or their respective subsidiaries or affiliates or any of their respective securities, and who may be engaged in investment and other market-related activities with respect to such entities' securities  (such Lenders, "Public Lenders")).  At the reasonable request of the Lead Arranger, (A) you will assist, and cause your affiliates, advisors to assist, the Lead Arranger in the preparation of Informational Materials to be used in connection with the syndication of the Senior Credit Facility to Public Lenders, which will not contain MNPI (the "Public Informational Materials" and all other Informational Materials other than Public Informational Materials, the "Private Informational Materials")), (B) you will identify and conspicuously mark any Public Informational Materials "*PUBLIC*", and (C) you will identify and conspicuously mark any Informational Materials that include any MNPI as "*PRIVATE AND CONFIDENTIAL*" (it being agreed and understood that any Informational Materials that do not contain a conspicuous mark of "*PUBLIC*" or "*PRIVATE AND CONFIDENTIAL*" shall be deemed to be Private Informational Materials for all purposes hereunder).  Notwithstanding the foregoing, you agree that the Commitment Parties may distribute the following documents to all prospective Lenders (including the Public Lenders) on your behalf, unless you advise the Commitment Parties in writing (including by email) within a reasonable time prior to their intended distributions that such material should not be distributed to Public Lenders: (w) administrative materials for prospective Lenders such as lender meeting invitations and funding and closing memoranda, (x) notifications of changes in the terms of the Senior Credit Facility, (y) financial information regarding the Borrower and its subsidiaries (other than the Projections) and (z) other materials intended for prospective Lenders after the initial distribution of the Informational Materials, including drafts and final versions of the Term Sheet and the definitive documentation for the Senior Credit Facility (the "Financing Documentation").  If you advise us in writing (including by email) that any of the foregoing items (other than the Financing Documentation) should not be distributed to Public Lenders, then the Commitment Parties will not distribute such materials to Public Lenders without further discussions with you.  Before distribution of any Informational Materials to prospective Lenders, you shall provide us with a customary letter authorizing the dissemination of the Informational Materials and confirming the accuracy and completeness in all material respects of the information contained therein and, in the case of Public Informational Materials, confirming the absence of MNPI therefrom.

6.      Indemnification.  You agree to indemnify and hold harmless the Commitment Parties and each of their respective affiliates, directors, officers, employees, partners, representatives, advisors and agents and each of their respective heirs, successors and assigns (each, an "Indemnified Party") from and against any and all actions, suits, losses, claims, damages, penalties, liabilities and expenses of any kind or nature (including legal expenses), joint or several, to which such Indemnified Party may become subject or that may be incurred or asserted or awarded against such Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter, the Fee Letters, the Transactions or any related transaction (including, without limitation, the execution and delivery of this Commitment Letter and the Financing Documentation and the closing of the Transactions) or (b) the use or the contemplated use of the proceeds of the Senior Credit Facility, and will reimburse each Indemnified Party for all reasonable and documented out-of-pocket expenses (including reasonable and documented out-of-pocket attorneys' fees, expenses and charges) on demand as they are incurred in connection with any of the foregoing; provided that no Indemnified Party will have any right to indemnification for any of the foregoing to the extent resulting from (i) such Indemnified Party's own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment, (ii) a material breach in bad faith of the funding obligations of such Indemnified Party under this Commitment Letter as determined by a court of competent jurisdiction in a final non-appealable judgment or (iii) any dispute solely among Indemnified Parties, other than any claims against any Commitment Party in its respective capacity or in fulfilling its role as an administrative agent or arranger or any similar role hereunder or under the Senior

Credit Facility, and other than any claims arising out of any act, omission, or representation on the part of, or any information provided by or on behalf of, the Parent, the Borrower, or any subsidiary or affiliate thereof.  In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equity holders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  You also agree that no affiliate, equityholder or creditor of yours is intended to be, and none of such persons or entities shall be, third party beneficiaries of this Commitment Letter, and therefore no Indemnified Party will have any liability (whether direct or indirect, in contract or tort, or otherwise) to your affiliates or to your or their respective equityholders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby.  You also agree that no Indemnified Party will have any liability (whether direct or indirect, in contract or tort, or otherwise) to you arising out of, related to or in connection with any aspect of the Transactions, except to the extent such liability to you is determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from one or more Indemnified Party's gross negligence or willful misconduct or a material breach in bad faith of the funding obligations of such Indemnified Party under this Commitment Letter.  Each Initial Lender shall be liable solely in respect of its own commitment (if any) to the Senior Credit Facility on a several, and not joint, basis with any other Lender.  No Indemnified Party or any other party hereto will be liable for any indirect, consequential, special or punitive damages in connection with this Commitment Letter, the Fee Letters, the Financing Documentation or any other element of the Transactions.  For the avoidance of doubt, the parties hereto acknowledge and agree that a claim for indemnity under the preceding provisions of this Section 6, to the extent covered thereby, is a claim of direct or actual damages and nothing contained in the foregoing sentence shall limit your indemnification obligations to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnified Party is otherwise entitled to indemnification hereunder.  No Indemnified Party will be liable to you, your affiliates or any other person for any damages arising from the use by others of Informational Materials or other materials obtained by Electronic Means.  You shall not, without the prior written consent of each Indemnified Party affected thereby, settle any threatened or pending claim or action that would give rise to the right of any Indemnified Party to claim indemnification hereunder unless such settlement (x) includes a full and unconditional release of all liabilities arising out of such claim or action against such Indemnified Party, (y) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of such Indemnified Party and (z) requires no action on the part of the Indemnified Party other than its consent.

7.     Expenses.  You agree to reimburse each of the Commitment Parties, from time to time on demand, for all reasonable and documented out-of-pocket costs and expenses of the Commitment Parties, including, without limitation, reasonable and documented out-of-pocket legal fees and expenses, due diligence expenses and all printing, reproduction, document delivery, travel, CUSIP, SyndTrak and communication costs, incurred in connection with the syndication and execution of the Senior Credit Facility and the preparation, review, negotiation, execution, delivery and enforcement of this Commitment Letter, the Fee Letters, the Financing Documentation and any security arrangements in connection therewith regardless of whether the Closing Date occurs.

8.     Fees.  As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to cause to be paid the nonrefundable fees described in the Fee Letters on the terms and subject to the conditions set forth therein.

9.     Confidentiality.

(a)     This Commitment Letter and the Fee Letters (collectively, the "Commitment Documents") and the existence and contents hereof and thereof shall be confidential and may not be disclosed, directly or indirectly, by you in whole or in part to any person without the prior written consent of the respective Commitment Parties that are party hereto or thereto, except for disclosure (i) hereof or thereof on a confidential basis to your affiliates and your and your affiliates' directors, officers, employees, accountants, attorneys and other professional advisors who have been advised of their obligation to maintain the confidentiality of the Commitment Documents for the purpose of evaluating, negotiating or entering into the Transactions, (ii) in any legal, judicial or administrative proceeding (other than pursuant to your or your subsidiaries' bankruptcy cases which are addressed in clauses (iii) and (iv) below), or as otherwise required by law or regulation or as requested by any governmental authority (in which case, you agree, to the extent not prohibited by law, to inform us promptly in advance thereof) (provided that any information relating to pricing, fees and expenses has been redacted in a manner reasonably acceptable to Wells Fargo Bank), (iii) pursuant to your or your subsidiaries' bankruptcy cases (in which case, you agree, to the extent not prohibited by law, to inform the Lead Arranger promptly thereof and to file the Fee Letters under seal), (iv) to the office of the U.S. Trustee, any statutory committee appointed in your or your subsidiaries' bankruptcy cases and their respective advisors and professionals, in each case, on a confidential and "need to know" basis, and (v) this Commitment Letter, but not the Fee Letters, in any required filings with the Securities and Exchange Commission and other applicable regulatory authorities and stock exchanges.  Notwithstanding the foregoing, it is agreed and understood that you and your subsidiaries shall be permitted to disclose this Commitment Letter and the Fee Letters and the contents thereof to the bankruptcy court (in the case of the Fee Letters, under seal) to the extent disclosure thereof is necessary or advisable to consummate the transactions contemplated herein. In connection with any disclosure by you to any third party as set forth above (except as set forth in clause (ii) above), you shall notify such third party of the confidential nature of the Commitment Documents and agree to be responsible for any failure by any third party to whom you disclosed the Commitment Documents or any portion thereof to maintain the confidentiality of the Commitment Documents or any portion thereof.

(b)     Each Commitment Party agrees to maintain in confidence any and all of your non-public Information and Projections and not disclose such information; provided that nothing herein shall prevent any Commitment Party from disclosing any such information (i) to any Lenders or participants or prospective Lenders or participants, (ii) in any legal, judicial, administrative proceeding or other compulsory process or otherwise as required by applicable law or regulations (in which case, we agree, to the extent permitted by law and to the extent practicable, to inform you promptly in advance thereof), (iii) upon the request or demand of any regulatory authority having jurisdiction over any Commitment Party or any affiliate thereof, (iv) to the employees, legal counsel, independent auditors, professionals and other experts or agents of any Commitment Party or any affiliate thereof who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (v) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party or any employee, legal counsel, independent auditor, professional, expert or agent thereof or of any affiliate thereof in breach of this Commitment Letter, (vi) to the extent that such information is received by a Commitment Party from a third party that is not to such Commitment Party's knowledge subject to confidentiality obligations to you, (vii) to the extent that such information is independently developed by a Commitment Party or any of its affiliates, (viii) for purposes of establishing a "due diligence" defense, and (ix) with your prior written consent; provided that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of Wells Fargo Bank or customary market standards for dissemination of such type of information.  The provisions of this paragraph with respect to the Commitment Parties shall

automatically terminate on the earlier of (i) two years following the date of this Commitment Letter and (ii) the Closing Date.

(c)    The Commitment Parties shall be permitted to use information related to the syndication and arrangement of the Senior Credit Facility (including your name and company logo) in connection with obtaining a CUSIP number, marketing, press releases or other transactional announcements or updates provided to investor or trade publications, subject to confidentiality obligations or disclosure restrictions reasonably requested by you.  Prior to the Closing Date, the Commitment Parties shall have the right to review and approve any public announcement or public filing made by you or your representatives relating to the Senior Credit Facility or to any of the Commitment Parties in connection therewith, before any such announcement or filing is made (such approval not to be unreasonably withheld or delayed).

(d)    The Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "PATRIOT Act"), each of them is required to obtain, verify and record information that identifies you and any additional borrowers or guarantors under the Senior Credit Facility, which information includes your and their respective names, addresses, tax identification numbers and other information that will allow the Commitment Parties and the other Lenders to identify you and such other parties in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for each of us and the Lenders.

10.    Other Services.

(a)    Nothing contained herein shall limit or preclude the Commitment Parties or any of their affiliates from carrying on any business with, providing banking or other financial services to, or from participating in any capacity, including as an equity investor, in any party whatsoever, including, without limitation, any competitor, supplier or customer of you or any of your affiliates, or any other party that may have interests different than or adverse to such parties.

(b)    You acknowledge that the Commitment Parties and their respective affiliates (i) may be providing debt financing, equity capital or other services (including financial advisory services) to other entities and persons with which you or your affiliates may have conflicting interests regarding the Transactions and otherwise, (ii) may act, without violation of its contractual obligations to you, as it deems appropriate with respect to such other entities or persons, and (iii) have no obligation in connection with the Transactions to use, or to furnish to you or your affiliates or subsidiaries, confidential information obtained from other entities or persons.

(c)    In connection with all aspects of the Transactions, you acknowledge and agree that: (i) the Senior Credit Facility and any related arranging or other services contemplated in this Commitment Letter constitute an arm's-length commercial transaction between you and your affiliates, on the one hand, and the Commitment Parties and their respective affiliates, on the other hand, and you are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the Transactions, (ii) in connection with the process leading to the Transactions, each of Commitment Parties and their respective affiliates is and has been acting solely as a principal and not as a financial advisor, agent or fiduciary, for you or any of your management, affiliates, equity holders, directors, officers, employees, creditors or any other party, (iii) no Commitment Party and no affiliate thereof has assumed or will assume an advisory, agency or fiduciary responsibility in your or your affiliates' favor with respect to any of the Transactions or the process leading thereto (irrespective of whether any Commitment Party or any of its affiliates has advised or is currently advising you or your affiliates on other matters) and no Commitment Party and no any affiliate thereof has any obligation to you or your

affiliates with respect to the Transactions except those obligations expressly set forth in the Commitment Documents, (iv) the Commitment Parties and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates and no Commitment Party shall have any obligation to disclose any of such interests, and (v) no Commitment Party and no affiliate thereof has provided any legal, accounting, regulatory or tax advice with respect to any of the Transactions and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate.  You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against any Commitment Party or any of their respective affiliates with respect to any breach or alleged breach of agency, fiduciary duty or conflict of interest.

      11.    <u>Acceptance/Expiration of Commitments</u>.

      (a)    This Commitment Letter and the Commitment of each Initial Lender and the undertakings of each Commitment Party set forth herein shall automatically terminate at 5:00 p.m. (New York City Time) on May 11, 2016 (the "<u>Acceptance Deadline</u>"), without further action or notice unless signed counterparts of this Commitment Letter and the Fee Letters shall have been delivered to the Lead Arranger by such time to the attention of Bryan M. McDavid, Director (electronic mail: Bryan.M.McDavid@wellsfargo.com).

      (b)    In the event this Commitment Letter is accepted by you as provided above, the Commitments and agreements of the Initial Lenders and the undertakings of each Commitment Party set forth herein will automatically terminate without further action or notice at the earlier of the following (such date being the "<u>Commitment Termination Date</u>"):  (i) 5:00 p.m. (New York City Time) on the date the BCA (as defined below) is terminated in accordance with the terms thereof if the Closing Date shall not have occurred by such time, and (ii) 5:00 p.m. (New York City Time) on the date that is 120 days after May 12, 2016 (the "<u>Scheduled Termination Date</u>") if the Closing Date shall not have occurred by such time; *provided however,* the Scheduled Termination Date shall be extended to the extent the Outside Date (as defined in the BCA in effect on the date hereof) is extended and the Commitment Parties holding at least 50.1% of the Commitments consents to such extension of the Commitment Termination Date; *provided further that,* in no event shall the Scheduled Termination Date be later than 5:00 p.m. (New York City Time) on the date that is 150 days after May 12, 2016 without the prior written consent of all of the Commitment Parties.  For purposes of this Commitment Letter and the Fee Letters, the "<u>BCA</u>" means that certain Backstop Commitment Agreement dated as of the date hereof, by and among the Parent and the other parties thereto, as amended from time to time in accordance with the terms thereof unless as otherwise noted herein or in the Fee Letters.

      12.    <u>Survival</u>.  The sections of this Commitment Letter and the Fee Letters relating to Indemnification, Expenses, Confidentiality, Other Services, Survival and Governing Law shall survive any termination or expiration of this Commitment Letter, the Commitment of each Initial Lender or the undertakings of each Commitment Party set forth herein (regardless of whether the Financing Documentation is executed and delivered), and the sections relating to Syndication and Information shall survive until the Closing Date; <u>provided</u> that your obligations under this Commitment Letter (other than your obligations with respect to the sections of this Commitment Letter relating to Syndication, Information, Confidentiality, Other Services, Survival and Governing Law) shall be superseded by the provisions of the Financing Documentation upon the initial funding thereunder.

      13.    <u>Governing Law</u>.  **THIS COMMITMENT LETTER AND THE FEE LETTERS, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED THERETO (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF OR THEREOF), SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE**

**STATE OF NEW YORK (INCLUDING SECTION 5-1401 AND SECTION 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REFERENCE TO ANY OTHER CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF. THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS COMMITMENT LETTER OR THE FEE LETTERS.** With respect to any suit, action or proceeding arising in respect of this Commitment Letter or the Fee Letters or any of the matters contemplated hereby or thereby, the parties hereto hereby irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court located in the Borough of Manhattan, and irrevocably and unconditionally waive any objection to the laying of venue of such suit, action or proceeding brought in such court and any claim that such suit, action or proceeding has been brought in an inconvenient forum. The parties hereto hereby agree that service of any process, summons, notice or document by registered mail addressed to you or each of the Commitment Parties will be effective service of process against such party for any action or proceeding relating to any such dispute. A final judgment in any such action or proceeding may be enforced in any other courts with jurisdiction over you or each of the Commitment Parties.

14.    <u>Miscellaneous</u>. This Commitment Letter and the Fee Letters embody the entire agreement among the Commitment Parties and you and your affiliates with respect to the specific matters set forth above and supersede all prior agreements and understandings relating to the subject matter hereof. No person has been authorized by any of the Commitment Parties to make any oral or written statements inconsistent with this Commitment Letter or the Fee Letters. This Commitment Letter shall not be assignable by you without the prior written consent of the Commitment Parties, and any purported assignment without such consent shall be void. This Commitment Letter and the Fee Letters are not intended to benefit or create any rights in favor of any person other than the parties hereto, the Lenders and, with respect to indemnification, each Indemnified Party. This Commitment Letter and the Fee Letters may be executed in separate counterparts and delivery of an executed signature page of this Commitment Letter and the Fee Letters by facsimile or electronic mail shall be effective as delivery of manually executed counterpart hereof; <u>provided</u> that, upon the request of any party hereto, such facsimile transmission or electronic mail transmission shall be promptly followed by the original thereof. This Commitment Letter and the Lender Fee Letter may only be amended, modified or superseded by an agreement in writing signed by each of you and the Commitment Parties. The Agent Fee Letter may only be amended, modified or superseded by an agreement in writing signed by each of you and Wells Fargo Bank.

*[Signature Pages Follow]*

If you are in agreement with the foregoing, please indicate acceptance of the terms hereof by signing the enclosed counterpart of this Commitment Letter and returning it to the Lead Arranger, together with executed counterparts of the Fee Letters, by no later than the Acceptance Deadline.

Sincerely,

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____
      Bryan M. McDavid
      Director

*Signature Page to Commitment Letter (Penn Virginia Holding Corp.)*

**ROYAL BANK OF CANADA,**
as an Initial Lender

By:
Name: Mark Lumpkin, Jr.
Title: Authorized Signatory

**BANK OF AMERICA, N.A.,**
as an Initial Lender

By: _____
Name:  Edna Aguilar Mitchell
Title:  Director

**THE BANK OF NOVA SCOTIA,**
as an Initial Lender

By: _____

Name: ALAN DAWSON

Title: DIRECTOR

**CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH,**
as an Initial Lender

By:
Name: Didier Siffer
Title: Authorized Signatory

By:
Name:
Title: Laura Katherine Schembri
Authorized Signatory

**BRANCH BANKING AND TRUST COMPANY,**
as an Initial Lender

By: _____

Name: DAVID A. WHITE

Title: SENIOR VICE PRESIDENT

*Signature Page to Commitment Letter (Penn Virginia Holding Corp.)*

**BARCLAYS BANK PLC,**
as an Initial Lender

By: _____

Name: Vanessa Kurbatskiy

Title: Vice President

**COMERICA BANK,**
as an Initial Lender

By:

Name: Barry Carroll

Title: Vice President

**SOCIÉTÉ GÉNÉRALE,**
as an Initial Lender

By:

Name:    Max Sonnonstine

Title:    Director

**CAPITAL ONE, NATIONAL ASSOCIATION,**
as an Initial Lender

By:
Name: LAUREL VARNEY
Title: VP

*Signature Page to Commitment Letter (Penn Virginia Holding Corp.)*

**SUNTRUST BANK,**
as an Initial Lender

By:
Name: William S Kawalec
Title: First Vice President

*Signature Page to Commitment Letter (Penn Virginia Holding Corp.)*

**SANTANDER BANK, N.A.,**
as an Initial Lender

By: _____
Name: Mark Connelly
Title: SVP

By: _____
Name: DAVID O'DRISCOLL
Title: SVP

*Signature Page to Commitment Letter (Penn Virginia Holding Corp.)*

Agreed to and accepted as of the date first
above written:

PENN VIRGINIA HOLDING CORP.

By: _____
   Name:  Steven A. Harman
   Title:  Senior Vice President, Chief Finance Officer and Treasurer


PENN VIRGINIA CORPORATION

By: _____
   Name:  Steven A. Harman
   Title:  Senior Vice President, Chief Finance Officer and Treasurer

**Annex A**
**Commitments**

| Initial Lender | Commitment Percentage | Commitment Amount if Initial Borrowing Base is $128,000,000 |
| --- | --- | --- |
| | | |

**Exhibit A**

**Term Sheet**

**[See attached.]**

**Exhibit F** **to the Restructuring Support Agreement**

**Form of Transferee Joinder**

**Form of Transferee Joinder**

This joinder (this "<u>Joinder</u>") to the Restructuring Support Agreement (the "<u>Agreement</u>"), dated as of [_____], 2016, by and among:  (i) Penn Virginia Corporation ("<u>Penn Virginia</u>"); Penn Virginia Holding Corp.; Penn Virginia MC Corporation; Penn Virginia MC Energy L.L.C.; Penn Virginia MC Gathering Company L.L.C.; Penn Virginia MC Operating Company L.L.C.; Penn Virginia Oil & Gas Corporation; Penn Virginia Oil & Gas GP LLC; Penn Virginia Oil & Gas LP LLC; Penn Virginia Oil & Gas, L.P.; Penn Virginia Resource Holdings Corp. (such subsidiaries and Penn Virginia, each a "<u>PVA Entity</u>" and, collectively with Penn Virginia, the "<u>PVA Entities</u>"); (ii) the Consenting RBL Lenders; and (iii) the Consenting Noteholders, is executed and delivered by [_____] (the "<u>Joining Party</u>") as of [_____].  Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.      <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as <u>Annex 1</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties.

2.      <u>Representations and Warranties</u>.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the RBL Claims and/or Note Claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 16</u> of the Agreement to each other Party.

3.      <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.      <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By:

Name:

Title:

Holdings: $_____ of Debt
          Under the RBL Credit Facility

Holdings: $_____ of Debt
          Under the Indenture

Holdings: _____
          Shares of Common Stock

Holdings: _____
          Shares 6.0% Convertible Preferred Stock

**<u>Annex 1</u> to the Form of Transferee Joinder**

# EXHIBIT B

**Bullock Declaration**

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C.
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Justin R. Bernbrock (*pro hac vice* admission pending)
Benjamin M. Rhode (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PENN VIRGINIA CORPORATION, *et al.*,[1] | ) | Case No. 16-32395 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF R. SETH BULLOCK,
## CHIEF RESTRUCTURING OFFICER OF
## PENN VIRGINIA CORPORATION, IN SUPPORT OF
## THE DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (I) AUTHORIZING THE DEBTORS TO ASSUME (A) THE
## RESTRUCTURING SUPPORT AGREEMENT, (B) THE BACKSTOP
## COMMITMENT AGREEMENT, AND (C) THE EXIT COMMITMENT
## LETTERS, (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN FEES
## IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Penn Virginia Corporation (4320); Penn Virginia Holding Corp. (7384); Penn Virginia MC Corporation (0458); Penn Virginia MC Energy L.L.C. (0462); Penn Virginia MC Operating Company L.L.C. (0466); Penn Virginia Oil & Gas Corporation (7929); Penn Virginia Oil & Gas GP LLC (3686); Penn Virginia Oil & Gas LP LLC (8109); Penn Virginia Oil & Gas, L.P. (9487). The location of the Debtors' service address is: Four Radnor Corporate Center, Suite 200, 100 Matsonford Road, Radnor, Pennsylvania 19087.

I, R. Seth Bullock, Chief Restructuring Officer of Penn Virginia Corporation ("Penn Virginia"), hereby declare under penalty of perjury:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M") and have served as the Chief Restructuring Officer of Penn Virginia, a corporation organized under the laws of the Commonwealth of Virginia, and a debtor and debtor in possession in the above-captioned chapter 11 cases of Penn Virginia and its affiliates as debtors and debtors in possession (collectively, the "Debtors") since March 2016, and served as financial advisor to the Debtors starting in January 2016.   I have over fifteen years of experience in corporate restructuring and distressed investing, including extensive experience in the energy sector and, specifically, the upstream sector of the oil and gas industry.

2.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am also familiar with the circumstances leading to these chapter 11 cases and was involved in the negotiation of the terms of the Restructuring Support Agreement and ancillary documentation.   I submit this declaration in support of *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Assume (A) the Restructuring Support Agreement, (B) the Backstop Commitment Agreement, and (C) the Exit Commitment Letters, (II) Authorizing the Debtors to Pay Certain Fees in Connection Therewith, and (III) Granting Related Relief* (the "Motion").[2]

3.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including the A&M team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Restructuring Support Agreement, as applicable.

my opinions based upon my experience and knowledge.  I am over the age of 18 and authorized

to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would

testify competently to the facts set forth in this declaration.

### Restructuring Support Agreement

4.      The Debtors have commenced these chapter 11 cases with a consensual

restructuring framework in place that will swiftly resolve the Debtors' highly leveraged balance

sheet and provide substantial new sources of post-emergence liquidity.  The Restructuring

Support Agreement, along with the DIP Financing, Rights Offering, and Exit Facility,

collectively provide the Debtors with the resources and flexibility both during these chapter 11

cases and post-emergence to pursue and implement a value-maximizing restructuring

transaction.  In simple terms, the Restructuring Support Agreement contemplates a value-

maximizing transaction under which the RBL Lenders will be paid in full and the Noteholders

and general unsecured claim holders will, subject to dilution by the Rights Offering,

Commitment Premium, and Management Incentive Plan, receive 100 percent of the equity in

reorganized Penn Virginia.  Further, certain settlements in the Restructuring Support Agreement

enable the Debtors to avoid protracted, value-destructive litigation that would delay their

emergence from chapter 11.

5.      The Restructuring Support Agreement is the product of good-faith, arms'-length

negotiations among the Debtors and the Restructuring Support Parties, each of whom had

separate, sophisticated legal counsel and financial advisors and whom, collectively, represent the

overwhelming majority of the holders of the Debtors' prepetition funded-debt obligations.

6.      To capture the full benefit of the Restructuring Support Agreement, the Debtors

must move efficiently through chapter 11.  The Restructuring Support Parties' various

commitments are contingent upon the Debtors' executing their restructuring in accordance with

the Milestones.  In light of the tumultuous market backdrop, the Restructuring Support Parties'

various concessions, and their commitments to fund post-emergence sources of liquidity—which

would almost certainly be unavailable to the Debtors from any other source—I believe that the

Milestones are reasonable and the Debtors are prepared to execute their restructuring in

accordance therewith.  In light of the Debtors' progress to date, I am confident that they can

consummate their restructuring in accordance with the Milestones.

7.      Additionally, pursuant to the Restructuring Support Agreement, the Debtors have

agreed to pay the Professional Fees.  By securing the support and cooperation of the

Restructuring Support Parties, the Debtors have significantly reduced the potential cost and

duration of their chapter 11 cases.  Payment of the Professional Fees pursuant to the

Restructuring Support Agreement was a negotiated component of the agreements and a material

inducement for the Restructuring Support Parties' various concessions and commitments

thereunder.  Additionally, based on my conversations with the Debtors' advisors, and my

experience as a restructuring professional, I understand that payment of the Professional Fees

under the Restructuring Support Agreement is a market-based term that courts frequently

approve in similar circumstances.  Accordingly, I believe that payment of the Professional Fees

is reasonable and appropriate under the circumstances.

**The Backstop Fees and Exit Commitment Fees are Appropriate.**

8.      The Rights Offering and Exit Facility are of great benefit to the Debtors by

solidifying their post-emergence liquidity position.  Locking in the Backstop Parties' and Exit

Facility Lenders' commitments through the assumption of the Restructuring Support Agreement

will further benefit the Debtors by minimizing the risk associated with these chapter 11 cases.

Even under normal operating conditions, the Debtors would expect to pay certain fees in

connection with such transactions.  In light of market conditions, and the lack of traditional

4

sources of capital for E&P companies, the Debtors are satisfied that the Backstop Fees and Exit Commitment Fees represent the market rate.

9.      Further, Jefferies examined and compared both the Backstop Fees and the Exit Commitment Fees to fees paid to new capital providers in both in- and out-of-court transactions similar to the Rights Offering and Exit Facility and determined that such fees are within market levels.  Based on my conversations with Jefferies, the Debtors' other advisors, and my more than fifteen years of experience in corporate restructuring and distressed investing, I believe that the Backstop Fees and Exit Commitment Fees are reasonable, appropriate under the circumstances, and in line with the market for similar transactions.

## Marketing Process

10.      In addition to weighing the costs and benefits of attempting to fund a non-consensual chapter 11 proceeding with proceeds from their Swap Contracts, the Debtors engaged in a third-party marketing process, at least in part, to test the market for the highest and otherwise best restructuring alternative.  Starting in mid-2015 through late 2015, Jefferies began exploring various strategic alternatives on the Debtors' behalf, including exploring alternative sources of financing and the sale of some or all of the Debtors' assets.  In connection with this process a number of third parties conducted substantial diligence regarding the Debtors and their assets.

11.      In January 2016, the Debtors announced the engagement of Jefferies, K&E, and A&M to assist the Debtors with exploring more comprehensive restructuring alternatives.  The Debtors and their advisors continued to explore various third-party restructuring alternatives in the months preceding the Petition Date.  Due to its efforts on the Debtors' behalf over the second half of 2015, Jefferies had a well-defined population of potential interested investors, both strategic and financial, that were familiar with the Debtors' assets and liquidity constraints.  With

the assistance of Jefferies, the Debtors contacted 16 potential third-party investors, including both strategic and financial investors, specifically requesting restructuring proposals.  A number of these parties conducted further due diligence in connection with their analysis of whether to submit such a proposal.   Because of the 2015 process, the Debtors were well-positioned to provide any information third-party investors may have requested.   The Debtors ultimately received four Third-Party Proposals.   Additionally, while the Debtors brokered the joint resolution among the RBL Lenders and Noteholders embodied in the Restructuring Support Agreement, over the course of their prepetition marketing process, the Debtors received and considered separate proposals from the RBL Agent and the Ad Hoc Committee.

12.     The Third-Party Proposals generally contemplated outside investments in the form of junior debtor-in-possession financing and post-emergence equity rights offerings (or similar equity investments) in return for the majority of the reorganized Penn Virginia's equity. Noteholders were generally left with significantly less than half of reorganized Penn Virginia's equity.  The Debtors, their management team and advisors, and the Board closely considered the Third-Party Proposals and, as set forth below, ultimately determined that the Restructuring Support Agreement embodies the best alternative to maximize value for all of the Debtors' estates.  Further, the Debtors presented the Third-Party Proposals to both the RBL Lenders and the Ad Hoc Committee and the overwhelming majority—holding approximately 87 percent in principal of the Debtors' aggregate prepetition funded-debt obligations—elected to support the RSA.

### Board Consideration

13.     As the Debtors' Chief Restructuring Officer, I participated in all board-led discussions regarding the restructuring negotiations, including the third-party marketing process. The Board was actively engaged in the above-described negotiations and third-party marketing

process.   Over the course of the first four months of 2016, the Board met regularly and consistently to receive updates and authorize various actions, including, for example, entry into the RBL Amendments.   Prior to entry into the Restructuring Support Agreement, the Board met to receive a comprehensive presentation from the Debtors' advisors regarding the final terms of the Restructuring Support Agreement, the relative benefits of the transactions contemplated thereby, the legal and financial ramifications of entry therein, and the chapter 11 process generally.   Ultimately, on May 9, 2016, the Board unanimously authorized the Debtors' entry into the Restructuring Support Agreement and commencement of these chapter 11 cases, subject to the resolution of certain remaining open issues that were subsequently resolved.

### Debtors' Business Judgment

14.     Without the benefits and protections provided by the Restructuring Support Agreement, the Debtors could potentially face a prolonged stay in bankruptcy.   In light of the Debtors' prepetition defaults under the RBL Facility, and based on all of the Debtors' prepetition restructuring negotiations, I believe they likely could not have navigated a soft landing in chapter 11 absent the RBL Lenders' support. The RBL Lenders' support was, in turn, ultimately contingent upon the participation of the Noteholders—the RBL Lenders specifically stated that they would not fund a restructuring process that the Noteholders did not support.   The swift, consensual process contemplated by the Restructuring Support Agreement presents far less execution risk than any available alternative, accomplishes a critical deleveraging, and better preserves estate assets for the benefit of the Debtors' stakeholders.

15.     The Third-Party Proposals were non-binding and had higher execution risk and associated costs to the Debtors.   First, it is not clear that the Debtors would have had the support of the RBL Lenders under any of the Third-Party Proposals.   Even with the RBL Lenders' support, if the Debtors had proceeded with one of the Third-Party Proposals, they almost

certainly would have faced postpetition litigation with the Noteholders. Ultimately, I do not believe that the all-in economics of the Third-Party Proposals were as favorable as those of the Restructuring Support Agreement, especially in light of the additional cost and uncertainty attendant to the non-consensual process contemplated by the Third-Party Proposals. Further, the Debtors negotiated a full fiduciary-out provision as part of the Restructuring Support Agreement in the event that proceeding with the transactions contemplated thereby would be inconsistent with the Debtors' fiduciary duties to maximize value for their stakeholders.

16.     Finally, as stated above, the Debtors shared the Third-Party Proposals with both the RBL Lenders, 100 percent of which signed the Restructuring Support Agreement, and Ad Hoc Committee, which represents holders of approximately 86 percent in principal amount of the Notes and the Debtors' largest unsecured creditor constituency. The RBL Lenders and the Ad Hoc Committee chose to support the Restructuring Support Agreement and its more consensual path. In light of this fact, current market uncertainty, and the other considerations outlined above, I believe at this time that pursuing any alternative transaction without the support of the RBL Lenders and Noteholders would not be reasonable. The Debtors engaged in a thorough analysis of the Restructuring Support Agreement *vis-à-vis* the Third-Party Proposals and determined that the Restructuring Support Agreement represents the value-maximizing transaction. Accordingly, I believe that assumption of the Restructuring Support Agreement, including the Backstop Commitment Agreement and Exit Commitment Letters, and payment of all fees contemplated thereunder is a reasonable exercise of the Debtors' business judgment.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May   11, 2016                    Respectfully submitted,

_R. Seth Bullock_

R. Seth Bullock
Chief Restructuring Officer
Penn Virginia Corporation